**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
4110 SE Hawthorne Blvd. # 168
Portland, OR 97214
(503) 388-9160
davebeckerlaw@gmail.com

**Oliver J. H. Stiefel (OSB # 135436)**
oliver@crag.org – (503) 227-2212
**Maura C. Fahey (OSB # 133549)**
maura@crag.org – (503) 525-2722
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Fax: (503) 296-5454

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **STOP B2H COALITION**, an Oregon non-profit corporation, **GREATER HELLS CANYON COUNCIL**, an Oregon non-profit corporation, **CAROL "FUJI" KREIDER**, an individual, **JIM KREIDER**, an individual, and **GAIL CARBIENER**, an individual, | Case No. 2:19-cv-1822-SI |
| Plaintiffs, | |
| v. | **FIRST AMENDED COMPLAINT** |
| **BUREAU OF LAND MANAGEMENT**, **U.S. DEPARTMENT OF THE INTERIOR, JOSE LINARES**, State Director (Acting), BLM Oregon/Washington, **U.S. FOREST SERVICE,** and **TOM MONTOYA,** Forest Supervisor, Wallowa-Whitman National Forest | |
| Defendants | |

and

**IDAHO POWER COMPANY** and **PACIFICORP,**

Intervenor-Defendants

_____

## NATURE OF ACTION

1.      This case seeks judicial review and vacatur of the U.S. Department of the

Interior's ("DOI") November 17, 2017, Record of Decision ("DOI ROD") approving Right-of-

Way grants to Idaho Power Corporation ("Idaho Power") for the construction, operation, and

maintenance of the Boardman to Hemingway Transmission Line Project ("B2H Project"), and

review and vacatur of the Right-of-Way grants issued by the DOI's Bureau of Land Management

("BLM"). Plaintiffs are local citizens and grassroots non-profit organizations who will be

harmed by the ecological and scenic degradation that the proposed 293-mile transmission line

will cause along its route. They also challenge the decision (included in the DOI ROD) by the

BLM's Oregon/Washington State Director to amend the Baker and Southeast Oregon Resource

Management Plans ("RMPs") to downgrade protection of visual resources in areas where the

B2H transmission line would come within view of or cross the National Historic Oregon Trail,

and seek its vacatur.

2.      Plaintiffs also seek review and vacatur of the November 9, 2018, Record of

Decision issued by the U.S. Forest Service's Wallowa-Whitman National Forest ("NF") to grant

a Special Use Authorization allowing logging of trees and construction of the B2H transmission

line within a 6.8 mile-long corridor, in two segments, on land administered by the Forest Service

within the Wallowa-Whitman NF ("USFS ROD"), of the Special Use Authorization, and of the

November 25, 2016 Final Environmental Impact Statement ("FEIS") upon which both the DOI

ROD and the USFS ROD rely. The USFS ROD also arbitrarily amended three elements of the

Wallowa-Whitman NF Land and Resources Management Plan ("Forest Plan") by degrading visual quality standards, overriding the Forest Plan's direction to protect old forest habitat in the Eastside Screens, and overriding the Forest Plan's direction to protect anadromous and their habitat in the Pacific Anadromous Fish Strategy ("PACFISH") in the two segments which the B2H Project would cross.

3.      If implemented, the DOI, BLM, and USFS approvals of the Rights-of-Way, RMP amendments, and Special Use Authorization for the B2H Project on federal land will allow construction of the entire transmission route, resulting in significant harm to greater sage-grouse (*Centrocercus urophasianus*), a species of ground-dwelling bird whose numbers have plummeted in Oregon and throughout the West. The sage-grouse population in Oregon in 2019, about 14,000 birds, was at its lowest level since reliable estimates first became available in 1996. The Baker population of sage-grouse—the smallest in Oregon, and most at risk of extirpation— would suffer harm from having portions of the B2H Project located as close as two miles to their breeding grounds and within priority habitat for sage-grouse conservation. While the FEIS generally acknowledges the harm that transmission lines can cause to sage-grouse, it does not take a hard look at the likely effect of the B2H Project on sage-grouse, and does not evaluate the effects on the Baker population in the context of the plummeting sage-grouse numbers in Oregon and range-wide at all. In light of the population decrease Oregon-wide from about 22,000 birds in 2016 to about 14,000 birds in 2019, and decreases in populations in other states in the West over the same period of between 8% and 61%, a supplemental Environmental Impact Statement is needed to fully evaluate the likely impact of the B2H transmission line on this increasingly imperiled species.

4.      The B2H Project would cut across one of the few remaining segments of the Oregon Trail near the National Historic Oregon Trail Interpretive Center, forever marring the magnificent views of the intact trail for the 40,000 annual visitors. It would place 170-feet tall towers and the transmission line less than a mile from the Interpretive Center's main building, and within 350 feet of an observation point on the Interpretive Center's grounds. The Interpretive Center and surrounding grounds is one of the few areas where the absence of meaningful development allows tourists to contemplate the landscape as it looked to the immigrants who followed the Oregon Trail in the 1800s. The BLM Oregon State Director arbitrarily amended the Baker and Southeast Oregon RMPs to downgrade visual resource management provisions on land containing remaining traces of the Oregon Trail to allow the Selected Alternative in the DOI ROD—and the viewshed degradation caused by the B2H Project transmission line and its 170-foot-tall towers—to be consistent with the RMPs.

5.      In addition, Idaho Power has proposed a route to the state regulatory agency that must sign off on the entire transmission route that differs significantly from the DOI ROD's Selected Alternative route near the city of La Grande, Oregon—a route that was not disclosed and available for public comment during the BLM's public comment period on the B2H Project. Significant new information regarding this route shows that threats to human safety will be greater than described in the FEIS because of serious instability and geologic hazards along Idaho Power's new route, increased noise impacts (which the FEIS does not address at all for this route's effects on homes in and near La Grande), and harm to aesthetic and recreational values at Morgan Lake Park, an important Union County recreation and camping site that the new proposed route will come far closer to than DOI ROD's Selected Alternative. The significant new information about this route (and a nearby variation), available since the

November 2016 FEIS, also warrants preparation of a supplemental Environmental Impact Statement.

6.      Accordingly, plaintiffs seek relief from this Court holding unlawful, setting aside, and vacating the DOI ROD, BLM RMP amendments and the Right-of-Way grants, the USFS ROD and Special Use Authorization, and the FEIS, and ordering the agencies to prepare a new or supplemental environmental review.

## JURISDICTION AND VENUE

7.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m-12, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–87, the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1614, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*., and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*. An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 701–06.

8.      Venue is proper in this Court under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, the decision to amend the Baker and Southeast Oregon RMPs was issued within this district by the BLM's State Director in Portland, Oregon, the decision to approve the 2018 USFS ROD and amend the Wallowa-Whitman NF Forest Plan was issued within this district by the Wallowa-Whitman NF Forest Supervisor, defendants reside in this district, plaintiffs' principal places of business and residence are in this district, and the vast majority of the public lands and resources affected by the B2H Project are located in this district.

