**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
4110 SE Hawthorne Blvd. # 168
Portland, OR 97214
(503) 388-9160
davebeckerlaw@gmail.com

**Oliver J. H. Stiefel (OSB # 135436)**
oliver@crag.org – (503) 227-2212
**Maura C. Fahey (OSB # 133549)**
maura@crag.org – (503) 525-2722
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Fax: (503) 296-5454

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PENDLETON DIVISION

| | |
|---|---|
| **STOP B2H COALITION**, *et al.* | Case No. 2-19-cv-01822-SI |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |
| **BUREAU OF LAND MANAGEMENT**, *et al.*, | |
| Defendants | |
| and | |
| **IDAHO POWER COMPANY** and **PACIFICORP**, | **ORAL ARGUMENT REQUESTED** |
| Intervenor-Defendants | |

## MOTION

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1, plaintiffs Stop B2H Coalition, Jim Kreider, Carol "Fuji" Kreider, Gail Carbiener, and Greater Hells Canyon Council respectfully move for an order granting them summary judgment on their claims against defendants the Bureau of Land Management (the "Bureau") and U.S. Department of the Interior ("DOI"). Pursuant to LR 7-1, the parties have conferred and have been unable to resolve the motion. Plaintiffs challenge final administrative actions of the Bureau and DOI approving rights-of-way that will allow Idaho Power Company ("Idaho Power") to construct the Boardman to Hemingway Transmission Line Project ("B2H Project") across federal public lands in northeastern Oregon. Plaintiffs' claims arise under the National Environmental Policy Act ("NEPA") and Federal Land Policy and Management Act ("FLPMA"), and are reviewed by this Court under the judicial review provisions of the Administrative Procedure Act ("APA").

The Final Environmental Impact Statement ("FEIS") describes the B2H Project's effects on eighteen resources. *See* AR_169875–78 (Table of Contents). Plaintiffs focus on potential harm to three: the greater sage-grouse, the National Historic Oregon Trail, and to the people and environment near the City of La Grande.

This motion is supported by the legal memorandum below and by declarations, exhibits, and supporting materials cited therein.[1] The following declarations are filed herewith:

- Declaration of Dr. Clait E. Braun, describing and attaching significant new information related to greater sage-grouse;

- Declaration of Craig Miller, attaching demonstrative maps related to the Baker population of sage-grouse that were prepared using Oregon Department of Fish & Wildlife ("ODFW") lek count and location data in the administrative record and more recent ODFW lek count and location data;

---

[1] References to "AR_" are to the Bureau's Administrative Record within the Corrected Administrative Record lodged on August 20, 2020 (ECF No. 39). Leading zeroes are omitted.

-   Declaration of David H. Becker, attaching and describing demonstrative exhibits that summarize, clarify, or condense certain data and information in the administrative record, and exhibits describing significant new information related to greater sage-grouse, impacts to the Oregon Trail, and impacts to the City of La Grande from the proposed transmission line;

-   Declarations of Gail Carbiener, Brian Kelly, Carol "Fuji" Kreider, Jim Kreider, and Michael Brock Evans, which demonstrate that plaintiffs have standing.

-   Second Declaration of David H. Becker, attaching excerpts of the administrative record cited in the legal memorandum, with—as Exhibit 1—a table cross-referencing the "AR" pages from the corrected administrative record cited in plaintiffs' opening brief to which of the remaining Exhibits attached thereto the pages appear in;[2]

Because the defendants have approved a project in a manner that is inconsistent with their legal obligations, plaintiffs respectfully request that the Court hold unlawful and set aside the approvals of the B2H Project. Specifically, plaintiffs respectfully request that this Court grant declaratory and injunctive relief:

A.    Order, declare, and adjudge that DOI's November 17, 2017, Record of Decision ("ROD") and the Bureau's Right-of-Way ("ROW") grants and accompanying FEIS are unlawful under, and in violation of, NEPA and FLPMA;

B.    Issue an order setting aside and vacating DOI's November 17, 2017 ROD and the Bureau's ROW grants and the accompanying FEIS;

C.    Order, declare, and adjudge that the Bureau's failure to prepare a Supplemental Environmental Impact Statement ("SEIS") is unlawful, and in violation of NEPA;

---

[2] This Second Becker Declaration is submitted with the goal of facilitating the Court's review of the voluminous administrative record and in consideration of the Court's Standing Order 2020-12 Amended (June 29, 2020) that suspends the paper copies requirement in LR 5-8 except upon the Court's request. Plaintiffs normally would not submit such excerpts, but respectfully submit that, if the Court is currently primarily reviewing documents in electronic format, having excerpts of the 182,745-page record may make that review easier. If the Court were to order submission of paper copies, plaintiffs likely would seek leave to withdraw this Second Becker Declaration, because of the cost to non-profit and individual plaintiffs of printing paper copies.

D.      Order the preparation of a Draft SEIS to address deficiencies in the FEIS and to disclose and evaluate significant new information relevant to environmental concerns and bearing on the B2H Project and its impacts;

E.      Enter temporary, preliminary, or permanent injunctive relief as hereinafter prayed for by plaintiffs, including by enjoining defendants from allowing construction to commence on the B2H Project through ground-clearing, site preparation, or other such actions until such time as defendants have fully complied with law and prepared a new NEPA analysis or supplemented the current analysis in compliance with NEPA;

F.      Enter injunctive relief barring defendants from implementing or further implementing DOI's November 17, 2017 ROD and the Bureau's ROW grants, unless and until such time as defendants have completed a lawful environmental analysis and issued a new, lawful decision that complies with the requirements of the APA, NEPA, and FLPMA, as well as any further injunctive or other relief necessary to mitigate for any resource-damaging or -threatening actions taken prior to this Court's issuance of a decision on plaintiffs' claims;

G.      Award plaintiffs their reasonable costs, litigation expenses, and attorney fees associated with this litigation as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., and all other applicable authorities; and

H.      Grant such other further relief as plaintiffs may request or the Court deems just and proper.

<u>**TABLE OF CONTENTS**</u>

**MOTION** ........................................................................................................................... i
**TABLE OF CONTENTS** .............................................................................................. iv
**TABLE OF AUTHORITIES** ....................................................................................... vii
**GLOSSARY OF ACRONYMS** ..................................................................................... ix

**INTRODUCTION** ........................................................................................................... 1

**FACTUAL AND ADMINISTRATIVE BACKGROUND** ......................................... 3

   **I.**    **THE B2H TRANSMISSION LINE PROJECT** ................................................. 3

     **A.**   **Description of the B2H Project, the Public Response, and the DEIS.** ...................... 3

     **B.**   **The FEIS, ROD, Protests, and This Suit.** ................................................................ 5

  **II.**   **THE AFFECTED NATURAL AND HUMAN ENVIRONMENT** ...................... 5

     **A.**   **The B2H Project and Greater Sage-Grouse.** ........................................................... 5
       **1.**   *The B2H Project presents unique threats of harm to sage-grouse up to four or more miles from the transmission line itself.* .......................................................... 5
       **2.**   *If built, the B2H Project would affect the Baker population of sage-grouse that has a greater than 60% chance of extirpation within two decades.* ............................. 8
       **3.**   *Although not disclosed in the FEIS, the record shows that about 35% to 50% of the remaining Baker population used leks within four miles of the B2H Project.* ......... 9
       **4.**   *The FEIS's discussion of sage-grouse impacts and the 2015 ARMPA.* .............. 12
       **5.**   *Significant new information regarding the Baker population.* ........................... 13

     **B.**   **The B2H Project and the Oregon Trail.** ................................................................ 15
       **1.**   *The Trail, Interpretive Center, and the Bureau's management obligations.* ....... 15
       **2.**   *The B2H Project would seriously degrade views and enjoyment of the Trail.* ..... 16
       **3.**   *The Bureau rejected an alternative to bury the line near the Interpretive Center.* ................................................................................................... 17
       **4.**   *Significant new information shows undergrounding is more feasible and less costly than Idaho Power and the Bureau stated.* ........................................................ 20

     **C.**   **The B2H Project and the City of La Grande.** ....................................................... 20
       **1.**   *The Mill Creek Alternative closest to La Grande was not disclosed in the DEIS and the FEIS's discussion of its impacts omits several important factors.* .................. 20
       **2.**   *Significant new information regarding the Mill Creek Alternative.* ................... 23

**ARGUMENT** ................................................................................................................. 24

  **I. STANDARDS OF REVIEW** ..................................................................................... 24

**II. LEGAL STANDARDS** ..................................................................................25

   **A.**   **National Environmental Policy Act.** ...................................................25

   **B.**   **Federal Land Policy and Management Act.** ..................................26

**III. DEFENDANTS' ANALYSIS OF SAGE-GROUSE IMPACTS VIOLATED NEPA** ............................................................................................26

   **A.**   **The Bureau Failed to Disclose an Accurate Environmental Baseline and to Take a Hard Look at the B2H Project's Impacts to the Baker Population.** ...............................................................26

   **B.**   **The Bureau Failed to Evaluate the Effectiveness of Proposed Mitigation.** ......................................................................................30

   **C.**   **The Bureau Failed to Analyze Cumulative Impacts from Livestock Grazing.** ...........................................................................32

   **D.**   **Significant New Information Regarding Sage-Grouse Requires an SEIS.** .............................................................................................33

**IV. DEFENDANTS VIOLATED NEPA WITH RESPECT TO THE OREGON TRAIL** .........................................................................................35

   **A.**   **The Bureau Violated NEPA by Failing to Develop and Study an Alternative for Burying the Line Near the Interpretive Center.** ...35

       **1.**   *The rationale for not evaluating burial of the line near the Interpretive Center is unsupported by evidence and based on a predetermined decision.* ...............................36

       **2.**   *Significant new information confirms that burying a short section is feasible.* ... 38

   **B.**   **The Bureau did not Evaluate the Effectiveness of Proposed Mitigation.** ......................................................................................38

**V. DEFENDANTS VIOLATED NEPA BY NOT PREPARING SUPPLEMENTAL ANALYSIS ON THE MILL CREEK ALTERNATIVE** ...........................................39

   **A.**   **NEPA Required the Bureau to Issue a Supplemental DEIS for Comments.** ..................................................................................39

   **B.**   **The FEIS Failed to Take a Hard Look at the Impacts to the Human Environment From the Mill Creek Alternative and its Variation.** ......................40

   **C.**   **Significant New Information Requires Preparation of a SEIS.** ............................41

**VI. DEFENDANTS VIOLATED FLPMA BY FAILING TO INCLUDE PROTECTIVE TERMS, CONDITIONS, AND STIPULATIONS IN THE RIGHTS-OF-WAY** ....................................................................................41

**CONCLUSION** ................................................................................... 42

# TABLE OF AUTHORITIES

**Cases**

*Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845 (9th Cir. 1997) .................................. 24

*Animal Def. Council v. Hodel*, 840 F.2d 1432 (9th Cir. 1988) ................................... 36

*Bundorf v. Jewell*, 142 F. Supp. 3d 1138 (D. Nev. 2015) ........................................... 34

*Cent. Or. LandWatch v. Connaughton*, 905 F. Supp. 2d 1192 (D. Or. 2012) ............................. 29

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000) ........................... 25, 33, 38

*Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095 (9th Cir. 2016) ..... 8, 32, 33, 41

*Guevara v. Holder*, 649 F.3d 1086 (9th Cir. 2011) ...................................................... 25

*Half Moon Bay Fishermans' Ass'n v. Carlucci*, 857 F.2d 505 (9th Cir. 1998) ...................... 26

*Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) ................................ 40

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004) .. 25, 38

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1999) ........................................... 33

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) ..................................................... 37

