Beth S. Ginsberg, OSB No. 070890
beth.ginsberg@stoel.com
James C. Feldman, *pro hac vice*
james.feldman@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone:   206.624.0900
Facsimile:    206.386.7500

*Attorneys for Intervenor-Defendants*
*Idaho Power Company and PacifiCorp*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| STOP B2H COALITION, an Oregon non-profit corporation, GREATER HELLS CANYON COUNCIL, an Oregon non-profit corporation, CAROL "FUJI" KREIDER, an individual, JIM KREIDER, an individual, and GAIL CARBIENER, an individual, | Case No.:  2:19-cv-01822-SI |
| Plaintiffs, | |
| v. | IDAHO POWER COMPANY AND PACIFICORP'S CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT |
| BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF THE INTERIOR, JOSE LINARES, State Director (Acting), BLM Oregon/Washington, U.S. FOREST SERVICE, and TOM MONTOYA, Forest Supervisor, Wallowa-Whitman National Forest, | REQUEST FOR ORAL ARGUMENT |
| Defendants, | |
| and | |
| IDAHO POWER CO. and PACIFICORP, | |
| Intervenor-Defendants. | |

# MOTION

Pursuant to Fed. R. Civ. P. 56 and LR 56-1, Intervenor-Defendants Idaho Power Company ("Idaho Power") and PacifiCorp (together, "the Utilities") respectfully cross-move for summary judgment.  Plaintiffs Stop B2H Coalition, Greater Hells Canyon Council, Carol "Fuji" Kreider, Jim Kreider, and Gail Carbiener (collectively, "Plaintiffs" or "Stop B2H") have filed suit challenging the Final Environmental Impact Statement ("EIS"), Record of Decision ("ROD"), and Rights-of-Way ("ROW") grants issued by the Bureau of Land Management ("BLM") and the U.S. Department of the Interior (together with the U.S. Forest Service, "Federal Defendants") for the Boardman to Hemingway Transmission Line Project (the "B2H Project" or "Project").  Pursuant to LR 7-1, the parties have conferred and have been unable to resolve the motion.

For the reasons detailed in the following Memorandum in Support of the Cross-Motion for Summary Judgment, the Federal Defendants' challenged agency actions comply with the law. Accordingly, Intervenor-Defendants respectfully request that the Court:

A.  Deny Plaintiffs' First Claim alleging Federal Defendants violated the National Environmental Policy Act ("NEPA");

B.  Deny Plaintiffs' Second Claim alleging Federal Defendants violated the Federal Lands Policy Management Act ("FLPMA");

C.  Deny Plaintiffs' Third Claim brought under the National Forest Management Act ("NFMA") against the U.S. Forest Service, which is not pursued in Plaintiffs' Motion for Summary Judgment;[1]

---

[1] *See Audubon Soc'y of Portland v. U.S. Army Corps of Eng'rs*, 15–cv–665–SI, 2016 WL 4577009, at *4 (D. Or. Aug. 31, 2016) ("Plaintiffs offer evidence and argument supporting only

D.  Uphold BLM's Final EIS, the Department of the Interior's ROD, and the

corresponding ROW grant to Idaho Power for the B2H Project, and otherwise affirm

the federal agency actions challenged in this lawsuit.

DATED:  October 22, 2020

STOEL RIVES LLP


*s/ Beth S. Ginsberg*
BETH S. GINSBERG (OSB No. 070890)
beth.ginsberg@stoel.com
JAMES C. FELDMAN (*pro hac vice*)
james.feldman@stoel.com

*Attorneys for Intervenor-Defendants Idaho
Power Company and PacifiCorp*

---

eight of the twelve claims asserted in Plaintiffs' Second Amended Complaint.  Summary
judgment is therefore granted against the four claims for which Plaintiffs did not offer any
evidence or argument.").

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 2

    A.    The Purpose and National Significance of the B2H Project .................................... 2

    B.    The B2H Project Went Through Extensive Inter-Agency NEPA and Related Administrative Processes .............................................................. 4

    C.    BLM's ROD Is Conditioned on Approval of the Final Design and Mitigation Packages and State Siting Approval ........................................ 6

    D.    Congressional and Executive Action Relevant to Transmission Line Permitting ................................................................................................ 8

III.  ARGUMENT ..................................................................................................... 9

    A.    The BLM's Analysis of Impacts to Sage-Grouse Complies with NEPA ............... 9

        1.    BLM took a hard look at the impacts to sage-grouse ................................. 9

        2.    The EIS properly discloses the sage-grouse "baseline" .............................. 10

        3.    The EIS appropriately addressed sage-grouse mitigation ........................... 16

        4.    BLM adequately considered the impacts of grazing ................................... 21

        5.    No supplementation was required regarding sage-grouse ........................... 25

    B.    The EIS Fully Evaluated the Impacts to the Oregon Trail ................................... 27

        1.    BLM took a hard look at the impacts on the Interpretive Center ............. 27

        2.    BLM appropriately declined to carry forward the line burial alternative ....................................................................................... 28

        3.    BLM is not required to prepare a Supplemental EIS to reevaluate the feasibility of burying portions of the B2H Project transmission line .................................................................................. 32

        4.    BLM appropriately considered mitigation to the Oregon Trail ................ 34

    C.    The Mill Creek Alternative Does Not Require Supplemental NEPA Analysis or Additional Public Comment ................................................ 37

    D.    BLM Complied with FLPMA by Including Protective Terms, Conditions, and Stipulations in the ROW Grant to Idaho Power ......................... 40

IV.   CONCLUSION .................................................................................................. 42

## TABLE OF AUTHORITIES

**Cases**

*Alaska Survival v. Surface Transp. Bd.*,
  705 F.3d 1073 (9th Cir. 2013) ...............................................................29

*Am. Rivers v. FERC*,
  201 F.3d 1186 (9th Cir. 1999) ..........................................................29, 30

*Am. Wild Horse Campaign v. Zinke*,
  353 F. Supp. 3d 971 (D. Nev. 2018) ......................................................11

*Audubon Soc'y of Portland v. U.S. Army Corps of Eng'rs*,
  15–cv–665–SI, 2016 WL 4577009 (D. Or. Aug. 31, 2016) ..................... ii

*Cascadia Wildlands Project v. U.S. Forest Serv.*,
  386 F. Supp. 2d 1149 (D. Or. 2005) ......................................................23

*Cascadia Wildlands v. Carlton*,
  341 F. Supp. 3d 1195 (D. Or. 2018) ......................................................25

*City of Angoon v. Hodel*,
  803 F.2d 1016 (9th Cir. 1986) ...............................................................29

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*,
  123 F.3d 1142 (9th Cir. 1997) ..........................................................18, 29

*City of Olmsted Falls, Ohio v. FAA*,
  292 F.3d 261 (D.C. Cir. 2002) ....................................................25, 26, 32

*Coal. on Sensible Transp., Inc. v. Dole*,
  826 F.2d 60 (D.C. Cir. 1987) .................................................................15

*Confederated Tribes of Umatilla Indian Rsrv. v. Bonneville Power Admin.*,
  342 F.3d 924 (9th Cir. 2003) .................................................................25

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
  CV 14-1667, 2015 WL 12659937 (C.D. Cal. June 30, 2015), *aff'd sub nom.*
  *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906 (9th
  Cir. 2018) ..............................................................................................11

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ...............................................................................24

*Friends of Se.'s Future v. Morrison*,
153 F.3d 1059 (9th Cir. 1998) ................................................................................12

*Headwaters, Inc. v. BLM, Medford Dist.*,
914 F.2d 1174 (9th Cir. 1990) ................................................................................34

*Idaho Conservation League v. Mumma*,
956 F.2d 1508 (9th Cir. 1992) ................................................................................10

*Cal. ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*,
767 F.3d 781 (9th Cir. 2014) ..................................................................................15

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
42 F.3d 517 (9th Cir. 1994), *as amended on denial of reh'g* (Dec. 20, 1994)..................17, 20

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ..................................................................................22

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ................................................................................................25

*Moapa Band of Paiutes v. BLM*,
10–CV–02021, 2011 WL 4738120 (D. Nev. Oct. 6, 2011), *aff'd*, 546 F. App'x
655 (9th Cir. 2013) ..................................................................................................26

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) ..................................................................................10

*Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*,
222 F.3d 677 (9th Cir. 2000) ..................................................................................17

*Nat'l Parks Conservation Ass'n v. Jewell*,
965 F. Supp. 2d 67 (D.D.C. 2013) ..........................................................................37

*Neighbors of Cuddy Mountain v. Alexander*,
303 F.3d 1059 (9th Cir. 2002) ..................................................................................2

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ............................................................................................25, 26

*Or. Env't Council v. Kunzman*,
817 F.2d 484 (9th Cir. 1987) ..................................................................................11

*Or. Nat. Desert Ass'n v. BLM*,
625 F.3d 1092 (9th Cir. 2010) ................................................................................23

*Or. Nat. Res. Council v. Harrell*,
  52 F.3d 1499 (9th Cir. 1995) ........................................................................26

*Oregon Natural Desert Association v. Jewell*,
  840 F.3d 562 (9th Cir. 2016) ...............................................................15, 16

*Protect Our Communities Foundation v. Jewell*,
  825 F.3d 571 (9th Cir. 2016) ........................................................................19

*Protect Our Communities Foundation v. U.S. Dep't of Agriculture*,
  11-CV-00093, 2011 WL 13356151, slip op. (S.D. Cal. Sept. 15, 2011).................................41

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)............................................................................ passim

*Roosevelt Campobello Int'l Park Comm'n v. EPA*,
  684 F.2d 1041 (1st Cir. 1982).................................................................38, 40

*S. Utah Wilderness All. v. Off. of Surface Min. Reclamation & Enf't*,
  07CV678, 2008 WL 4912058 (D. Utah Nov. 14, 2008), *aff'd*, 620 F.3d 1227
  (10th Cir. 2010)..................................................................................26

*Selkirk Conservation All. v. Forsgren*,
  336 F.3d 944 (9th Cir. 2003) ........................................................................23

*South Fork Band Council of Western Shoshone of Nevada v. U.S. Dep't of the
  Interior*,
  588 F.3d 718 (9th Cir. 2009) ........................................................................35

*Spiller v. White*,
  352 F.3d 235 (5th Cir. 2003) .........................................................................2

*State of Cal. v. Block*,
  690 F.2d 753 (9th Cir. 1982) ...............................................................10, 39

*State of Montana v. Johnson*,
  738 F.2d 1074 (9th Cir. 1984) ......................................................................42

*Webster v. U.S. Dep't of Agric.*,
  685 F.3d 411 (4th Cir. 2012) ........................................................................38

*WildEarth Guardians v. Jeffries*,
  370 F. Supp. 3d 1208 (D. Or. 2019) ...............................................................23