9.    The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

10.    Plaintiff STOP B2H COALITION is an Oregon non-profit, public interest organization with about 700 individual members and supporters, as well as organizational members, including the Oregon-California Trails Association, Friends of the Grande Ronde Valley, Oregon Rural Action, Range Ecology Group, Wildlands Defense, Blue Mountain Alliance, and Greater Hells Canyon Council. It has an office in La Grande, Oregon. The Stop B2H Coalition is a non-political, grassroots organization whose purpose is to fight the proposed B2H Project and to advocate for alternative means of electric power distribution and local renewable power and for the conservation of scenic, ecological, cultural, recreational, and public safety values on and near the route of the proposed B2H Project transmission line and Project area. Members and staff of Stop B2H Coalition and their organizational members recreate; hike; camp; photograph scenery, plants and wildlife; search for historical and cultural sites (such as remaining traces of the National Historic Oregon Trail); and engage in other occupational, scientific, and recreational activities within and near the B2H Project area. Stop B2H Coalition's staff and members derive recreational, inspirational, scientific, and aesthetic benefit from their activities within that area, including studying and observing sage-grouse, enjoying the historical and scenic resources provided by the Oregon Trail and the National Historic Oregon Trail Interpretive Center, and enjoying Morgan Lake Park and the Ladd Marsh Wildlife Area. Stop B2H Coalition's staff and members intend to continue to use and enjoy these lands frequently and on an ongoing basis in the future. Stop B2H Coalition and its members participated throughout the public processes that led to the FEIS, the DOI ROD, and the USFS ROD.

11.     Plaintiff GREATER HELLS CANYON COUNCIL ("GHCC") is a regional nonprofit organization based in La Grande, Oregon with approximately 1,000 members. For over 50 years, GHCC's mission has been to connect, protect, and restore the wild lands, waters, native species and habitats of the greater Hells Canyon region, ensuring a legacy of healthy ecosystems for future generations. GHCC has been actively involved in commenting on, protesting, and objecting to the B2H Project, both under its current name and under its name prior to 2017 (Hells Canyon Preservation Council, "HCPC"). GHCC's staff and members regularly visit the public lands along, near, and within the viewshed of the B2H Project transmission line route and Project area. GHCC's staff and members seek to ensure that the BLM and Forest Service faithfully and fully implement and comply with federal law for conservation and management of the natural resources of the greater Hells Canyon area, including the public lands over which the B2H Project transmission line would pass and in and near the B2H Project area, as a means of protecting their interests. GHCC has been active in monitoring ecological conditions for the sage-grouse on public lands managed by BLM in northeastern Oregon and in advocating for the species' protection. GHCC's staff and members hike; hunt; camp; birdwatch; photograph scenery, botany and wildlife; and engage in other vocational, scientific, and recreational activities within and near the corridor through which the B2H Project transmission line would pass. GHCC's staff and members derive recreational, inspirational, scientific, and aesthetic benefit from their activities within that area, including studying and appreciating sage-grouse and enjoying the historical and scenic resources provided by the Oregon Trail and the National Historic Oregon Trail Interpretive Center. GHCC's staff and members intend to continue to use and enjoy the public lands affected by the B2H Project frequently and on an ongoing basis in the future.

12.     Plaintiff CAROL "FUJI" KREIDER owns property on which she resides located less than ½ mile from the proposed route of the B2H Project near La Grande, Oregon. She is Secretary/Treasurer of Stop B2H Coalition and for many years has been concerned about the B2H Project's effects on the lands and resources along the proposed transmission line's route, including her own property. She uses the public lands that will be affected by the B2H Project for recreational, aesthetic, and spiritual activities frequently and will continue to do so regularly in the future. The Project will adversely affect Fuji Kreider's interests by construction of an industrial-scale transmission line that will cause harm to the scenic, cultural, and ecological resources along the 293-mile route, including the portions on public lands and the portions on private lands that would not exist but for the federal Right-of-Way and Special Use Authorization, thereby harming her use and enjoyment of her land and the public natural resources of the area. She has spoken at public meetings related to the B2H Project and authored multiple letters opposing the Project on behalf of community groups and herself, submitting them to BLM and the Forest Service. Fuji Kreider participated throughout the public processes that led to the FEIS, the DOI ROD, and the USFS ROD.

13.     Plaintiff JIM KREIDER owns property on which he resides located less than ½ mile from the proposed route of the B2H Project near La Grande, Oregon. He is Co-Chair of Stop B2H Coalition and for many years has been concerned about the B2H Project's effects on the lands and resources along the proposed transmission line's route, including the property he shares with Fuji Kreider. He uses the public lands that will be affected by the B2H Project for recreational, aesthetic, and spiritual activities frequently and will continue to do so regularly in the future. The Project will adversely affect Jim Kreider's interests by construction of an industrial-scale transmission line that will cause harm to the scenic, cultural, and ecological

resources along the 293-mile route, including the portions on public lands and the portions on private lands that would not exist but for the federal Right-of-Way and Special Use Authorization, thereby harming his use and enjoyment of his land and the public natural resources of the area. He has spoken at public meetings related to the B2H Project and authored multiple letters opposing the Project on behalf of community groups and himself, submitting them to BLM and the Forest Service. Jim Kreider participated throughout the public processes that led to the FEIS, the DOI ROD, and the USFS ROD.

14.    Plaintiff GAIL CARBIENER resides in Bend, Oregon, and is a member of the Oregon-California Trails Association and an ex officio member of Oregon's Historic Trails Advisory Committee. He has walked and surveyed many of the remaining segments of the National Historic Oregon Trail, including on public and private lands that will be affected by the B2H Project. He is concerned about the B2H Project's impacts on the viewsheds that include remaining portions and wheel ruts of the Oregon Trail where the historic Trail can be seen with no transmission lines or roads, allowing visitors to see what the immigrants who used the Oregon Trail in the 1800s saw. He uses the public lands that will be affected by the B2H Project for recreational, aesthetic, and spiritual activities frequently and will continue to do so regularly in the future. The Project will adversely affect Gail Carbiener's interests by construction of an industrial-scale transmission line that will cause harm to the scenic, cultural, and ecological resources along the 293-mile route, including the portions on public lands and the portions on private lands that would not exist but for the federal Right-of-Way and Special Use Authorization, thereby harming his use and enjoyment of the lands and natural resources of the area. He has spoken at public meetings related to the B2H Project and authored multiple letters opposing the Project on behalf of community groups and himself, submitting them to BLM and

the Forest Service. Gail Carbiener participated throughout the public processes that led to the FEIS, the DOI ROD, and the USFS ROD.

15.     The plaintiffs and their members use and enjoy the public lands and natural resources on and near the B2H Project area at issue in this case for recreational, scientific, spiritual, educational, aesthetic, and other purposes. They enjoy fishing, hiking, camping, hunting, bird watching, study, contemplation, photography and other activities in and around these public lands. The plaintiffs and their members also participate in information gathering and dissemination, education and public outreach, agency land use and conservation planning processes, and other activities relating to BLM's and the Forest Service's management and administration of these public lands. The plaintiffs and their members' recreational, scientific, educational, and aesthetic interests will be injured if the B2H Project is constructed, including by noise impacts to homes and public lands, increased risk of wildfire, and increased harm to wildlife, scenic and historic resources, and recreational areas that the B2H Project will cause.

16.     Defendant BUREAU OF LAND MANAGEMENT is an agency or instrumentality of the United States, and is charged with managing the public lands and resources governed by the DOI ROD, Right-of-Way grants, and RMP amendments at issue in this case, in accordance and compliance with federal laws and regulations. BLM issued the RMP amendments and Right-of-Way grants at issue in this case and was the lead agency involved in preparing the FEIS, and has principal authority for the actions and inactions alleged herein.