*Montana v. Johnson*, 738 F.2d 1074 (9th Cir. 1984) ................................................. 42

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . 24

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir 1999) ...................... 35, 36

*N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006) ................................ 26

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) .................. 25

*Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953 (9th Cir. 2005) ...................... 27

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998) ............. 30, 32

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468 (9th Cir. 1994) ............................. 25

*Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) ........................... 26, 28, 29, 30

*Or. Natural Desert Ass'n v. Rose*, 921 F.3d 1185 (9th Cir. 2019) ......................... 27, 41

*S. Fork Band Council of W. Shoshone v. U.S. Dep't of Interior*,
    588 F.3d 718 (9th Cir. 2009) .................................................................. 30, 32, 39

*Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007) ........................................... 24

*Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997) ................................ 37

*W. Watersheds Proj. v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) .................................... 35

*W. Watersheds Proj. v. Bernhardt*, 392 F. Supp. 3d 1225 (D. Or. 2019) ............................. 32, 33

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................ 24

5 U.S.C. § 706(2)(D) ................................................................................ 24

16 U.S.C. §§ 1241–51 ................................................................................ 15

16 U.S.C. § 1246(c) ............................................................................ 16, 36

16 U.S.C. § 1248(a) ................................................................................ 16

42 U.S.C. § 4331(b)(2) .............................................................................. 25

42 U.S.C. § 4332(2)(C) .............................................................................. 25

42 U.S.C. § 4332(2)(E) .............................................................................. 35

43 U.S.C. § 1701(a)(8) .............................................................................. 26

43 U.S.C. § 1761(a)(4) .............................................................................. 26

43 U.S.C. § 1765(a)(ii) ......................................................................... 26, 42

43 U.S.C. § 1765(b)(v)-(vi) ..................................................................... 26, 42

**Regulations**

40 C.F.R. § 1500.1(a)..............................................................................................25

40 C.F.R. § 1502.1..................................................................................................25

40 C.F.R. § 1502.14(a)............................................................................................35

40 C.F.R. § 1502.16................................................................................................32

40 C.F.R. § 1502.2(g)..............................................................................................36

40 C.F.R. § 1502.9(c)(1)(ii)........................................................................33, 39, 41

40 C.F.R. § 1502.9(c)(4)..........................................................................................39

40 C.F.R. § 1506.1(a)..............................................................................................36

40 C.F.R. § 1506.5(a)..............................................................................................37

40 C.F.R. § 1508.25................................................................................................32

40 C.F.R. § 1508.7..................................................................................................32

40 C.F.R. § 1508.8..................................................................................................32

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| APA | Administrative Procedure Act |
| ARMPA | 2015 Oregon Greater Sage-Grouse Approved Resource Management Plan Amendments |
| B2H Project | Boardman to Hemingway Transmission Line Project |
| Bureau | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| CMP | Compensatory Mitigation Plan |
| COT | Conservation Objectives Team |
| DOI | U.S. Department of the Interior |
| DOI ROD | Record of Decision for DOI Approving B2H Project Right-of-Way |
| DEIS | Draft Environmental Impact Statement |
| EFSC | Energy Facility Siting Council (Oregon Department of Energy) |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy Management Act |
| Forest Service | U.S. Forest Service |
| GHMA | General Habitat Management Area |
| NEPA | National Environmental Policy Act |
| NHOTIC | National Historic Oregon Trail Interpretive Center |
| ODFW | Oregon Department of Fish & Wildlife |
| PAC | Priority Area of Conservation |
| PHMA | Priority Habitat Management Area |
| POD | Plan of Development |
| ROW | Right-of-way |
| RMP | Resource Management Plan |
| SEIS | Supplemental Environmental Impact Statement |
| USFWS | U.S. Fish & Wildlife Service |

## INTRODUCTION

The federal defendants' final actions challenged in this case provide necessary authorizations for construction of an industrial scale transmission line—the B2H Project—that would devastate ecological, scenic, and cultural resources in eastern Oregon. The starkly beautiful sagebrush steppe in this area harbors the smallest and most imperiled population of greater sage-grouse in Oregon. The 291-mile transmission line would run along towers up to 195 feet tall through habitat used by about half of the remaining birds in this dwindling population, all but assuring its extirpation. The line also would pass less than 200 feet from the Oregon Trail Interpretive Center the Bureau manages, where over 50,000 visitors each year appreciate the scenic beauty of the Baker Valley and walk along the historic wagon ruts that mark the path of European immigrants to the Pacific Northwest. And the route of the line as now proposed would pass concerningly close to the City of La Grande, forever disturbing the fabric of the community.

The Bureau failed in its duties under NEPA to disclose and assess information about the B2H Project's likely harm. First, it did not disclose that the Baker sage-grouse population had a nearly 62% risk of extirpation within two decades, that 35% to 50% of the remaining 165 birds used habitat likely to be harmed by the Project, or that the line's effects on sage-grouse would extend much farther than the distance listed in the FEIS. Although a Compensatory Mitigation Plan ("CMP") will be prepared later, the FEIS does not evaluate whether mitigation is likely to be effective—nor does it evaluate the cumulative impacts of livestock grazing on sage-grouse. Significant new information—more recent lek counts and a new scientific study—shows that half of the remaining population now attends leks within four miles of the line, and confirms that harm to sage-grouse is likely up to more than seven miles from the line itself. The B2H Project will likely cause sage-grouse to abandon leks and lead to extirpation of the Baker population.

Second, despite many pleas from the public, and despite acknowledging the feasibility of doing so, the Bureau refused to disclose and analyze in detail information about an alternative of burying the transmission line for about two miles in the viewshed of the Interpretive Center—an alternative more consistent with the Bureau's management obligations for the Oregon Trail. But the Bureau dismissed consideration of such alternative even before scoping began. Idaho Power asserted it was "not willing to entertain" such option, and the Bureau improperly included unsupported and unverified excuses supplied by the developer as its rationale for not fully developing and studying this alternative—even though Idaho Power and the Bureau recognized that a short burial was feasible. New information showing that burial of transmission lines is increasingly common underscores the need for an SEIS to fully study this alternative.

Third, the Bureau inserted a new alternative route in the FEIS, the Mill Creek alternative, that was not available for public comment in the Draft Environmental Impact Statement ("DEIS"), without first issuing a supplement to the DEIS. This route would come within one mile of the City of La Grande—several miles closer than the alternatives evaluated in the DEIS—and have more likely impacts to the viewshed, recreational opportunities, and enjoyment of the residents in and near La Grande. The new route is analyzed in a cursory fashion, with no analysis of the noise impacts from the line or visual simulations of how it would dominate the skyline. Significant new information for this route now shows that Idaho Power will obtain a certificate to use it from state regulators, along with a variance from state noise standards—also requiring an SEIS to properly evaluate the impacts from this late addition to the NEPA process.

The Bureau also did not include terms and conditions in the Project's rights-of-way to minimize damage to scenic values and protect sage-grouse habitat, or consider ones to protect the Interpretive Center and the public interest, in violation of its duties under FLPMA.

## FACTUAL AND ADMINISTRATIVE BACKGROUND

I.      **THE B2H TRANSMISSION LINE PROJECT**

      A.      **Description of the B2H Project, the Public Response, and the DEIS.**

Idaho Power first conceived the B2H Project in 2006 to import power from the Boardman coal-fired generating plant, through northeast Oregon, to meet its load requirements in the Boise, Idaho, metropolitan area. AR_4867.[3] The line would run almost 300 miles from a new substation near Boardman, Oregon, to the Hemingway substation near Melba, Idaho. AR_169923.

The B2H Project would cross federal, state, and private lands in Oregon and Idaho, including federal public land managed by the Bureau and the Forest Service, with approximately two-thirds of the Project located on nonfederal lands. AR_169923, 169929. The 500 kV single-circuit, alternating-current, overhead transmission line would be carried on towers up to 195 feet tall, spaced 1,200 to 1,800 feet apart, with the line a minimum of 29.5 feet above the ground. AR_170067, 170071. The line would dominate the viewshed, obliterating views in areas of scenic significance. *See, e.g.*, AR_173598, 173606 (photo simulation at Interpretive Center's Panorama Point); AR_173624, 173626 (Oregon Trail Birch Creek interpretive site simulation).

The B2H Project area covers six segments that are based generally on similar geography, natural features, drainages, resources, and/or land uses. Each segment has multiple alternative routes, and some of the alternative routes have one or more smaller variations. AR_169932, 169947, 169949 (Segment maps). This case focuses on unevaluated alternatives and affected resources in Segment 2 (Union County) and Segment 3 (Baker County). AR_169953, 169955.

Because the B2H Project would cross federal public lands, the Bureau—as federal lead

---

[3] The 2007 right-of-way application gave a June 2012 in-service date. AR_4880. The Project website now says that "[c]onstruction is expected to begin in 2023" and "planned to be in-service in 2026 or later." https://www.boardmantohemingway.com/ (visited August 31, 2020).

agency—began scoping for an EIS in September 2008. AR_169997. In late 2008/early 2009, the Bureau sent guidance to federal, state, and local Cooperating Agencies on the NEPA process to coordinate with them on issues and routes to address. AR_1187, 1224, 1254, 93500–01. The agency's decision was whether to grant, grant with modifications, or deny part or all of the application for a ROW to construct, operate, and maintain the B2H Project on Bureau-administered lands—including the terms, conditions, and stipulations of any ROW. AR_170006.

The initial public response to the transmission line was overwhelmingly negative. Many were concerned about the irreparable effects on the scenery and historic resources at the Oregon Trail Interpretive Center near Baker City. *See* AR_66549–55. One person described how the Interpretive Center—although managed by the Bureau—involved joint private/governmental funding and offered Baker County "a new and viable economic future" when it opened in 1992. AR 62780. There, one could "understand the scenic and aesthetic values provided to visitors as they try to imagine themselves traveling the same route as did the pioneers of the Oregon Trail. The unique portion of the Oregon Trail continues to remain unblemished by site obscuring buildings, bridges, smog or other intrusive man-made structures." AR_62778.

Idaho Power also must obtain a Site Certificate from Oregon's Energy Facility Siting Council ("EFSC"). AR_170029. Idaho Power began the EFSC process in July 2010, and that process has run parallel to the federal approval process since.[4] The Bureau reopened public scoping in late 2010; Idaho Power submitted a new ROW application in June 2010, and updated the application and Plan of Development through May 2013. AR_169930, 170011.

The Bureau issued the DEIS in December 2014, evaluating impacts on both federal and non-federal lands, and the public comment period closed in March 2015. AR_19281. Numerous

---

[4] *See* https://www.oregon.gov/energy/facilities-safety/facilities/Pages/B2H.aspx (Timeline).

commenters lamented the transmission line's likely irreparable harm to the Oregon Trail and urged the Bureau to consider an alternative of burying the transmission line for a short section within sight of the Interpretive Center. *See, e.g.*, AR_19698–99, 19798, 20618, 20679–80. Many also expressed concerns about the likely serious harm from the transmission line to greater sage-grouse. *See, e.g.*, AR_19593–97, 19600–05, 19693–710, 19777–90, 19856–71, 19882–914.

> ### B.    The FEIS, ROD, Protests, and This Suit.

The Bureau issued the FEIS in November 2016. AR_23147. No public comment period was allowed for the FEIS. AR_55718. The FEIS identified the Agency Preferred Alternative for the entire Project, choosing alternatives (or variations) within each of the six segments, consisting of 69 links. AR_169993; *see* AR_169989, 169991 (route maps); AR_169953 (route links in Union County, Segment 2), 169955 (route links in Baker Valley, Segment 3).