*Wilderness Watch, Inc. v. Creachbaum*,
  225 F. Supp. 3d 1192 (W.D. Wash. 2016), *aff'd by* 731 F. App'x 709 (9th Cir.
  2018) ..............................................................................................13

**Statutes**

16 U.S.C. § 824p ........................................................................................................8

42 U.S.C. § 4370m *et seq.* ........................................................................................8

42 U.S.C. § 13201 *et seq.* .........................................................................................8

42 U.S.C. § 15926 .....................................................................................................8

43 U.S.C. § 1765(a)(ii) ............................................................................................41

Energy Policy Act of 2005 ...................................................................................8, 31

Federal Lands Policy Management Act ............................................................. passim

Forest Management Act (NFMA) ................................................................................ ii

National Environmental Policy Act (NEPA) ..................................................... passim

**Regulations**

40 C.F.R. § 1500.1(c) ..............................................................................................23

40 C.F.R. §§ 1502.9(c)(1)(i)–(ii) (2019) ................................................................39

40 C.F.R. §§ 1502.9(c)(1)(ii), (c)(4) .......................................................................38

40 C.F.R. § 1502.14(a) ............................................................................................29

40 C.F.R. § 1508.1(g)(3) .....................................................................................21, 24

40 C.F.R. § 1508.7 (1978) .......................................................................................25

80 Fed. Reg. 59,858 (Oct. 2, 2015) ....................................................................21, 22

85 Fed. Reg. 43,304 (July 16, 2020) ..................................................................8, 9, 21

## I.  INTRODUCTION

The B2H Project will provide an essential 500-kilovolt (kV) transmission line that will stabilize the power grid in the Northwest, help increase electric reliability, integrate new renewable energy into the grid, create jobs, and save consumers money.  The Obama Administration recognized the need to transform the nation's electric system into a modern, 21st century grid that is safer and more secure, and President Obama's Rapid Response Team for Transmission selected the B2H Project as one of seven pilot projects consistent with that goal and deserving of expedited and coordinated permit review.  The B2H Project represents a nearly billion-dollar investment in the Northwest's clean-energy future.

The environmental impacts of the B2H Project were carefully and thoroughly reviewed by BLM through a transparent and robust process under NEPA that lasted more than *eight years*.  The resulting EIS comprehensively evaluates *48 alternative routes* and the impacts of *each* alternative route, in more than 5,000 pages of textual analysis and supporting technical appendices.  The EIS devotes hundreds of pages to evaluating the B2H Project's effects on sage-grouse and sage-grouse habitat, and to the Project's effects on views of the Oregon Trail from the National Historic Oregon Trail Interpretive Center.  And, the EIS includes a comprehensive Mitigation Framework that will ensure, among other things, that the B2H Project results in a "net benefit" to the sage-grouse.  Indeed, even a cursory view of the EIS demonstrates that impacts to sage-grouse were given special emphasis in the Final NEPA analysis in response to comments from Plaintiffs and other interested parties.

Plaintiffs in this case are opposed to siting the B2H Project where they reside and have filed this not-in-my-backyard lawsuit to prevent that from happening.  They quibble with the robust NEPA analysis, demanding more process and more study, through a supplemental EIS.

Like many NEPA plaintiffs, however, "[t]hey really don't want more process. . . . What they really desire is a [different] substantive result." *Spiller v. White*, 352 F.3d 235, 245 (5th Cir. 2003). But NEPA does not "mandate particular results." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1063 (9th Cir. 2002). Rather, "NEPA exists to ensure a process." *Id*. BLM followed the statutorily mandated NEPA process. Nothing more was required.

Critically, the BLM did make some *substantive* decisions related to the B2H Project, including amending its resource management plans ("RMPs") to specifically allow for this nationally important electrical infrastructure project to move forward. *See* AR 156514 (amending the Baker RMP and the Southeastern Oregon RMP). Plaintiffs repeatedly bemoan the fact that the B2H Project was exempted from certain underlying siting prohibitions on condition that the B2H Project create a net benefit for sage-grouse. *See, e.g.*, Dkt. 43 at 11 ("This would prohibit *any* ROW for the B2H Project through" priority sage-grouse habitat, but "B2H is exempt from" certain restrictions in the RMP). Plaintiffs, however, decided *not* to challenge BLM's underlying RMP decisions exempting the B2H Project from key siting restrictions, and cannot attempt to repackage those claims now under NEPA.

## II. FACTUAL BACKGROUND

### A. The Purpose and National Significance of the B2H Project.

As an electric utility that generates, transmits, distributes, purchases, and sells electric energy to over 560,000 customers in a 24,000 square-mile service area in eastern Oregon and southern Idaho, Idaho Power Company has established a goal of providing 100% clean energy

by 2045.  Dkt. 16 ¶¶ 3, 9.[2]  The B2H Project is vital to the efforts of Idaho Power and PacifiCorp to integrate clean, renewable energy resources into the power grid and to provide low-cost, reliable power to their customers.  *Id.* ¶¶ 8–9; Dkt. 17 ¶¶ 7, 9.

When built, the 293-mile Project will consist of a 500-kilovolt, high-voltage electric transmission line capable of delivering bi-directionally approximately 1,000 megawatts of clean, affordable power between eastern Oregon and southwestern Idaho.  Dkt. 16 ¶¶ 3, 5.  The B2H Project will connect the Intermountain West with the power grid serving the Pacific Northwest and will alleviate existing transmission constraints during peak use periods to serve the regions' residences, farms, businesses, and other electricity users.  *Id.* ¶ 5; AR 156515–16.

The existing transmission pathway between the Pacific Northwest and Intermountain West is currently at full capacity during peak winter periods when consumers in the Northwest use electricity to heat their homes and businesses, and during peak summer periods when consumers in the Intermountain West use electricity for residential and commercial air conditioning and irrigation.  Dkt. 17 ¶ 6.  The B2H Project will relieve these transmission constraints by increasing transmission capacity to meet increasing forecasted demand while improving system reliability.  AR 156515–16, 26899–900.  By increasing the reliable and cost-effective energy exchange between the regions and connecting remote wind and solar energy resources to the grid, the B2H Project will play an important role in protecting the environment by circumventing the need to build new power plants.  AR 156515–16.

---

[2] Idaho Power Company first proposed the B2H Project in 2007 and subsequently entered into a funding agreement with PacifiCorp in 2012 resulting in PacifiCorp now holding a 55% share in the permitting interests of the B2H Project.  Dkts. 16 and 17.

The B2H Project will connect the Bonneville Power Administration's planned Longhorn Substation four miles east of Boardman, Oregon to Idaho Power's existing Hemingway Substation in Owyhee County, Idaho. AR 26900. When built, the Project would cross approximately 100 miles of federal land managed by the BLM, U.S. Forest Service, Bureau of Reclamation, and U.S. Navy, three miles of state lands, and 190 miles of private lands in five counties in Oregon and one county in Idaho. AR 59069, 169923.

The B2H Project has been championed by both the Obama and Trump Administrations for its unique ability to increase electric reliability and energy independence by integrating new renewable energy into the nation's aging power grid, while providing low-cost energy to urban and rural customers alike. Dkt. 16 ¶ 9; AR 59073. Given its national importance, the B2H Project was selected by a multi-agency task force—created by the Obama Administration and known as the "Rapid Response Team for Transmission"—as one of seven nationally significant transmission projects prioritized for *fast-tracked and streamlined federal permitting* and development. AR 35940–46. The Project's selection as a priority Rapid Response Team project followed the Obama Administration's commitment to expedite and simplify the permitting of nationally significant transmission projects on federal lands. AR 156507.

**B.    The B2H Project Went Through Extensive Inter-Agency NEPA and Related Administrative Processes.**

Idaho Power Company first applied to BLM for a ROW in 2007. AR 107627.[3] Shortly after filing its ROW application and in response to initial community concerns about the proposed B2H Project, Idaho Power initiated a year-long Community Advisory Process

---

[3] In the interests of judicial economy, the Utilities hereby adopt the federal government's statement of facts (Dkt. 53 at 4–8), to allow the Utilities to focus on issues and factual information more directly central to the interests of the Utility Intervenors.

("CAP").  The CAP included over 275 public meetings to gather public input, identify and address community concerns, and ultimately refine its proposed route to minimize B2H Project impacts on the environment, farmers, ranchers, and historic sites.  Dkt. 16 ¶ 10; AR 169997.

Parallel to the CAP process, the BLM began its own comprehensive review under NEPA that incorporated comments received through the CAP process.  AR 169997.  In conducting the NEPA process, the BLM coordinated very closely with a number of other cooperating federal and state agencies including the U.S. Forest Service, U.S. Fish and Wildlife Service ("FWS"), the Bureau of Reclamation, National Oceanic and Atmospheric ("NOAA") Fisheries, the U.S. Navy, and Idaho and Oregon's respective fish and wildlife agencies.  AR 170001, 39781, 52308. The BLM held eight formal public scoping meetings, followed by a number of meetings with affected landowners and other stakeholders in order to prepare and publish a Draft EIS on December 19, 2014, and then a Final EIS on November 28, 2016.  AR 156557, 156500.

The multi-volume Final EIS spans over 5,000 pages and includes 11 technical appendices containing the methodology, data, and scientific information used by the drafters to reach the conclusions drawn in the EIS as well as several appendices devoted specifically to the proposed mitigation and design specifications necessary to prevent adverse effects on sage-grouse and viewsheds from materializing as a result of the Project.  *See* AR 169857–175605.  In addition to the ROW grant issued through BLM's ROD, the EIS also evaluates several underlying land use plan amendments to the Baker RMP and Southeastern Oregon RMP that exempt the B2H Project from certain sage-grouse and Oregon Trail visual restrictions while requiring the Project to provide compensatory mitigation to offset effects on those resources, and in the case of sage-grouse, *provide the species a net benefit.*  AR 156514, 156518.  Plaintiffs' summary judgment motion does not challenge those amendments.  *See* Dkt. 43.

C.    **BLM's ROD Is Conditioned on Approval of the Final Design and Mitigation Packages and State Siting Approval.**

Construction will not begin until the BLM, in consultation with a number of cooperating agencies with jurisdiction over affected species and resources (including FWS, NOAA Fisheries, Oregon Department of Fish and Wildlife ("ODFW"), and Idaho Department of Fish and Game), first approve a Final Plan of Development ("POD") containing final design specifications and a full suite of compensatory mitigation and monitoring measures, and then issue the Utilities a Notice to Proceed ("NTP").  AR 156509, 156485.[4]  The POD will include species-specific conservation measures, requirements related to transmission line structures to minimize effects on sensitive species like sage-grouse, and a final Greater Sage-Grouse Mitigation Plan.  AR 156512, 156824–954.