17.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is an agency or instrumentality of the United States, and is charged with managing the public lands and resources governed by the DOI ROD, Right-of-Way grants, and RMP amendments at issue in this case, in accordance and compliance with federal laws and regulations. DOI issued the DOI

ROD at issue in this case, which was signed on November 17, 2017, by Deputy Assistant Secretary Katharine S. MacGregor, and has principal authority for the actions and inactions alleged herein.

18.     Defendant JOSE LINARES is sued solely in his official capacity as acting State Director of the BLM in Oregon/Washington, in Portland, Oregon. The State Director is the BLM official responsible for issuing the decision to amend the Baker and Southeast Oregon RMPs in the DOI ROD at issue in this case, and has principal authority for the actions and inactions alleged herein. JOSE LINARES is currently the successor to Jamie E. Connell, the BLM Oregon/Washington State Director who signed the decision to amend the Baker and Southeast Oregon RMPs included in the DOI ROD, and is substituted for Theresa Hanley pursuant to Federal Rule of Civil Procedure 25(d).

19.     Defendant UNITED STATES FOREST SERVICE is an agency or instrumentality of the United States, and is charged with managing the public lands and resources in the Wallowa-Whitman NF in accordance and compliance with federal laws and regulations. The Forest Service issued the USFS ROD and Forest Plan amendments at issue in this case, and has principal authority for the actions and inactions alleged herein.

20.     Defendant TOM MONTOYA is sued solely in his official capacity as Forest Supervisor of the Wallowa-Whitman NF. The Forest Supervisor is the Forest Service official responsible for issuing the USFS ROD and Wallowa-Whitman NF Forest Plan amendments at issue in this case, and has principal authority for the actions and inactions alleged herein.

## STATEMENT OF FACTS

### Federal and State Administrative Processes and Description of the B2H Project Route

21.     BLM is the lead federal agency responsible for preparing the FEIS in accordance with NEPA. BLM began the scoping process for the B2H Project in September 2008. After Idaho Power submitted revised right-of-way applications, BLM issued a Draft Environmental Impact Statement ("DEIS") for public review and comment in December 2014. The public comment period in the NEPA process for the B2H Project closed in March 2015. BLM issued the FEIS in November 2016.

22.     The DOI ROD (along with the USFS ROD) authorize the federal-lands portions of the 293-mile B2H transmission line, which also crosses approximately 200 miles of private lands, connecting the Longhorn Substation proposed by the Bonneville Power Administration ("BPA") near Boardman, Oregon, to the existing Hemingway Substation near Melba, Idaho. The DOI ROD was issued on November 17, 2017. It authorizes the issuance of a 250-foot-wide Right-of-Way to Idaho Power on 85.6 miles of BLM-administered public lands for the construction, operation, and maintenance of a single-circuit alternating-current, 500-kilovolt (kV) transmission line along the Agency Preferred Alternative route identified in the FEIS. This route is also identified as the "Selected Alternative" in the DOI ROD. BLM issued four Right-of-Way lease/grants to Idaho Power related to the authorized Right-of-Way on or about January 9, 2018. Idaho Power has not demonstrated that it needs the full 500 kV capacity of the B2H Project. The DOI ROD also authorizes new access roads, control gates, communication regeneration sites, and re-routing of about eight miles of existing transmission line. The transmission line towers would generally be 170-foot-tall self-supported steel lattice structures with typical spans of approximately 1,500 feet between structures, except for the portion of the

transmission line near Naval Weapons Station Training Facility Boardman at the very northern

end of the transmission line route, where towers would be 100-feet tall. The Project area

boundary (outlined in black dashes) and Selected Alternative in the DOI ROD are shown in the

following map:



23.    The B2H Project area is organized into six segments based on similar geography,

natural features, drainages, resources, and/or land uses. Each segment begins and ends where the

alternative routes meet and intersect at a common point. The maps on the following pages

illustrate the locations of each segment of the Project area, including the alternatives that were

listed in the FEIS.





24.    The DOI ROD also includes the decision by the BLM Oregon/Washington State Director to amend the Baker and Southeast Oregon RMPs to downgrade the Visual Resource Management ("VRM") classes on a total of about 94 acres to allow the Right-Of-Way to be consistent with the newly-amended RMPs. This included downgrading the VRM class in the vicinity of the National Historic Oregon Trail Interpretive Center about 10 miles east of Baker City, Oregon, where the B2H transmission line would cut perpendicular across one of the remaining visible segments of the Oregon Trail and its ruts less than one mile from the Interpretive Center and within 350 feet of an observation point on the Interpretive Center site.

25.    Several details concerning design, construction, and mitigation actions were not finalized at the time the DOI ROD authorized the Right-of-Way grants to Idaho Power for the portion of the B2H transmission line on BLM-administered lands. Post-DOI ROD requirements include completing an acceptable final Plan of Development ("POD"), which will include mitigation requirements and right-of-way grant stipulations required to be met before BLM issues the final notice to proceed ("NTP"). The NTP cannot be issued until Idaho Power has acquired authorizations for the B2H Project on state and private lands, completed biological resources surveys, acquired remaining federal permits and required state and local permits, complied with stipulations and conditions of approval set forth in all agency decisions, including fully developed environmental management plans, and developed Compensatory Mitigation Plans for transmission line impacts to greater sage-grouse and to Riparian Conservation Areas. In addition, Idaho Power may not begin construction until compliance with all applicable federal, state, and local and other laws and regulations is documented as satisfactorily complete. Idaho Power has not yet obtained site certification from the State of Oregon's Energy Facility Siting Council ("EFSC") nor obtained the required authorization from the Department of the Interior's

Bureau of Reclamation or the Section 404 Clean Water Act permit from the U.S. Army Corps of Engineers.

26.     Unless and until the BLM issues the NTP, no surface-disturbing activities associated with construction of the B2H transmission line can occur. Prior to the issuance of the final NTP, all applicable environmental protection and mitigation plans needed must be completed by Idaho Power and approved by BLM, and proof of possession of all required and applicable federal permits must be submitted by Idaho Power to BLM. BLM may suspend or terminate in whole or in part any NTP that has been issued when, in the judgment of the BLM-authorized officer, unforeseen conditions arise that result in the approved terms and conditions being inadequate to protect the public health and safety or to protect the environment. BLM has regulatory authority to add terms and conditions to the final NTP. Idaho Power may request limited notices to proceed with geotechnical investigation and other site surveys prior to completion of the final POD for construction and prior to the issuance of the final NTP for construction. There remains major federal action to occur in relation to the B2H Project.

27.     The issues in this case primarily concern effects of the B2H Project in Segments 2 through 5 of the transmission line route. Segment 2 is predominantly in Union County, Oregon, which lies between the Blue and Wallowa Mountains. The geography in Union County is mountainous and predominantly forested. The city of La Grande, the county seat, lies east of the Blue Mountains in the Grande Ronde Valley. The valley is part of the Columbia River Plateau; was and is used by Native Americans for its natural resources; and, historically, was a waypoint along the Oregon Trail. The economy is based on agriculture (farming and ranching), forest products, and recreation opportunities offered in nearby mountains, such as hunting, fishing, camping, and skiing. The Oregon Trail passes through Union County roughly parallel to

Interstate 84, which passes along and through the east side of La Grande. Within Segment 2 there would be significant effects on the Oregon Trail and other National Historic Trails, including visibility from Hilgard Junction (a site with high potential for public recreation) and views from a mostly intact segment of the Oregon Trail and/or Goodales' Cutoff Trail. The B2H Project transmission line, with its 170-foot-tall towers, would also significantly mar views from La Grande and the nearby Morgan Lake Park recreation area. In Segment 2, the proposed transmission line would cross the Wallowa-Whitman NF. Big game winter and summer ranges are abundant in Segment 2.