The DOI issued its ROD in November 2017, authorizing the issuance of a 250-foot-wide ROW to Idaho Power on 85.6 miles of Bureau-administered lands for construction, operation, and maintenance of a 500-kV transmission line following the Agency Preferred Alternative identified in the FEIS, which the ROD identified as the Selected Alternative. AR_156509–10. After the Bureau dismissed all of the protests to the Resource Management Plan ("RMP") amendments related to visual resources, AR_55706–67, this suit followed.

## II.    THE AFFECTED NATURAL AND HUMAN ENVIRONMENT

> ### A.    The B2H Project and Greater Sage-Grouse.

> #### 1.    *The B2H Project presents unique threats of harm to sage-grouse up to four or more miles from the transmission line itself.*

Powerlines like the B2H Project pose unique threats to sage-grouse because their effects extend far beyond the line's actual footprint. AR_82134. In 2010, the U.S. Fish & Wildlife Service ("USFWS") explained that "[i]n areas where the vegetation is low and the terrain

relatively flat, power poles provide an attractive hunting and roosting perch, as well as nesting stratum for many species of raptors and corvids." *Id*. It cited a study finding sage-grouse predators' average foraging distances range up to 4.3 miles, *id*., a figure also cited in the FEIS, "suggesting that the extent of habitat indirectly affected as a result of existing and planned transmission line infrastructure could be substantial." AR_170855. The presence of a powerline causes habitat fragmentation and alters sage-grouse dispersal patterns, leading sage-grouse to avoid otherwise suitable breeding habitat. AR_82134, 82202. As the USFWS's 2013 Conservation Objectives Team ("COT") report explains, "Sage-grouse populations can be significantly reduced, and in some cases locally extirpated, by non-renewable energy development activities, even when mitigative measures are implemented." AR_130583.

Sage-grouse are sagebrush obligates, relying on large expanses of sagebrush year-round for breeding, nesting, brood rearing, and winter habitat. AR_82121. They need sagebrush to survive, yet almost half of the historical sagebrush habitat has been destroyed, and much that remains is badly fragmented. AR_82133, 82192. The bird's life cycle is centered around their breeding grounds, or "leks." AR_82121. After mating, female sage-grouse may travel up to 12.5 miles from the lek to nest, with an average range between 2.1 and 4.8 miles. *Id*. Lekking, nesting, and brood-rearing runs from March to August, during which time sage-grouse are particularly susceptible to predation. AR_82177. Late brood-rearing and summer habitat includes areas such as wet meadows where forbs are available, but as vegetation dries up through late summer and fall, sage-grouse shift their diet entirely to sagebrush, on which they depend all winter. AR_82122. This progression of diet also requires sage-grouse to migrate throughout the year: in 2011, ODFW documented sage-grouse in the Baker area moving an average of 15.9 km (9.9 miles) from their breeding to their summer habitat, 4.9 km (3 miles) from summer to winter

habitat, and 3.3 km (2.1 miles) from winter to breeding habitat. AR_129694.

Sage-grouse are ground-dwelling birds who usually do not fly at heights where collision with powerlines are a significant threat—although they are more prone than other birds to injury from collisions with transmission towers and other ground-based infrastructure. AR_170849. Rather, in addition to predation, the primary dangers to sage-grouse from the B2H Project would be to "increase the potential for fragmentation of habitats primarily as a result of avoidance of habitats near the transmission line due to the introduction of tall structures, [electromagnetic fields], and new roads." AR_170850. Possibly due to increased likelihood of predators, sage-grouse instinctively avoid areas that contain tall structures. AR_170850, 82135. The Project's 195-foot tall towers would be the first structures near the route through the treeless northwestern-most portion of the Baker Priority Area for Conservation ("PAC"). *See* AR_77592, 77652–55 (map and photographs from 2011 survey showing where B2H line would intersect this PAC).

The FEIS cites a 2014 scientific study (Manier *et al.*) for the facts that sage-grouse may avoid habitats within 0.4 to 2.9 miles of transmission lines and that "higher densities of power lines within 4.0 miles of a lek may negatively influence lek persistence." AR_170850–51. The Manier article itself describes "recent research" finding even larger foraging ranges for ravens, a common sage-grouse predator, of up to 6.8 miles, and negative trends in lek counts associated with communication towers within 18 km (11.2 miles) and a transmission line within 20 km (12.4 miles). AR_131125. However, these more recent research findings of harm far beyond four miles from tall structures and lines are not disclosed in the FEIS. *See* AR_170850–51.

Finally, change that disturbs habitat and normal life cycle patterns—like a new powerline with tall towers—is difficult for the birds. "Sage-grouse exhibit strong site fidelity (loyalty to a particular area even when the area is no longer of value) to seasonal habitats, which includes

breeding, nesting, brood rearing, and wintering areas . . . . [S]age-grouse rarely switch between

these habitats once they have been selected, limiting their adaptability to changes." AR_82121.

> **2.   *If built, the B2H Project would affect the Baker population of sage-grouse that has a greater than 60% chance of extirpation within two decades*.**

Greater sage-grouse are a Bureau-designated "sensitive" species, for which the agency

must "initiate proactive conservation measures that reduce or eliminate threats . . . to minimize

the likelihood and need for listing . . . under the [Endangered Species Act]." AR_109262;

AR_170768. The B2H Project would affect two northeastern Oregon sage-grouse populations,

the Baker and Northern Great Basin populations (specifically the Cow Valley PAC in the latter).

AR_170812–18; 19274 (map showing all alternatives in relation to sage-grouse habitat); Becker

Decl. ¶¶ 3–4 & Exs. 1–2 (maps showing Selected Alternative and sage-grouse habitat).

The ODFW has designated 20 PACs, which "mirror [ODFW] Core Area Habitat."

AR_156437. ODFW Core Areas are "equivalent to" the Bureau's designated Priority Habitat

Management Areas ("PHMA")—defined as "[l]and identified as having the highest habitat value

for maintaining sustainable Greater Sage-Grouse populations." AR_170813, 170750.[5] The

circular Core Areas represent a four-mile radius around leks; the outer edge of the PAC/PHMA

indicates a lek four miles away. *See* AR_129755, 129771 (map of Baker Core Areas), 19274

(FEIS map of Baker PAC); Becker Decl. Exs. 1–2 (maps of PAC/PHMA and Selected

Alternative). The B2H Project would cross about 20 miles of the western edge of the Baker PAC,

and skirt along its southern boundary and the eastern edge of the Cow Valley PAC. AR_19274.

The Baker population/PAC is the smallest and northeastern-most of Oregon's five sage-

---

[5] The Baker population, Baker PAC, and PHMA are co-extensive. AR_19274 (map showing that Baker PAC and PHMA are identical); AR_131936, 131937–38 (ODFW lek count data showing all leks in Baker population also in Baker PAC, and vice-versa); Becker Decl. Exs. 2 (detail from map at AR_19274), 3 at 1–2 (highlighting Baker leks from AR_131937–38).

grouse populations. AR_129693, 130648–49. The FEIS offers sparse information about the Baker population, but suggests a dire situation: "In 2015, the moving 5-year average population in Baker core habitat dropped to 165 birds," whereas the population was 2,017 birds in 2003. AR_170813. Ten of the 34 leks in the core habitat area had no observed males for ten years prior to 2015. *Id*. The FEIS states that "[t]he Baker population is more at risk and likely less resilient than other populations, since connectivity with other populations appears limited," and that "the environmental similarity to extirpated populations is high" for the Baker population. *Id*. In plain English, the last data cited in the FEIS—for 2015—showed that Baker had fallen to only eight percent of its 2003 baseline, that many leks had been inactive for more than a decade, and that it was at some risk of extirpation.[6] But the FEIS does not disclose the magnitude of this risk.

In fact, the risk of extirpation is more than *twelve times* as great as other Oregon sage-grouse populations. The Bureau's Oregon State Office biologist, Glenn Fredrick, described in comments on an internal draft of the DEIS that "the Baker Population is identified as at risk of extirpation (61.9% chance of <50 birds in year 2037)." AR_33584. Frederick noted that "[i]t is the most vulnerable population in Oregon. The other populations vary from 2.1% to 5.5% chance of extirpation by 2037." *Id*.; *see* AR_130649 (2013 USFWS COT report citing same figures); AR_129407 (2011 scientific article citing same figures). None of this is disclosed in the FEIS.

### 3. *Although not disclosed in the FEIS, the record shows that about 35% to 50% of the remaining Baker population used leks within four miles of the B2H Project.*

The FEIS also offers the public an incomplete and misleading baseline description of this population's dire straits because it contains no information about where the few remaining birds

---

[6] By contrast, the three leks in the Cow Valley PAC "in proximity to the B2H Project" saw *increases* in male attendance from 2003 to 2014 of 63%–79%. AR_170827. Because these leks in the Cow Valley PAC appear relatively robust and less-affected by the B2H Project than the Baker PAC, direct/indirect impacts to the Cow Valley PAC are not discussed further.

live within the area designated as PAC (and PHMA).[7] When ODFW developed the "Core Area" approach in 2011 that evolved into the PACs and later PHMA, only a small fraction of the Baker PAC habitat was actually being used by the few remaining birds: only 18 of the 34 Baker population leks were active[8] during 2005–10. AR_129696. If the few remaining birds cluster in habitat harmed by the B2H Project, the risk of extirpation would be greater. The FEIS cryptically notes that "[t]he Magpie Peak area is a particularly important area of habitat for the Baker Oregon PAC. Impacts on this area would be estimated at a higher magnitude than adjacent areas." AR_170813.[9] But there is no map showing where Magpie Peak is relative to the affected birds, leks, or habitat—and it is impossible for the public to divine this statement's significance.

The DEIS included four maps of sage-grouse habitat showing the precursors to PHMA and General Habitat Management Areas ("GHMA"),[10] and some information about the amount of habitat and number of leks within five miles of the various routes. See, e.g., AR_16748 (Baker population map), 16797. But the DEIS disclosed nothing about the attendance at the Baker populations' leks, or maps showing where the leks were in relation to the alternative routes, that would have allowed the public to understand and meaningfully comment on the likely harm from the Project. The FEIS removed DEIS's maps, replacing them with a single map. See AR_19274.

The administrative record—but not the DEIS or FEIS—does contain data allowing one to

[7] The FEIS also does not provide a clear statement of how much habitat the Baker population uses. Compare AR_170812 ("the current amount of habitat available to [the Baker] population is 853,848 acres") with AR_170813 (243,259 acres of the 336,539-acre Baker PAC is existing sage-grouse habitat and 77,434 acres is potential sage-grouse habitat).
[8] ODFW defines two key terms that appear in the FEIS: "active" lek, defined as one "attended by ≥1 male sage-grouse during the breeding season," and "occupied" lek, defined as "[a] regularly visited lek that has had ≥ 1 male counted in one or more of the last seven years." AR_129816.
[9] The DEIS referred to the Magpie Peak area as the "most critical Greater Sage-Grouse habitat in the Baker Valley," but the FEIS omits this description. AR_16753; see AR_170813.
[10] "Lands where some special management will apply" to protect sage-grouse. AR_170750.

piece together where the few remaining birds are concentrated and how close they are to the "most critical" Magpie Peak area. AR_16753. A 2011 aerial survey map has the names of nine leks within about four miles of the transmission line route through the northwestern-most portion of the PAC and within about ten miles of one another. AR_77592. None of the maps in the DEIS showed where Magpie Peak is, but from one of the Segment maps in the FEIS, it is possible to discern its location: adjacent to that concentration of nine leks in the 2011 map. *See* AR_169955, 77592; *see also* Miller Decl. Ex. 1 (map compiled from ODFW lek location data in the record showing Magpie Peak). The Bureau did prepare a map in May 2014 showing that concentration of nine leks in the Magpie Peak area within a four-mile buffer from the proposed and alternative routes, but did not make that information public in the DEIS or FEIS. *See* AR_83393.