In addition, Idaho Power will not begin construction until the Oregon Energy Facility Siting Council ("EFSC") first finds that the B2H Project complies with state-specific siting standards and issues a site certificate for the portions of the Project in Oregon.  A proposed order was issued in July 2020 and EFSC is expected to complete its administrative process by the end of 2021.  The Stop B2H Plaintiffs are a party to the contested case (*see* Second Declaration of Mitch Colburn ¶ 4) and will continue to actively oppose the Project through the culmination of that administrative proceeding that will address all of the alleged harms raised by Plaintiffs in this case, including alleged sage-grouse habitat and population injuries, harm caused by visual impairments of the Oregon Trail, and harm caused by both perceived gaps in mitigation and by cumulative impacts, and the alternatives preferred by Plaintiffs.  A site certificate is not expected until the end of 2021, and construction is not anticipated to commence until 2023.  AR 156508.

---

[4] A Draft POD was included in the ROD as Appendix D. AR 156824–954.

The POD will include site-specific mitigation measures and will require Idaho Power to complete preconstruction surveys and monitoring to identify areas in need of special protection for sage-grouse.  AR 173032, 173034–37 (Table B-1).  The POD also establishes seasonal restrictions to protect sage-grouse habitat and leks (breeding grounds) within a certain number of miles of the transmission line from various construction, operation, and maintenance activities. AR 173032, 173034–37.

The Final EIS was revised to include additional discussion of the effectiveness of mitigation measures in reducing impacts on Greater Sage-Grouse, including the design measures the Utilities have agreed to employ in addition to site-specific conservation measures.  AR 55763.  Appendix C to the Final EIS contains a Mitigation Framework that identifies the measures that the Utilities must take to avoid, minimize, and then compensate for any remaining adverse effects from the Project.  *See* AR 173038–85 (Final EIS Appendix C Mitigation Framework); 170117–28 (Table 2-7); 170131.  The Mitigation Framework will be used to prepare a final Compensatory Mitigation Plan ("CMP") that must be approved in the Final POD by the cooperating wildlife agencies before construction can commence.  AR 173043.  Thus, after the final engineering design is prepared and approved by the cooperating agencies, the Mitigation Framework will be used to quantify the direct and indirect impacts of the finally designed alignment and identify a suite of site-specific mitigation options to be employed and then monitored to ensure success.  AR 55762.

D.   **Congressional and Executive Action Relevant to Transmission Line
      Permitting.**[5]

Congress passed the Energy Policy Act of 2005, recognizing the importance of

establishing electrical transmission corridors in the Western United States.[6]  This legislation

expedited applications to upgrade electrical transmission lines in an effort to improve reliability,

relieve congestion, and enhance the capability of the national grid.  *See* 42 U.S.C. § 15926

(directing designation of energy ROW corridors on Federal land in Western states); *see also* 16

U.S.C. § 824p (designation of national interest electric transmission corridors).

A decade later, Congress enacted the Fixing America's Surface Transportation (FAST)

Act of 2015,[7] to streamline the permitting processes for certain large-scale, nationally significant

infrastructure projects requiring NEPA review, including the B2H Project.  AR 156507; 42

U.S.C. §§ 4370m-2–4370m-6.  "These statutes reflect that Congress has recognized that the

environmental review process can be more efficient and effective, including for infrastructure

projects. . . . Congress also has identified specific process improvements that can accelerate

environmental reviews, including improved interagency coordination, concurrent reviews, and

increased transparency."  85 Fed. Reg. 43,304, 43,311 (July 16, 2020).

In addition to Congressional efforts to streamline environmental review and permitting

processes, several Executive orders and proclamations issued during the Obama and Trump

Administrations provide added authority for streamlined environmental review of critical

infrastructure projects like the B2H Project.  In 2011, a task force composed of nine separate

---

[5] The Utilities adopt and incorporate Federal Defendants' discussion of the applicable legal
framework.  *See* Dkt. 53 at 2–4, 8.

[6] 42 U.S.C. § 13201 *et seq.*

[7] *See* Pub. L. No. 114–94, 129 Stat. 131242 (codified at 42 U.S.C. § 4370m *et seq.*).

federal agencies[8] designated the B2H Project as one of seven nationally significant transmission projects prioritized for fast-tracked development based on the Project's ability to increase electric transmission reliability, save money for consumers, and integrate new renewable energy sources into the grid.[9]  This designation as a high priority project was complemented by numerous Executive actions designed to "ensure that agencies apply NEPA in a manner that reduces unnecessary burdens and delays."[10]  Each of the above-mentioned statutes and executive actions are intended to make the environmental review process for the B2H Project timelier and more efficient.

### III.  ARGUMENT

A.      **The BLM's Analysis of Impacts to Sage-Grouse Complies with NEPA.**

      1.      **BLM took a hard look at the impacts to sage-grouse.**

"NEPA does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions."

---

[8] The Rapid Response Team for Transmission was created by the Obama Administration and consists of the U.S. Department of Energy, U.S. Department of Agriculture, U.S. Department of Commerce, U.S. Department of Defense, U.S. Environmental Protection Agency, Council on Environmental Quality, Advisory Council on Historic Preservation, U.S. Department of the Interior, and Federal Energy Regulatory Commission.  *See* AR 35943.

[9] AR 35940–46.

[10] 85 Fed. Reg. 43,312; *see also* Presidential Memorandum (Aug. 31, 2011) (Speeding Infrastructure Development Through More Efficient and Effective Permitting and Environmental Review); Exec. Order No. 13604, 77 Fed. Reg. 18,885 (Mar. 22, 2012) (Improving Performance of Federal Permitting and Review of Infrastructure Projects) (directing agencies to significantly reduce the aggregate time required to make Federal permitting and review decisions on infrastructure projects); Presidential Memorandum, 78 Fed. Reg. 30,733 (May 17, 2013) (Modernizing Federal Infrastructure Review and Permitting Regulations, Policies, and Procedures) (directing agencies to conduct concurrent and integrated reviews); Exec. Order No. 13766, 82 Fed. Reg. 8,657 (Jan. 24, 2017) (Expediting Environmental Reviews and Approvals for High Priority Infrastructure Projects).

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (internal

citation and quotation marks omitted).  "If the adverse environmental effects of the proposed

action are adequately identified and evaluated, the agency is not constrained by NEPA from

deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley

Citizens Council*, 490 U.S. 332, 350 (1989).  Thus, as the Supreme Court explained by example,

so long as an agency complies with the procedural requirement of NEPA, it is free to conclude

that "the benefits to be derived from downhill skiing" justified issuance of a permit, even if the

permit would result in "the loss of 15 percent, 50 percent, or even 100 percent of the mule deer

herd." *Id*.  "NEPA merely prohibits uninformed" decision-making.  *Id*.

    A reviewing judge must make "a pragmatic judgment whether the EIS's form, content

and preparation foster both informed decision-making and informed public participation." *State

of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).  "Once satisfied that a proposing agency has

taken a 'hard look' at a decision's environmental consequences, the review is at an end." *Id*.

(citation omitted).  The role of the court in reviewing an agency's compliance with NEPA is to

ask "whether an EIS contains a reasonably thorough discussion of the significant aspects of the

probable environmental consequences." *Idaho Conservation League v. Mumma*, 956 F.2d 1508,

1519 (9th Cir. 1992) (internal citations and quotation marks omitted).

### 2.    The EIS properly discloses the sage-grouse "baseline."

    Plaintiffs initially argue that BLM failed to set a "baseline" for sage-grouse, and therefore

the EIS violates NEPA.  Dkt. 43 at 26–30.  In support of its baseline argument, Stop B2H points

to a half-dozen alleged deficiencies that it claims make the EIS confusing and unintelligible.  As

set forth below, these claims largely misrepresent the analysis by plucking phrases out of context

and ignoring the analysis in the EIS. "This is the classic 'cherry picking' argument, which is

often made but rarely successful," because "[c]herry picking information out of the record is insufficient to" show that an agency was arbitrary and capricious. *Am. Wild Horse Campaign v. Zinke*, 353 F. Supp. 3d 971, 984, 988 (D. Nev. 2018).

*First*, Stop B2H says the EIS "confuses the public" and "understates the harm" by using two different numbers for habitat available for sage-grouse, one stating 853,848 acres, and the other stating 336,539 acres. Dkt. 43 at 27. Plaintiffs pull these numbers out of context. The "853,848 acres" cited in the EIS represents the "the current amount of habitat available to this population" as set forth in the 2011 ODFW Sage-Grouse Strategy. AR 170812. The EIS then proceeds to explain that the FWS also identified "essential areas" of habitat called "Oregon [Priority Area of Conservation or 'PACs']" for the Baker population, and explained that these "Oregon PACs" are determined by "breeding bird densities, winter habitat use, and connective habitat." AR 170812–13. The "336,539-acre" habitat figure cited represents the size of the Baker "Priority Area of Conservation," not all habitat. AR 170813. This reasonable discussion of different types of habitat is explained in the EIS, is neither confusing nor misleading, and provides no evidence that BLM failed to take a hard look at the impacts to sage-grouse. *See Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, CV 14-1667, 2015 WL 12659937, at *24 (C.D. Cal. June 30, 2015)[11] ("[T]his explanation makes clear the distinction between a 'trip' and a 'tripend' so that it would be 'readily understandable by governmental decisionmakers and by interested non-professional laypersons likely to be affected by actions taken under the EIS.'") (*quoting Or. Env't Council v. Kunzman*, 817 F.2d 484, 494 (9th Cir. 1987)).

---

[11] *Aff'd sub nom. Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906 (9th Cir. 2018).

***Second***, Stop B2H argues that the EIS fails to "disclose baseline information that the Baker population has a high risk of extirpation" and therefore BLM violated its "hard look" obligations under NEPA. Dkt. 43 at 27. This argument, too, selectively quotes the record while ignoring BLM's clear analysis.

The EIS candidly acknowledges that "[f]ragmentation of habitat into smaller patches can result in extirpation of local Greater Sage-Grouse populations." AR 170783. The EIS also candidly acknowledges that the Oregon Baker sage-grouse population is in decline, and as of 2013, was more than 62% below the 2003 sage-grouse baseline count, and further disclosed that the 2015 population count dropped below the hard trigger in BLM's Resource and Land Management Plan for the Baker area requiring more restrictive management actions. AR 170813. Accordingly, the EIS concluded that

> the Baker population is more at risk and likely less resilient than other populations, since connectivity to other populations appears limited. There is no redundancy in this population as all birds are believed to be in one general area. *For the entire population, the environmental similarity to extirpated populations is high.*

*Id*. (emphasis added) (citation omitted). BLM thus fully disclosed the baseline status of the Oregon Baker population as being already near extirpation, and the risk of additional fragmentation.

Plaintiffs apparently fault the EIS for not labeling the population baseline as having a "high risk of extirpation." Dkt. 43 at 27. But, the EIS literally says that the population is at a "higher risk" than other populations, has "no redundancy," and already looks like an "extirpated population." AR 170813. This discussion fully informs the public in readily understandable terms that the Oregon Baker population faces a significant risk of extirpation. Plaintiffs' quibbling with the choice of words expressed in the EIS text to communicate what was clearly expressed necessarily fails. *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir.