28.     Segment 3 is located primarily in Baker County, Oregon. BLM has identified concerns about visibility of the proposed transmission line from Baker Valley as an issue, and has identified potential effects on the residential and agricultural land uses around Baker City as an issue of concern. The western side of Baker Valley is an agricultural area; the eastern side of Baker Valley has irrigated and dryland agriculture operations. The segment includes a portion of the Wallowa-Whitman National Forest on the easternmost route. The BLM and Forest Service have identified the loss of forested habitat (and associated effects on wildlife habitat and timber products) as an issue. The National Historic Oregon Trail Interpretive Center and several remaining extant segments of the National Historic Oregon Trail are present in Segment 3. Central Baker Valley also contains greater sage-grouse Priority Habitat Management Areas ("PHMA") and General Habitat Management Areas ("GHMA").

29.     Segment 4 is located in southern Baker County and northern Malheur County. The area near Brogan, Oregon, about halfway between Baker City and Vale, centers on a farming area along Willow Creek characterized by irrigated agriculture and some dryland farming. The vegetation/habitat outside the agricultural areas is predominantly

grassland/shrubland and sagebrush. Oregon Trail segments are present in Segment 4 including in the Oregon Trail Area of Critical Environmental Concern – Birch Creek and Tub Mountain portions. Greater sage-grouse PHMA and GHMA also are present in Segment 4.

30.     Segment 5 is located in Malheur County. The geography is predominantly northern Great Basin topography, hydrology, and vegetation/habitat, with agricultural (mostly grazing) and residential uses in the eastern portion of the area. Greater sage-grouse GHMA also is present in Segments 2, 5, and 6 (which is located in Idaho's Treasure Valley).

31.     All alternative routes that cross GHMA would have long-term, moderate residual impacts on greater sage-grouse. All alternative routes that cross PHMA would have long-term, high residual impacts on greater sage-grouse.

32.     The USFS ROD was issued on November 9, 2018 and signed by Forest Supervisor Tom Montoya on that date. It approved a Special Use Authorization allowing Idaho Power to use and occupy 6.8 miles, in two segments, on land administered by the Forest Service in the Wallowa-Whitman NF. The Special Use Authorization grant requires Idaho Power to provide a final POD and satisfy a series of other conditions, including providing final construction plans. Upon satisfaction of these conditions, the Forest Service will issue a letter authorizing construction to begin. The USFS ROD also amended three elements of the Wallowa-Whitman NF Forest Plan: (1) visual quality standards for Management Area 17; (2) direction to protect old forest habitat in the Eastside Screens; and (3) direction to protect anadromous fish and their habitat in the PACFISH strategy. These amendments authorize construction of the B2H Project despite provisions of the Forest Plan that, without the amendment, would have precluded construction within the Wallowa-Whitman NF.

33.     The Eastside Screens are designed to preserve old growth trees in the National

Forest by maintaining all structural live trees greater than or equal to 21-inch diameter at breast

height ("dbh"), ensuring that late and old structure ("LOS") stands do not fall below the Historic

Range of Variability ("HRV"), and manipulating forest structure to move conditions towards

HRV. The Eastside Screens prohibit timber sale activity in LOS stages that are below the HRV,

and require no net loss of LOS. The amendment to the Wallowa-Whitman NF Forest Plan to

allow construction of the B2H Project will result in the sale and cutting of structural live trees

greater than or equal to 21-inch dbh and timber sale activity within LOS stages that are below

HRV, a net loss of LOS, and will prevent manipulating structure to move towards HRV. Without

the amendment to the Wallowa-Whitman NF Forest Plan, the Eastside Screens would preclude

construction of the B2H Project in the Wallowa-Whitman NF.

34.     The PACFISH strategy in the Wallowa-Whitman NF Forest Plan imposes

management measures on new projects to mitigate the effects of those projects to anadromous

fish and their habitat by reducing the risk of loss of populations and reducing potential negative

impacts on aquatic habitat. PACFISH establishes goals to maintain or restore fish habitat, along

with riparian management objectives ("RMOs") that describe good habitat for anadromous and

native fish. The amendments to the Wallowa-Whitman NF Forest Plan to allow construction and

maintenance of the B2H Project will result in the amendment of Forest Plan PACFISH standard

TM-1 (for timber management) to allow logging in Riparian Habitat Conservation Areas; the

amendment to Forest Plan PACFISH standard LH-3 (for Lands) to allow issuance of a special-

use authorization for the B2H Project, when some activities may retard or prevent attainment of

some RMOs and may not fully avoid adverse effects on listed anadromous fish; and the

amendment to Forest Plan PACFISH RMOs—particularly those for water temperature and the

requirement that Riparian Habitat Conservation Areas be managed so that activities would not retard attainment of RMOs. Without these amendments to the Wallowa-Whitman NF Forest Plan, PACFISH would preclude construction of the B2H Project in the Wallowa-Whitman NF.

35.    Approximately 200 miles of the B2H transmission line route crosses private land. The FEIS analyzes the transmission line's environmental impacts on the private lands that the B2H transmission line would cross. The federal agencies were required to evaluate private-land impacts in the FEIS because the transmission line segments across public and private lands are connected actions, given that the federal actions cannot or will not proceed unless actions approving the route across private lands also proceed, and because all of the segments, including those authorized by the DOI ROD and USFS ROD, are interdependent parts of a larger action— the B2H Project—and depend on the larger action for their justification.

36.    Approval of the entire route of the B2H Project, including the transmission line alignments on private land, is the responsibility of the Oregon EFSC. Idaho Power submitted what it termed the complete application for a state site certificate for the B2H Project to EFSC in September 2018. EFSC issued a draft proposed order for the B2H Project in May 2019, and allowed public comments until late August 2019. Idaho Power's deadline to respond to the public comments was extended until November 7, 2019. The EFSC permitting process is still ongoing. EFSC will decide whether to issue a site certificate by late 2020 or early 2021. If it obtains all of the necessary approvals and permits, Idaho Power plans to begin construction on the B2H Project in 2023. Idaho Power plans to place the B2H Project in service sometime between 2026 and 2028.

37.    Idaho Power's September 2018 application to EFSC includes a request for site certification of a route for the B2H transmission line that differs significantly on some sections

of private land from the Selected Alternative route approved in the DOI ROD, issued in 2017.