Also, an ODFW spreadsheet includes coordinates for the 34 Baker population leks and the number of male sage-grouse counted at each from 1980 to 2014. AR_131937–38, 131945–46; Becker Decl. ¶¶ 5–6 & Exs. 3–4. Assembling the scattered data onto a single map shows that the highest-attended lek in the Magpie Peak area was the Big Creek lek, which had 19 males in 2011 (the last year it was surveyed) and 38 males in 2010. Miller Decl. Ex. 1; *see* Becker Decl. Ex. 4; AR_131945. The three active leks near Magpie Peak (Big Creek, Crews Creek, and Magpie Creek #1)—all within four miles of the B2H line—accounted for 45 (29.2%) of the 154 males counted in 2010 and 34 (22.9%) of the 149 males counted in 2011 in the entire Baker PAC. *See* Becker Decl. Ex. 4; Miller Decl. Ex. 1. The habitat in the Magpie Peak area is indeed "critical" because about one-quarter of the remaining Baker population was using it. AR_16753.

Two leks east of Baker City—Virtue #2 and Ridgeline—also lie within four miles of the Project route, and are shown on the Bureau's May 2014 map. AR_83393; *see* Miller Decl. Ex. 1. The 2010 and 2011 counts at these leks were: Virtue #2 (21, 18); Ridgeline (14, not surveyed).

Becker Decl. Ex 4. Together, the active leks within four miles of the Project route accounted for 51.9% of all males counted in the Baker PAC in 2010 and 34.9% of all males counted in the Baker PAC in 2011. *Id*. These facts are not disclosed or analyzed in the DEIS and FEIS.

Nor do the DEIS and FEIS disclose the location of critical winter habitat and where the B2H Project would pass through it, although this information likewise was available to the Bureau. ODFW in 2011 mapped winter habitat, with the Baker population's winter habitat concentrated along the southwestern and western edges of the Core Areas, *see* AR_129770, precisely the area that the B2H Project will affect. *See* AR_19274; Becker Decl. Ex. 2.

### 4.   *The FEIS's discussion of sage-grouse impacts and the 2015 ARMPA.*

The FEIS describes only how many miles of habitat designated as PHMA or GHMA each route alternative would cross, and the number of leks at various distances from the line—without information about the number of birds attending those leks. AR_170804–05, 170814, 170818. The route selected through this population was the "Flagstaff B – Burnt River West Alternative." AR_169993, 156509. This route "would have long-term high and moderate residual impacts" on sage-grouse. AR_170899. Specifically, "[p]ermanent high residual impacts would occur where PHMA is crossed as permanent loss of PHMA and other impacts could result in population-level effects," while "[l]ong-term moderate residual impacts would occur where GHMA is crossed because impacts would have adverse effects on [sage-grouse], but would not reduce population viability." *Id*. The FEIS never explains what "population-level effects" means. The FEIS lists "direct effects" as 309 acres of PHMA and 314 acres of GHMA disturbed, AR_170894, and that "indirect effects on [sage-grouse] would be anticipated within a 3.1-mile buffer around the route centerline" and "[i]mpacts also would be expected on leks present within the 3.1-mile buffer." AR_170899–900; *see* AR_170818 (table of number of leks within 3.1 miles of alternatives).

Also, the 165-bird population count in 2015 triggered the adaptive management hard trigger in the Oregon Greater Sage Grouse Approved Resource Management Plan Amendments ("ARMPA") "which requires that more restrictive management actions are taken to stop a severe deviation from [sage-grouse] conservation objectives." AR_170813. One hard-trigger response is to "[m]ake PHMA exclusion areas for new ROW authorizations." AR_175986. This would prohibit *any* ROW for the B2H Project through PHMA. However, because the B2H Project's NEPA process began before ARMPA amended the Oregon RMPs, B2H is exempt from the ARMPA. AR_170019–20. But, because of this exemption, the Bureau required that any compensatory mitigation for the B2H Project must "demonstrate a net conservation gain." AR_170020, 175670. The Project's "high residual impacts" also obligate the Project "to achieve a net conservation gain for Greater Sage-Grouse through compensatory mitigation." AR_170908.

Finally, the FEIS does not disclose the serious effects that livestock grazing has on sage-grouse and their habitat or evaluate it as a cumulative impact of the B2H Project. *See* AR_172560–62, 66–69, 73–76, 80–82, 87–89 (cumulative impacts discussions for sage-grouse); AR_171305 (B2H Project intersects 106,885 acres of grazing allotments in Segment 3, where Baker PAC is located), 171310 (Project intersects 177,979 acres of allotments in Segment 4).

### 5. *Significant new information regarding the Baker population.*

New information relevant to the Project's effects to sage-grouse has become available since the FEIS issued.[11] The FEIS offers no information about the status of sage-grouse across Oregon, *see* AR_170780–83, 170812–20, 170826–30, 170834–35, but recent data shows these populations are crashing: only an estimated 13,827 individuals remained in Oregon in 2019 after

---

[11] Plaintiffs submitted new information about sage-grouse and other issues to the Bureau in October 2019, but received no response. *See* Becker Decl. Ex. 6.

three straight years of declines—the lowest figure in the 1980–2019 analysis period. Braun Decl.

¶ 17 & Ex. 2 at 15. The statewide population decreased 24.9% from 2018 to 2019 alone. *Id*. The

Baker population now accounts for 3.9% of the statewide total. *Id*. ¶ 18 & Ex. 2 at 17.

More recent lek count data show that the number of active leks in the Baker population

dropped to only seven (out of 34) in 2018. Braun Decl. ¶¶ 22–23 & Ex. 3. The 2018 ODFW data

that Dr. Braun reviewed included a lek—Guzzler #2—that was not on the 2014 spreadsheet the

Bureau relied on (at AR_131922–46), but is within four miles of the B2H Project route in the

Magpie Peak area. Braun Decl. ¶ 22 & Ex. 4; Miller Decl. Ex. 3. Five males attended this lek in

2018, and seven in 2017, and the Big Creek lek closest to Magpie Peak hosted 24 males in 2018

and 27 in 2017. Braun Decl. ¶ 23 & Exs. 3, 4; Miller Decl. Ex. 3. The total male counts for all

Baker PAC leks in those years, according to the ODFW lek count spreadsheet, were 92 in 2018

and 102 in 2017. *Id*. Thus the two Magpie Peak-area leks still active in 2018 hosted 31.5% and

33.3% of all birds counted in the entire Baker population in those two years, respectively. *See id*.

When the Virtue #2 lek is added (16 males in 2018 and 14 in 2017), the three active leks within

four miles of the transmission line accounted for 48.9% of all males counted in 2018 and 47.1%

of all males counted in 2017—nearly half the remaining Baker sage-grouse population. *See id*.

Dr. Braun also describes that the most comprehensive study of responses of sage-grouse

to transmission lines was published in 2018 (Gibson *et al*.). Braun Decl. ¶¶ 27–32 & Ex. 5. This

study focused on ten years of observation of sage-grouse impacts from a 299 km (185.8 mile)-

long transmission line in Nevada and summarized available science, concluding that indirect

effects on sage-grouse, including reduced nest survival, extended up to 12.5 km [7.7 miles] from

the transmission line, primarily because of predation from ravens. *Id*. Ex. 5 at 1, 17, 22, 28.

Gibson *et al*. recommends that agencies "assume at least a 10-km [6.2 mile] radius of

disturbance" when siting transmission lines— farther than the recommendations in Manier *et al.*
*Id*. at 28. The study described that "the use of perch deterrents on power lines has not been
demonstrated to be consistently effective in reducing common raven predation rates on greater
sage-grouse nests." *Id*. at 1–2. Based on this new information, Dr. Braun concludes that the B2H
Project is likely to lead sage-grouse to abandon the Big Creek, Guzzler #2, and Virtue #2 leks
within ten years, and to the extirpation of the Baker population. Braun Decl. ¶¶ 27–32.

      **B.**      **The B2H Project and the Oregon Trail.**

          **1.**     ***The Trail, Interpretive Center, and the Bureau's management obligations.***

     The B2H transmission line would roughly parallel, and in some places crisscross, the
path of the fabled Oregon Trail. AR_170045, 170047, 171990, 172008, 172026, 172048, 172058
(maps). Originally blazed by Native Americans and further developed by European explorers,
trappers, and immigrants to the Pacific Northwest, the Trail is an iconic historical path marking
the expansion of European settlement in this region. AR 171965, 124214. Congress designated
the Oregon Trail as a National Historic Trail in 1978 by amending the National Trails System
Act ("NTSA"), 16 U.S.C. §§ 1241–51. AR_124214. Only about 15% of the 2,170 miles of the
Trail's primary route are still visible as a wagon road, of which about 44 miles are visible in
Oregon along various segments. AR_124216. The National Park Service defines the primary
purpose of the National Historic Oregon Trail as "to identify, preserve, and interpret the sites,
route, and history of the Oregon Trail for all people to experience and understand." AR_171966.

     The Bureau manages the Interpretive Center on Flagstaff Hill near Baker City, which had
recorded nearly two million visitors as of 2009, including 66,000 in that year alone. AR_171420.
The Interpretive Center includes a visitor center and four miles of interpretive trails that allow
tourists to view and walk along preserved segments of the historic Trail. *See id*.; *see also* Becker

Decl. Ex. 5 (Interpretive Center map from Bureau's website). Its mission includes "preserving and protecting its historic, cultural heritage, natural, and visual features." AR_171420.

The Baker Field Office also manages 10 parcels of public land as the Oregon Trail Area of Critical Environmental Concern ("ACEC") "to protect the historic, cultural, and scenic values associated with the Oregon [Trail]." AR_171967. The Baker RMP provides that "[i]ntact portions of the Oregon Trail will be managed for public values, with restrictions to preserve the historic resource." AR_97179. The NTSA, which governs the Bureau's management of the Oregon Trail, provides that "[o]ther uses along the trail, which will not substantially interfere with the nature and purposes of the trail, may be permitted," but "efforts shall be made to avoid activities incompatible with the purposes for which such trails were established." 16 U.S.C. § 1246(c). Easements granted over (or under) a National Historic Trail "shall be related to the policy and purpose" of the NSTA. *Id.* § 1248(a). The Bureau's guidance (Management Manual 6280) echoes that the agency "may not permit proposed uses along National Trails which will substantially interfere with the nature and purposes of the trail." AR_171960.

### 2. *The B2H Project would seriously degrade views and enjoyment of the Trail.*

Notwithstanding the NSTA and its guidance requiring the Bureau to protect the historic and scenic values of the Oregon Trail and the Interpretive Center and not permit uses that would substantially interfere with the nature and purposes of the Oregon Trail, the Selected Alternative would have "high residual impacts" on Trail management and scenic resources. AR_172155, 172195, 172206. These impacts would affect 9.0 miles in Segment 3 at the Interpretive Center and two units of the Oregon Trail ACEC, AR_170316, and 15.1 miles in Segment 4 at the Birch Creek portion of the ACEC. AR_170324–25. The B2H Project would be "incompatible with . . . the intended experience of the trail," "visually dominat[ing]," and "incongruent with existing

landscape or historic features," and would "substantially compromise[]" recreational

opportunities. AR_171981; *see, e.g.*, AR_173600, 173606, 173614, 173626 (visual simulations).