1998) ("[W]e may not fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies.") (internal citation and quotation marks omitted); *Wilderness Watch, Inc. v. Creachbaum*, 225 F. Supp. 3d 1192, 1207 (W.D. Wash. 2016), (refusing to "engage in a 'magic words review,' where the propriety of the Park Service's analysis hinges on whether it included the correct words in its MRWs, rather than whether its analysis carried the substantive weight arbitrary and capricious review demands") *aff'd by* 731 F. App'x 709 (9th Cir. 2018).

**Third**, Plaintiffs complain that the EIS inadequately disclosed the baseline by failing to provide the exact location of all known leks by "incorrectly" stating that "'all birds are believed to be in one general area.'" Dkt. 43 at 28.  Here too, Stop B2H highlights statements out of context and ignores the actual analysis in the EIS.  The full sentence states: "There is no redundancy in this population as all birds are believed to be in one general area."  AR 170813. This statement relates to the baseline risk of extirpation (discussed above), not lek location.

As to the location of the leks, the EIS explains that it evaluated the number of leks within .25, 2.0, and 3.1 miles of the transmission line centerlines.  AR 170763.  The EIS relies on "lek locations" data developed by the Idaho Department of Fish and Game and ODFW, and B2H project-specific surveys by Tetra Tech, Inc.  *See* AR 170755 (identifying "Data Sources" for EIS).  The EIS includes a table (Table 3-153) showing the number of leks within .25, 2.0, and 3.1 miles for each of the alternative routes through the Baker Valley.  AR 170815–18.  This provides a more-than-sufficient baseline for BLM to make a reasoned choice between alternatives with respect to the impacts to the Baker sage-grouse population.[12]

---

[12] The exact location of the leks were purposefully not disclosed at the request of ODFW to ensure their protection.  *See* Dkt. 53 at 12; Dkt. 53-1 ¶ 2.

Plaintiffs apparently desire more discussion about the potential importance of particular

leks, specifically, those at Magpie Peak. Dkt. 43 at 28. But here, too, the EIS candidly discloses

that "[t]he Magpie Peak area is a particularly important area of habitat for the Baker Oregon

PAC. Impacts on this area would be estimated at a higher magnitude than adjacent areas." AR

170813. The EIS provides maps illustrating the various routes near Magpie Peak (AR 170182–

91), a map showing all habitat areas impacted by those routes (AR 175584 (Map MV-9)), and a

Table (Table 3-153) showing the number of leks impacted for each alternative. Nothing more

was required to permit a reasoned choice between alternatives.

**Fourth**, Plaintiffs argue that the EIS "did not disclose how many leks would be indirectly

affected by the B2H Project" because the BLM only looked at leks within 3.1 miles of the

transmission line, while there was evidence of impacted leks at four miles or farther from the

power line. Dkt. 43 at 28–29. Plaintiffs contend that the EIS should have disclosed the number

of leks within four miles (or some greater distance).[13] This argument is equally unavailing.

The EIS fully explains the reasons for using a 3.1-mile radius to analyze indirect effects.

The EIS explains that "[i]ndirect effects on . . . Greater Sage-Grouse were quantified as the

percentage of acres within a set distance from alternative routes centerline," and the "percentage

of Greater Sage-Grouse habitat was calculated within 3.1 miles of alternative routes centerline."

AR 170763. The EIS explains that the 3.1 mile "[b]uffer distances for Greater Sage-Grouse are

based on findings on disturbance buffers from tall structures by Manier et al. (2014) and are

consistent with Appendix B – Lek Buffer Distances in the Oregon Greater Sage-Grouse

---

[13] Plaintiffs also assert that BLM did not disclose whether any birds were using the identified leks. This is not accurate. Table 3-153 clearly delineates occupied and unoccupied leks. AR 170815.

[Approved Area Resource Management Plan Amendment ("ARMPA")]." *Id.*; *see also* AR

170850–51 (discussing multiple studies on the impact of transmission lines at various distances

and noting that "there is no single distance that is an appropriate buffer"); AR 131118 (Manier

reference stating "there is no single distance that is an appropriate buffer for all populations and

habitats across the sage-grouse range"); AR 175375 (ARMPA recommending a two-mile buffer

for "transmission lines" and a 3.1-mile buffer for "surface disturbance").

Stop B2H uses the same information to draw a different technical conclusion.  But, "[t]he

NEPA process involves an almost endless series of judgment calls," and "[t]he line-drawing

decisions necessitated by [the NEPA process] are vested in the agencies, not the courts." *Coal.*

*on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).  BLM's scientists, not the

Plaintiffs, are vested with discretion to make these technical judgment calls, which should not be

second-guessed. *Cal. ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the*

*Interior*, 767 F.3d 781, 792 (9th Cir. 2014).  Here BLM fully justified its line-drawing decision

in the record.  Nothing more was required by NEPA.[14]

*Fifth*, Plaintiffs argue that the EIS "did not disclose baseline information about sage-

grouse winter habitat" and unsuccessfully analogize their case to *Oregon Natural Desert*

*Association v. Jewell*, 840 F.3d 562 (9th Cir. 2016).  Dkt. 43 at 29.  In *Oregon Natural Desert*

*Association*, the BLM assumed that the project area *did not have winter sage-grouse habitat*.

840 F.3d at 570.  Here by contrast, the EIS identified winter habitat in the impact area and

treated that habitat as sage-grouse *core areas*.  *See* AR 170781 ("[L]ek density strata, winter

---

[14] Contrary to the record, Plaintiffs claim they were deprived of the opportunity for "meaningful
public comment" on the impact to leks within four miles.  The Draft EIS originally identified all
leks within a five-mile area, allowing Plaintiffs every opportunity to comment on the impacts to
leks within that area.  AR 16797.

Page - 15 – IDAHO POWER CO. AND PACIFICORP'S CROSS-MOTION FOR SUMMARY
JUDGMENT AND MEMORANDUM IN SUPPORT

habitat use areas, and connectivity corridors were integrated to classify Greater Sage-Grouse

habitat into core areas, and low density areas."  Core areas include "where known winter habitat

use polygons overlap with either low lek density strata, connectivity corridors, or occupied

habitat.").  Not only does the EIS identify winter habitat, it places timing restrictions on

construction to protect that core habitat.  AR 174083.[15]

*Lastly*, Plaintiffs argue that the phrase "population-level effects" is "unintelligible" and

that the EIS therefore violates NEPA.  Dkt. 43 at 29–30.  There is nothing "unintelligible" about

population-level effects, and indeed public comments by other citizen groups used the same

"population-level" terminology.  *See* AR 174264 (comments by Oregon Natural Desert

Association); AR 174351 (comments by WildEarth Guardians).  This term was repeatedly used

in the Draft EIS, and if Plaintiffs thought this term was "unintelligible" they should have said so

in public comments.  It is too late to make this trifling argument now.  *Oregon Nat. Desert Ass'n*,

840 F.3d at 574 ("Because ONDA never brought the issue of inter-population or genetic

connectivity to the BLM's attention during the environmental review process, we conclude that

the issue was not exhausted and is not now subject to review.").

### 3. The EIS appropriately addressed sage-grouse mitigation.

NEPA does not require that an agency actually mitigate impacts; nor does it "require a

fully developed plan that will mitigate environmental harm before an agency can act."[16]  *Methow*

---

[15] In addition to being factually inapposite, the decision in *Oregon Natural Desert Association* is also legally inapposite.  In that case*,* the presence of winter habitat was a critical consideration because the presence of that habitat would preclude siting the project under the terms of BLM's RMP.  840 F.3d at 570.  Here, by contrast, the presence of sage-grouse habitat does not preclude the B2H Project under BLM's RMP.

[16] To streamline the briefing process, the Utilities adopt the government's description of what NEPA requires in the way of mitigation.  *See* Dkt. 53 at 25–26.

*Valley*, 490 U.S. at 353; *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000) ("[A] mitigation plan need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements."). Instead, "NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 528 (9th Cir. 1994), *as amended on denial of reh'g* (Dec. 20, 1994).

*First*, the EIS here provides the requisite discussion of potential mitigation measures necessary to ensure that the BLM took a hard look at the impacts to sage-grouse. The EIS evaluates potential mitigation at three levels. *First*, BLM looked at "design feature" mitigation—which includes measures that "would be implemented as standard practice of construction, operation, and/or maintenance," and would apply to all lands (regardless of ownership). AR 170116. BLM described each "design feature" and the expected effectiveness, including design features that would benefit sage-grouse, at Table 2-7. AR 170117–28 (identifying and evaluating 37 design feature mitigation measures); AR 173060–61 (identifying which specific design features will benefit sage-grouse).

*Second*, BLM then looked at "selective mitigation" measures that the applicant could apply to specific lands, to further "avoid, minimize, or rectify/reduce over time moderate or high impacts." AR 173040. BLM described each "selective mitigation" measure and the expected effectiveness, including measures that would benefit sage-grouse, at Table 2-13. *See* AR 170141–45 (identifying and evaluating 15 selective mitigation measures); AR 173060–61 (identifying which specific selective mitigation measures will benefit sage-grouse).

*Third*, BLM then evaluated whether *after* application of the design feature and selective mitigation measures, there would still be "residual" impacts. AR 170135. For sage-grouse, BLM

concluded that "[a]ll alternative routes that cross [general habitat management areas] would have long-term moderate residual impacts on Greater Sage-Grouse," and that "all alternative routes that cross [priority habitat management areas] would have long-term high residual impacts on the Greater Sage Grouse." AR 169969. The EIS then explains that these long-term impacts would be inconsistent with the ARMPA for Oregon sage-grouse, which requires the B2H Project to "achieve a net conservation gain for Greater Sage-Grouse through compensatory mitigation." *Id*.

To address that discrepancy, BLM provides a 48-page "Mitigation Framework" intended to address residual impacts, and achieve (for sage-grouse) the required net benefit. AR 173038–85 (Appendix C). The Mitigation Framework identifies and discusses the residual impacts to sage-grouse (AR 173060), identifies the design and selective mitigation measures that can avoid, minimize, or rectify impacts to sage-grouse (AR 173060–61), identifies the reasonably foreseeable remaining impacts to sage-grouse that may require compensatory mitigation (AR 173061–62), identifies a method for calculating the amount of needed compensatory mitigation (AR 173062–63), and provides examples of allowed compensatory mitigation options for sage-grouse (AR 173065–66).