Notably, the route for which Idaho Power is seeking site certification from EFSC departs from

the BLM Selected Alternative near the city of La Grande, Oregon. The route that Idaho Power

proposed to EFSC would bring the transmission line to within 2,000 feet of the La Grande city

limits, thereby dominating the viewshed from the city. The route Idaho Power proposes to EFSC

for the transmission line near La Grande—called the "Mill Creek alternative" in the FEIS—is

several miles closer to La Grande than BLM's Selected Alternative. Idaho Power has also

proposed to EFSC, as a variation the Mill Creek alternative, a route described in the FEIS as the

"Morgan Lake alternative." The Morgan Lake alternative is also several miles closer to La

Grande than BLM's Selected Alternative. Neither the Mill Creek alternative nor the Morgan

Lake alternative were disclosed to the public in the DEIS for the B2H Project, and neither was

available for public comment during BLM's NEPA process. The Mill Creek and Morgan Lake

alternatives are major variations of the alternative routes discussed in the DEIS. The Mill Creek

and Morgan Lake alternatives are not within the spectrum of alternatives discussed in the DEIS.

These two new alternatives are shown by the blue lines to the right of the red Proposed Action

Alternative in the following enlargement of Inset B from the map of the Northern Area of the

alternatives that appears above on page 13.



38.    These two alternatives were inserted into the FEIS with an inadequate

consideration of their likely impact which was uninformed by the public disclosure and comment

that NEPA requires. These two alternatives will cause significant harm to the public and the

plaintiffs and their members by increasing the risk of wildfires and landslides near La Grande,

increasing noise impacts to the homes that will be within a mile of the B2H Project transmission

line, degrading recreational resources such as Morgan Lake Park and the Ladd Marsh Wildlife

Area, and dominating and degrading the viewshed to the west of La Grande. The following map

shows the route for which Idaho Power has requested a site certificate from EFSC:

*Boardman to Hemingway Transmission Line Project*                                                                *Exhibit B*



**Figure B-1. Location Map**

FIRST AMENDED COMPLAINT
- 23 -

**Greater Sage-Grouse and Impacts From the B2H Project**

39.     Greater sage-grouse are symbolic of the vast, open lands between the Rocky Mountains and the Sierra Nevada and Cascade ranges. But sage-grouse are in trouble. As many as 16 million of these iconic birds once ranged across 297 million acres of sagebrush grasslands, an area of western North America so vast it is sometimes called the Sagebrush Sea. Sage grouse once numbered in the millions but have seen their range, which stretches across portions of 11 states, diminished by oil and gas drilling, wildfires, grazing and other pressures.

40.     Over the past 200 years, agriculture and development have reduced the bird's available habitat by nearly half. In that time, sage-grouse abundance has steadily declined to perhaps fewer than 50,000 birds range-wide today, by some estimates. Scientists understand that the fate of the sage-grouse may be a harbinger for hundreds of other species dependent upon the West's sagebrush habitats.

41.     Today, the sagebrush ecosystem is among the most vulnerable in North America. The sage-grouse is in danger of extinction from fragmentation and loss of its sagebrush habitat and increasing isolation of populations due to human activities, including livestock grazing, energy development and transmission, and ever-expanding motorized transportation networks. Other factors, like Earth's changing climate, the establishment and spread of weeds and invasive species that replace sagebrush plant communities, and changing wildfire regimes in sagebrush landscapes, also have damaged sage-grouse habitat throughout the West.

42.     Transmission lines pose serious threats to sage-grouse. The ground-dwelling and low-flying birds are in little danger of striking the charged lines. Rather, the danger to sage-grouse comes from predators, such as raptors and ravens, who can perch on the line and its towers and prey on sage-grouse eggs, chicks, and nesting birds. Sage-grouse also avoid tall

structures and overhead lines. Sage-grouse nest up to 11 miles from their breeding sites (called "leks"). The migration of sage-grouse across the habitat provides opportunities for populations to interbreed and thus enhance the genetic connectivity among populations that frequent different lek sites. The B2H transmission line will fragment sage-grouse habitat by disrupting the movement of sage-grouse who will avoid the transmission lines and its tall towers. The B2H transmission line will sever the genetic connectivity among populations. The B2H transmission line will harm sage-grouse due to increased predation from raptors and ravens who can use the B2H Project's components for perching.

43.    In 2015, BLM approved amendments to the Baker and Southeast Oregon RMPs designed to protect greater sage-grouse (Approved Resource Management Plan Amendments, or "2015 ARMPA"). BLM adopted the 2015 ARMPA in response to the threats identified in the U.S. Fish & Wildlife Service's 2010 finding that the greater sage-grouse was "warranted" for listing under the Endangered Species Act because of loss and fragmentation of sagebrush habitat and the inadequacy of the various state conservation plans then in place, but precluded from immediate listing by higher priority listing actions. *See* 12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocerus urophasianus*) as Threatened or Endangered, 75 Fed. Reg. 13,910 (Mar. 23, 2010). The greater sage-grouse is a BLM and Forest Service sensitive species, and is considered vulnerable by the State of Oregon.

44.    The 2015 ARMPA designated greater sage-grouse habitat areas, including PHMA and GHMA, changed management objectives including realty actions such as transmission rights-of-way, and established conservation standards for designated PHMA and GHMA. These included the designation of PHMA and GHMA as avoidance zones for transmission line rights-of-way. Key features of the 2015 ARMPAs included protections for highest-priority habitats

designated as Sagebrush Focal Areas, density and disturbance caps for energy and other industrial activity, buffers around leks, triggers for increased protections if habitats or populations fall below specified levels, and a net conservation gain mitigation requirement for activities that affect sage-grouse habitat. The 2015 ARMPA's Adaptive Management Strategy (Appendix J) identifies hard and soft triggers for sage-grouse habitat and populations within Oregon Priority Areas of Concern ("PAC"). Hard triggers represent a threshold indicating that immediate and more restrictive action is needed to address sage-grouse conservation objectives.

45.    However, the 2015 ARMPAs expressly excepted the B2H Project from the requirements of the new sage-grouse protections. This exclusion was based on the expectation that the NEPA process for the B2H Project and related decisionmaking would include conservation measures for sage-grouse along the B2H transmission line route meant to achieve a net conservation benefit to sage-grouse.

46.    The FEIS and DOI ROD do not provide mitigation for harms to sage-grouse from the B2H Project that is as protective as the 2015 ARMPA. For example, the Selected Alternative allows construction of the B2H transmission line within 2.0 to 3.1 miles from leks. This includes areas that the 2015 ARMPA would require to be excluded from new transmission line construction. The sage-grouse Baker PAC occurs within Segment 3 of the proposed transmission line. The population hard trigger threshold for the Baker PAC is 170 males. This hard trigger threshold was exceeded for the first time in 2016, and has been exceeded each of the past four years, with the five-year average from 2015–2019 being only 103 males. The 2015 ARMPA requires BLM to immediately implement responses within the Baker PAC once the hard trigger has been reached, including making PHMA exclusion areas for new Right-of-Way authorizations and prohibiting new road construction within four miles of active sage-grouse leks. The DOI

ROD and FEIS for the B2H Project do not include these protective responses. The DOI ROD and FEIS for the B2H Project do not take a hard look at the need for immediate implementation of the protective responses as part of the B2H Project or at the effectiveness of any mitigation proposed to conserve sage-grouse. The DOI ROD requires Idaho Power to develop a complete and comprehensive Greater Sage-Grouse Compensatory Mitigation Plan ("CMP"). The CMP was not prepared before the FEIS and DOI ROD were issued. The FEIS and DOI ROD did not evaluate whether the as-yet-undeveloped CMP would be effective in mitigating harm to the fragile populations of sage-grouse that would be affected within the Baker PAC and Cow Valley PAC. The public will have no opportunity to review and comment on the CMP as part of an agency decisionmaking process unless BLM prepares a supplemental NEPA analysis to disclose the CMP to the public prior to issuing the NTP.