The Project would be only 500 feet from the Interpretive Center's Panorama Point, filling

the field of vision of hikers visiting the historic wagon ruts, with a tower directly atop the Oregon

Trail less than 200 feet outside the Interpretive Center's grounds. AR_12873, 159396, 172169.[12]

### 3.   *The Bureau rejected an alternative to bury the line near the Interpretive Center.*

Even as the first commenters in 2008 asked the Bureau to bury the line for a short

distance near the Interpretive Center, *e.g.*, AR_11632, 62711, the agency was providing direction

to the Cooperating Agencies about the NEPA process in late 2008/early 2009, with specific

guidance on alternative development that categorically prohibited such an alternative from being

considered. AR_52863, 93500. The guidance stated that "[r]easonable alternatives include those

that are practical or feasible from the technical and economic standpoint and use common sense,

rather than are simply desirable from the standpoint of the applicant," but specified that "the

following criteria will be used to determine route alternatives that are not reasonable and don't

require analysis: . . . The route alternative is not feasible from a common sense standpoint (e.g. *it

would require some* or all *of the transmission line to be buried*)." AR_93500 (underlining

original, italics added). Without analysis or explanation, the Bureau decreed that burying even

"some" of the transmission line was "not reasonable" and contrary to "common sense."

The predetermined decision not to study a short underground section near the Interpretive

Center also was clear at early scoping meetings: a comment in 2010 noted that "[a]t the local

---

[12] The only photo simulation from Panorama Point is highly misleading: it shows the line four
times farther away than it actually would be, with the Project's towers beyond the existing line,
whereas the B2H line will run closer to Panorama Point than the existing line. *See* AR_12873,
159396, 157670, 172169, 173606; *see also* AR_173664 (simulation from visitor's center using
misleading wide-angle view and showing B2H Project towers farther away than existing line).

meetings, the use of underground wires has been repeatedly suggested, particularly in the area of the Interpretive Center," but Idaho Power told the public "that it was not a possibility because electricity run underground for long distances becomes uncontrollable." AR_67320.

As the NEPA process unfolded, the developer and agency sought to backfill the decision already made. In April 2013, in response to questions from the Bureau about ways to minimize visual impacts to the Interpretive Center from B2H Project, Idaho Power offered excuses for why it would not consider burying the line, none of which cites to any source. AR_134844–45. But even Idaho Power conceded that burial of the 500 kV line for less than five miles is operationally practical, and admitted that "undergrounding the transmission line is theoretically feasible"—but declared it was "not comfortable with or willing to entertain this option," citing an $80 million per mile cost of an underground project in California that had been buried underneath two major roads and a shopping center. AR_134845; *see* AR_20679–80. There is no evidence that the Bureau independently verified the potential cost of burying the line near the Interpretive Center.

The Bureau's discussions of burying the transmission line in the DEIS and FEIS both focus on the straw man of burying the entire 300-mile transmission line. *See* AR_16473; 170206–08. In the December 2014 DEIS, the Bureau cited a single source to claim that burying an entire transmission line "can be nearly 15 times the cost per mile for an aboveground line of the same capacity." AR_16473. However, a USFWS scientist commented on an internal draft that "[e]conomic costs of short sections of above ground vs. buried transmission lines may be more similar than disclosed," because the "basis for estimating costs comes from a single citation that estimated cost for burying dozens of miles of transmission line . . . and this lengthy example may not be applicable to short reaches of below ground construction costs in eastern Oregon." AR_14280. In passive voice, the DEIS states "no segments of the transmission line have been

identified where burying would be feasible." AR_16473. However, the Bureau had Idaho

Power's letter stating that burying a short section *would* be feasible, and there is no evidence in

the record showing that the Bureau actually tried to identify any segments for potential burial.

Many comments on the DEIS urged the Bureau to fully develop and study the alternative

of burying the line near the Interpretive Center. *See, e.g.*, AR_19699, 19798, 20679–80, 20697,

20814, 21078. Before the FEIS, Idaho Power supplied the Bureau with a list of "[r]easons for not

using underground transmission lines for the B2H Project." AR_155525–27. The FEIS simply

parrots many of the talking points Idaho Power had supplied, again asserting that the cost to bury

"a transmission line" can be 10 to 15 times greater than an overhead line. *Compare* AR 170206–

08 *with* AR_134844–45 *and* AR_155525–27; *see* AR_170208. The FEIS again claims that "no

segments of the proposed transmission line have been identified where burying the transmission

line would be justified," but there is no evidence that the Bureau actually conducted such

inquiry. AR_170208. The FEIS concedes that burying a segment of up to 3.5 miles *is* feasible,

citing the one built in Chino Hills, California. AR_170206. One of the three references cited—a

2010 Everglades National Park 500 kV Underground Study—confirms that buried "installations

up to 10 miles in length . . . are underway *proving the electric utility industry accepts the fact

that 500kV circuits can be satisfactorily installed in an underground system*." AR_182342

(emphasis added). This study shows that—as of 2010—"[s]ince 1990 the cost premium for

Underground vs Overhead has dropped from 25X to 7X on a foot by foot comparison." *Id.*

The cost estimate of the B2H Project is about $950,000,000, or roughly $3.264 million

per mile. AR_134254. A seven-times premium for a roughly two-mile buried segment would add

roughly four or five percent to the cost of B2H. The Bureau knew this, yet chose to highlight a

higher cost at the behest of the developer while refusing to conduct any cost-benefit analysis of

the preservation of the priceless viewshed and visitor experience at the Interpretive Center.

    **4.**   *Significant new information shows undergrounding is more feasible and less costly than Idaho Power and the Bureau stated.*

Since 2017, there have been many additional examples of burying 500 kV transmission lines for short segments and even their full length. Plaintiffs supplied some of these to the Bureau in October 2019, *see* Becker Decl. Ex. 6 at 7–9, 92–94, 178–94, and additional examples of projects and industry publications show that the feasibility and reliability of burying segments of transmission lines has increased as costs have decreased. *See id*. Exs. 7–9. For example, in the Midwest, SOO Green is proposing to bury the full length of a 2,100 MW, 525 kV underground high-voltage direct current transmission line for 350 miles along existing rail corridors from Iowa to Illinois. *Id.* Ex. 7. AEP Transmission prepared a brochure in 2018 indicating that it might cost only five times as much to bury a section of transmission line in a rural area. *Id.* Ex. 9 at 2. The Bureau never considered this new information.

    **C.**    **The B2H Project and the City of La Grande.**

    **1.**   *The Mill Creek Alternative closest to La Grande was not disclosed in the DEIS and the FEIS's discussion of its impacts omits several important factors.*

Early versions of the alternatives in 2010 showed routes passing at least six miles from La Grande, the largest city in Union County. AR_5094, 5913, 5917. The 2014 DEIS offered the public only two routes in this area for consideration and public comment: the Applicant's Proposed Action about four miles west of La Grande, and the Glass Hill Alternative another two miles further west of that. AR_16346. The Glass Hill Alternative had been "developed to address concerns about the Proposed Action's proximity to the Ladd Marsh Wildlife Management Area and visibility concerns from La Grande in Union County." AR_16344.

The Bureau shocked the public in March 2016 by announcing the unevaluated Mill Creek

Alternative as the Preliminary Agency Preferred Alternative, but did not reopen a public comment period for this new alternative. *See* AR_32886, 32888. Near La Grande, the Mill Creek Alternative would parallel and cross an intact segment of the Oregon Trail and pass within a half-mile of the city limits. AR_169953, 12871, 159375–76, 179495 (maps showing Mill Creek Alternative). It would *cross* the Ladd Marsh Wildlife Management Area—which the Glass Hill Alternative was developed to give a wide berth to. AR_12871, 16344, 159379. And it would pass within 1,200 feet of several "noise sensitive receptors," mostly homes. AR_12871.

The Mill Creek Alternative was added in the November 2016 FEIS, with a variation (the "Morgan Lake variation," marked as link 2-48) to the west of the new Alternative. AR_169953 (map). But "[t]he Mill Creek Alternative was not addressed in the Draft EIS." AR_170182. Although the FEIS changed the Agency Preferred Alternative back to Glass Hill, AR_55718, the public again was deprived of a chance to comment. AR_55718 ("Contrary to the protester's comments, the [Bureau] did not tell the public that a comment period would be provided for the FEIS," but rather advised the public that the regulations required no comment period and "no such comment period was provided for this final EIS."). In June 2017, Idaho Power identified the Mill Creek alternative as its "Proposed Route" in its Amended Preliminary Application to EFSC. AR_159373–81. Although the Bureau was on notice of this, *see* AR_28561, the FEIS still showed an "Applicant Proposed Alternative" from 2008—a decade out of date. The DOI ROD in November 2017 then included the Glass Hill route in the Selected Alternative. AR_156509–10.

The lack of public comment opportunity was unfortunate, because the evaluation of this brand-new route in the FEIS is haphazard and cursory. The FEIS devotes a few words to each resource that the Mill Creek Alternative would affect. *See, e.g.*, AR_170235 ("[T]he Mill Creek Alternative would still affect the community, residences, and agriculture."); AR_170289 (9.5

miles of residual high impacts to Oregon Trail, with "[h]igh impacts on views from Blue

Mountains High Potential Route Segment and National Park Service Auto Tour Route").

The discussion of wildlife impacts is negligible. The FEIS mentions that "the Ladd Marsh

Wildlife Area, which encompasses one of the largest remaining wetlands in northeast Oregon

and provides habitat for waterfowl and other birds and wildlife, is crossed by central portions of

the Mill Creek Alternative" and that "Rebarrow Forest, Winn Meadow, and conservation

easements west of Ladd Marsh Wildlife Area provide habitat for elk and other wildlife."

AR_170803. But it notes only that "wildlife habitat on the Ladd Marsh Wildlife Area, as well as

Rebarrow Forest, Winn Meadow, and other lands west of Ladd Marsh Wildlife Area would be

affected by central portions of the routes in Segment 2," without providing any detail, and that

generalized "potential effects" are discussed in another section. AR_170880.

The FEIS never acknowledges that the Mill Creek Alternative would pass within about a

mile of Winn Meadow and Rebarrow Forest, nor the significance of these protected areas. *See*

AR_19938 (map showing these area); 12871. In a letter sent to Idaho Power in January 2012, a

biology professor at Eastern Oregon University ("EOU") described that "[s]tate owned and

managed lands (ODFW), Winn Meadow (Joel Rice), and EOU's Rebarrow Forest comprise a

unique and extremely important wildlife corridor" connecting Ladd Marsh with upland habitat

on Glass Hill. AR_19932. She explains that "[p]rotecting the integrity of the ODFW-Winn

Meadow-Rebarrow corridor should be a high priority among all who know of its value," *id.*, and

adds another twenty pages detailing the biological and ecological significance of this area.

AR_19934–53. Yet the FEIS did not evaluate the significant ecological value of these areas or

what risk is posed by the Mill Creek Alternative. *See* AR_170803, 170880. Nor did it evaluate

the likely harm to migratory waterfowl at Ladd Marsh from a transmission line passing directly

through their habitat, noting merely that collision risk is "potentially higher." *See* AR_170887.

Nor does the FEIS provide visual simulations of the Mill Creek Alternative, although it "would have higher impacts on residences than either the Applicant's Proposed Action Alternative or the Glass Hill Alternative because the Mill Creek Alternative would extend closer to [La Grande] and affect a higher number of residences," some within ½ mile. AR_171628. The Bureau *had* such simulations—it simply did not disclose them to the public. *See* AR_179496–501. Impacts to the important recreational area at Morgan Lake are understated. *See* AR_171432.