The Mitigation Framework will guide the development of the comprehensive CMP (which cannot be developed until a route is selected and engineered) and will be incorporated into the POD approval. AR 173038. The Comprehensive mitigation plan must achieve a net gain for the sage-grouse and will be backed by monitoring and an adaptive management framework. AR 173043. This kind of conceptual mitigation plan fully satisfies BLM's hard look obligations with respect to mitigation. *See City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1151 (9th Cir. 1997) ("'conceptual' mitigation plan" that "aspires to replace the removed wetlands" provided sufficient discussion of potential mitigation).

Page - 18 – IDAHO POWER CO. AND PACIFICORP'S CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

Indeed, the Ninth Circuit rejected a NEPA challenge to a similar mitigation plan in *Protect Our Communities Foundation v. Jewell*, 825 F.3d 571 (9th Cir. 2016). In that case, the plaintiffs claimed that "the mitigation measures outlined in the EIS do not provide 'sufficient detail,' and that the EIS improperly defers the formulation of certain mitigation measures until post-development monitoring and inspection." *Id*. at 582. The court rejected that argument because the EIS provided "ample detail and adequate baseline data for the agency to evaluate the overall environmental impact of the Project," concluding that these arguments "merely 'fly speck' the EIS." *Id.* The court then endorsed the "inclusion of an adaptive-management plan, among other mitigation measures," similar to the one incorporated in the B2H Project, as providing needed "flexibility in responding to environmental impacts through a regime of continued monitoring and inspection." *Id*.

Plaintiffs' arguments here similarly fly speck the adaptive mitigation regime imposed on the B2H Project and ignore the specificity of the planned mitigation and corresponding monitoring regime described in the record. Plaintiffs claim confusion as to which design and selective mitigation measures will benefit sage-grouse (Dkt. 43 at 30) but overlook the sage-grouse-specific discussion in Appendix C that specifically addresses which measures can and will benefit sage-grouse. AR 173060–61. Plaintiffs claim that the EIS does not discuss the efficacy of design and selective mitigation measures specific to sage-grouse (Dkt. 43 at 30), but ignore both the discussion in the EIS fully disclosing the fact that there will be moderate to high residual impacts to sage-grouse (AR 169969), and the discussion in Appendix C expressly identifying and listing those residual impacts for sage-grouse (AR 173060). Plaintiffs incorrectly claim that the EIS improperly presumes that the selective mitigation measure of "perch deterrents" will be wholly effective (Dkt. 43 at 31), contrary to the EIS that candidly discloses

"[i]ncreased avian presence and predation due to increased perching and nesting opportunities on transmission structures" as a residual impact despite design and selective mitigation.  AR 173060.  BLM's obligation under NEPA is to discuss potential mitigation, and its potential effectiveness, and that is precisely what the EIS does.  *See Laguna Greenbelt*, 42 F.3d at 528 ("The EIS also discloses that mitigation measures may not be totally successful.").

   ***Lastly***, Plaintiffs complain that "[i]nstead of evaluating whether mitigation will be effective, Appendix C states that it is '*presumed* to be effective at reducing potential impacts on an acceptable level.'"  Dkt. 43 at 31.  This presumption, they claim, is proof that the EIS did not actually evaluate the effectiveness of mitigation in the EIS.  Again, Plaintiffs have improperly plucked phrases out of context.

   Appendix C actually says: "In general, the identified strategies to avoid, minimize, and rectify and/or restore impacts are presumed to be effective at reducing potential impacts on an acceptable level."  AR 173042.  This is not a statement about the *efficacy* of mitigation (the analysis needed for NEPA), but a substantive determination of what levels of impact are acceptable (a substantive consideration outside of NEPA).  Regardless, Appendix C readily discloses that more mitigation (to a level greater than what would be normally required) may be necessary for some resources (including sage-grouse, which require a net benefit to the conservation of the species); Appendix C then establishes a framework for providing that additional compensatory mitigation.  *Id*.  This goes above and beyond anything required by NEPA.  *See Laguna Greenbelt*, 42 F.3d at 528 ("NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated.").

### 4.    BLM adequately considered the impacts of grazing.

Stop B2H claims that "grazing is a 'threat' to sage grouse" and that BLM should have

therefore discussed grazing as a cumulative impact.  Dkt. 43 at 32.  Current NEPA regulations do

not require consideration of cumulative impacts.  40 C.F.R. § 1508.1(g)(3).  However, NEPA

regulations (now repealed)[17] previously required consideration of cumulative impacts.[18]

BLM satisfied its obligations to consider cumulative effects as required under the prior

NEPA regulations.  The EIS relies on and incorporates by reference the U.S. Geological

Survey's ("USGS") 2013 baseline environmental report for sage-grouse.  *See* AR 130182

(report), 170752 (incorporating USGS report).  The USGS baseline report comprehensively

evaluates the impacts of past grazing practices on the sage-grouse and its habitat.  AR 130287–

95.  The EIS clearly indicates the threat to sage-grouse is from "improper livestock grazing

management" and not "grazing" *per se*.  AR 170782.  This is consistent with FWS's findings,

discussed in the EIS, that sage-grouse face a "threat" from "improper grazing."  *See* AR 170746

(discussing FWS's 12-month finding responding to petition to list Greater Sage-Grouse); 80 Fed.

Reg. 59,858, 59,888 (Oct. 2, 2015).  Indeed, it is well recognized that "[t]he effects of grazing on

the structure and composition of sage-grouse habitat can be positive, negative, or neutral, and

will vary with timing and intensity of use and a host of environmental factors."  AR 129717.

---

[17] *See* 85 Fed. Reg. 43,304 (July 16, 2020) (repealing definition of "cumulative impact" and
reflecting change in position from prior regulations, clarifying that "analysis of cumulative
effects, as defined in the 1978 regulations, is not required under NEPA.").

[18] The Utilities adopt the government's description of what is required in a cumulative effects'
analysis under the former NEPA regulations.  Dkt. 53 at 15–16.

Likewise, "[a]ppropriate livestock grazing regimes can be compatible with sage-grouse habitat needs."  AR 129777.

Although *improper grazing* practices have historically adversely impacted sage-grouse habitat and, while the baseline discussed in the EIS addresses that historic impact, both BLM and FWS have more recently taken steps to ensure that improper grazing does not continue to occur on federal lands.  As FWS explained, the BLM is now requiring appropriate measures in federal grazing plans "to benefit or be neutral to sage-grouse."  80 Fed. Reg. 59,877.  BLM's ARMPA now includes "grazing practices" that will meet sage-grouse "habitat objectives" and avoid adverse impacts to sage-grouse.  *See* AR 175746 (Oregon ARMPA providing required best management practices ("BMPs") for grazing to protect sage-grouse).  Under these circumstances, BLM was not required to discuss the cumulative impact of grazing activities that would "benefit or be neutral to the sage-grouse."  80 Fed. Reg. 59,877; *see League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 762 (9th Cir. 2014) (cumulative effects analysis is not required where project would not impact stream temperatures).

The comprehensive record demonstrates that BLM analyzed other actions that had significant potential to cause adverse cumulative effects.  The potential impacts of grazing to sage-grouse were acknowledged throughout the EIS and, as mentioned above, have been the subject of significant management by BLM, FWS, and ODFW.  *See* AR 172420 ("Rangeland grazing in the B2H Project area did not expand appreciably in the 1973 to 2000 USGS study period, and improving grazing practices and rangeland improvements somewhat improved range conditions during that period." (citation omitted)).  Because each agency has adopted programs to substantively negate the impacts of improper grazing, it is unclear what the EIS could have

meaningfully added to those discussions.  NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action." *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1100 (9th Cir. 2010) (*quoting* 40 C.F.R. § 1500.1(c)).

BLM acted through the ARMPA to both reduce grazing and impose requirements ensuring no adverse effects to sage-grouse from grazing.  It is reasonable for BLM to assume it will follow its own rules, and accordingly, the Court should defer to BLM's reasonable decision as to the scope of the cumulative effects' review.  *See Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 959 (9th Cir. 2003) ("[U]nder NEPA we defer to an agency's determination of the scope of its cumulative effects review.") (internal citation and quotation marks omitted).

Plaintiffs have not challenged the underlying ARMPA or measures to protect sage-grouse habitat, nor have they provided any studies or rationale for why BLM would have been required to address the cumulative impacts of grazing on sage-grouse in light of these proactive protections.  *See WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1240–41 (D. Or. 2019) (rejecting plaintiffs' argument that the agency's EIS did not sufficiently analyze project's cumulative impacts with regard to livestock grazing).  Under these circumstances, BLM's rational decision with respect to its cumulative impacts analysis is entitled to discretion.  *See id.* at 1241 ("The [agency] has the discretion to select the appropriate factors for cumulative impact review." (citing *Cascadia Wildlands Project v. U.S. Forest Serv.*, 386 F. Supp. 2d 1149, 1167 (D. Or. 2005)).

Plaintiffs' present concerns about sage-grouse also ring hollow in light of their public participation.  If Plaintiffs disagreed with the FWS's 12-month finding or the efficacy of changes to the ARMPA or believed that *current* BLM grazing practices continued to be a "threat" to the sage-grouse, they should have alerted the BLM to those concerns and provided supporting

documentation. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (Parties must

"structure their participation" in the public process "so that it ... alerts the agency to the [parties']

position and contentions, in order to allow the agency to give the issue meaningful

consideration.") (internal citation and quotation marks omitted; alterations in original). Plaintiffs

did not do so. Despite submitting *hundreds of pages of comments* opposing the B2H Project,[19]

the extent of Plaintiffs' public comments on grazing is limited to raising questions ("How is

grazing as being conducted harmful to sage-grouse?") and citing a single study from 2013 that

discussed *past* grazing practices that have since been addressed by BLM. *See* AR 174049–404

(comments and responses), 55498 (protest). These comments do not put BLM on notice of any

*current* grazing concerns that need to be addressed as cumulative impacts.

　　　Plaintiffs' arguments at bottom would transform NEPA's informed decision-making

process into a game of administrative "gotcha," allowing them to derail a multi-year

environmental review process for a nationally significant energy project prioritized by both the

Obama and Trump Administrations for expedited permitting, a critical infrastructure project

supported by thousands of pages of robust analysis, based on oblique and tangential concerns

that were never fully articulated to the agency. NEPA's "rule of reason" does not allow such a

strained result.

　　　In any event, Plaintiffs' arguments are futile because current NEPA implementing

regulations do not require a cumulative impact analysis. *See* 40 C.F.R. § 1508.1(g)(3) ("An

agency's analysis of effects shall be consistent with this paragraph (g). Cumulative impact,

---

[19] *See, e.g.*, AR 174049–404 (NGO Comments on Draft EIS); 175065–568 (Individual
Comments on Draft EIS); 55530–43 (Plaintiffs Jim and C. Fuji Kreider Protest Letter); 55544–
93 (Wildlands Defense Protest Letter); 66247–79 (Plaintiffs Gail Carbiener and Oregon
California Trails Association Protest Letter).

defined in 40 CFR 1508.7 (1978), is repealed.").  Even if it were somehow critical to BLM's

environmental analysis (which it was not), BLM would not be obligated to conduct additional

cumulative impact analyses on remand.[20]

### 5.    No supplementation was required regarding sage-grouse.

Plaintiffs further claim that BLM was required to supplement the EIS, and in support of

that argument, they submit extra-record declarations and supporting materials (principally a 2018

Report from ODFW), which they claim shows that "the Oregon population has declined each

year since 2016."  Dkt. 43 at 33–34.[21]  This claim fails on multiple grounds.  "[A]n agency need

not supplement an EIS every time new information comes to light after the EIS is finalized.  To

require otherwise would render agency decisionmaking intractable, always awaiting updated

information only to find the new information outdated by the time a decision is made."