47.     The Baker population is one of five sage-grouse populations in Oregon. It is also the smallest of the five, and is the most at risk, and likely less resilient, than other populations, since connectivity to other populations is limited. The FEIS's discussion of impacts to sage-grouse is based on data from 2016 and earlier, which showed an estimate of 571 birds in 2013 (based on a five-year moving average) and 165 birds in 2016 (based on a five-year moving average) in Baker population core habitat. The number of observed males on leks monitored in both 2003 and 2019 in the Baker population has fallen from 236 in 2003 to only 58 in 2019—a decline of approximately 75%. The risk of extirpation of this population is high. Yet the FEIS does not take a hard look at the likely impacts of the B2H project to sage-grouse, any remaining connectivity to other populations, or the continued existence of the Baker population. There is some genetic connectivity between the Baker sage-grouse population and other populations. The introduction of tall structures can fragment sage-grouse habitat. However, the FEIS does not

address how the B2H project or different alternatives are likely to affect this connectivity—which is tremendously important to ensuring that the Baker population is not extirpated.

48.      In addition, the FEIS does not disclose or evaluate any data or information about the Oregon statewide population of sage-grouse. The FEIS does not disclose or evaluate any data or information about the abundance of sage-grouse across their entire range in the Western United States. Without this key data and information, there is an inadequate environmental baseline for evaluating the effects of the B2H Project on sage-grouse. This information is important for the public, and the agency decisionmakers, to understand whether and how the potential extirpation of the Baker population—hastened by the construction of a new transmission line through its habitat—will affect the continued state-wide and range-wide existence of this imperiled bird.

49.      Sage-grouse continue to struggle across Oregon. The bird's statewide population has declined dramatically in recent years. The population stood at about 22,000 birds in 2016. It dropped by 7.7% in 2017, then by another 10.2% in 2018, and then by another 24.9% in 2019. By the end of 2018, the Oregon Department of Fish and Wildlife had estimated that the Oregon statewide sage-grouse population dropped to about 18,421 individuals. This is far below the State of Oregon's population goal and is 37% below the 2003 baseline population estimate of 29,237 individuals. In 2019, the statewide population of sage-grouse reached its lowest number since reliable estimates have been recorded beginning in 1996. In 2019, Oregon estimated the spring sage-grouse population to be 13,827 birds—a 36% decline since 2016—and less than half the state's population goal of 30,000 birds. This significant new information about the perilous condition of the sage-grouse throughout Oregon, and whether *any* impact to the Baker population from the B2H Project can be justified, should be considered in a supplemental Environmental

Impact Statement. In 2019, the Baker population made up 3.9% of the Oregon statewide population, up from 2.3% in 2017, showing the growing importance of the Baker population to the survival of sage-grouse throughout Oregon.

50.     In addition, 2019 has seen a rash of new information from across the West showing that sage-grouse populations in several states have declined severely just in the last three or four years. For example, sage-grouse populations in Montana dropped from about 78,000 sage-grouse in 2016 to about 44,000 in 2019. The sage-grouse population in Wyoming has decreased, with the number of birds per lek counted in 2019 dropping about 20% from the 2018 count and more than 40% from the 2016 count. In Utah, the 2019 sage-grouse lek count marked a 61% decline from 2015. Sage-grouse numbers in Idaho dropped more than 50% between 2015 and 2019. Sage-grouse numbers in Nevada declined by 8% in lek counts of male birds between 2018 and 2019. A supplemental Environmental Impact Statement is needed to consider the effects of proceeding with the B2H Project if it causes any impact to sage-grouse along its route in light of the horrific declines in sage-grouse populations in Oregon and across the West since the FEIS issued in November 2016.

### The National Historic Oregon Trail and Impacts From the B2H Project

51.     The Selected Alternative for the B2H Project would cut across the National Historic Oregon Trail in seven places, most notably near the National Historic Oregon Trail Interpretive Center about five miles east of Baker City, Oregon. The Oregon Trail is a wagon road that stretched from Missouri to Oregon's Willamette Valley, serving as a route for immigrant settlers through the 1800s. Only about 50 miles of the original approximately 300 miles of the trail from the Snake River at the Idaho border to The Dalles, Oregon, remain visible. The FEIS acknowledges that the B2H Project would highly impact several segments of the

Oregon Trail and highly impact views from the National Park Service's auto tour route for the historic Trail in Segments 1, 2, 3, and 4 of the B2H Project. The most severe impacts would be near the National Historic Oregon Trail Interpretive Center.

52.     The website for the Oregon Trail Interpretive Center, which BLM administers, touts the "magnificent vistas of the historic trail route" available at the site. https://www.blm.gov/learn/interpretive-centers/national-historic-oregon-trail-interpretive-center. The Interpretive Center has averaged 40,000 visitors per year over the past five years. Approximately 10% of the Interpretive Center's annual visitation is from organized educational groups who participate in a self-guided hike, ranger-provided educational activities, special exhibits, theater presentations by staff or contracted interpreters, and use site specific educational materials. The following photographs show (1) the magnificent vista from the Interpretive Center, with the line of the Oregon Trail and remaining ruts visible at the center of the photograph, and (2) a ground-level perspective of the Oregon Trail near the Interpretive Center. The B2H transmission line would devastate the viewshed from BLM's own Interpretive Center, permanently marring the experience for the roughly 40,000 visitors who visit to be able to understand and visualize the experience of the immigrants who passed along the Oregon Trail nearly two centuries ago.





53.     The Interpretive Center site includes a one-mile stretch of the Oregon Trail route and ruts, with adjacent ruts on public and private lands, together with 4.5 miles of hiking trails that allow visitors to walk along remaining portions of the Oregon Trail. BLM designed the Interpretive Center to be a destination visitor center, with significant input and support from the local community and state tourism and economic development organizations. The facility and operations were designed to accommodate recreational and educational activities for the general public and enhance sustainable tourism initiatives in eastern Oregon.

54.     BLM's Selected Alternative for the B2H Project would cut perpendicular across an intact segment of the Oregon Trail approximately one mile from the Interpretive Center and immediately adjacent to the federal land on which the Interpretive Center sits, replacing the magnificent vistas that allow visitors to view the landscape almost as the immigrants who followed the Oregon Trail did in the 1800s with views of a transmission line strung on massive 170-foot towers. The location of the Selected Alternative for the B2H transmission line where it intersects the Oregon Trail adjacent to the Interpretive Center site is shown in the following map:



55.     Several commenters urged BLM to consider (and select) an alternative that would have buried approximately two miles of the B2H transmission line near the National Historic Oregon Trail Interpretive Center. Burial of an approximately two-mile segment of the B2H transmission line is feasible. A buried 3.5 mile-long 500 kV underground transmission line project in Chino Hills, California, which crosses under two major thoroughfares, several minor roadways, a shopping center, two flood-control channels and two holes of a golf course, is completed and operational.