Finally, the FEIS contains no information about noise impacts from the Mill Creek Alternative. Its section on noise does not mention Mill Creek, *see* AR_172384–404, and no sensitive noise receptors along this route are listed in the appendix. AR_173738–58; *see* AR_173736 ("audible noise modeling was not updated for sensitive receptors along each alternative route in the Final EIS"). This is problematic because Idaho Power provided a map to the Bureau showing at least 60–70 potential sensitive noise receptors within a mile of the Mill Creek Alternative, many within 1,200 feet. AR_12871. Idaho Power's noise studies for an alternative in adjacent Umatilla County "indicate that NSRs closer than 1,200 feet from the Project centerline will likely exceed the 10 dBA criteria" in the Oregon state anti-degradation regulation, which prohibits new industrial noise increasing by more than 10 dBA above ambient noise levels. AR_12867; *see* AR_12866. Idaho Power righteously added, "[f]rom a public policy perspective, Idaho Power believes that it is untenable to propose locating a 500-kV transmission line within 1,200 feet of so many residences when a viable alternative (the preferred route) exists that would avoid those impacts." AR_12867. The November 2016 FEIS discusses none of this.

## 2. *Significant new information regarding the Mill Creek Alternative.*

Plaintiffs submitted new information to the Bureau in October 2019, advising it that

Idaho Power definitively had asked EFSC to permit the Mill Creek Alternative in its Complete

Application in September 2018 and describing new information regarding harm from this route.

Becker Decl. Ex. 6 at 1, 3–7, 34–37, 46–62, 91–92, 105–110, 127, 135–162, 198–255. In July

2020, EFSC issued the Proposed Order for the B2H Project, not only authorizing the Mill Creek

Alternative (with the Morgan Lake variation), but also granting Idaho Power a variance along the

entire route from the 10 dBA noise anti-degradation standard. *Id.* Ex. 10 at 2–16, 32–38.

## ARGUMENT

### I.    STANDARD OF REVIEW

Under the APA, which governs review of violations of NEPA and FLPMA, a court

"shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law," or adopted "without observance of

procedure required by law." 5 U.S.C. §§ 706(2)(A), (D). The Court must determine if the agency

considered relevant factors and whether it articulated a rational connection between the facts

found and the conclusions it made. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An action is unlawful "if the agency has relied on factors

which Congress has not intended it to consider, entirely failed to consider an important aspect of

the problem, [or] offered an explanation for its decision that runs counter to the evidence before

the agency." *Id.* at 43. An agency's decision may be upheld only on the basis of the reasoning

found in the decision itself. *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997).

Although the APA standard of review is "narrow" and "deferential," it requires the Court

to undertake "an inquiry into the facts [that is] searching and careful." *Sierra Club v. Bosworth*,

510 F.3d 1016, 1022 (9th Cir. 2007) (internal quotation omitted). A court "will defer to an

agency's decision only if it is fully informed and well-considered, and . . . will disapprove of an

agency's decision if it made a clear error of judgment." *Id.* at 1023 (internal quotation marks and citations omitted). Courts afford limited deference to conclusory opinions unsupported by meaningful analysis. *See Guevara v. Holder*, 649 F.3d 1086, 1091 (9th Cir. 2011); *see also Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004) ("NEPA documents are inadequate if they contain only narratives of expert opinions.").

An action based on significant new information or circumstances to compel preparation of an SEIS arises under 5 U.S.C. § 706(1), and review of such claims is not limited to the administrative record. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000). The Ninth Circuit favors Rule 56 summary judgment motions to resolve claims under the APA. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994).

## II.     LEGAL STANDARDS

### A.     National Environmental Policy Act.

NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress declared a policy that the federal government "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," requiring federal agencies to prepare a detailed EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. §§ 4331(b)(2), 4332(2)(C). The purpose of NEPA is twofold: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). An EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

**B.      Federal Land Policy and Management Act.**

FLPMA declares a policy that "the public lands be managed in a manner that will protect

the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water

resource, and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA authorizes the grant of

rights-of-way on public lands for transmission lines. *Id*. § 1761(a)(4). But such grants "shall

contain . . . terms and conditions which will . . . minimize damage to scenic and esthetic values

and fish and wildlife habitat and otherwise protect the environment" and may include ones

deemed necessary to "require location of the right-of-way along a route that will cause least

damage to the environment . . . and . . . otherwise protect the public interest in the lands traversed

by the right-of-way or adjacent thereto." *Id*. §§ 1765(a)(ii), (b)(v)-(vi).

**III.      DEFENDANTS' ANALYSIS OF SAGE-GROUSE IMPACTS VIOLATED NEPA**

**A.      The Bureau Failed to Disclose an Accurate Environmental Baseline and to
Take a Hard Look at the B2H Project's Impacts to the Baker Population.**

Establishing an accurate environmental baseline is a critical part of an EIS. To properly

account for a project's impacts, the agency must first "describe the environment of the area(s) to

be affected or created by the alternatives under consideration." 40 C.F.R § 1502.15. It is against

this baseline information that an agency measures and evaluates impacts. *See Or. Natural Desert*

*Ass'n v. Jewell* ("*ONDA v. Jewell*"), 840 F.3d 562, 568–69 (9th Cir. 2016). "Without

establishing the baseline conditions which exist [in the action area], there is simply no way to

determine what effect [the action] will have on the environment and, consequently, no way to

comply with NEPA." *Half Moon Bay Fishermans' Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir.

1998). Moreover, NEPA's "hard look" obligation "should involve a discussion of adverse

impacts that does not improperly minimize negative side effects." *N. Alaska Envtl. Ctr. v.*

*Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006). The Ninth Circuit has "warned that general

statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification for why an agency could not supply more definitive information." *Or. Natural Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019) (internal quotation marks and citation omitted). The FEIS's analysis of impacts to the Baker population improperly downplays the likely harm to the birds from the Project vis-à-vis inadequate baseline information in five ways.

First, the FEIS offers no explanation for stating two wildly different figures for the Baker population's habitat, first that "the current amount of habitat available to this population is 853,848 acres," and later that the coextensive Baker PAC covers 336,539 acres. AR_170812–13. Including the far larger number confuses the public and understates harm by suggesting that impacts on this population would be minimal due to the small number of acres *directly* affected (309 acres of PHMA)—while offering no data on how many acres will be *indirectly* affected. *See* AR_170894. An inaccurate number in a NEPA analysis shows the agency did not correctly disclose the baseline, take a "hard look" at the project's effects, or inform the public of the likely impacts. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 956 (9th Cir. 2005).

Second, the FEIS failed to disclose baseline information that the Baker population has a high risk of extirpation. The FEIS says only that this "population is more at risk and likely less resilient" than other Oregon populations, and does not explicitly say it is at risk of extirpation. AR_170813. In fact, the Bureau's own biologist pointed out during the DEIS development process that the Baker population had a 61.9% probability of extirpation, twelve times that of any other Oregon population. *Supra* pp. 9–10. The FEIS's failure to disclose *accurate* baseline information about the perilous condition of the Baker population, along with a general statement about "some risk," does not constitute a "hard look" when the agency had available, but failed to disclose, more definitive information. This violates NEPA. *Rose*, 921 F.3d at 1191.

Third, the Bureau violated NEPA by failing to disclose where within the Baker PAC the few remaining birds were actually using habitat, and where such habitat lay in relation to the B2H Project. The FEIS states, incorrectly, that "all birds are believed to be in one general area," AR_170813, and discloses no information at all about how many birds are present at which Baker PAC leks, or which birds would be affected by the B2H Project—even though that information was available to the Bureau. *See supra* pp. 11–12; Miller Decl. Exs. 1–2; Braun Decl. Ex. 3. Although the DEIS calls the habitat near Magpie Peak "the most critical" and the FEIS states that impacts there would be of "a higher magnitude," neither provides accurate baseline information about how many of the few remaining birds used habitat in the Magpie Peak area, or where the area is in relation to the transmission line. *See* AR_16753, 170813. By failing to disclose accurate baseline information to the public about which areas of habitat the 165 remaining birds in the Baker population were using, and their proximity to the "critical" Magpie Peak area, the Bureau improperly minimized the impacts to the population from the B2H Project and violated NEPA. *See ONDA v. Jewell*, 840 F.3d at 568–69 (failure to disclose and evaluate baseline information about sage-grouse at the project site violated NEPA).

Fourth, the Bureau did not disclose how many leks would be indirectly affected by the B2H Project or how many birds used each lek, despite evidence that sage-grouse predators are likely to forage up to an average of 4.3 miles from their perches and nests on the transmission towers, AR_82134, that ravens may range up to 6.8 miles, AR_131125, that the "probability of lek persistence decreased with proximity to power lines and the increasing proportion of power lines in a 4-mile area around leks," AR_170851, and recent research that had found negative trends in counts at leks within 11.2 to 12.4 miles of towers or transmission lines. AR_131125.

The DEIS had considered a five-mile analysis area, AR_16797, while the 2012 Wildlife

Resource Report used a four-mile analysis area, as did the Bureau's 2014 maps. AR_154814, 83393. The FEIS arbitrarily listed only the number of Baker PAC leks within 3.1 miles of the line, with no data on how many birds were using which (if any) of them. AR_170818, 170899–900. Simply stating the number of miles of line within PHMA and the number of leks within 3.1 miles provides no information about the true extent of impacts to the Baker population—and has the dubious effect of excluding the Big Creek, Crews Creek, and Virtue #2 leks, all within four miles of the line, from the analysis. *See* Miller Decl. Ex. 2. The Bureau's failure to disclose this essential information in the DEIS precluded informed and meaningful public comment, *see* AR_19703–04, and its absence from the FEIS precluded the informed decisionmaking NEPA requires. The Bureau here *had* the information—it chose not to disclose it. This violates NEPA. *Cent. Or. LandWatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012).

Finally, the Bureau did not disclose baseline information about sage-grouse winter habitat in relation to the B2H Project. The Baker population's winter habitat is clustered in the western part of the PAC, closest to the Project's route. *See* AR_129770; *supra* p. 12. Sage-grouse depend on specific habitat for their needs during winter. AR_82122. The FEIS does not evaluate the impact of the B2H Project's presence in and adjacent to this winter habitat on the Baker population. "Without appropriate data regarding sage grouse use of the [project] site during the winter . . . it was not possible to begin to assess whether sage grouse would be impacted with regard to access to viable sagebrush habitat in the winter months." *ONDA v. Jewell*, 840 F.3d at 570. The failure to disclose the presence of and effects on winter habitat violates NEPA.

The FEIS's conclusion that "permanent loss of PHMA and other impacts could result in population-level effects" is unintelligible with no explanation of what "population-level effects" mean and without sufficient baseline information about the population's risk of extirpation and

where the B2H Project would affect the habitat that birds were actually using. AR_170899.

> **B.      The Bureau Failed to Evaluate the Effectiveness of Proposed Mitigation.**

As in *ONDA v. Jewell*, "with impacts on sage grouse not properly established, the [Bureau] did not know what impacts to mitigate, or whether the mitigation proposed would be adequate to offset damage to wintering sage grouse." *Id.* at 571. Here, the FEIS fails to consider *at all* whether proposed mitigation is likely to avoid harm and the potential extirpation of the Baker population. Under NEPA, agencies must discuss mitigation measures in "sufficient detail to ensure that environmental consequences have been fairly evaluated," which involves "an assessment of whether the proposed mitigation measures can be effective." *S. Fork Band Council of W. Shoshone v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (quotation omitted). "A mitigation discussion without at least *some* evaluation of effectiveness is useless" in assessing if environmental impacts can be avoided. *Id.* "A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) (quotation omitted).