*Cascadia Wildlands v. Carlton*, 341 F. Supp. 3d 1195, 1201 (D. Or. 2018) (*quoting Marsh v. Or.*

*Nat. Res. Council*, 490 U.S. 360, 373 (1989) (brackets in original); *see also City of Olmsted*

*Falls, Ohio v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002) ("A supplemental EIS is only required

where new information provides a *seriously* different picture of the environmental landscape.")

(internal citation and quotation marks omitted).

Equally important, "supplementation is necessary only if there remains 'major Federal

action' to occur, as that term is used in" NEPA.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55,

73 (2004) (internal citation, quotation marks, and alteration omitted).  Here, Plaintiffs identify no

---

[20] *See Norton*, 542 U.S. at 63 ("[T]he only agency action that can be compelled under the APA is action legally *required*."); *Confederated Tribes of Umatilla Indian Rsrv. v. Bonneville Power Admin.*, 342 F.3d 924, 933 (9th Cir. 2003) ("[O]ur limited judicial powers prevent us from imposing additional procedural requirements.").

[21] The Utilities adopt the government's arguments on NEPA supplementation and their motion to strike extra-record materials and supporting declaration.  Dkt. 53 at 29–33; Dkt. 58.

*ongoing* action that has yet to occur.  While BLM clearly took a major federal action by approving the ROW and amending its RMPs, "that action is completed when the plan is approved."  *Id.*   Here, as the record of decision states, the "ROD constitutes the Department's and BLM's final decision for the B2H Project, including mitigation and monitoring requirements."  AR 156501.  Accordingly, "[t]here is no ongoing 'major Federal action' that could require supplementation."  *Norton*, 542 U.S. at 73; *Or. Nat. Res. Council v. Harrell*, 52 F.3d 1499, 1504 (9th Cir. 1995) (issuance of Final EIS and ROD constitutes final agency action).

To the extent that Plaintiffs intend to claim that the BLM's anticipated issuance of a NTP at some future date constitutes a "major federal action," at least two courts have disagreed.  *S. Utah Wilderness All. v. Off. of Surface Min. Reclamation & Enf't*, 07CV678, 2008 WL 4912058, at *11 (D. Utah Nov. 14, 2008) ("Notices to Proceed for the coal-haul road and surface facilities does not constitute 'major federal action.'"), *aff'd*, 620 F.3d 1227 (10th Cir. 2010); *Moapa Band of Paiutes v. BLM*, 10–CV–02021, 2011 WL 4738120, at *13 (D. Nev. Oct. 6, 2011) ("BLM's issuance of the notice to proceed does not constitute major federal action yet to occur because it is not discretionary."), *aff'd*, 546 F. App'x 655 (9th Cir. 2013).

In any event, even if there were an ongoing federal action (and there is not), Plaintiffs' proffered information on the declining numbers of sage-grouse in the Baker population does not "provide[] a *seriously* different picture of the environmental landscape."  *City of Olmsted Falls*, 292 F.3d at 274.  As set forth above, the EIS candidly disclosed that the Oregon Baker sage-grouse population is in decline (62% decline from 2003 to 2013).  AR 170813.  Plaintiffs' "new information" shows that the total Baker population dipped in 2014, but as of 2018 was actually higher than 2013.  Dkt. 44-2 at 25.  This is not a seriously different picture of the species' status.  Rather, as a condition of the ROD, the BLM will not issue a NTP until Idaho Power completes

the compensatory mitigation plan required by the EIS and ROD demonstrating a net benefit to sage-grouse will be achieved.  AR 157444.  Because neither that future obligation, nor the relevant facts concerning the status of the species has changed, a Supplemental EIS is simply not required.

> **B.** **The EIS Fully Evaluated the Impacts to the Oregon Trail.**

Plaintiffs have also marshalled a series of baseless arguments related to the Oregon Trail Interpretive Center ("Interpretive Center").  Specifically, Plaintiffs claim that BLM violated NEPA by (1) failing to develop an alternative that would bury the transmission line near the Interpretive Center and (2) not taking into account new, extra-record information suggesting decreasing costs associated with burying transmission lines that requires BLM to prepare a Supplemental EIS.  Like their sage-grouse arguments, Plaintiffs' Interpretive Center arguments do little more than selectively cherry pick the record and provide no basis to find BLM's analysis was arbitrary or capricious.

> **1.** **BLM took a hard look at the impacts on the Interpretive Center.**

The Administrative Record reflects that BLM took a hard look at line burial, and ultimately concluded that burial was neither practicable nor feasible for a host of reasons "beyond the added cost, including longer outages, increased time for repairs, no ability to visually assess, decreased reliability in service, and need for specialized equipment."  AR 55724. BLM took the requisite hard look and candidly acknowledged that certain routes for the B2H Project, including the Agency Preferred Alternative, would significantly impact views from the Interpretive Center.  *See* AR 156519 ("[T]he presence of large transmission towers would introduce long-term impacts on views as well as indirect impacts on recreational experiences and historic and cultural settings."); AR 172195 ("All other alternatives would highly impact the

[Interpretive Center] and environs … .").  Although Plaintiffs emphasize that the B2H Project

will mar the views from the Interpretive Center, the scenery around the Interpretive Center is not

unspoiled.  Indeed, there is already a high voltage 230-kV transmission line located below the

Interpretive Center.  The Final EIS explains that "views from the [Interpretive Center] include

the community of Baker City and adjacent agricultural lands.  From a historic standpoint these

would be seen as modifications to the setting; whereas, for modern day recreation viewers, these

elements are to be expected in the viewshed."  AR 171978.  Additionally, "[f]rom the

[Interpretive Center], the proposed transmission line would be viewed in context with

consolidated development at the edge of the Baker Valley (i.e., the existing 230-kV transmission

line … .)."  AR 156544.

Although the route ultimately selected for the B2H Project may further impair visual

resources near the Interpretive Center, NEPA is a procedural statute that does not mandate

specific outcomes.  *See Methow Valley*, 490 U.S. at 350 ("[I]t is now well settled that NEPA

itself does not mandate particular results.").  Tasked with balancing competing interests in its

management of federal lands, the BLM rationally concluded that the importance of improving

the capability and reliability of the region's power supply outweighs any additional degradation

of views from the Interpretive Center.  The agency's reasoned decision does not violate NEPA.

### 2.     BLM appropriately declined to carry forward the line burial alternative.

Plaintiffs contend the only reason that burial of the transmission line was not carried

forward as an alternative is because Idaho Power was unwilling to pay increased costs associated

with burying a portion of the line, and then misleadingly suggest that BLM capitulated to Idaho

Power's refusal to consider line burial.  Dkt. 43 at 17–20, 36–37.  The Administrative Record

belies this argument and reveals that there were numerous reasons for BLM's decision to reject line burial.

BLM's EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013) (internal citation and quotation marks omitted). The rule of reason "guides both the choice of alternatives as well as the extent to which the [EIS] must discuss each alternative." *City of Carmel–by–the–Sea*, 123 F.3d at 1155. "[F]or alternatives which were eliminated from detailed study, [the environmental impact statement must] *briefly discuss* the reasons for their having been eliminated." *Am. Rivers v. FERC*, 201 F.3d 1186, 1200 (9th Cir. 1999) (brackets in original) (*quoting* 40 C.F.R. § 1502.14(a)). "Those challenging the failure to consider an alternative have a duty to show that the alternative is viable." *Alaska Survival*, 705 F.3d at 1087 (*citing City of Angoon v. Hodel*, 803 F.2d 1016, 1021–22 (9th Cir. 1986)).

The record here demonstrates that BLM thoroughly considered but ultimately eliminated from detailed analysis an alternative that would have buried portions of the transmission line, concluding that burial was neither practicable nor feasible and could result in additional unintended environmental impacts. *See* AR 170205–08 (EIS's discussion of alternatives considered but eliminated from detailed analysis). In deciding not to carry this alternative forward, BLM explained the numerous drawbacks of undergrounding high-voltage transmission lines in the EIS:

> Underground transmission lines reduce system reliability and increase the complexity of systems operation and maintenance. While underground systems comparatively have fewer forced outages than overhead lines, damage to the cable or components often result in longer durations of outages. When a failure occurs, underground cables cannot be diagnosed visually, as is the case with an overhead line, rather the cable system must be tested with specialized equipment to locate the damaged sections of the cable. Typical time needed to repair failure of accessories

> such as terminations and splices is often lengthy because these repairs require
> additional effort to identify, access, expose, and repair the damaged cables, and
> could take several days or weeks to fully restore. (An underground 500 kV
> transmission line could take months to repair if new cable must be manufactured.)
> Therefore, reliability of the transmission line service is reduced compared to an
> overhead transmission line (for which damaged areas are relatively easy to locate
> and repairs are typically less than 24 hours). The potential for long-term outages
> associated with the 500-kV transmission line would be unacceptable for a circuit
> carrying bulk power to a large service area.

AR 170207. BLM thus provided the required "brief discussion" for not carrying this alternative

forward. *Am. Rivers*, 201 F.3d at 1200.

In addition to reduced reliability and longer duration of outages, BLM also identified

substantial environmental drawbacks associated with undergrounding portions of transmission

lines. These disadvantages include increased ground and vegetation disturbance from excavating

large trenches for line burial, the need to construct two 200 x 400-foot overhead-to-underground

transition stations at either end of the buried segment, and splicing vaults every 1,500 feet, none

of which are required by traditional overhead transmission lines. AR 170207. BLM observed

that increased surface disturbances associated with undergrounding portions of the transmission

line could result in unintended adverse impacts to sage-grouse habitat. AR 55753. Indeed,

ODFW encouraged BLM in selecting the environmentally preferred route for the B2H Project to

prioritize alternatives minimizing impacts to sage-grouse over alternatives designed to lessen

visual impacts to cultural resources along the Oregon Trail. *See* AR 49962 ("The [ODFW]

understands that Project impacts to cultural resources, such as the Oregon Trail, led to the

selection of the Willow Creek Alternative. … Cultural resources are stationary, inanimate objects

on the landscape.").[22]

---

[22] Idaho Power proposed to route the transmission line behind the Interpretive Center to protect
the view (*See* AR 170183, Map 2-7c variation 3-28), but ODFW objected due to sage-grouse
habitat concerns. *See* AR 170236 (explaining the environmentally preferable alternative selected

Given the numerous drawbacks associated with undergrounding portions of the transmission line, BLM reasonably determined that an alternative burying any segment of the B2H Project transmission line "would not meet the BLM's purpose and need to advance federal policy direction in the Energy Policy Act of 2005 aimed at increasing capability and reliability of power transmission."  AR 170208.