56.     BLM and DOI did not develop, disclose, or evaluate an alternative that would bury the B2H transmission line near the Interpretive Center to avoid the devastating visual impacts of an above-ground line with 170-foot-tall towers crossing the Oregon Trail within a mile of the Interpretive Center's main building and within 350 feet from an observation point on the Interpretive Center site. Nor did BLM or DOI provide a reasoned explanation for declining to evaluate this feasible alternative that better conforms to BLM's management obligations for the Interpretive Center, as reflected in its VRM class designation for that area prior to the amendments to VRM classes in the DOI ROD. BLM and DOI did not adequately evaluate the scenic and visual effects of the B2H transmission line at the points where it crosses or passes near the Oregon Trail.

57.     Since the FEIS was completed, three additional segments of the Oregon Trail within the 3.66 mile-long La Grande to Hilgard Historic District (west of the city of La Grande) have been proposed for listing on the National Register of Historic Places by the Oregon State Advisory Committee on Historic Preservation. Idaho Power has now proposed the Mill Creek alternative as its proposed route before EFSC. The Mill Creek alternative would intersect with at least one of these segments (in two places). The Mill Creek alternative would pass over or near

two others. The FEIS did not consider the potentially significant impacts of the B2H Project to these previously-unidentified segments of the Oregon Trail, warranting a supplement to the FEIS.

### Other Impacts From the B2H Project and Significant New Information

58.     Idaho Power chose the Mill Creek alternative as its proposed route in its application to Oregon's EFSC for a state site certificate, and proposed the Morgan Lake alternative as a potential variation for EFSC's consideration. In March 2020, Idaho Power sent letters to property owners in Union County stating that Idaho Power is now focused on building the Morgan Lake alternative. The Mill Creek alternative and Morgan Lake alternative are different from the FEIS's Selected Alternative near La Grande. The FEIS does not take a hard look at the impacts from either of these routes. Neither of these alternatives were disclosed in the DEIS. The public never had a chance to comment on the route that the applicant is now planning to take over the private land west of La Grande, and the federal decisionmakers did not have a properly-informed analysis of that route available when they decided to approve the DOI ROD.

59.     The Mill Creek alternative (Idaho Power's preferred route at EFSC) comes within 2,000 feet of the La Grande city limits, while the Morgan Lake alternative (the route that Idaho Power told landowners in March 2020 that it is focused on building) would pass within ¼ mile of Morgan Lake Park, an important recreational and camping location for visitors from La Grande and elsewhere. The FEIS's discussion of geologic hazards and slope instability along these alternatives does not disclose sufficient information about potential dangers if these routes were selected. Significant new information, much of it developed in the EFSC process (where Idaho Power first disclosed some of the likely impacts), shows that the geologic hazards and slope

instability of the proposed transmission line near La Grande pose greater threats to human safety than disclosed in the FEIS.

60.     The FEIS does not evaluate the likely impacts of audible noise from the B2H transmission line (including the Mill Creek and Morgan Lake alternatives) on homes and recreation sites, except to say that the issue will be addressed by the EFSC. However, new information about noise impacts, developed during the EFSC permitting process, indicates that ambient noise along the Mill Creek and Morgan Lake alternative routes that Idaho Power is asking EFSC to approve is likely to be significant due to the proximity to homes in La Grande and to the campground at Morgan Lake Park. Similarly, the FEIS considered no information about effects on recreation and aesthetics at Morgan Lake Park from the Mill Creek and Morgan Lake alternatives. The FEIS did not take a "hard look" at these issues. In March 2020, Idaho Power also sent letters to landowners along the transmission line route seeking consent for Idaho Power or its consultants to access their property to conduct additional land surveys and studies to document environmental conditions. Any information obtained from these additional studies must be disclosed to the public for comment in a supplemental NEPA process.

61.     The DOI ROD and USFS ROD rely on a flawed evaluation of mitigation in the FEIS. The FEIS does not evaluate the effectiveness of proposed mitigation measures. Many of the mitigation plans on which the BLM and Forest Service rely had not yet been developed at the time the FEIS issued. In particular, the Comprehensive Mitigation Plan for sage-grouse, which BLM insists will provide a net conservation benefit to the species, has not yet been developed.

62.     The FEIS also did not take a "hard look" at the risk of wildfire damage from the B2H transmission line. Significant new information, including the November 2018 Camp Fire in Paradise, California, that resulted in 85 fatalities and which was sparked by power transmission

lines operated by Pacific Gas & Electric ("PG&E"), illustrates the potential danger of wildfire damage from transmission lines, particularly as the Earth's climate changes and areas like northeastern Oregon become hotter and drier. Also, in October 2019, PG&E shut down service to 17 counties and over 2,000,000 customers in northern California because of the heightened risk of wildfires from its transmission lines in hot, windy conditions.

## FIRST CLAIM FOR RELIEF
## NATIONAL ENVIRONMENTAL POLICY ACT

63.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

64.     NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); *see* 42 U.S.C. § 4331. NEPA requires federal agencies to study the environmental impacts of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. Pt. 1502.

65.     Aimed at informed agency decisionmaking and meaningful public participation, NEPA's "action-forcing" procedures require agencies to, among other things, properly define proposals, develop a reasonable "purpose and need" statement to frame the environmental review, consider a reasonable range of alternatives, establish an accurate baseline for analysis, ensure the professional and scientific integrity of their discussions and analyses, include all information that is "essential to a reasoned choice," discuss mitigation measures including the effectiveness of those measures, study related proposals in a single impact statement, take a "hard look" at the potential impacts of the proposed action, and assess the cumulative impacts from the proposed action. *See, e.g.*, 40 C.F.R. §§ 1500.1(b), 1500.2(b), 1502.1, 1502.4(a), 1502.13, 1502.15 1502.22(a), 1502.24, 1508.20.

66.    An agency also must "prepare [a] supplement[] to [its] final environmental impact statement if … [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

67.    Defendants violated NEPA and its implementing regulations through issuance of the November 17, 2017, DOI ROD and BLM RMP amendments and Right-of-Way grants, the November 9, 2018, USFS ROD, Special Use Authorization, and Forest Plan amendments, and the accompanying FEIS. These violations include, but are not limited to:

   a.  Relying upon a "purpose and need" statement that does not demonstrate that Idaho Power has an actual need for the B2H Project;

   b.  Failing to consider a reasonable range of alternatives, including failing to fully consider viable and feasible alternatives offered by the public during the NEPA process, which include the alternative of burying the B2H transmission line in the vicinity of the National Historic Oregon Trail Interpretive Center;

   c.  Failing to establish an accurate environmental baseline with regard to impacts from the B2H Project, including impacts to greater sage-grouse;

   d.  Failing to take a "hard look" at the environmental impacts of the B2H Project, including those to sage-grouse, the Oregon Trail, old-growth trees in the Wallowa-Whitman NF, and humans living near the transmission route and alternative routes who are at risk from noise effects, geologic hazards, and harm to recreational and aesthetic interests and values;

e.  Failing to consider significant factors related to the conditions of sage-grouse and their habitat, including but not limited to recent declines in the sage-grouse population in Oregon and other states throughout the bird's habitat;

f.  Failing to discuss in a meaningful way whether the vague or as-yet undeveloped mitigation measures listed in the FEIS will be effective; and

g.  Failing to supplement the FEIS based on new information regarding impacts from noise effects and stability hazards of the Mill Creek and Morgan Lake alternatives—which are closer to La Grande than the FEIS Selected Alternative, and which Idaho Power has now chosen as its route in seeking site certification from EFSC—as well as impacts from those alternatives on nearby recreational and wildlife management sites, new information regarding the plight of sage-grouse, new information regarding impacts to the Oregon Trail, and new information regarding the risk of wildfire from the B2H Project.