The mitigation for the B2H Project's effects consists of "design features" and "selective mitigation measures" to minimize harm. AR_169969, 170116–28, 170140–48. Not all apply to sage-grouse. AR_170761; Becker Decl. Ex. 11 (highlighting the applicable ones). Although the FEIS includes columns purporting to evaluate "effectiveness," none of the measures that apply to sage-grouse is evaluated for whether it will be effective in preventing harm from predators, long-term avoidance of the line, and abandonment of nearby leks. *See* AR_170116–28, 170140–48.

Some have nothing to do with mitigating these indirect effects. *See, e.g.*, AR_170118–20 (*e.g.*, environmental training). Ones that might (*e.g.*, preconstruction surveys) do not discuss whether they will effectively mitigate indirect effects of the Project on the Baker population's

long-term survival. AR_170118. Nor do the selective mitigation measures (save one) address

long-term indirect effects to sage-grouse, and the "effectiveness" column's entries only describe

what their purpose is, not whether they will actually mitigate harm. *See* AR_170140–48.

The "perch deterrents" measure "*may* include use of devices to deter raptors from

perching on transmission line structures in habitat for high priority prey species (e.g., sage-

grouse)." AR_170145 (emphasis added). However, their use is not mandatory, and they are not

evaluated in the "effectiveness" column. *Id*. In fact, perch deterrents are *not* effective. *See*

AR_178883–85 ("Corvids and raptors overcame the deterrents by perching directly on them.").

The FEIS concedes that there will be residual effects not mitigated by these design

features and mitigation measures. AR_170147–48. Because it is exempt from the ARMPA and

the PHMA hard-trigger exclusion requirement (although the Selected Alternative will cross 13.2

miles of PHMA for the Baker population, *see* AR_170814), the B2H Project must "achieve a net

conservation gain for Greater Sage-Grouse through compensatory mitigation as described in"

Appendix C. AR_170908. "Compensatory mitigation" means "[m]easures taken to compensate

for impacts by replacing or providing substitute resources or environments." AR_173042.

But Appendix C does not discuss whether compensatory mitigation is likely to be

effective in avoiding effects likely to extirpate the Baker population, or whether Idaho Power

will achieve the required "net conservation gain." *See* AR_173038–85. It is only a framework for

a CMP that "cannot be developed until a route is selected and [Idaho Power] completes final

engineering and design of the route and ancillary facilities." AR_173038. Instead of evaluating

whether mitigation will be effective, Appendix C states that it is "*presumed* to be effective at

reducing potential impacts on an acceptable level." AR_173042 (emphasis added). And the CMP

"also will develop performance standards that will be used to monitor and assess the

effectiveness of compensatory mitigation measures"—conceding that the effectiveness of compensatory mitigation is *not* evaluated in the FEIS or Appendix C. AR_173046.

Simply presuming that mitigation measures will be effective, and deferring evaluation of compensatory mitigation to some future Plan, does not substitute for an evaluation of whether they will be. The absence in the FEIS and Appendix C of any "assessment of whether the proposed mitigation measures can be effective" violates NEPA. *S. Fork Band*, 588 F.3d at 727.

### C.    The Bureau Failed to Analyze Cumulative Impacts from Livestock Grazing.

An FEIS must discuss and analyze cumulative impacts.[13] 40 C.F.R. §§ 1502.16, 1508.8, 1508.25; *see Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016). For a lawful analysis, "some quantified or detailed information is required. Without such information, neither the courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." *Neighbors of Cuddy Mountain*, 137 F.3d at 1379.

The FEIS does not consider the cumulative impacts from livestock grazing on sage-grouse that are seriously threatened by the B2H Project. *See* AR_172560–62, 66–69, 73–76, 80–82, 87–89. The Bureau had before it public comments and scientific documents about the harm that grazing causes to sage-grouse. *See, e.g.*, AR_19884–914, 82139, 82142–48, 126892, 182303. It even recognized that grazing is a "threat" to sage-grouse. AR_170746. This Court has found that livestock grazing likely harms sage-grouse and their habitat in numerous ways. *See, e.g.*, *W. Watersheds Proj. v. Bernhardt*, 392 F. Supp. 3d 1225, 1242–43, 1255–56 (D. Or. 2019).

The "Cumulative Effects" section of the FEIS identifies grazing among the "existing agricultural operations" in the cumulative impact analysis area. AR_172411, 172420. It then

---

[13] A cumulative impact "is the impact on the environment which results from the incremental impact of the [proposed] action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

evaluates the cumulative effects *on* grazing from the B2H Project and other actions. *See, e.g.*, AR_172644–45, 172654–56, 172661–62. However, grazing is not listed as a past, present, or reasonably foreseeable future action for sage-grouse. AR 172566–67, 70, 74, 81, 88–89.

Here, defendants violated NEPA by not discussing the cumulative effects of livestock grazing on sage-grouse at all. "In a cumulative impact analysis, an agency must take a 'hard look' at *all* actions that may combine with the action under consideration to affect the environment." *Great Basin*, 844 F.3d at 1104 (emphasis original, internal quotation marks and quotation omitted). Grazing "is likely to cause destruction of sage-grouse habitat," including by disturbing nests, causing nesting females to flush, and revealing eggs to predators. *W. Watersheds*, 392 F. Supp. 3d at 1255. In Segments 3 and 4 (where the B2H Project affects the Baker and Cow Valley PACs), the Selected Alternative will cross through 106,885 acres and 178,066 acres of grazing allotments. AR_171305, 171310, 19249 (map of route/allotment intersection). The omission of any discussion about how the widespread and detrimental impacts of grazing would combine with impacts from the transmission line—both of which lead to predation and habitat fragmentation—violates NEPA. *Great Basin*, 844 F.3d at 1104–06.

### D.    Significant New Information Regarding Sage-Grouse Requires an SEIS.

A federal agency must supplement its FEIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," 40 C.F.R. § 1502.9(c)(1)(ii). It "cannot simply rest on the original [EIS]. The agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a 'hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval.'" *Friends of the Clearwater*, 222 F.3d at 557 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1999)).

The FEIS offers no information about the status of the Oregon sage-grouse population, although public comments had alerted the Bureau about the perilous decline of the statewide and Baker populations. The most recent data show that the Oregon population has declined each year since 2016, with a 24.9% decline from 2018 to 2019 alone, to only about 13,827 individual birds—the lowest since ODFW began evaluating the population in 1980, and less than half the 2003 population baseline. Braun Decl. ¶ 17 & Ex. 2 at 15. The Baker population is now 3.9% of the state total, but with the overall precarious state of sage-grouse in Oregon, this population's extirpation could lead to an Endangered Species Act listing for the species. *Id.* ¶¶ 11, 21, 31.

Significant new information about active leks in the Baker PAC is also available based on more recent lek counts than considered in the FEIS. The 2018 ODFW data shows that 48.9% of the 92 remaining males of the Baker population attended the Big Creek, Guzzler #2, and Virtue #2 leks, within four miles of the B2H Project. *Id.* ¶¶ 22–23 & Exs. 3, 4; Miller Decl. Ex. 3; *supra* p. 14. For four straight years, the Baker population has been below the "hard" ARMPA trigger of 170 males that should require ROW exclusion from PHMA, with only 103 males counted in 2019. AR_156440. Also, the 2018 Gibson *et al.* study provides significant new scientific evidence that transmission line effects harmful to sage-grouse can extend up to 7.7 miles from the lines, and that perch deterrents are not effective. Braun Decl. ¶¶ 27–28 & Ex. 5 at 1–2. This new information shows that the Project is likely to lead sage-grouse to abandon the Magpie Peak-area leks (and Virtue #2) and to the extirpation of the Baker population. *See* Braun Decl. ¶¶ 27–32. The new information about the birds' concentration near the B2H Project's route and confirmation that effects from foraging predators and avoidance extends up to 7.7 miles from the line warrants preparation of an SEIS. *Bundorf v. Jewell*, 142 F. Supp. 3d 1138, 1150–51 (D. Nev. 2015) (new data on prevalence of golden eagles and their foraging distances warranted SEIS).

IV.    **DEFENDANTS VIOLATED NEPA WITH RESPECT TO THE OREGON TRAIL**

A.    **The Bureau Violated NEPA by Failing to Develop and Study an Alternative for Burying the Line Near the Interpretive Center.**

NEPA requires the Bureau to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Whether to bury the B2H Project line near the Interpretive Center was such a conflict, further triggering the Bureau's obligation to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The Bureau violated NEPA by failing to develop and study in detail the alternative of burying the line underground for a short, two-mile section in the viewshed of the Oregon Trail Interpretive Center, despite recognizing that such an option was technologically feasible and that, indeed, a 3.5-mile, 500 kV line had been buried in Chino Hills, California.

The "existence of a viable but unexamined alternative renders an [EIS] inadequate." *W. Watersheds Proj. v. Abbey*, 719 F.3d 1035, 1052 (9th Cir. 2013). An agency must consider feasible alternatives that "might operate in a more friendly way toward the protected objects" the agency manages, *id.*, or are "more consistent with its basic policy objectives than the alternatives [considered]." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir 1999).

Burying the line for two miles to preserve the viewshed and experience for visitors to the Interpretive Center who walk among the wagon ruts, imagining the travails of immigrants to the Oregon Territory, almost certainly would "operate in a more friendly way" towards the Oregon Trail and the Bureau's Interpretive Center. Towers up to 165 feet tall would mar the viewshed, including a tower that would sit nearly atop the Trail route just outside the Interpretive Center. *See* AR_2131, 159396, 173606, 173664. The Bureau's visual simulations misleadingly and incorrectly show the B2H towers smaller and farther from the Interpretive Center than they

would actually appear, understating the impact for the public and decisionmaker. *Supra* at p. 17 n.12; *see Animal Def. Council v. Hodel*, 840 F.2d 1432, 1439 (9th Cir. 1988) (incomplete and misleading information that prevents informed comparison of alternatives violates NEPA).

Certainly, the advocates for burying this short section—like the Oregon-California Trails Association, of which plaintiff Carbiener is an officer—believe it would be more protective of the Trail. *See* AR_19699, 19798, 20679–80, 20697, 20814, 21078–79. Burying this section also is more consistent with the Bureau's duty under the Baker RMP to manage the Oregon Trail "for public values, with restrictions to preserve historic resources," AR_97179, and under the NSTA to avoid projects that "substantially interfere" with the nature of the Trail and "to avoid activities incompatible with the purposes for which such trails were established." 16 U.S.C. § 1246(c). Burying this section also better aligns with the Interpretive Center's mission of "preserving and protecting its historic, cultural heritage, natural, and visual features." AR_171420. Burial of the line near the Interpretive Center is more consistent with the Bureau's policy objectives for the Oregon Trail, and thus it should have been studied in detail. *Muckleshoot*, 177 F.3d 800 at 813.

### 1. *The rationale for not evaluating burial of the line near the Interpretive Center is unsupported by evidence and based on a predetermined decision.*

The Bureau declared, at the outset of the NEPA process, even before development of alternatives began, that it would not consider an alternative of burying *any* portion of the transmission line, and deemed such alternative categorically "not reasonable," AR_93500—even though the contemporaneous 2010 Everglades 500 kV study cited planned projects with up to 10 miles of buried 500 kV circuits. AR_182342. The Bureau's predetermination not to consider burying even short portions of the line violated NEPA: an EIS "shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." 40 C.F.R. § 1502.2(g); *see id*. § 1506.1(a) (actions that would "[l]imit the choice

of reasonable alternatives" prohibited); *see also Metcalf v. Daley*, 214 F.3d 1135, 1143–44 (9th

Cir. 2000) (committing to a course of action before preparing NEPA analysis violates NEPA).