Unable to counter the agency's reasoned explanation for why transmission line burial was eliminated as an alternative, Plaintiffs resort to conspiracies, and dismiss the stated reasons as "excuses," meant to "backfill the decision already made."  *See* Dkt. 43 at 17–19.  Specifically, Plaintiffs cherry pick the record to claim that Idaho Power "polluted the process by declaring, before the DEIS was issued, that it was 'not comfortable with or willing to entertain this option.'"  Dkt. 43 at 37.  Idaho Power's statement, taken from an April 2013 letter to BLM, in context provides:

> Although undergrounding the transmission line is theoretically feasible, Idaho Power is not comfortable or willing to entertain this option due to the extreme installation costs, operations and maintenance outage windows, unknown/unproven reliability, and unknown/unproven service life. … Repair of the duct bank itself, should the occasion arise, could extend well beyond a 1 month timeframe.  This is a serious concern when considering the overall operational impacts of removing a major 500 kV transmission line from service for any time period, and the risk to large amounts of system load.

AR 134845.  Far from foreclosing BLM's ability to perform a reasoned analysis, Idaho Power's response appropriately articulated legitimate concerns about the drawbacks of a particular technology or alternative.  This is exactly the give-and-take that NEPA requires.

---

by BLM avoids greater sage-grouse habitat whereas Idaho Power's initially proposed route would preserve views by routing east of the Interpretive Center but would also cross sage-grouse priority habitat), *see also* AR 158410, 158898–99 (explaining Oregon and BLM are unlikely to approve routes to the east of the Interpretive Center impacting sage-grouse habitat).

Plaintiffs also try misdirection, selectively citing the record to suggest that undergrounding of transmission lines is commonplace, claiming that "a 3.5 mile 500 kV line had been buried in Chino Hills, California." Dkt. 43 at 35. But the EIS makes exactly the opposite point. Far from acknowledging the customariness of undergrounding high voltage transmission lines, BLM observes "[b]urying 500-kV transmission lines is *not* commonly considered due to significant technical challenges, minimal experience with the technology worldwide, reduced reliability, ground disturbance from trenching or boring, and significant costs. … There are only three such underground 500-kV installations in the world [including one in California]." AR 170206 (emphasis added). The existence of a single outlier transmission project in the United States utilizing new and relatively untested technology does not obligate BLM to carry forward an alternative that the agency has reasonably determined does not meet the purpose and need of the B2H Project.

### 3. BLM is not required to prepare a Supplemental EIS to reevaluate the feasibility of burying portions of the B2H Project transmission line.

Plaintiffs also assert that BLM is required to prepare a Supplemental EIS to consider "new information" that purportedly provides "additional examples of projects and industry publications show[ing] that the feasibility and reliability of burying segments of transmission lines has increased as costs have decreased." Dkt. 43 at 20, 38. This argument fails, as discussed above, because Plaintiffs identify no *ongoing* action that needs to be supplemented. Even if there were an ongoing action, the supposed new evidence falls well short of the required showing of "a *seriously* different picture of the environmental landscape." *City of Olmsted Falls*, 292 F.3d at 274.

Plaintiffs' Motion for Summary Judgment cites only two examples to support their claim.[23]  Dkt. 43 at 20, 38.  The first example is a *proposal* by SOO Green to bury a 350-mile high-voltage *direct-current* transmission line[24] in the Midwest along existing rail corridors.  *See* Dkt. 43 at 20; Dkt. 46-7.  The second is a two-page *brochure* from AEP Transmission "indicating that it might cost only five times as much to bury a section of transmission line in a rural area."  Dkt. 43 at 20; Dkt. 46-9.  Strikingly, neither of Plaintiffs' examples of "new information" involve the successful permitting, construction, or operation of a buried high-voltage *alternating-current* 500-kV transmission line.[25]  Nor do they address the environmental consequences of those projects.

If the bar is so low that mere "proposals" and "brochures" are enough to trigger the "significant new circumstances or information" standard for a Supplemental EIS, project

---

[23] Although not specifically referenced in their Motion for Summary Judgment, Plaintiffs include a third exhibit, an article from an online Canadian construction trade website, discussing the authors' experiences on a small-scale underground utility project to reconfigure a substation in southern Alberta.  *See* Dkt. 46-8.  Considering the author "provides engineering services on a variety of transmission line projects ranging in voltages from 43.5 kV to 240 kV," *id.* at 12, it is unclear how the information in the article presents "significant new circumstances or information" that would have any bearing or relevance to the construction of a 300-mile high-voltage 500-kV transmission line.

[24] Unlike the SOO Green proposal, the B2H Project is a high-voltage *alternating-current* transmission line.  The BLM eliminated a direct-current transmission line from consideration for the B2H Project because direct-current cannot provide for bi-directional electrical transmission between the Pacific Northwest and the Intermountain West, and therefore did not meet the Project's purpose and need.  *See* AR 170205–06.

[25] Ironically, far from providing "significant new information," the AEP brochure cited by Plaintiffs observes "multiple factors can affect the reliability and security of underground and overhead transmission lines," and notes that for underground lines, "outages can last days or weeks depending on the time it takes to mobilize crews, obtain appropriate equipment, locate the issue and complete repairs underground. … Isolating and fixing the problem can take a while." Dkt. 46-9 at 1.  *These are the very same reasons that BLM eliminated burial of the transmission line from further analysis*.

opponents could indefinitely stall the NEPA review process by forcing an agency back to the

drawing board based on nebulous or speculative assertions of "new information." *See*

*Headwaters, Inc. v. BLM, Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir. 1990) (affirming BLM's

decision not to supplement where plaintiffs' "'new' evidence was either not credible, lacking

significance, or adequately addressed in the existing [NEPA] statements").

### 4.    BLM appropriately considered mitigation to the Oregon Trail

Plaintiffs claim that BLM did not sufficiently evaluate the effectiveness of proposed

mitigation measures and argue the "[CMP] does not evaluate whether it would be effective at

avoiding impacts to the Oregon Trail … ."  Dkt. 43 at 39.  But neither the Administrative Record

nor caselaw support Plaintiffs' argument.[26]

Contrary to Plaintiffs' assertions, BLM addressed the effectiveness of mitigation

measures designed to reduce visual impacts around the Oregon Trail as well as other impacted

National Historic Trails in the "Mitigation Planning and Effectiveness" section of the EIS.  AR

171984–87.  The EIS specifically analyzes 10 selective mitigation measures that are designed to

minimize or avoid impacts to the landscape near the Oregon Trail, including a description of

each measure's anticipated effectiveness at mitigating impacts to visual resources.  *See, e.g.*, AR

171985–86 ("This selective mitigation measure [minimizing tree clearance] would reduce

impacts by decreasing visual contrast created by the removal of overstory vegetation (trees) and

the hard visual line created by the cleared right-of-way or forest interface as well as screening

views from trail-associated viewing locations by limiting clearing in the immediate

---

[26] Plaintiffs incorrectly state that mitigation for the Oregon Trail must achieve no net loss.  That level of mitigation is not required for impacts to trails.  *See* AR 173076 (compensatory mitigation for trails designed to meet "requirement to not substantially interfere with the nature and purposes of the trail").

foreground."); AR 171986 (discussing how tower design for the transmission line has been modified to match towers of existing parallel transmission lines to reduce visual contrast "so the structures begin to blend into the setting"); AR 171987 (describing how the use of helicopters in construction of the B2H Project will "reduce visual contrast . . . by limiting the amount of landform disturbance and vegetation removal created by the construction of new access roads"). BLM's thorough discussion of mitigation in the EIS and appendices contain sufficient detail to ensure that the environmental consequences of the B2H Project have been fairly evaluated. *Methow Valley*, 490 U.S. at 352.

Plaintiffs rely on *South Fork Band Council of Western Shoshone of Nevada v. U.S. Department of the Interior*, 588 F.3d 718 (9th Cir. 2009), but that case is plainly inapposite. In *South Fork Band*, the Ninth Circuit determined that an EIS did not sufficiently assess the effectiveness of the mitigation measures relating to groundwater removal because it stated only that the "[f]easibility and success of mitigation would depend on site-specific conditions and details of the mitigation plan." *Id.* at 727. The Court noted nothing was said in the EIS about whether the mitigation measures would *avoid* any of the anticipated harms. Here, by contrast, the BLM fully evaluated the effectiveness of the proposed selective mitigation measures.

Plaintiffs effectively ignore the "selective" mitigation measures, and as with the sage-grouse, complain about the potential effectiveness of additional "compensatory" mitigation measures contemplated in Appendix C. Dkt. 43 at 39. This argument ignores the extensive framework for compensatory mitigation measures contained in the EIS and misapplies the applicable legal standard for considering the effectiveness of mitigation. NEPA does not "demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act" or a "detailed explanation of specific measures which *will* be employed to

mitigate the adverse impacts of a proposed action[.]" *Methow Valley*, 490 U.S. at 353 (internal citation and quotation marks omitted).

Regardless, any suggestion that compensatory mitigation for the B2H Project will be insufficient is without merit. The EIS and its appendices contain a detailed Mitigation Framework that identifies several types of compensatory mitigation to offset residual impacts on views from trail-associated recreation sites and viewing locations. *See, e.g.*, AR 173074–77. These potential measures include, but are not limited to, securing additional trail land or perpetual conservation easements, funding updates to existing interpretive sites (including the Interpretive Center), establishing protective barriers, restoration work, identifying and funding new interpretive sites or areas, establishing new interpretive signs, kiosks, and visitor centers, and parking areas to facilitate access to historic trails. AR 173076–77. Significantly, "[t]he final detailed compensatory mitigation plan will be developed through both coordination with BLM National Trails staff and the guidance of the cooperating agencies." AR 173077.[27] Idaho Power cannot begin construction on the B2H Project until the Final CMP has been finalized in consultation with numerous cooperating agencies, including the National Park Service, which is responsible for overseeing National Historic Trails. *See id.* ("This final detailed compensatory mitigation plan will be reviewed by the cooperating agencies and a recommendation will be made to the Authorized Officer for approval prior to any issuance of Notice to Proceed."); AR 173704 ("The [NPS] has been invited to participate in this consultation in its capacity as

---

[27] Compensatory mitigation for the B2H Project will be determined in accordance with a Programmatic Agreement between numerous state, federal, and tribal entities that sets forth in detail the process for selecting, implementing, and ensuring the effectiveness of Project mitigation. *See* AR 173700–35 (Final EIS Appendix I).

administrator of the Oregon National Historic Trail … .").  Accordingly, there is no situation in which the B2H Project will proceed without sufficient or effective mitigation.