68.     The DOI ROD, BLM RMP amendments, Right-of-Way grants, the USFS ROD and Special Use Authorization, and the FEIS therefore are arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and its implementing regulations, and have caused or threaten serious prejudice and injury to plaintiffs' rights and interests.

69.     The DOI ROD, BLM RMP amendments, Right-of-Way grants, the USFS ROD and Special Use Authorization, and the FEIS are judicially reviewable by this Court pursuant to 5 U.S.C. §§ 704 and 706(2) and must be held unlawful and set aside for the reasons identified above. BLM's failure to supplement the FEIS is judicially reviewable by this Court pursuant to 5 U.S.C. §§ 704 and 706(1).

## SECOND CLAIM FOR RELIEF
## FEDERAL LAND POLICY AND MANAGEMENT ACT

70.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

71.     FLPMA requires BLM and DOI to include in any Right-of-Way grant terms and conditions that will "carry out the purposes of FLPMA" and "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." 43 U.S.C. § 1765(a). FLPMA also requires that a Right-of-Way contain terms and conditions necessary to "protect Federal property and economic interests," efficiently manage the lands that are subject to the ROW "or are adjacent thereto," and "otherwise protect the public interest" in the ROW lands or lands "adjacent thereto." *Id*. § 1765(b).

72.     The DOI ROD, BLM RMP amendments, Right-of-Way grants, and FEIS do not describe how the B2H Project Right-of-Way grants would comply with these obligations, or how the terms and conditions of the Right-of-Way grants will protect federal property and economic interests and minimize damage to scenic and aesthetic values and wildlife habitat. The impacts from the B2H Project will seriously damage scenic and aesthetic values on federal land in and near the Project area, harm federal economic interests, including by reducing visitation to the National Historic Oregon Trail Interpretive Center, and seriously harm greater sage-grouse in and near the Project area. The terms and conditions in the DOI ROD and the Right-of-Way grants do not minimize damage to these values, interests, and resources.

73.     DOI and BLM have violated FLPMA and its implementing regulations through issuance of the November 17, 2017, DOI ROD, BLM RMP amendments and Right-of-Way grants. These violations include, but are not limited to:

> a.   Failing to include terms and conditions in the Right-of-Way grants to minimize damage to scenic and aesthetic values, and to protect federal property and

economic interests and the public's interest in BLM-administered lands,

particularly in the vicinity of the Oregon Trail Interpretive Center and at other

points where the B2H Project crosses or passes near the Oregon Trail; and

b.  Failing to include terms and conditions in the Right-of-Way grants to minimize

damage to wildlife habitat, particularly in the vicinity of sage-grouse leks and

other sage-grouse habitat.

74.    The DOI ROD, BLM RMP amendments, Right-of-Way grants, and FEIS

therefore are arbitrary, capricious, an abuse of discretion, and not in accordance with FLPMA

and its implementing regulations, and have caused or threaten serious prejudice and injury to

plaintiffs' rights and interests.

75.    The DOI ROD, BLM RMP amendments, Right-of-Way grants, and FEIS are

judicially reviewable by this Court pursuant to 5 U.S.C. §§ 704 and 706(2), and must be held

unlawful and set aside for the reasons identified above.

**THIRD CLAIM FOR RELIEF**
**NATIONAL FOREST MANAGEMENT ACT**

76.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

77.    NFMA establishes a two-step process for forest planning. First, it requires the

Forest Service to develop, maintain, and revise Forest Plans for each national forest. 16 U.S.C. §

1604(a).

78.    In the second step of the forest planning process, the Forest Service assesses site-

specific actions. All site-specific decisions must be consistent with the Forest Plan. 16 U.S.C. §

1604(i). The Forest Service has violated NFMA by failing to ensure that the B2H Project is

consistent with the Wallowa Whitman NF Forest Plan and by adopting Forest Plan amendments

that arbitrarily and without reasoned explanation diminish the protections in the Wallowa

Whitman NF Forest Plan for visual resources, large-diameter old growth trees, and anadromous fish.

79.    The USFS ROD, Special Use Authorization, and FEIS therefore are arbitrary, capricious, an abuse of discretion, and not in accordance with NFMA and its implementing regulations, and have caused or threaten serious prejudice and injury to plaintiffs' rights and interests.

80.    The USFS ROD, Special Use Authorization, and FEIS are judicially reviewable by this Court pursuant to 5 U.S.C. §§ 704 and 706(2), and must be held unlawful and set aside for the reasons identified above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.    Order, declare, and adjudge that DOI's November 17, 2017, Record of Decision and BLM's Resource Management Plan Amendments, Right-of-Way grants, and accompanying Final Environmental Impact Statement are unlawful under, and in violation of, NEPA and FLPMA;

B.    Order, declare, and adjudge that the Forest Service's November 9, 2018, Record of Decision, Special Use Authorization, and Forest Plan Amendments and accompanying Final Environmental Impact Statement are unlawful under, and in violation of, NEPA and NFMA;

C.    Issue an order setting aside and vacating DOI's November 17, 2017, Record of Decision and BLM's Resource Management Plan Amendments, the Right-of-Way grants, the Forest Service's November 9, 2018, Record of Decision and Forest Plan Amendments, the Forest Service's Special Use Authorization, and the accompanying Final Environmental Impact Statement;

D.      Order, declare, and adjudge that BLM's failure to prepare a Supplemental Environmental Impact Statement is unlawful, and in violation of, NEPA;

E.      Order the preparation of a Draft Supplemental Environmental Impact Statement to address deficiencies in the Final Environmental Impact Statement and to disclose and evaluate significant new information relevant to environmental concerns and bearing on the B2H Project and its impacts;

F.      Enter temporary, preliminary, or permanent injunctive relief as hereinafter prayed for by plaintiffs, including by enjoining defendants from allowing construction to commence on the B2H Project through ground-clearing, site preparation, or other such actions until such time as defendants have fully complied with law and prepared a new NEPA analysis or supplemented the current analysis in compliance with NEPA;

G.      Enter injunctive relief barring defendants from implementing or further implementing DOI's November 17, 2017, Record of Decision and BLM's Resource Management Plan Amendments, the Right-of-Way grants, the Forest Service's November 9, 2018, Record of Decision and Forest Plan Amendments, and the Forest Service's Special Use Authorization, unless and until such time as defendants have completed a lawful environmental analysis and issued a new, lawful decision that complies with the requirements of the APA, NEPA, FLPMA, and NFMA, as well as any further injunctive or other relief necessary to mitigate for any resource-damaging or -threatening actions taken prior to this Court's issuance of a decision on plaintiffs' claims;

H.      Award plaintiffs their reasonable costs, litigation expenses, and attorney fees associated with this litigation as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., and all other applicable authorities; and

I.      Grant such other further relief as plaintiffs may request or the Court deems just

and proper.

DATED this 1st day of May 2020.                    Respectfully submitted,

                                                    s/David H. Becker

                                                   David H. Becker (OSB # 081507)
                                                   Law Office of David H. Becker, LLC

                                                   Of Attorneys for Plaintiffs