Idaho Power also polluted the process by declaring, before the DEIS was issued, that it

was "not comfortable with or willing to entertain this option," and also submitting a list of

"[r]easons for not using underground transmission lines for the B2H Project." AR_134845,

155525–27. However, as the Bureau itself nearly recognized, reasonable alternatives are not

those that are "simply desirable from the standpoint of the applicant," yet it bowed to the

developer's wishes. AR_93500; *see Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 669

(7th Cir. 1997) ("An agency cannot restrict its analysis to those alternative means by which a

particular applicant can reach *his* goals.") (emphasis original, internal quotation marks omitted).

Whatever their origin, the DEIS and FEIS justifications for not developing and studying

the burial of a short section near the Interpretive Center are unsupported by any evidence, offer

no proof that the Bureau independently verified the excuses proffered by Idaho Power, and

actually run contrary to one of the sources cited. The DEIS cited only one source—for the

alleged high cost of burying an entire transmission line—but the USFWS noted that it "may not

be applicable to short reaches of below ground construction costs in eastern Oregon."

AR_16473, 14280. The FEIS and Idaho Power concede it *is* feasible to bury a 500 kV

transmission line for up to 3.5 miles. AR_170206, 134845; *supra* pp. 18–20. The rest of the

FEIS's pretextual justification for not studying a partial-burial alternative relies on unsupported

narrative assertions that were largely supplied by Idaho Power. AR_170206–08; *see supra* pp.

18–19. There is no evidence the Bureau complied with its obligation to "independently evaluate

the information submitted and . . . be responsible for its accuracy." 40 C.F.R. § 1506.5(a).

The FEIS's rationale is largely aimed at the straw man of burying the entire 300-mile

line, not a short section. *See* AR_170206–08. The 2010 Everglades study shows that burial of a

two-mile section near the Interpretive Center might add no more than 5% to the nearly $1 billion

cost of the B2H Project. *See supra* p. 20. Because the rationale offered for "rejecting" the

alternative of burying a short section of the line near the Interpretive Center runs contrary to the

facts in the record, and contains only an unsupported (and not independently verified) narrative,

it cannot support the decision to not evaluate this alternative. *Klamath Siskiyou*, 387 F.3d at 996.

### 2. *Significant new information confirms that burying a short section is feasible.*

New information since the FEIS shows that there have been many additional examples of

500 kV transmission lines buried for short segments, and that feasibility and reliability have

increased as costs have decreased. *See* Becker Decl. Ex. 6 at 7–9, 92–94, 178–94 (supplied to the

Bureau in October 2019), Exs. 7–9; *supra* p. 20. The Bureau must consider and evaluate new

information about the feasibility and reliability of transmission line burial, even after the initial

approval of a project. *Friends of the Clearwater*, 222 F.3d at 558. The new information "may

alter the results of [the] original environmental analysis," *id.* at 557, and thus warrants

preparation of an SEIS to develop, study, and fully and fairly evaluate the alternative of burying

a roughly two-mile section of the B2H Project to preserve the Interpretive Center's viewshed.

### B. The Bureau did not Evaluate the Effectiveness of Proposed Mitigation.

As for the sage-grouse, the FEIS includes design features and selective mitigation

measures to minimize impacts to the Oregon Trail. AR_170116–28; 170140–48, 171984–87,

173074–77. These state the mitigation measures' goals, but do not evaluate whether they actually

would be effective in avoiding the disastrous "high" impacts that would "substantially . . .

interfere with, or be incompatible with, the intended experience of the trail" and "be incongruent

with existing landscape or historic features" and "visually dominate high-quality, diverse, and

rare or unique scenery." AR_171981; *see* AR_171984–87, 170116–28; 170140–48.

In fact, the FEIS admits that "[w]ithout successful implementation of compensatory mitigation measures to offset these high residual impacts, the B2H Project would substantially interfere with the trail's nature and purpose." AR_172155, 172195, 172206. But the CMP does not evaluate whether it would be effective at avoiding impacts to the Oregon Trail, or whether it will be effective at doing what the Plan requires: to "achieve a no net loss outcome for affected qualifying resources and their values, services, and functions, or, as required or appropriate, a net benefit or net gain in outcomes." AR_173043; *see* AR_173074–77. The Bureau merely offers the conclusory (and confusing) statement, devoid of any supporting evidence, that the CMP "will identify . . . the level of compensatory mitigation identified to be commensurate with the adverse impacts identified in the Final EIS." AR_173076. Because the discussion of design features, mitigation measures, and compensatory mitigation does not evaluate whether mitigation would be effective in avoiding impacts or achieving "no net loss" to the irreplaceable scenic and historic values of the Oregon Trail, the FEIS violates NEPA. *S. Fork Band*, 588 F.3d at 727.

## V.    DEFENDANTS VIOLATED NEPA BY NOT PREPARING SUPPLEMENTAL ANALYSIS ON THE MILL CREEK ALTERNATIVE.

### A.    NEPA Required the Bureau to Issue a Supplemental DEIS for Comments.

The Mill Creek Alternative (and the Morgan Lake variation) were significant new circumstances relevant to environmental concerns bearing on the impacts of the proposed B2H Project, obligating the Bureau to prepare a Supplemental DEIS for public comment before proceeding to the FEIS. 40 C.F.R. §§ 1502.9(c)(1)(ii), (c)(4). The public—particularly in and near La Grande—was deprived of the opportunity to comment on the significant new, threatening, and controversial Mill Creek Alternative. The Mill Creek Alternative would have unique and serious impacts on the Ladd Marsh Wildlife Management Area, Winn Meadows, and

EOU's Rebarrow Forest, yet these are barely mentioned in the FEIS because the public could not comment on them. *See supra* pp. 22–23. Visual, noise, and recreational impacts are far greater and affect more people along the Mill Creek Alternative than the others. *See id*. Before the Bureau announced this new alternative as the Preliminary Agency Preferred Alternative, and "evaluated" the route in the FEIS, it had a duty under NEPA to issue a Supplemental DEIS. Once the Bureau *knew* Idaho Power had made this its Proposed Route in its EFSC Application, *supra* p. 22, it should have done so before issuing the DOI ROD. The failure to do so violated NEPA.

### B.   The FEIS Failed to Take a Hard Look at the Impacts to the Human Environment From the Mill Creek Alternative and its Variation.

The Bureau's failure to address noise impacts along the Mill Creek Alternative is egregious because Idaho Power provided a map showing many potential sensitive noise receptors within 1,200 feet of the new route. AR_12871. Yet the Bureau did not update its noise modeling for sensitive receptors along the new routes added in the FEIS, AR_173736, and the FEIS does not disclose or evaluate the significance of these noise impacts to the people of La Grande who live, work, and recreate in proximity to this route. *See* AR_173736–59; *supra* p. 24. By not evaluating noise impacts along the Mill Creek Alternative, the Bureau failed to take a "hard look" and violated NEPA. *See Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002) ("hard look" requires analysis of all foreseeable direct, indirect, and cumulative impacts).

The Bureau also failed to disclose and evaluate likely harm to protected areas like Ladd Marsh, Winn Meadow, and EOU's Rebarrow Forest from the Mill Creek Alternative, merely noting that these areas could suffer "potential effects." AR_170880; *see* AR_170803, 19932–53. There is also no analysis of harm to migratory waterfowl at Ladd Marsh, just a note that collision risk is "potentially higher." AR_170887. Visual impacts are "higher," but no simulations are provided. AR_171628. These amount to "general statements about 'possible' effects and 'some

risk' [that] do not constitute a 'hard look' absent a justification for why an agency could not supply more definitive information" that violate NEPA. *Rose*, 921 F.3d at 1191.

C.      **Significant New Information Requires Preparation of a SEIS.**

Plaintiffs supplied information to the Bureau in October 2019 confirming that Idaho Power's Completed Application was seeking EFSC approval of the Mill Creek Alternative, along with other information showing that route posed a greater threat to people and the environment than disclosed in the FEIS. *Supra* at p. 24. EFSC has now issued a Proposed Order authorizing the Mill Creek route (or Morgan Lake variation), and a variance from the Oregon noise anti-degradation standard that will allow the line to be permitted within earshot of homes near La Grande. *Id*. Becker Decl. Ex. 10 at 2–16, 32–38. The federal decisionmaker did not have this information when she approved the DOI ROD, and made an uninformed decision based on information never disclosed for public comment, thereby "'frustrating NEPA's goal of allowing the public the opportunity to play a role in the decisionmaking process.'" *Rose*, 921 F.3d at 1191 n.4 (quoting *Great Basin*, 844 F.3d at 1104). Idaho Power's definitive choice of the improperly-evaluated Mill Creek Alternative, and the approved noise variance (a factor the Bureau did not even consider for the new route), are "significant new circumstances" relevant to environmental concerns that obligate the Bureau to prepare a Supplemental FEIS. 40 C.F.R. § 1502.9(c)(1)(ii).

VI.     **DEFENDANTS VIOLATED FLPMA BY FAILING TO INCLUDE PROTECTIVE TERMS, CONDITIONS, AND STIPULATIONS IN THE RIGHTS-OF-WAY.**

As described above, the Bureau failed, in the NEPA process, to inform itself of the magnitude of the threats to the Baker sage-grouse population and to the people of La Grande from the Mill Creek Alternative; declined to develop and study a feasible alternative to bury a short section of the B2H Project to preserve the historic viewshed of the Oregon Trail Interpretive Center; and did not evaluate whether these threats could be effectively mitigated.

Because the Bureau decisionmakers lacked this fundamental information about potential damage to wildlife habitat and scenic values, and how such damage might be minimized, the rights-of-way issued by the Bureau do not contain obligatory terms and conditions that would minimize such damage. 43 U.S.C. § 1765(a)(ii); *see* AR_156448, 156471, 156486–494; *see also Montana v. Johnson*, 738 F.2d 1074, 1080 (9th Cir. 1984) (FLPMA Section 505 is judicially enforceable).

For example, given that the Bureau determined the Mill Creek Alternative would have more severe impacts to Ladd Marsh and the La Grande viewshed, it should have included a condition on the ROWs over public lands that the public lands could only be used if this route was avoided. To minimize damage to, and the likely extirpation of, the Baker sage-grouse population, the Bureau should have included a condition protective of sage-grouse, for example the avoidance of an area at least four, and possibly more, miles from active leks, in the ROWs.

FLPMA also requires the Bureau to make a determination whether to include conditions requiring the ROWs be located so as to cause the least damage to the environment and otherwise protect the public interest, both on federal public lands and adjacent private lands. *Id.* § 1765 (b)(v)-(vi). There is no indication that the Bureau or DOI considered conditioning the grant of the federal ROW upon the location of the route to do the least damage to the Baker sage-grouse population, the Oregon Trail Interpretive Center, or the people and environment near La Grande. The absence of conditions that minimize damage to scenic and aesthetic values and wildlife, and the failure to make a determination whether to include conditions to protect the public interest in the rights-of-way violates FLPMA. *Id.* §§ 1765(a)(ii), (b)(v)-(vi).

## **CONCLUSION**

For these reasons, plaintiffs respectfully request that this Court grant their motion and hold unlawful and vacate the DOI ROD, FEIS, and the Bureau's rights-of-way grants.

Respectfully submitted this 3rd of September 2020.

   s/ David H. Becker
**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC


   s/ Maura C. Fahey
**Maura C. Fahey (OSB # 133549)**
Crag Law Center


   s/ Oliver J. H. Stiefel
**Oliver J. H. Stiefel (OSB # 135436)**
Crag Law Center

Attorneys for Plaintiffs Stop B2H Coalition,
Jim Kreider, Carol "Fuji" Kreider, Gail
Carbiener, and Greater Hells Canyon
Council