The decision in *National Parks Conservation Association v. Jewell*, 965 F. Supp. 2d 67 (D.D.C. 2013) is instructive.  Similar to the present case, the district court considered environmental plaintiffs' challenge to an agency's decision to grant special use permits and an ROW for construction of a transmission line.  And like the current case, plaintiffs argued that the agency failed to sufficiently analyze the effectiveness of compensatory mitigation measures in the EIS.  The court observed, "[h]ere, the plaintiffs also want the specifics of compensatory mitigation measures *now*, but the [Final] EIS was required to provide only a reasonably complete discussion of potential mitigation measures."  *Id.* at 76 (internal citation and quotation marks). The district court held that in establishing both fixed mitigation measures to avoid impacts as well as compensatory mitigation measures that would be tailored to unavoidable project impacts, the Final EIS satisfied NEPA's mandate to discuss possible mitigation measures.  *Id.*  This Court should apply the sound reasoning from *National Parks Conservation Association* to reject Plaintiffs' claims.

C.    **The Mill Creek Alternative Does Not Require Supplemental NEPA Analysis or Additional Public Comment.**

BLM's EIS comprehensively evaluated the impacts of 48 different alternative routes across six different segments for the B2H Project.  AR 169933–45 (Table S-1).  One of those alternative routes – the 35-mile "Mill Creek Alternative" in segment two – was added to the Final EIS based on Draft EIS comments from Union County, requesting that BLM consider a route paralleling the existing 230-kV transmission line except for a deviation to the west in the area of La Grande.  AR 169936, 156530.  The ROD describes the Mill Creek Alternative as:

following the existing 230-k-V transmission line until Table Mountain where this alternative route *avoids closely approaching La Grande*, and residences south of town, by turning to the south and would be located 1 mile east of Morgan Lake.

AR 156530 (emphasis added).  The Mill Creek Alternative comprises the same geography and affected resources as other alternatives, and, as such, is a minor deviation from the routes disclosed and evaluated in the Draft EIS.  AR 55757, 170150.

Significantly, the Mill Creek Alternative is *not* on BLM managed land (*see* AR 169953), and BLM chose *not* to adopt that Alternative in the ROD.  Instead, the Selected Agency Preferred Alternative "is west of and the farthest from La Grande and associated land uses and cultural resources, including the Oregon National Historic Trail."  AR 156543.  Nonetheless, Plaintiffs contend that the Mill Creek Alternative is more environmentally damaging than disclosed in the EIS and that the inclusion of this alternative in the Final EIS "obligat[ed] the Bureau to prepare a Supplemental DEIS for public comment before proceeding to the FEIS." Dkt. 43 at 39 (*citing* 40 C.F.R. §§ 1502.9(c)(1)(ii), (c)(4)).  This argument is legally and logically flawed.

Principally, no "rule of reason" is served by requiring an agency to supplement a draft or final EIS to consider *additional environmental impacts* of an alternative the agency *did not adopt*.  "NEPA imposes procedural mandates for the purpose of ensuring informed decision making and public participation, not to impose red tape for its own sake."  *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 424 (4th Cir. 2012); *Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1041, 1047 (1st Cir. 1982) ("No purpose would be served by requiring EPA to study exhaustively all environmental impacts at each alternative site considered once it has reasonably concluded that none of the alternatives will be substantially preferable to the proposed site."). Indeed, "[t]he main policy reason for soliciting public comment is to use public input in

assessing a decision's environmental impact," and "agencies must have some flexibility to modify alternatives canvassed in the draft EIS to reflect public input." *Block*, 690 F.2d at 771. "[R]equiring agencies to repeat the public comment process when only minor modifications are made promises to prolong endlessly the NEPA review process." *Id*.

To facilitate NEPA's goals, then Ninth Circuit applies a "pragmatic judgment" as follows:

> (1) whether the alternative finally selected by the [agency] was within the range of alternatives the public could have reasonably anticipated the [agency] to be considering, and (2) whether the public's comments on the draft EIS alternatives also apply to the chosen alternative and inform the [agency] meaningfully of the public's attitudes toward the chosen alternative.

*Id*. at 772 (emphasis added).  This pragmatic test is undisputedly satisfied here.  The Mill Creek Alternative is neither the "alternative finally selected" nor the "chosen alternative."  Rather it was one of more than 40 alternatives that were considered but ultimately *rejected* by BLM.

Likewise, NEPA regulations require supplementation of a final EIS if the agency makes "substantial changes to *the proposed action*," or where there is new "information relevant to environmental concerns and bearing on the *proposed action* or its impacts."  40 C.F.R. §§ 1502.9(c)(1)(i)–(ii) (2019) (emphasis added).  But the Mill Creek Alternative is not included within BLM's "proposed action."  BLM proposed (and approved) a ROW through BLM land that does *not include* the Mill Creek Alternative.  BLM thus has no duty to supplement its EIS based on claims that the Mill Creek Alternative (if it *had* been selected) would have had more impacts than disclosed in the EIS.

In any event, Plaintiffs do not dispute that the EIS provided sufficient analysis for BLM to *decline* to select the Mill Creek Alternative, as Plaintiffs desired.  Since BLM concluded that the Mill Creek Alternative was not environmentally preferable to the Agency's Preferred

Alternative, "[n]o purpose would be served by requiring" BLM "to study exhaustively all environmental impacts" of that less desirable and rejected alternative. *Roosevelt Campobello*, 684 F.2d at 1047 (NEPA's evaluation of alternatives is guided by "rule of reason").

Plaintiffs' real concern is that EFSC (not BLM) may choose the Mill Creek Alternative because Idaho Power originally proposed that Alternative to EFSC. Idaho Power, however, no longer prefers that Alternative. *See* Second Colburn Decl. ¶ 5. In any event, this is an issue that Plaintiffs must take and have taken up with EFSC.[28] EFSC is performing its own environmental review, and Plaintiffs are currently participating in that administrative process and are free to submit the arguments marshalled in this case to EFSC. Plaintiffs' concerns about EFSC's future actions provide no basis for challenging BLM's reasoned analysis of alternatives in the EIS.

**D.    BLM Complied with FLPMA by Including Protective Terms, Conditions, and Stipulations in the ROW Grant to Idaho Power.**

Finally, Plaintiffs allege that BLM also violated FLPMA because "the rights-of-way issued by the Bureau do not contain obligatory terms and conditions that would minimize such damage." Dkt. 43 at 42. These arguments are also unsupported by the law[29] or the facts. BLM followed FLPMA's requirements in issuing the ROW grant for the B2H Project. BLM imposed terms and conditions on the ROW to minimize environmental impacts from the Project. *See* AR 156448 (listing terms and conditions of ROW grant). Specifically, the ROW's Special Stipulations and General Conditions require completion of the "comprehensive Compensatory Mitigation Plan, including appropriate compensatory mitigation for greater sage-grouse, riparian

---

[28] *See* http://stopb2h.org/our-strategy/ (last visited Oct. 18, 2020) (listing Plaintiffs' "four-pronged strategy" to include participating in and contesting the B2H Project through the Oregon energy facility siting process).

[29] The Utilities adopt the government's articulation of FLPMA's requirements. Dkt. 53 at 34.

conservation areas, Historic Oregon Trail, and cultural resources … ."  AR 156487.  Other

required conditions include management plans for historic properties and environmental

compliance as well as a biological resources conservation plan.  *See* AR 156486–87.  The ROW

grant incorporates all BMPs and mitigation measures contained in the Final EIS, ROD, and the

Plan of Development.[30]

This Court should adopt the reasoning in *Protect Our Communities Foundation v. U.S.

Department of Agriculture*, 11-CV-00093, 2011 WL 13356151, slip op. (S.D. Cal. Sept. 15,

2011) where environmentalists sought a preliminary injunction challenging approval of 117-mile

transmission line passing through Forest Service lands.  Plaintiffs sought to bury segments of the

transmission line and to require that the route avoid certain sensitive resources.  *Id.* at *8.  The

district court rejected plaintiffs' argument as to the sufficiency of the ROW terms and conditions

under FLPMA, noting that the agency's ROW grant adopted the extensive mitigation measures

from the EIS and ROD as well several conservation, restoration, and management plans.  *Id.*

The court concluded these mitigation measures were more than sufficient to "minimize damage

to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment"

under 43 U.S.C. § 1765(a)(ii).  *Id.*

Plaintiffs' argument essentially boils down to a disagreement with BLM over the specific

terms and conditions *that Plaintiffs would prefer*, including "a condition on the ROWs over

public land that the public lands could only be used if [the Mill Creek Alternative] route was

---

[30] *See* AR 156448 ¶ D (BMPs and mitigation measures "are incorporated into and made a part of
this grant instrument as fully and effectively as if they were set forth here in their entirety.").
Failure to comply with the terms and conditions established by the ROW would constitute
grounds for suspension or termination of the ROW grant.  *See* AR 156447 ("The Authorized
Officer will review the application for renewal to ensure the Holder is complying with the terms,
conditions, and stipulations of this instrument and applicable laws and regulations.").

avoided," and "a condition protective of sage-grouse, for example the avoidance of an area at least four, and possibly more, miles from active leks[.]"  Dkt. 43 at 42.  But nothing in FLPMA, NEPA, or the applicable RMPs require BLM to adopt these conditions.[31]  BLM did not select the Mill Creek Alternative (which is not even on BLM land), and BLM was plainly not obligated to preclude activity on non-federal lands that it did not select for inclusion in the Agency Preferred Alternative.  The 2015 sage grouse ARMPA is inapplicable and the BLM adequately protected that resource by ensuring that the Project includes mitigation that achieves a net benefit.

## IV.  CONCLUSION

For the reasons provided above, and in the federal government's memorandum, the Utilities respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment and grant summary judgment to the Utilities and the federal government.

DATED:  October 22, 2020

STOEL RIVES LLP

*s/ Beth S. Ginsberg*
BETH S. GINSBERG (OSB No. 070890)
beth.ginsberg@stoel.com
JAMES C. FELDMAN (*pro hac vice*)
james.feldman@stoel.com

*Attorneys for Intervenor-Defendants Idaho Power Company and PacifiCorp*

---

[31] The single case cited by Plaintiffs to support this argument, *State of Montana v. Johnson*, 738 F.2d 1074 (9th Cir. 1984), merely holds that section 505(a)(iv) of FLPMA allows states to impose more stringent measures of environmental protection on ROW grantees than the federal government requires.  *Id.* at 1079.  This case provides no support for Plaintiffs' position that FLPMA requires BLM to include the specific conditions Plaintiffs advocate in its ROW grants.