**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
4110 SE Hawthorne Blvd. # 168
Portland, OR 97214
(503) 388-9160
davebeckerlaw@gmail.com

**Oliver J. H. Stiefel (OSB # 135436)**
oliver@crag.org – (503) 227-2212
**Maura C. Fahey (OSB # 133549)**
maura@crag.org – (503) 525-2722
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Fax: (503) 296-5454

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PENDLETON DIVISION

| | |
|---|---|
| **STOP B2H COALITION**, *et al.* | Case No. 2-19-cv-01822-SI |
| Plaintiffs, | |
| v. | **PLAINTIFFS' RESPONSE TO CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| **BUREAU OF LAND MANAGEMENT**, *et al.*, | |
| Defendants | |
| and | |
| **IDAHO POWER COMPANY** and **PACIFICORP**, | |
| Intervenor-Defendants | |

<u>**TABLE OF CONTENTS**</u>

**TABLE OF CONTENTS** ................................................................................... i
**TABLE OF AUTHORITIES** .......................................................................... iv
**GLOSSARY OF ACRONYMS** ...................................................................... vi

**INTRODUCTION** ............................................................................................ 1

**ARGUMENT** ................................................................................................... 2

  **I. LEGAL STANDARDS: THE UNDERLYING PURPOSES OF NEPA AND THE
      SCOPE OF JUDICIAL REVIEW OF AGENCY DECISIONS** ........................ 2

    **A.**  **The Bureau Misunderstands the Purpose of NEPA as a Means of
        Disclosing Information About How to Avoid or Minimize Harm to
        the Environment** ........................................................................................ 2

    **B.**  **To Ensure Informed Decisionmaking and Public Participation, an
        Agency Must Follow NEPA Procedures Strictly and Fully and
        Fairly Disclose an Action's Likely Environmental Impacts.** ................... 3

    **C.**  **An Agency's Reasoning Must be Articulated in the FEIS itself, not
        in Post Hoc Rationalizations by Counsel or Other Parties.** .................... 4

  **II. THE BUREAU'S ANALYSIS OF THE B2H PROJECT'S LIKELY HARM TO
      SAGE-GROUSE VIOLATED NEPA** ............................................................ 5

    **A.**  **The Bureau Violated NEPA by not Disclosing Accurate Baseline
        Information About, or Taking a Hard Look at, the Likely Effects to
        the Species, its Habitat, and the Magnitude of Likely Harm from
        the Project.** ................................................................................................ 5

      **1.**  *The Bureau's inclusion of incorrect and misleading information about the amount
         of habitat available to the Baker population violates NEPA.* ........................... 5

      **2.**  *The Bureau misrepresents its statements in the FEIS regarding the Baker
         population's risk of extirpation, and the FEIS does not provide an accurate
         baseline of the extreme risk the population would be extirpated.* ................... 8

      **3.**  *The Bureau violated NEPA by not disclosing the distribution of the remaining
         birds in the Baker population because the agency had that information and effects
         of the Project on active leks vary by distance.* ............................................ 10

      **4.**  *The Bureau's limitation of its indirect impacts analysis to only those leks within 3.1
         miles of the transmission line route was arbitrary and capricious.* ...................... 14

**5.** *The failure to disclose that the Baker population's winter habitat is immediately adjacent to the Project route and evaluate the effects of the Project on winter habitat violates NEPA.* ............................................................ 16

**B.**    **The Bureau Promised the Public That the B2H Project Would Result in a Net Conservation Gain to Sage-Grouse But Failed to Evaluate the Effectiveness of Compensatory Mitigation and Other Proposed Mitigation.**................................................................17

**1.** *The Bureau's promise that the B2H Project would result in a net conservation gain to sage-grouse required the agency to evaluate whether compensatory mitigation could be effective in achieving that result, but the Bureau did not evaluate the effectiveness of compensatory mitigation.* ................................................. 17

**2.** *The Bureau did not evaluate the effectiveness of mitigation to protect sage-grouse from avian predators.* ................................................................. 21

**C.**    **The FEIS Does not Analyze Cumulative Impacts to Sage-Grouse from Livestock Grazing, and this Omission is Arbitrary and violates NEPA.**................................................................22

**D.**    **Because There Remains Major Federal Action to Occur, New Information About the Project's Effects on the Baker Population Requires an SEIS.** ...................................................................26

**1.** *The Bureau's pending decisionmaking and its regulatory authority to change the terms of the ROW show that major federal action remains to occur.* ...................... 26

**2.** *New information regarding the Baker and Oregon sage-grouse populations and the extent of the impact from transmission lines show the Project will affect sage-grouse to a significant extent not considered in the FEIS.* ..................................... 29

**III. DEFENDANTS VIOLATED NEPA BY NOT EVALUATING THE FEASIBLE ALTERNATIVE OF BURYING THE LINE NEAR THE INTERPRETIVE CENTER AND BY NOT EVALUATING WHETHER COMPENSATORY MITIGATION FOR HARM TO THE OREGON TRAIL CAN BE EFFECTIVE**................................................................31

**A.**    **The Bureau Violated NEPA by Failing to Develop and Study an Alternative for Burying the Line Near the Interpretive Center.**...........................31

**B.**    **New Information Confirms That Burying a Short Section is Feasible.**................................................................36

**C.**    **The Bureau did not Evaluate Whether Compensatory Mitigation can be Effective in Avoiding the Visual Harm to the Oregon Trail and Interpretive Center That Otherwise Would Violate the NTSA.** ....................37

**IV. DEFENDANTS VIOLATED NEPA BY NOT PREPARING SUPPLEMENTAL ANALYSIS ON THE MILL CREEK AND MORGAN LAKE ROUTES** ..............39

**A.**    **NEPA Required the Bureau to Issue a Supplemental DEIS for Comments.** .........................................................................................................39

**B.**    **Significant New Information Requires Preparation of a SEIS.** ...........................41

**V. DEFENDANTS VIOLATED FLPMA BY NOT INCLUDING TERMS IN THE ROW TO MINIMIZE DAMAGE TO SCENIC VALUES AND WILDLIFE** ........42

**CONCLUSION** ..................................................................................................... 42

# **TABLE OF AUTHORITIES**

## Cases

*Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124 (9th Cir. 2011)............................................. 24, 34

*Blue Mountains Biodiversity Proj. v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ...................... 15

*Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982).................................................................................. 41

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142 (9th Cir. 1997) ................. 20

*City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975).............................................................. 37

*Cold Mountain v. Garber*, 375 F.3d 884 (9th Cir. 2004).............................................................. 28

*Ctr. for Biol. Diversity v. Bureau of Land Mgmt.*,
    Nos. 2:14–cv–00226–APG, 2:14–cv–00228–APG, 2017 WL 3667700
    (D. Nev. Aug. 23, 2017) ........................................................................................................ 28

*Ctr. for Biol. Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013) .............................................. 28

*Ctr. for Biol. Diversity v. U.S. Forest Serv.*, 349 F.3d 1157 (9th Cir. 2003)........................ 3, 9, 12

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ................... 4, 25

*Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114 (D. Mont. 2016)......................................... 18

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000)..................................... 31, 37

*Great Basin Mine Watch v. Hankins*, 456 F.3d 955 (9th Cir. 2006) ....................................... 10, 17

*Hammond v. Norton*, 370 F. Supp. 2d 226 (D.D.C. 2005) ........................................................... 28

*Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146 (9th Cir. 1998) ..................................... 10, 14, 32

*Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002)................. 14, 15, 16, 25

*Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549 (9th Cir. 2006)................................... 31

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004) ............................................................ 10, 17, 23, 25, 32

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*,
    No. CIV 06-1604-CL, 2007 WL 2068667 (D. Or. July 16, 2007) ....................................... 29

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976).................................................................................. 26

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517 (9th Cir. 1994) ........................... 22

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2004) ........................................................ 2, 13

*League of Wilderness Defs. v. Marquis-Brong*, 259 F. Supp. 2d 1115 (D. Or. 2003)................. 15

*League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ............................................................................................... 26

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989)......................................... 26, 27, 28, 29, 41

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000).......................................................................... 4

*Michigan v. EPA*, 576 U.S. 743 (2015) ....................................................................................... 4

*Moapa Band of Paiutes v. Bureau of Land Mgmt.*,
    No. 2:10-CV-02021-KJD, 2011 WL 4738120 (D. Nev. Oct. 6, 2011) .................................. 28

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir 1999)........... 32, 33, 34, 35

*N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006)................................... 4, 8, 14

*Nat'l Parks & Conserv. Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058 (9th Cir. 2010) 12, 22, 34

*Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953 (9th Cir. 2005)........................ 7, 8

*Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998)........................... 17

*Okanogan Highlands All. v. Williams*, 236 F.3d 468 (9th Cir. 2000) ......................................... 22

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010) 3, 4, 9, 19, 36, 38

*Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185 (9th Cir. 2019) ................................................. 4, 5

*Or. Nat. Res. Council v. Marsh*, 52 F.3d 1485 (9th Cir. 1995)................................................... 37

PLAINTIFFS' RESPONSE TO CROSS-MOTIONS FOR SUMMARY JUDGMENT AND
REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

iv

*Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120 (9th Cir. 2007)...........................................23
*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015).........................15
*Pac. Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012 (9th Cir. 2012) ................................4, 22
*Portland Gen. Elec. Co. v. BPA*, 501 F.3d 1009 (9th Cir. 2007)...............................................24
*Protect Our Communities Found. v. Jewell*, 825 F.3d 571 (9th Cir. 2016)...............................20
*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).......................3, 4, 20, 21, 39
*Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037 (9th Cir. 2011)........................40
*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
   588 F.3d 718 (9th Cir. 2009) ..........................................................................................20
*Western Watersheds Proj. v. Abbey*, 719 F.3d 1035 (9th Cir. 2013)....................................32, 36
*WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208 (D. Or. 2019) .....................................26
*WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920 (9th Cir. 2015) ..........11, 12, 16

## Statutes
16 U.S.C. § 1246(c) ..........................................................................................................35
43 U.S.C. § 1732(b) ..........................................................................................................19
43 U.S.C. § 1765(a)(ii) ......................................................................................................42
43 U.S.C. § 1765(b)(i) .......................................................................................................42


## Regulations
40 C.F.R. § 1500.1(b) ......................................................................................................7, 9
40 C.F.R. § 1500.2(b) ..........................................................................................................3
40 C.F.R. § 1502.1 ..............................................................................................................2
40 C.F.R. § 1502.2(g) ........................................................................................................32
40 C.F.R. § 1502.8 ..............................................................................................................3
40 C.F.R. § 1502.9(c)(1)(ii) ..........................................................................................29, 30
40 C.F.R. § 1502.9(d)(1)(ii) (2020) ....................................................................................29
40 C.F.R. § 1502.14 ...........................................................................................................36
40 C.F.R. § 1505.2(c) ..........................................................................................................2
40 C.F.R. § 1505.3 .......................................................................................................18, 19
40 C.F.R. § 1506.1(a) .........................................................................................................32
40 C.F.R. § 1508.1(g) (2020) .............................................................................................26
40 C.F.R. § 1508.1(q)(2) (2020) ........................................................................................27
40 C.F.R. § 1508.8(b) .........................................................................................................24
40 C.F.R. § 1508.18(a) .......................................................................................................27


## Other Authorities
*Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act*
   *Regulations*, 46 Fed. Reg. 18026 (Mar. 23, 1981).........................................................34, 40

PLAINTIFFS' RESPONSE TO CROSS-MOTIONS FOR SUMMARY JUDGMENT AND
REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

v

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| APA | Administrative Procedure Act |
| ARMPA | 2015 Oregon Greater Sage-Grouse Approved Resource Management Plan Amendments |
| B2H Project | Boardman to Hemingway Transmission Line Project |
| Bureau | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| CMP | Compensatory Mitigation Plan |
| COT | Conservation Objectives Team |
| DOI | U.S. Department of the Interior |
| DOI ROD | Record of Decision for DOI Approving B2H Project Right-of-Way |
| DEIS | Draft Environmental Impact Statement |
| EFSC | Energy Facility Siting Council (Oregon Department of Energy) |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy Management Act |
| Forest Service | U.S. Forest Service |
| GHMA | General Habitat Management Area |
| NEPA | National Environmental Policy Act |
| NHOTIC | National Historic Oregon Trail Interpretive Center |
| NTP | Notice to Proceed |
| NTSA | National Trails System Act |
| ODFW | Oregon Department of Fish & Wildlife |
| PAC | Priority Area of Conservation |
| PHMA | Priority Habitat Management Area |
| POD | Plan of Development |
| ROW | Right-of-way |
| RMP | Resource Management Plan |
| SEIS | Supplemental Environmental Impact Statement |
| USFWS | U.S. Fish & Wildlife Service |

## INTRODUCTION

The Bureau and intervenors ("Idaho Power") do not refute that the Bureau failed to take a searching and careful "hard look" at the B2H Project's effects under NEPA and to impose protective terms, conditions, and stipulations under FLMPA. Defending its actions, the Bureau relies on post hoc rationalizations rather than pointing to rationales offered in the decision documents themselves, and evinces several fundamental misunderstandings of the purpose of NEPA and the procedures that must be followed to prepare a lawful analysis.

Regarding the Baker sage-grouse population, the FEIS misrepresents and obscures information to downplay negative side effects. It omits key scientific data—such as the extreme risk of extirpation, the distribution of the remaining birds in relation to the line, and the cumulative effects of grazing—skewing the analysis to present as rosy a picture of the Project as possible and minimize the harm it is likely to cause to sage-grouse. The Bureau also acted arbitrarily by eliminating the admittedly feasible alternative of burying the Project's line near the Oregon Trail Interpretive Center, which would better protect that resource, and by not allowing the public the chance to comment on new routes near La Grande added to the FEIS. With an incomplete discussion of the B2H Project's impacts, the FEIS failed to provide a full and fair discussion of mitigation measures, including whether compensatory mitigation could off-set the serious harm, despite the fact that the B2H ROW *requires* a net conservation gain to sage-grouse and no net loss to the Oregon Trail's visual resources. Finally, significant new information has emerged, further calling into question the Bureau's representations about the B2H's Project's environmental consequences—yet the Bureau has not even considered this information.

Because the Bureau did not follow required procedures or fully and fairly discuss the likely harm from the B2H Project, the Bureau acted arbitrarily and contrary to law.

## ARGUMENT

## I.    LEGAL STANDARDS: THE UNDERLYING PURPOSES OF NEPA AND THE SCOPE OF JUDICIAL REVIEW OF AGENCY DECISIONS

The Bureau's and Idaho Power's cross-motions ignore or misstate fundamental principles of NEPA regarding public disclosure and informed decisionmaking, and rely on post hoc rationales to justify aspects of the FEIS and ROD that the Bureau did not supply in the decision documents themselves. These errors are rife in both cross-motions, and fall into a few general categories which are summarized here. Specific examples of such mischaracterizations and rationalizations are identified throughout this response/reply.

### A.    The Bureau Misunderstands the Purpose of NEPA as a Means of Disclosing Information About How to Avoid or Minimize Harm to the Environment.

The Bureau evinces a fundamental misunderstanding of the purpose of NEPA in arguing that "[b]ecause NEPA does not mandate particular results, there is no reason to minimize the B2H Project's environmental impacts." Defs. Br. (ECF No. 53) at 10 n.4. However, the very purpose of NEPA is to "provide full and fair discussion of significant environmental impacts and . . . inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.[1] Full and fair disclosure of likely environmental harm is meant "to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005). The EIS informs the ROD, which must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted." 40 C.F.R. § 1505.2(c).

---

[1] Plaintiffs agree with the Bureau and Idaho Power that the NEPA regulations in effect prior to September 14, 2020, govern this Court's review of the FEIS and ROD. Citations herein to these regulations are to the version in effect from 1978 until this earlier year, unless otherwise noted.

While NEPA does not mandate particular results, an EIS must include a full and fair discussion of "the extent to which adverse effects can be avoided." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989). This includes assessing "every significant aspect of the environmental impact" of a proposed action, and the analysis must address "considerations made relevant by the substantive statute driving the proposed action." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.* ("*ONDA v. Bureau*"), 625 F.3d 1092, 1109 (9th Cir. 2010).

### B.    To Ensure Informed Decisionmaking and Public Participation, an Agency Must Follow NEPA Procedures Strictly and Fully and Fairly Disclose an Action's Likely Environmental Impacts.

The Bureau argues that it was not required to include underlying data in the FEIS and that cryptic statements in scattered sections of the FEIS satisfy its disclosure obligations. *E.g.* Defs. Br. at 12–14, 16. But because NEPA is a procedural statute, its provisions must be strictly followed. *Ctr. for Biol. Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) ("The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted 'to the fullest extent possible' in accord with the policies embodied in the Act."). Among these are that an EIS "shall be concise, clear, and to the point, and shall be supported by evidence," and "shall be written in plain language . . . so that decisionmakers and the public can readily understand them." 40 C.F.R. §§ 1500.2(b), 1502.8. An EIS can thus "fulfil its role as an 'action-forcing device' . . . conducive to public analysis and agency reflection." *ONDA v. Bureau*, 625 F.3d at 1121 n.24. "NEPA is not a paper exercise," *id*. at 1124, but rather its goals are "realized through a set of 'action-forcing' procedures" which—if strictly followed—are "almost certain to affect the agency's substantive decision." *Robertson*, 490 U.S. at 350. An agency's final decision can be unwise, but NEPA prohibits it from being uninformed. *Id*. at 351.

NEPA also requires "that projects be objectively evaluated," with the "hard look" "taken

objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge

designed to rationalize a decision already made." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir.

2000). To this end, the "discussion of adverse impacts" must "not improperly minimize negative

side effects." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006).

### C.    An Agency's Reasoning Must be Articulated in the FEIS itself, not in Post Hoc Rationalizations by Counsel or Other Parties.

The cross-motions assert justifications for the Bureau's action that the agency did not

invoke in the FEIS or ROD, offering post hoc rationalizations for its failure to provide accurate

information or clear, full, and fair discussions of the Project's likely harm and whether it can be

mitigated. But the NEPA document "is where the [Bureau's] defense of its position must be

found." *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019) (alteration original,

quotation omitted); *see Robertson*, 490 U.S. at 352 ("the EIS will discuss the extent to which

adverse effects can be avoided"); *Pac. Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1031–

32 (9th Cir. 2012), *judgment vacated*, 570 U.S. 901 (2013) ("Discussion of significant

environmental impacts must appear in the text of an EIS."). If an agency does not articulate "a

position in the EIS itself," a court cannot defer to "*post hoc* rationalizations for agency

action." *ONDA v. Bureau*, 625 F.3d at 1120.

The Supreme Court recently emphasized that it is a "'foundational principle of

administrative law' that judicial review of agency action is limited to 'the grounds that the

agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of

Cal.*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). The

Court reiterated the "basic rule" that "[a]n agency must defend its actions based on the reasons it

gave when it acted." *Id.* at 1909. The requirement of contemporaneous explanation prohibits post

hoc rationalizations, whether by the agency, its counsel, or an intervenor. *See id.* at 1908–09.

II.    **THE BUREAU'S ANALYSIS OF THE B2H PROJECT'S LIKELY HARM TO SAGE-GROUSE VIOLATED NEPA**

The record shows the Baker sage-grouse population is at extreme risk of extirpation and half its remaining birds use leks likely to be harmed by the Project, making it likely the Project will drive the population extinct. But the FEIS omits and distorts essential baseline information, hiding data about the distribution of the remaining birds and the magnitude of risk of extirpation, and downplaying the risk of harm from the Project. New information shows the extent of the Project's impacts to be far greater than disclosed in the FEIS, requiring a supplemental EIS.

A.    **The Bureau Violated NEPA by not Disclosing Accurate Baseline Information About, or Taking a Hard Look at, the Likely Effects to the Species, its Habitat, and the Magnitude of Likely Harm from the Project.**

Establishment of an accurate baseline is a critical prerequisite to an agency's accurate disclosure of information about a project's likely harm to the environment and to the agency's "hard look" at environmental consequences. *Rose*, 921 F.3d at 1190–92. However, the FEIS includes inaccurate, misleading, and skewed baseline information that precluded a "hard look" and an informed decision by the agency official whether to authorize the Project.

1.    *The Bureau's inclusion of incorrect and misleading information about the amount of habitat available to the Baker population violates NEPA.*

The FEIS provides fundamentally inaccurate and misleading baseline information. The Bureau's assertion that the 853,848-acre figure in the FEIS is the "'current amount of habitat available to this [the Baker] population' according to [ODFW]" is false. Defs. Br. at 11 (quoting AR_170812) (second alteration added). The FEIS cites to the ODFW *Sage-Grouse Conservation Assessment and Strategy*, but the 853,848-acre figure does not appear in that document. *See* AR_129661–881. Instead, the 2011 ODFW *Strategy* includes figures for "[c]urrent distribution and status of habitat" (as of 2009), stating that "435,979 acres . . . of [the Baker Resource Area]

was comprised of sagebrush, and 88% of that appeared to be high viability habitat."

AR_129733.[2] Thus the 2011 ODFW *Strategy* actually discloses that *at most* only *half* of the

habitat figure stated in the FEIS was "available" to the sagebrush-obligate Baker population in

2009. It may be even less: the FEIS adds that only "243,259 acres . . . of the 336,539-acre Baker

Oregon PAC is comprised of *existing* [sage-grouse] habitat—with the rest described as "potential

habitat" that is "not currently suitable for [sage-grouse]." AR_170813 (emphasis added).[3]

A comparison of the 2011 ODFW *Strategy*'s maps of sage-grouse habitat viability for the

Baker Resource Area, occupied leks and habitat in Oregon, and Core Areas (equivalent to PACs)

to maps of sage-grouse habitat from the DEIS, FEIS, and the Miller Declaration (prepared from

the 2011 ODFW lek location data) also shows that the 853,848-acre figure is false. *See* Third

Becker Decl. Ex. 1 (filed herewith) at 1–6 (collecting AR_129735, 129765, 129771, AR_16748,

Becker Decl. Ex. 2 (ECF No. 46-2), Miller Decl. Ex. 2 (ECF No. 45-2)). All Baker population

leks and habitat lies northeast of Interstate 84, shown (but not labeled) on the ODFW maps. The

total area of the Baker PAC is 336,539 acres (shown as the blue Core Areas on AR_129771 and

in green on AR_16748, ECF No. 46-2, and ECF No. 45-2)—and thus there would need to be an

area two-and-a-half times larger encompassing the PAC if the 853,848-acre "habitat available"

figure were true. There is not—and that figure is not. *See* Third Becker Decl. Ex. 1 at 1–6.

---

[2] ODFW used Bureau administrative boundaries to estimate the "amount of remaining habitat." AR_129732.

[3] The Bureau also is wrong that—for the Baker population—there is any difference between the "Baker population" and "Baker PAC." Defs. Br. at 11 (citing AR_130586). The FEIS recognizes the PAC "includes much of the current range of the Baker population." AR_170812–13. ODFW assigns all leks in Oregon to PACs and populations—and all of the leks in the Baker population are in the Baker PAC, and vice-versa. *See* Becker Decl. Ex. 3 at 1–2 (ECF No. 46-3). ODFW used a four-mile radius from leks to define Core Areas (which became the PACs) because about 80% of nests are within four miles of leks. AR_129682, 129755. In 2011, the area within four miles of the 11 active Baker population leks lay almost entirely inside the Baker PAC—further proof the Baker population and Baker PAC are coterminous. Miller Decl. Ex. 2 (ECF No. 45-2).

"To take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data in an EIS." *Native Ecosystems Council v. U.S. Forest Serv*., 418 F.3d 953, 964 (9th Cir. 2005) (citing 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.")). The inclusion of the incorrect and misleading 853,848-acre figure for "current amount of habitat available" to the Baker population is significant because it established an erroneous baseline against which the impacts of the B2H Project were evaluated, precluding meaningful public comment and misleadingly exaggerating the Baker population's habitat to minimize the Project's impacts.

For example, the "Anticipated Acres of Disturbance for [sage-grouse] for Segment 3" (affecting the Baker population) for the selected Flagstaff B-Burnt River West alternative is 1,305 total acres. AR_170894. Contra the Bureau, Defs. Br. at 12 n.5, the FEIS pages it cites (AR_170854, 170895) do *not* list the acreage of habitat indirectly disturbed by avoidance and increased predation—though it is likely substantial. *See infra* pp. 14–16. Thus, according to the only concrete figures in the FEIS, the number of acres of Baker population habitat affected by the Project—the 1,305 total acres of "disturbance" (direct effects)—appears miniscule compared to the 853,848 acres of "habitat available" that begins the FEIS's discussion of this population. AR_170812. This presentation is at once highly misleading and fundamentally incorrect.

*Native Ecosystems Council* held that including an incorrect figure in the denominator of a calculation of elk hiding cover "skewed" the EIS's disclosure of this factor and therefore "did not provide a 'full and fair' discussion of the potential effects of the project on elk hiding cover." 418 F.3d at 965. The FEIS echoes this error: vastly overstating how much habitat is available deceives the official deciding whether to approve the Project into thinking any impacts are minor because they are diluted over a vast (albeit incorrect) area of sage-grouse habitat.

This error spills over into the cumulative effects analysis, where the FEIS asserts that, in Segment 3, "[t]he majority of [sage-grouse] habitat would remain undisturbed by the B2H Project and other actions in the [cumulative impacts analysis area]." AR_172569. Without an accurate baseline figure for the amount of sage-grouse habitat, and without disclosing the acreage for the amount of *indirect* harm from increased predation, the Bureau lacked any basis for stating that "the majority" of the habitat "would remain undisturbed"—a statement that downplays and improperly minimizes the adverse side effects of the Project, misleading the public and the decisionmaker. *N. Alaska Envtl. Ctr.*, 457 F.3d at 975.

The Bureau offered incorrect and misleading information about the amount of habitat available to the Baker population in the FEIS. An inaccurate number in a NEPA analysis shows the agency did not correctly disclose the baseline, take a "hard look" at the project's effects, or inform the public of the likely impacts. *Native Ecosystems Council*, 418 F.3d at 965.

> ### 2.  *The Bureau misrepresents its statements in the FEIS regarding the Baker population's risk of extirpation, and the FEIS does not provide an accurate baseline of the extreme risk the population would be extirpated.*

The Bureau is wrong that it accurately established the magnitude of the Baker population's risk of extirpation in the FEIS. Defs. Br. at 12. In litigation, it now claims the FEIS "noted that the Baker population faces a high risk of extirpation," *id*. at 10 (citing AR_170813), that the FEIS "assessed the birds' existence as high risk for extirpation," and that the FEIS "forthrightly disclose[s] that the Baker population—not the sage-grouse species as a whole— may face extinction." *Id.* at 14 (also citing AR_170813). The cited page shows the Bureau's characterizations to be false, and the cryptic statements therein do not inform the public, or the agency decisionmaker, of the magnitude of the Baker population's risk of extirpation.

The FEIS's sphynxlike statement at AR_170813 is that "[f]or the entire population, the

environmental similarity to extirpated populations is high." (citing Wisdom *et al.* 2011). This is

not the clear statement that the population is at high risk of extirpation the Bureau claims. It is

not clear from this statement what the Baker population's risk of extirpation *is*—and thus the

FEIS affords no accurate baseline for evaluating how the B2H Project would contribute to that

risk. NEPA's "disclosure requirement obligates the agency to make available to the public high

quality information, including accurate scientific analysis, expert agency comments and public

scrutiny, before decisions are made and actions are taken." *Ctr. for Biol. Diversity,* 349 F.3d at

1167 (citing 40 C.F.R. § 1500.1(b)). The ambiguous statement here does not constitute "high

quality information" nor an "accurate scientific analysis."

     "Clarity is at a premium in NEPA because the statute . . . is a democratic decisionmaking

tool, designed to 'foster excellent action' by 'help[ing] public officials make decisions that are

based on [an] understanding of environmental consequences.'" *ONDA v. Bureau*, 625 F.3d at

1121 n.24 (alterations original, citation omitted). The FEIS's recital of the Baker population's

risk of extirpation is anything *but* clear. It says only that this population is "more at risk" than the

other populations in Oregon—not at "high risk of extirpation." AR_170813. Idaho Power claims

the FEIS disclosed "higher risk" (actually "more at risk"), but this does not mean "high risk"—a

10% risk is "higher" than a 5% risk. Intvs. Br. at 12. Nor does the FEIS's sole reference to

extirpation related to the Baker population say the population is at a "high risk of extirpation,"

much less "forthrightly" say that it "may face extinction." AR_170813; *see* Defs. Br. at 14.

     Moreover, the agency *had* specific scientific data that would have made the two-in-three

chance of extirpation clear, but did not disclose it. The language on AR_170813 was unchanged

from the DEIS pages the Bureau cites (AR_16752–53), despite the Bureau's Mr. Frederick

urging the agency to cite the population's 61.9% risk of extirpation and the fact that other

Oregon populations had only 2.1% to 5.5% chance of extirpation. AR_33584. This violates NEPA, which "requires that the public receive the underlying environmental data" on which the opinion in the FEIS is based. *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998) ("allowing the [agency] to rely on expert opinions without hard data" is impermissible).

The Bureau's hyperbolic claim that its statement of high environmental similarity to unspecified extirpated populations is a "dooming prediction," Defs. Br. at 10 n.4, is not only wrong, but also does not satisfy NEPA because "vague and conclusory statements, without any supporting data, do not constitute a 'hard look' at the environmental consequences of the action as required by NEPA." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006).[4] The failure to provide the underlying data, and the vague and indecipherable statement downplaying the Baker population's extreme risk of extirpation, violate NEPA. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004) (NEPA "documents are unacceptable if they are indecipherable to the public").

### 3. *The Bureau violated NEPA by not disclosing the distribution of the remaining birds in the Baker population because the agency had that information and effects of the Project on active leks vary by distance.*

NEPA required the Bureau to disclose information about the distribution of the remaining Baker population sage-grouse within the PAC's PHMA habitat because the most serious effects of the transmission line—increased predation and tall-structure avoidance—vary according to the distance from the line, and the distribution of sage-grouse is not uniform throughout the PAC. As plaintiffs demonstrated, half of the remaining population is concentrated on leks within four

---

[4] *Great Basin* took issue with the fact that a report on hazardous waste claimed it could not be quantified—much as the Bureau here refused to quantify the Baker population's risk of extirpation, although it possessed the data—but "the report could at the least quantify the existing volumes of hazardous waste, and fails to do so." 456 F.3d at 973.

miles of the transmission line, an area where the birds are in the most danger from increased predation and likely to avoid the line and abandon their leks. Pls. Br. at 10–12, 28.

Not all habitat within the Baker PAC (*i.e.* PHMA) would be impacted equally by the proximity of the powerline—nor are sage-grouse equally distributed throughout the PAC. In 2011, the 11 active leks lay as close as two (Magpie Creek #1), and as far away as 16 miles (Hutton), from the Project route. Miller Decl. Ex. 2.[5] The available science showed that ravens prey up to 6.8 miles from powerline towers, with negative trends in lek counts up to 12.4 miles from a powerline, reducing the chance of lek persistence. AR_131125. Because sage-grouse focus their life cycles near their leks, 80% of hens nest within four miles of leks, and the birds exhibit "strong site fidelity," the birds tend to be concentrated near active leks during breeding and rearing periods when they are most susceptible to predators. *See* Pls. Br. at 6–8. Birds at leks closer to the new powerline would be more likely to abandon leks, whereas those whose lives focus on the Hutton lek would be beyond the area of indirect effects most times of the year.

The Ninth Circuit has held that the failure to disclose information about the concentration of species within habitat affected by a challenged activity violates NEPA. *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925–28 (9th Cir. 2015). That case involved an EIS assessing the impact of snowmobile use on big game winter habitat. *Id*. at 922–23. The Court stressed that "[t]o fulfill NEPA's public disclosure requirements, the agency must provide to the public the underlying environmental data from which the [agency] develops its opinions and arrives at its decisions." *Id*. at 925 (internal quotation marks omitted). The EIS failed to do so where it "list[ed] the percentage of big game winter range protected in each landscape area, but

---

[5] The FEIS's discussion includes another incorrect and misleading statement that "all birds are believed to be in one general area." AR_170813. This is not true. *See* Miller Decl. Ex. 2.

provide[d] virtually no information about where the big game winter range is actually located, nor the concentration of game in each area." *Id*. (internal quotation marks omitted).

The court held that this did not satisfy the requirement for establishing an accurate environmental baseline, and also that "[w]ithout data on the location of the big game winter range, the public was severely limited in its ability to participate in the decisionmaking process." *Id*. at 926. The data was not required to be presented "in any particular format," but the underlying data on the concentrations of affected species *had* to be disclosed so the public could understand how and where the proposed snowmobiling would affect the species. *Id*. at 926–27.

The Bureau argues it adequately disclosed information about sage-grouse, for example by stating that impacts would be higher in the Magpie Peak area, an important area of habitat for the Baker population. Defs. Br. at 6, 12–13. But this information is incomplete and scattered in different parts of the EIS and the record. *See* Pls. Br. at 10–11. A patchwork discussion in scattered sections of an EIS does not constitute a hard look. *Nat'l Parks & Conserv. Ass'n v. Bureau of Land Mgmt*., 606 F.3d 1058, 1073–74 (9th Cir. 2010); *see Ctr. for Biol. Diversity*, 349 F.3d at 1169 ("mere presence of the information in the record" cannot cure failure to disclose information in an EIS). The Bureau's own biologist, Mr. Frederick, recognized the importance of addressing the distribution of birds in the Baker population. He urged that the DEIS should explain that "anthropogenic disturbance outside the [then-2-mile] buffer zone [around leks] could impact >30% of the birds in the Baker Population," and that the FEIS should provide "basic statistics" on "lek attendance." AR_33582, 131922. He noted that "[s]imply stating how many acres or miles would be impacted is not an analysis of effects," AR_33584, and that "for [sage-grouse,] lek persistence and abandonment is the appropriate metric to use because nesting and early brood-rearing occur within a buffer surrounding the lek." AR_33583.

Plaintiffs likewise asked the Bureau to disclose "information in a manner that the public can understand and readily interpret" because "[t]he current presentation of information about the location of leks and critical segments of sage-grouse subpopulations in relation to the proposed routes is inadequate." AR_19704 (asking Bureau to "use maps that show the project, its impacts, and important locations like leks or the 'Magpie Peak area.'"). Similarly, the USFWS's comments on the administrative draft of the FEIS criticized the Bureau's sage-grouse analysis, noting it "provides a very general and mostly qualitative assessment of impacts" and that "[t]he broad determinations in the document include only limited contextual explanation or rationalization to allow readers to understand or support those determinations. Where impacts are more specifically quantified (mostly in the form of acres), there is little discussion or analysis to provide understanding of contextual significance of those impacts." AR_41084.

The FEIS does not address these concerns. *See, e.g.*, AR_170895 (no discussion whether the Project is likely to lead to lek abandonment). The Bureau relies on an extra-record, post hoc rationalization to argue that *ODFW* is to blame for the failure to disclose accurate scientific information about the distribution of the Baker population's birds across their habitat. Frederick Decl. ¶ 2 (ECF No. 53-1).[6] But nowhere in the FEIS—including in response to comments, *see* AR_19704—did the agency offer the rationale it asserts in litigation for not providing data and accurate scientific information that would have allowed the public and the agency decisionmaker to understand that about half the remaining Baker population was attending leks within four

---

[6] The Court should not consider that statement. *Lands Council*, 395 F.3d at 1030; LR 56-1(b). This excuse rings hollow, because the Bureau took no steps to remove lek location coordinates from the publicly-available administrative record it lodged—in contrast with plaintiffs' careful redaction of that information in their public filings—and plaintiffs' maps are consistent with the alleged ODFW stricture that lek locations not be disclosed "at a scale that would allow the leks to be easily located by the general public." Frederick Decl. ¶ 2; *see* Miller Decl. Exs. 1–3; *compare* AR_131937–38 *with* Second Becker Decl. Ex. 7 (redacted versions of same pages).

miles of the line. NEPA "*requires* that the public receive the underlying environmental data" supporting the agency's analysis. *Idaho Sporting Cong.*, 137 F.3d at 1150 (emphasis added). The FEIS's failure to disclose data on the distribution of the remaining birds and evaluate the Project's impacts in relation to where the line would intersect with them violates NEPA.

### 4.  *The Bureau's limitation of its indirect impacts analysis to only those leks within 3.1 miles of the transmission line route was arbitrary and capricious.*

The Bureau's inclusion of only leks within 3.1 miles of the Project route is not the "full and fair" disclosure NEPA requires. The agency arbitrarily used a figure that ignored scientific evidence that powerlines negatively affect sage-grouse lek persistence up to four miles away, AR_ 170851, that ravens forage up to 6.8 miles from transmission towers, and that powerlines were associated with negative trends in lek counts up to 12.4 miles away. AR_131125. A "hard look" at the Project's effects on the Baker population involves "considering *all* foreseeable direct and indirect impacts." *Idaho Sporting Cong.*, *Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002) (emphasis added). By limiting analysis of indirect effects to sage-grouse to a 3.1-mile buffer, the Bureau fails to consider *all foreseeable* indirect effects. The Bureau also "improperly minimize[s] negative side effects" of the Project by excluding from consideration two active leks—Big Creek and Virtue #2—that lie exactly four miles from the Project route, and which in 2011 hosted 37 of the Baker population's remaining 149 male sage-grouse (24.8%). *N. Alaska Envtl. Ctr.*, 457 F.3d at 975; Miller Decl. Ex. 2; Becker Decl. Ex. 4. The scientific evidence before the agency showed that these two leks would be indirectly harmed by the Project, but the FEIS does not disclose this because of the artificial limitation of the analysis area.

The 3.1-mile analysis area for indirect effects also is inexplicably different than the 11-mile analysis area for cumulative effects, which was selected on the rationale that "[s]age-grouse that attend leks up to 18 kilometers (11 miles) from the B2H Project may be indirectly affected

by the loss of habitat functionality during other seasons of the year." AR_172410. Nor does the

agency explain the reason it departed from the 5.0-mile analysis area used in the DEIS. AR_

16797; *see Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015)

("Unexplained inconsistency between agency actions is a reason for holding an interpretation to

be an arbitrary and capricious change." (internal quotation marks and citation omitted)).

The agency does not try to defend its 3.1-mile analysis area on its merits. Its only

justification for limiting its analysis to within 3.1 miles of the line is that the 2015 ARMPA

requires this. Defs. Br. at 14. But the B2H Project is exempt from the ARMPA, which does not

apply because "the NEPA process for the B2H Project has been underway for several years and

[the Bureau] is already assessing the impacts of the B2H Project on [sage-grouse] . . . through the

B2H Project NEPA process." AR_173059, 170019–20. This is a *separate* NEPA process, in

which the Bureau chose to analyze the B2H Project independently. And the justification offered

in the FEIS is actually weaker than the Bureau's litigating position: the FEIS states only that the

3.1-mile buffer is "consistent with" the ARMPA, without further explanation. AR_170763–64.

Although "[o]rdinarily, an agency has the discretion to determine the physical scope used

for measuring environmental impacts," its "choice of analysis scale must represent a reasoned

decision and cannot be arbitrary." *Idaho Sporting Cong.*, 305 F.3d at 973. A decision that runs

contrary to the scientific evidence in the record, as use of a 3.1-mile buffer does here, is arbitrary

and capricious and precluded a hard look at the environmental impacts of the Project. *See id*. at

973–74; *Blue Mountains Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998)

(failure to disclose contrary scientific evidence is arbitrary and capricious); *League of Wilderness*

*Defs. v. Marquis-Brong*, 259 F. Supp. 2d 1115, 1126 (D. Or. 2003) (agency "violated NEPA by

failing to disclose respected scientific evidence running contrary to the" agency decision).

**5.** ***The failure to disclose that the Baker population's winter habitat is immediately adjacent to the Project route and evaluate the effects of the Project on winter habitat violates NEPA.***

Because NEPA requires discussion of "all foreseeable direct and indirect impacts," *Idaho Sporting Cong.*, 305 F.3d at 973, the Bureau's excuse that it need only consider impacts to winter habitat if shown to be "by far the most significant concern" is wrong as a matter of law and rings hollow on this record. Defs. Br. at 14–15. Sage-grouse rely entirely on sagebrush throughout the winter, use the same habitat year after year, Pls. Br. at 6 (citing AR_82121, 82122), and avoid "energy infrastructure in important wintering habitat." AR_82148. Mr. Frederick noted that "development in wintering areas during the spring could adversely affect [sage-grouse] use of the area during the winter, especially if . . . anthropogenic structures remain." AR_33582. The ODFW winter habitat map shows the Baker population's entire winter habitat to be only one-fifth the size of—and concentrated in the southwest corner of—the PAC, and all of it appears to be within about four or five miles of the Project route. *See* Third Becker Decl. Ex. 1 at 6–7. The new line may cause the population to avoid its winter habitat entirely.

The Bureau cites a single FEIS page to suggest that impacts to winter habitat were considered, but that page does not evaluate the effects on winter habitat, much less disclose where that habitat *is* in relation to the Project. Defs. Br. at 14–15 (citing AR_170812). The failure to disclose the location where winter habitat is concentrated fails to establish an accurate baseline for evaluating what the Project's effects will be on the Baker population's unique and specific winter needs. *See WildEarth Guardians*, 790 F.3d at 925–28 (failure to establish baseline for big game winter habitat violated NEPA); *Idaho Sporting Cong*, 137 F.3d at 1150.

Ultimately, the Bureau claims it adequately disclosed that the Project would have "population-level" effects on the Baker population, but neither the Bureau nor Idaho Power can

point to any place in the FEIS where the Bureau explains what "population-level" effects means. The plain meaning would seem to be "effects affecting the whole population"—which says nothing about whether such widespread effects are minor, or major. It is meaningless as an effects analysis, *see* AR_41084—the epitome of the sort of vague, conclusory, indecipherable statement that violates NEPA. *Great Basin*, 456 F.3d at 973; *Klamath-Siskiyou*, 387 F.3d at 996.[7]

**B.    The Bureau Promised the Public That the B2H Project Would Result in a Net Conservation Gain to Sage-Grouse But Failed to Evaluate the Effectiveness of Compensatory Mitigation and Other Proposed Mitigation.**

Having failed to disclose and evaluate essential information about the Project's likely harm to sage-grouse, the Bureau *could not* properly discharge its duty to fully and fairly evaluate the effectiveness of mitigation meant to avoid harm to the imperiled birds. *See Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) (project's significant impacts "obligated [the agency] to describe what mitigating efforts it could pursue to off-set the damages that would result from the [project]"). The Bureau cannot identify where in the FEIS it evaluated the effectiveness of mitigation meant to prevent avian predators from harming sage-grouse, nor where it evaluated whether compensatory mitigation could be effective in mitigating and offsetting harm to sage-grouse to achieve the Project's promised net conservation benefit.

**1.    *The Bureau's promise that the B2H Project would result in a net conservation gain to sage-grouse required the agency to evaluate whether compensatory mitigation could be effective in achieving that result, but the Bureau did not evaluate the effectiveness of compensatory mitigation.***

The Bureau concedes that it had to evaluate the effectiveness of mitigation in the FEIS,

---

[7] Idaho Power makes a strange exhaustion argument, chastising plaintiffs for not taking issue with the Bureau's vague statement in the *FEIS* that the B2H line will "result in population-level effects" in their public comments on the *DEIS*. Intvs. Br. at 16. The DEIS, however, did not include this statement, which was inserted for the first time into the FEIS. *E.g*, AR_170899; *see generally* AR_16290–18687 (DEIS in which all references to "population-level" in Chapter 3— Affected Environment and Environmental Consequences—are preceded by "no" or "without.).

but disputes what such analysis requires. Defs. Br. at 26. The "residual impacts" listed in Appendix C, described generally as long-term habitat loss, increased predation, and avoidance, are meant to be offset by compensatory mitigation. But neither cross-motion explains where the FEIS or Appendix C evaluates if compensatory mitigation can be effective in mitigating these impacts to provide the "net conservation gain" the Project must achieve. Defs. Br. at 28; Intvs. Br. at 18–20. They cannot answer the fact that Appendix C shows no effectiveness evaluation has been done because the future CMP "will develop performance standards that will be used to monitor and assess the effectiveness of compensatory mitigation measures." AR_173046.

The Bureau is bound by its promise, in the ARMPA, that—as a trade-off for exempting the B2H line from the ARMPA and its protective measures—the Project's compensatory mitigation would achieve a "net conservation benefit" for sage-grouse. AR_175670; *see Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1123–25 (D. Mont. 2016) (agency must "follow through with the commitments it makes"); 40 C.F.R. § 1505.3 ("Mitigation . . . and other conditions established in the [EIS] or during its review and committed as part of the decision shall be implemented by the lead agency"). The Bureau and Idaho Power acknowledge that the Project must "achieve a net conservation benefit" for sage grouse, and that this is a condition of the ROW grant. Defs. Br. at 34; Intvs. Br. at 18 (same).

But the agency argues that its FEIS was not required to evaluate whether compensatory mitigation could be effective in achieving this promised benefit. Defs. Br. at 28. This is incorrect. The ROD expressly states that "the purpose of the compensatory mitigation identified and analyzed *as a requirement* in the Final EIS was to satisfy the requirements of NEPA, as well as [the Bureau's] statutory obligations under FLPMA." AR_156568 (emphasis added). The agency's rationale in its decision documents trumps its litigating position—indeed, its cross-

motion eventually admits that—based on its obligations under FLPMA—it added the net

conservation benefit as a binding mitigation condition for the Project. Defs. Br. at 34 (citing

AR_156523, 156571); *see* AR_156521–22 (B2H ROD explaining that "mitigation measures,

including compensation requirements" flow from the Bureau's duty under FLPMA Section

302(b), 43 U.S.C. § 1732(b), "to prevent unnecessary or undue degradation of the lands").

      An agency must "consider every significant aspect of the environmental impact of a

proposed action" and "the considerations made relevant by the substantive statute driving the

proposed action must be addressed in NEPA analysis." *ONDA v. Bureau*, 625 F.3d at 1109.

Because the promised net conservation gain to sage-grouse from the Project's compensatory

mitigation flows from the Bureau's obligations under FLPMA, the agency had to evaluate

whether the compensatory mitigation could achieve the promised net conservation gain. The

ARMPA's promise makes it a relevant consideration under NEPA as well. 40 C.F.R. § 1505.3.

      Compensatory mitigation is thus the lynchpin of the Bureau's approval of B2H Project: it

is the price the Bureau promised for excluding B2H from ARMPA, and the promise in this FEIS

that harm to sage-grouse will not only be avoided, but that the birds will be *better off* because of

the Project. The public and decisionmaker are beneficiaries of this promise, but are left with no

evaluation whether compensatory mitigation could be effective in achieving the promised

conservation gain. The Bureau argues that no fully developed plan that *will* avoid impacts is

needed. Defs. Br. at 25–26. But the issue here is whether the public, and the decisionmaker, were

sufficiently informed as to whether the compensatory mitigation contemplated in the future CMP

*could* be effective—not the extent to which the CMP was, or was not developed.

      The purpose of evaluating effectiveness is to ensure that "a hard look be taken, if

possible, *before* the environmentally harmful actions are put into effect." *S. Fork Band Council*

*of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009). This evaluation is required even if the "success of mitigation would depend on site-specific conditions and details of the mitigation plan" to be developed later—as the CMP will be. *Id*.; AR_173062 ("The appropriate amount of compensatory mitigation . . . will be determined based on the final design and engineering of any selected route."). It is part of the agency's obligation to "discuss the extent to which adverse effects can be avoided. . . . Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Robertson*, 490 U.S. at 352. "Even if the discussion must necessarily be tentative or contingent, NEPA requires that the agency give some sense of whether [the harmful effect to the protected resource] could be avoided." *S. Fork Band*, 588 F.3d at 727. Ultimately, this evaluation must "ensure that environmental consequences have been fairly evaluated." *Robertson*, 490 U.S. at 352. Absent an assessment whether compensatory mitigation can be effective in achieving the promised net conservation gain, there is no way to conclude that the Project's environmental consequences to sage-grouse were *fully and fairly* evaluated.

The Bureau explained that achieving the conservation gain will require "a hierarchy for mitigation," including the Mitigation Framework outlined in Appendix C. AR_19602. But this "is intended to be a detailed framework, not a site-specific mitigation plan," that will later be used to prepare the CMP. *Id.* The cross-motions cite inapposite cases, which involved court review of plans that already had been developed. Defs. Br. at 26; Intvs. Br. at 18–19.[8] By

---

[8] In *Protect Our Communities Foundation v. Jewell*, the Ninth Circuit reviewed an 85-page, project-specific Avian and Bat Protection Plan the agency had incorporated into the EIS, noting also the "EIS's inclusion of an adaptive management plan." 825 F.3d 571, 577–78, 582 (9th Cir. 2016). The court found these to be sufficiently detailed, but whether there was adequate evaluation of these plans' effectiveness was not at issue in the case. *See id.* at 582. Likewise, in *City of Carmel-by-the-Sea v. U.S. Department of Transportation*, the mitigation plan (cont.)

contrast here, not only is there not yet a CMP, but there is only a "Mitigation Framework"—*not* a mitigation plan—for eventually developing a CMP. Compensatory mitigation here is two steps farther away from the plans involved in those cases. Nor do those cases address the issue in this case: whether the government evaluated the effectiveness of the proposed mitigation. Because the Bureau did not evaluate whether compensatory mitigation could be effective in offsetting harm to sage-grouse and achieving a net conservation benefit, it violated NEPA.

> **2.    *The Bureau did not evaluate the effectiveness of mitigation to protect sage-grouse from avian predators.***

The Bureau defends its assessment of mitigation mainly by listing measures not pertinent to the Project's harmful effects from installing predator perches across the treeless sagebrush steppe that are likely to make sage-grouse avoid the line, abandon leks, and lead to the extirpation of the Baker population. Defs. Br. at 26. The FEIS does not evaluate the effectiveness of the only mitigation measure relevant to this paramount harm—perch deterrents. AR_170145. The "mitigation effectiveness" entry for "flight diverters and perch deterrents" does not mention the latter, stating only that "[m]arking guy wires and overhead optical ground wires on segments of the transmission lines that are adjacent to or cross through high-priority avian habitat or where risk of avian collisions are elevated would minimize the risk of avian collision." *Id*.

Evaluation of the effectiveness of this sole measure to mitigate the Project's effects from predation on sage-grouse needed to appear in the FEIS, not in the Bureau's litigation brief. *Robertson*, 490 U.S. at 351–52 ("*the EIS will discuss the extent to which adverse effects can be

---

already existed (but "remain[ed] flexible to adapt for future problems"), and described three specific physical locations where 11.95 acres of destroyed wetlands would be replaced—a far cry from the promise here to achieve a net conservation gain to sage-grouse after extirpating the Baker population, with no more than a list of possible actions that might be used. 123 F.3d 1142, 1154, 1167 n.22 (9th Cir. 1997). The case involved a claim that the mitigation plan lacked sufficient detail—not whether the agency had evaluated its effectiveness. *Id*. at 1152–53.

avoided." (emphasis added)); Defs. Br. at 28. The Bureau's citation to the listing of residual

impacts in the ROD does not substitute for the effectiveness evaluation that was required in the

FEIS to allow meaningful public comment. *See* Defs. Br. at 28 (citing AR_157439–40).

Nor do statements in Appendix C substitute for an analysis in the text of the FEIS itself.

An appendix provides only "material which substantiates any analysis fundamental to the [EIS],"

40 C.F.R. § 1502.18(b); *see Pac. Rivers*, 689 F.3d at 1031–32. Idaho Power rationalizes that the

list of residual impacts that warrant compensatory mitigation should be inferred to be an

evaluation of the effectiveness of sage-grouse predator impacts mitigation. Intvs. Br. at 9. By

contrast, the EIS in *Laguna Greenbelt, Inc. v. U.S. Department of Transportation*, did assess the

likely effectiveness of each mitigation measure. 42 F.3d 517, 528 (9th Cir. 1994). In the EIS in

*Okanogan Highlands Alliance v. Williams*, cited by the Bureau, "[e]ach mitigating process was

evaluated separately and given an effectiveness rating." 236 F.3d 468, 477 (9th Cir. 2000). A

"patchwork" discussion in scattered sections of an EIS and its appendices, as the cross-motions

describe here, does not constitute a "hard look" under NEPA. *Nat'l Parks*, 606 F.3d at 1073–74.

### C.      The FEIS Does not Analyze Cumulative Impacts to Sage-Grouse from Livestock Grazing, and this Omission is Arbitrary and violates NEPA.

The Bureau cannot escape the fact that it did not evaluate the cumulative impacts of

livestock grazing on sage-grouse when combined with the harm from the B2H transmission line.

It does not point to any place in the FEIS's 17-page analysis of the Project's cumulative effects

to sage-grouse and their habitat where the agency evaluated the cumulative impacts from

livestock grazing. *See* Defs. Br. at 15–17; AR_172560–62, 66–69, 73–76, 80–82, 87–89 (FEIS

sections describing cumulative impacts to sage-grouse). Instead, the agency offers two specious

arguments: that other scattered information in the FEIS somehow constitutes an analysis of the

cumulative impacts from grazing and the Project to sage-grouse, and that the agency has

exercised discretion to leave grazing out of its cumulative impacts analysis.

To satisfy NEPA, "a cumulative effects analysis 'must be more than perfunctory; it must provide a *useful analysis* of the cumulative impacts of past, present, and future projects.'" *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1133 (9th Cir. 2007) (quoting *Klamath-Siskiyou*, 387 F.3d at 994)). It requires "two critical features": "it must not only describe related projects but also enumerate the environmental effects of those projects," and "it must consider the interaction of multiple activities and cannot focus exclusively on the environmental impacts of an individual project." *Id.* Neither of the facts the Bureau points to—the acreage of grazing allotments through which the B2H line would pass, and the harm "not necessarily from grazing" from the indirect effect of increasing predation from raptors and ravens—satisfies the two critical features. *See* Defs. Br. at 16–17. Simply listing the acreage of grazing without "enumerating the environmental effects" of this harmful practice is not a "useful analysis." *Brong*, 492 F.3d at 1133. Describing only the indirect impacts of the *Project* from increased risk of raptor and raven predation, without evaluating how grazing heightens this risk in a different way and the "interaction" of these activities, violates the express purpose of a *cumulative* effects analysis. *Id*.

The record shows that harm from grazing and the Project would interact so as to multiply likely harm to sage-grouse. The Project will install towers in currently-treeless sage-grouse habitat from which raptors and ravens are likely to increase predation of sage-grouse. Pls. Br. at 6–7, 14–15, 32–33. "Sage-grouse need significant grass and shrub cover for protection from predators particularly during nesting season," but grazing reduces grass cover—"negatively affect[ing] nesting success." AR_82134, 82145 (USFWS 2010 "Warranted But Precluded" Finding). The effect of an action that increases predation, where grazing makes predation easier, is certain to "be greater than the sum of the parts." *Klamath-Siskiyou*, 387 F.3d at 994.

The Bureau itself, in the FEIS, quoting the USFWS's 2010 "Warranted But Precluded" Finding, identified "grazing"—not poorly-managed grazing—as one of the "major threats" to sage-grouse, AR_170746, and numerous commenters described these harms as well. AR_19863 ("livestock grazing contributes a further threat" to threats from "increased predation" on sage-grouse due to powerlines), 19884–914, 19894 ("Grazing Disturbance Footprint Represents Significant Indirect and Cumulative Threat" to sage-grouse), 19908 (asking Bureau to "fully take into account the serious adverse indirect and cumulative impacts from the huge burden of livestock grazing occurring" in the affected resource areas).[9] The FEIS also identified "livestock grazing practices"—not improper grazing[10]—as causing fragmentation to wildlife habitat. AR_170764. In any event, it is the removal of vegetation—*the very purpose of grazing*—that increases the risk of predation. AR_82145. There is no evidence in the FEIS that grazing will somehow "benefit" sage-grouse. It is the Bureau's litigating position, not a rationale offered in the FEIS itself. Defs. Br. at 17 (citing the 2015 ARMPA, not the FEIS).[11]

The Bureau argues it has discretion to omit grazing impacts to sage-grouse from its cumulative impacts analysis, but can point to nothing in the FEIS showing it actually exercised such discretion; this is a post hoc rationalization for ignoring an activity that is both pervasive

---

[9] Idaho Power argues that plaintiffs did not exhaust this issue, Intvs. Br. at 23–24, but it suffices for exhaustion "if the issue was considered sua sponte by the agency or was raised by someone other than the [litigating] party." *Portland Gen. Elec. Co. v. BPA*, 501 F.3d 1009, 1024 (9th Cir. 2007). Nor do commenters need to "incant [certain] magic words" to preserve an issue if the agency had an opportunity to address it. *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1133 (9th Cir. 2011) (internal quotation marks and citation omitted, alteration original).

[10] Neither of the sources the FEIS cites at AR_170782 actually limits effects of grazing to only "improper" grazing. *See* AR_131649, 182303.

[11] Even if the implausible claim that grazing *benefits* sage-grouse were true, the effects of grazing on sage-grouse needed to be analyzed as a cumulative impact, because "effects" include "those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial." 40 C.F.R. § 1508.8(b).

within the Project Area and harmful to sage-grouse. *See* Defs. Br. at 16.[12] While an agency has discretion in selecting the scope of its review, that choice "must represent a reasoned decision and cannot be arbitrary." *Idaho Sporting Cong.*, 305 F.3d at 973. The FEIS does not explain why grazing is omitted, although it is indisputably as much a past, present, and foreseeable future action with "effects" on sage-grouse habitat as the 13 actions evaluated. AR_172566–67.

The Bureau identified that "[g]razing is a primary use of public and private lands in the B2H Project area," with allotments totaling nearly 285,000 acres *intersected* by the B2H route in Segments 3 and 4 alone. AR_16920, 171305, 171310. Given that cumulative impact analysis area includes PHMA and GHMA within 11 miles of the B2H line, the amount of grazing in the analysis area is likely much greater. *See* AR_172410. Grazing *is* evaluated as a past and present action in the cumulative effects analysis for fish, AR_172603, but grazing is arbitrarily, and without explanation, omitted from the analysis of effects for sage grouse. AR_172566–67.

The case the Bureau cites to justify its unexplained omission of grazing from the sage-grouse cumulative effects analysis did not involve the extensive evidence of how grazing harms sage-grouse, nor any explanation of how "individual impacts might combine or synergistically interact with each other" to harm the affected species. *Klamath-Siskiyou*, 387 F.3d at 997. Notably absent from *WildEarth Guardians v. Jeffries* were any studies of grazing impacts to elk habitat, or evidence of pervasive grazing, or any rationale supporting an argument that grazing

---

[12] Idaho Power's entire argument is pure post hoc rationalization, inventing a rationale for the Bureau's failure to evaluate cumulative impacts that the agency itself did not, disregarding that the agency itself offered *no* evaluation of the cumulative effects of grazing on sage-grouse and *no* justification for omitting it from the FEIS. Intvs. Br. at 21–25. Defense of an agency's actions must be based on the explanation it gave at the time, not one manufactured later based on materials that are not referenced in the FEIS's cumulative effects analysis. *Regents*, 140 S. Ct. at 1907–09. Ironically, Idaho Power's post hoc rationalization that somehow only improper grazing matters is not even supplied in the Bureau's own post hoc rationalization. *See* Defs. Br. at 15–17.

needed to be considered as a cumulative impact related to designation of off-highway vehicle

trails. *See* 370 F. Supp. 3d 1208, 1241 (D. Or. 2019). By contrast, the scientific record here

shows that grazing is harmful to sage-grouse in ways that combine synergistically with the likely

harm from the B2H Project to exacerbate that harm. *See supra* pp. 23–24; Pls. Br. at 32.[13]

Finally, Idaho Power does not question that the NEPA regulations in effect at the time the

ROD was issued govern this Court's review of the adequacy of the FEIS, but suggests that

judicial review would be futile. *See* Intvs. Br. at 24–25. The only issue currently before the Court

is whether the FEIS complied with the cumulative impacts regulation in effect when the ROD

issued. Whether the agency would have to consider the synergistic harms from grazing and the

Project on sage-grouse on remand is beyond the scope of the review of the challenged actions.[14]

### D.    Because There Remains Major Federal Action to Occur, New Information About the Project's Effects on the Baker Population Requires an SEIS.

#### 1.    *The Bureau's pending decisionmaking and its regulatory authority to change the terms of the ROW show that major federal action remains to occur.*

A federal agency must supplement an EIS "if there *remains 'major Federal actio[n]' to*

*occur*, and if the new information is sufficient to show that the remaining action will 'affec[t] the

quality of the human environment' in a significant manner or to a significant extent not already

considered." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989) (emphasis added). A

---

[13] The case Idaho Power cites, Intvs. Br. at 22, is inapposite because it involved a project that *itself* had no effect on the protected resource—unlike the B2H Project, which *will* harm sage-grouse. *League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 762 (9th Cir. 2014).

[14] It is likely the agency would have to, because *prior* to the 1978 NEPA regulations that defined "cumulative impacts," the Supreme Court observed that the NEPA *statute* requires consideration of "cumulative or synergistic environmental impact[s]" to produce a "comprehensive" EIS that takes a "hard look" at the likely effects of a project. *Kleppe v. Sierra Club*, 427 U.S. 390, 409–10 & 410 n.21 (1976). Also, the new regulations define "effects" to include reasonably foreseeable "effects that occur at the same time and place as the proposed action or alternatives"—which likely encompasses effects from grazing, 40 C.F.R. § 1508.1(g) (2020).

"major Federal action" is one "subject to Federal control and responsibility," including "new and

continuing activities, including projects and programs entirely or partly financed, assisted,

conducted, regulated or approved by federal agencies." 40 C.F.R. § 1508.18(a).[15] The cross-

motions misstate the controlling standard in *Marsh*, incorrectly implying that federal action must

be "ongoing" to trigger the duty to supplement. *See* Defs. Br. at 29; Intvs. Br. at 26.

The cross-motions admit that the ROW is conditioned on the Bureau's pending decisions

whether to approve the CMP (and only if the Project results in a net conservation gain to sage-

grouse), the as-yet-unsubmitted new Plan of Development ("POD"), a final sage-grouse

mitigation plan, and the Notice to Proceed ("NTP") allowing construction to begin. Defs. Br. at

7–8; Intvs. Br. at 6–7. Appendix B to the ROD describes 13 plans (including plans for wildlife

conservation and visual resources protection) the Bureau must approve before the agency will

issue the NTP. AR_156568–72; *see* AR_156485–88 (ROW). And the Bureau retains the "right

to . . . [c]hange the terms and conditions of [the ROW] grant as . . . necessary to protect . . . the

environment," 43 C.F.R. § 2805.15(e), or terminate any NTP for similar reasons. AR_156568.

Supplementation of an EIS "is at times necessary to satisfy [NEPA's] 'action-forcing'

purpose" with respect to an agency's "still pending decisionmaking process." *Marsh*, 490 U.S. at

371, 374. The Bureau's pending decisionmaking processes are numerous and "environmentally

significant."[16] *Id*. at 372 (internal quotation and citation omitted). The Ninth Circuit has not

articulated exactly what constitutes major federal action remaining to occur, other than to

emphasize *Marsh*'s focus on "'*still pending* decisionmaking process[es]'" and to hold that purely

---

[15] This definition remains in the new NEPA regulations. 40 C.F.R. § 1508.1(q)(2) (2020).
[16] For example, the ROD specifies that "[n]o construction can begin until the [Bureau] . . . has determined that the Greater Sage-grouse Mitigation Plan complies with Federal and state policies for avoiding or minimizing adverse effects on the species and its habitat and the approved plan is consistent with USFWS and state agencies recommendations." AR_156512.

ministerial actions—such as calculating the bond amount for resumption of mining under a plan

of operations approved and implemented 25 years earlier—do not qualify. *Ctr. for Biol. Diversity*

*v. Salazar*, 706 F.3d 1085, 1088, 1095 (9th Cir. 2013) (quoting *Marsh*, 490 U.S. at 374).[17]

By contrast, the cases cited by the Bureau and Idaho Power lack the sort of substantial

decisionmaking and discretion remaining here.[18] In a case more analogous to the B2H Project, a

court concluded that an agency's discretionary approval of a POD and issuance of an NTP based

on a series of conditions were *not* "purely ministerial" and constituted major federal action

remaining to occur. *Hammond v. Norton*, 370 F. Supp. 2d 226, 255–56 (D.D.C. 2005) (holding,

however, that the alleged trigger for supplementation—a different pipeline's effects—was not a

new circumstance bearing on the proposed action). Similarly, in *Cold Mountain v. Garber*, there

was no federal action remaining to occur after the agency issued a permit to operate a temporary

structure for capturing and testing bison. 375 F.3d 884, 887, 894 (9th Cir. 2004). Here, the

transmission line is a permanent structure that will extend across 85.6 miles of Bureau-

administered public land, and extensive decisionmaking and several environmentally significant

actions remain to occur. Where key elements of a federal project remain pending, and the agency

has regulatory authority to rescind or modify the initial approval, there remains major federal

action to occur, triggering the duty to supplement. *Klamath-Siskiyou Wildlands Ctr. v. U.S.*

---

[17] Idaho Power is wrong that, if an FEIS is a "final agency action" for judicial review, then once a "final" EIS has been issued there can be no remaining action requiring supplementation. Intvs. Br. at 26. The NEPA regulations expressly provide for supplementation of "final" EISs. 40 C.F.R. § 1502.9(c)(1); *see Marsh*, 490 U.S. at 364–65 (describing supplement to a final EIS).

[18] In *Center for Biological Diversity v. Bureau of Land Management*, the agency had "little decision-making to do" for the first phase of a multi-phase project. Nos. 2:14–cv–00226–APG, 2:14–cv–00228–APG, 2017 WL 3667700, at *11 (D. Nev. Aug. 23, 2017). In *Moapa Band of Paiutes v. Bureau of Land Management*, the NTP for evaporation pond and landfill construction did not involve any Bureau discretion if permits, fees, and communication plan approved by another agency were submitted. No. 2:10-CV-02021-KJD, 2011 WL 4738120, at *13 (D. Nev. Oct. 6, 2011).

*Forest Serv.*, No. CIV 06-1604-CL, 2007 WL 2068667, at *1–2 (D. Or. July 16, 2007) (meadow

restoration project and logging authorized by timber sale were not complete and agency

"retain[ed] the right to rescind or modify the sale based on environmental concerns").

> **2.** ***New information regarding the Baker and Oregon sage-grouse populations and the extent of the impact from transmission lines show the Project will affect sage-grouse to a significant extent not considered in the FEIS.***

The Braun Declaration and attached studies and data are significant new information

bearing on the Project's impacts to the Baker population that show potential harm from the

Project at an "extent not already considered" in the FEIS. *Marsh*, 490 U.S. at 374; 40 C.F.R.

§ 1502.9(c)(1)(ii); 40 C.F.R. § 1502.9(d)(1)(ii) (2020) (same language as prior version). For

example, although the FEIS generically states potential indirect effects from transmission lines,

its specific analysis of impacts to the Baker population states that "indirect effects on [sage-

grouse] would be anticipated within a 3.1-mile buffer around the route centerline"—no effects

from the Project beyond that limit are considered. AR_170895, 170899. New evidence—the

2018 Gibson *et al*. study, the most comprehensive study of transmission line effects on sage-

grouse yet published—shows that indirect harm may occur to sage-grouse far beyond the 3.1-

mile area considered in the FEIS. Braun Decl. ¶¶ 27–32 & Ex. 5 (ECF Nos. 44, 44-5). This ten-

year study concluded that indirect effects on sage-grouse, including reduced nest survival,

extended up to 7.7 miles from the transmission line, primarily due to predation by ravens. *Id*. Ex.

5 at 1, 17, 22, 28. It recommends that agencies "assume at least a [6.2 mile] radius of

disturbance" when siting powerlines—twice what the FEIS considered. *Id.* at 28; AR_170899.

Evidence that indirect harm to sage-grouse extends more than double the distance considered in

the FEIS is significant and bears on the Project's potential impacts. 40 C.F.R. § 1502.9(c)(1)(ii).

Assuming that indirect effects extend at least out to 6.2 miles from the Project route (as

recommended by the Gibson study), even the Sardine Creek lek—the second most-heavily attended in 2018—is within the area likely to be harmed by the Project, but beyond the 3.1-mile area analyzed in the FEIS. *See* Braun Decl. Ex. 4. Sixty-seven of the 92 remaining males counted in 2018—72.8%—would be within the "radius of disturbance" of indirect effects. *See id*. Exs. 3–4. Mr. Frederick's declaration does not address the new Gibson study. ECF No. 53-1 ¶¶ 3–4.

Also, the 2018 lek count data showed that only seven Baker population leks were active, down from 11 in 2011, with only 92 males attending in 2018. Braun Decl. Exs. 3, 4. The fact that the population is now smaller and concentrated on fewer leks increases the risk that the Project— by leading birds to abandon leks near the line—will be the direct cause of its extirpation within five to ten years after construction. Braun Decl. ¶¶ 28, 31. Neither the enigmatic statement about the population's environmental similarity to extirpated populations, AR_170813, nor the FEIS's discussion of indirect effects to leks within 3.1 miles of the line, addresses the extent to which *the Project* is likely to cause the population's extirpation. *See* AR_170894–95, 170899, 170812– 21. In contrast, Dr. Braun concludes that abandonment of at least the leks within four miles of the line, and the population's extirpation, will result from the Project. Braun Decl. ¶¶ 28, 31–32.

Nor does the FEIS disclose the overall plunge in the sage-grouse population Oregon-wide. *See id*. ¶ 17. The Project's likelihood of causing the extirpation of the Baker population, combined with the overall depressed status of sage-grouse in Oregon—the 2019 ODFW report shows it has reached its lowest level since 1980, and is now less than half the 2003 population baseline, *id*. Ex. 2 at 15—is likely to lead to the birds' listing on the Endangered Species list. *Id*. ¶ 31. Despite the Bureau's obligation to ensure its actions "do not contribute to the listing of any [sensitive] species under the ESA," AR_170743, the FEIS does not address the extent to which the Project is likely to lead to federal listing for sage-grouse, *see* AR_170849–56, 170894–95,

170899–900, although the FEIS does so for other species. *E.g.* AR_170686, 170696; 173218–27.

The Frederick Declaration only addresses whether the new information shows a different extent of the "overall downward trend" of the Baker population—not what the new information shows about what the extent of the Project's impacts may be, or the extent to which the Project is likely to lead to the population's extirpation and an ESA listing for sage-grouse. ECF No. 53-1 ¶¶ 3–4.[19] Significant information showing that the extent of the impacts from the Project may be much greater than considered in the FEIS, and that the stakes are thus higher for the Baker population, requires supplementation. The new information included in and with the Braun Declaration easily satisfies the "low standard" for showing "substantial questions whether a project may have a significant effect" and thus requires supplementation of the FEIS. *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 561–62 (9th Cir. 2006).

## III.  DEFENDANTS VIOLATED NEPA BY NOT EVALUATING THE FEASIBLE ALTERNATIVE OF BURYING THE LINE NEAR THE INTERPRETIVE CENTER AND BY NOT EVALUATING WHETHER COMPENSATORY MITIGATION FOR HARM TO THE OREGON TRAIL CAN BE EFFECTIVE

### A.  The Bureau Violated NEPA by Failing to Develop and Study an Alternative for Burying the Line Near the Interpretive Center.

Neither cross-motion refutes the statements in the FEIS and elsewhere in the record that confirm that it is technologically feasible to bury the B2H line for a couple of miles to protect the historic viewshed and scenic values of the Oregon Trail Interpretive Center. Pls. Br. at 18–19; AR_170206; AR_182342; *see* Defs. Br. at 19–22; Intvs. Br. at 28–32. The narrow issue therefore is whether the Bureau provided an adequate explanation for eliminating an alternative that would

---

[19] Plaintiffs alerted the Bureau to new information regarding sage-grouse a year ago, and the Gibson study has been available for two years, yet the agency did not respond or react. The agency had the duty to "be alert to new information that may alter the results of its original environmental analysis." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000). The Bureau failed in this duty.

PLAINTIFFS' RESPONSE TO CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

31

do so. This question is controlled by *Western Watersheds Project v. Abbey* and *Muckleshoot Indian Tribe v. U.S. Forest Service*. 719 F.3d 1035 (9th Cir. 2013); 177 F.3d 800 (9th Cir 1999). However, the cross-motions offer no argument related to this controlling authority.[20]

The explanation supplied does not satisfy *Abbey* and *Muckleshoot*. The Bureau decided, at the very beginning of the NEPA process, in guidance about development of alternatives, that certain alternatives are "not reasonable and don't require analysis"—among these, any alternatives that "would require some or all of the transmission line to be buried." AR_93500. This action, which "[l]imit[ed] the choice of reasonable alternatives," violated NEPA. 40 C.F.R. § 1506.1(a). The ensuing efforts to justify the decision made at the outset of the process violated the procedural duty that an EIS "shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." *Id.* § 1502.2(g).

The cross-motions rely on unsupported statements in the FEIS, and statements outside the FEIS, to dismiss the alternative of burying the line, arguing that the Bureau's decision was reasonable. *See* Defs. Br. at 20; Intvs. Br. at 30–31. This presents three problems. First, NEPA documents are inadequate if not supported: the public must be provided with underlying data supporting the agency's decision. *Klamath-Siskiyou*, 387 F.3d at 996; *Idaho Sporting Cong.*, 137 F.3d at 1150. The only sources cited to justify eliminating the alternative of burying the line are three documents cited at AR_170208 regarding cost. *See* AR_170206–08. There is no evidence at all in the record, much less cited in the FEIS, for the proposition that a buried line would create *more* disturbance than a 140-foot tall tower and transmission line placed 500 feet from Panorama Point. Defs. Br. at 21 & n.6. This speculation does not even make sense, given that the

---

[20] Accordingly, the Bureau and Idaho Power are precluded from raising such arguments in their replies. *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) ("[A]rguments raised for the first time in a reply brief are waived.").

surface above a buried line is easily restored. *See* Becker Decl. Ex. 10 at 183–84.

Second, the FEIS's only statement addressing why *burial of a short section of the line*, such as the roughly two-mile burial alternative near the Interpretive Center, was eliminated from consideration is a conclusory statement: "[f]or the B2H Project, no segments of the proposed transmission line have been identified where burying the transmission line would be justified." AR_170208. The rest of the narrative is concerned with the burial of an entire, 300-mile long transmission line. *See* AR_170206–08. But the Bureau cannot point to any document that shows that this statement is true—that is, nothing that shows where the agency *attempted to identify* any segment of the line or justify whether it should be evaluated in detail.

The Bureau's inability to show where it actually evaluated potential segments for burial but found none to be justified is a tacit admission that it did not do this. Including a misleading statement in the FEIS to justify not evaluating the burial of a short segment near the Interpretive Center violates NEPA. *Muckleshoot*, 177 F.3d at 813 ("there is nothing in the record to demonstrate that the [agency] even considered" the alleged justification for eliminating one viable alternative from consideration). The unsupported statement is not surprising, given that the Bureau predetermined that it would not consider burial of "some" of the line. AR_93500.[21]

Third, the trigger for the agency's duty to "independently evaluate the information submitted" for the environmental analysis and to "be responsible for its accuracy" is the agency's request to the applicant "to submit environmental information." 40 C.F.R. § 1506.5(a). Nothing more is required. *Barnes*, 655 F.3d at 1131. The Bureau solicited information from Idaho Power about line-burial, AR_134844–45, but there is no evidence the Bureau independently evaluated

---

[21] The Bureau now claims that it considered cost with respect to burying a short segment of the line, Defs. Br. at 22, but that is post hoc reasoning that appears nowhere in the record, either.

the information or its accuracy before it was inserted into the FEIS. *See* AR_170206–08.

The Bureau is wrong that it did not need to consider the feasible alternative of burying a short stretch of line because it would "rewrite Idaho Power's business plan." Defs. Br. at 20. The Ninth Circuit requires agencies to develop and study alternatives to proposed action that are not an applicant's preferred alternative. *Muckleshoot*, 177 F.3d at 814 ("detailed consideration of a trade involving deed restrictions or other modifications to the acreage involved" was required because it was "in the public interest," even though that alternative was dismissed by the agency "on the grounds that it would decrease [the applicant's] incentive to trade."); *Nat'l Parks*, 606 F.3d at 1070 (private interests may not define the scope of the proposed project).[22] NEPA's alternatives regulation requires consideration of reasonable alternatives, "whether the proponent or applicant likes . . . a particular alternative. Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981). Ironically, the Bureau's litigating position is the exact opposite of its assertion in the alternatives development memorandum a decade ago that reasonable alternatives are *not* those that are "simply desirable from the standpoint of the applicant." AR_93500.

Both cross-motions rely on post hoc reasoning not in the FEIS to argue that burial of a short segment of the line should not be considered as an alternative. The Bureau concurs that it might cost $50 million to bury a two-mile segment of line, based on the actual seven-times-the-cost-of-overhead line (in 2010) figure stated in the very study on which the FEIS relies (the FEIS had misleadingly cited only "10 to 15 times" higher cost, AR_170208). Defs. Br. at 22;

---

[22] The Bureau cites out-of-Circuit precedent without addressing *Muckleshoot*. Defs. Br. at 19–20.

AR_182342. Because this alternative is technologically feasible, and has been done elsewhere, including under the city of Chino, California (more complicated to engineer than the farm fields near the Interpretive Center, *see* Becker Decl. Ex. 10 at 178–85), the public was entitled to a full and fair discussion of the relative tradeoffs—as was the Department of the Interior official (whose department also manages the Interpretive Center) deciding whether to approve the ROW.

The Bureau must manage the Oregon Trail "for public values, with restrictions to preserve historic resources," AR_97179, avoid projects that "substantially interfere" with the nature of the Trail and "activities incompatible with the purposes for which such trails were established," 16 U.S.C. § 1246(c), and "preserv[e] and protect[ ] [the Interpretive Center's] historic, cultural heritage, natural, and visual features." AR_171420. *Muckleshoot* also teaches that an agency must consider alternatives "more consistent with its basic policy objectives than the alternatives that were the subject of final consideration." 177 F.3d at 813. Given the priceless historical values of the Oregon Trail and the Interpretive Center, the public and the ultimate decisionmaker were entitled to a detailed discussion whether it would be worth $50 million to preserve the "magnificent vistas of the historic trail route"[23] that allow visitors to readily imagine what traveling the Trail must have been like. The Bureau's cross-motion does not even mention these "protected objects" that it has a responsibility to protect—which is remarkable, given the Ninth Circuit's instruction that feasible alternatives that "might operate in a more friendly way toward the protected objects" must be evaluated. *Abbey*, 719 F.3d at 1052.

Certainly there are cost-benefit tradeoffs for burying the line to protect the magnificent vistas—but the purpose of developing and studying in detail the alternative of burying the line

---

[23] This description is touted on the Bureau's website at https://www.blm.gov/learn/interpretive-centers/national-historic-oregon-trail-interpretive-center (last visited Nov. 12, 2020).

near the Interpretive Center is to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public"—not to smother feasible alternatives in the cradle. 40 C.F.R. § 1502.14. The buried 500 kV line in Chino shows this option is feasible, and it accords with the Bureau's management duties. Whether it is ultimately *selected*, based on cost or other considerations, is not the issue; rather, the decisionmaker needed a fully-developed alternative—and public input—to weigh the trade-offs and make a fully informed decision.

"The touchstone for courts reviewing challenges to an EIS under NEPA is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *ONDA v. Bureau*, 625 F.3d at 1122 (internal quotation marks and citations omitted). Failing to develop an alternative for burying the line near the Interpretive Center and omitting a full and fair discussion of that option did not. By relying on unsupported statements and including only a misleading "worst-case" figure for potential increased cost, the Bureau's rationale for not evaluating the alternative of burying a short section of the line violates NEPA.

### B.  New Information Confirms That Burying a Short Section is Feasible.

The Bureau's only justification for eliminating burial of a short segment of the line that is supported with evidence is the alleged "10 to 15 times" cost of burying a long-distance line. AR_170208. Information from a major transmission company that costs of burial may be only five times as great in a rural area like that surrounding the Interpretive Center, Becker Decl. Ex. 9 at 2, is new information bearing on the proposed action and not considered in the FEIS. That is, the cost of burial may be only half, or one-third, of what the FEIS states.[24] Even informal new

---

[24] Idaho Power notes, as did plaintiffs, Pls. Br. at 3, 20, that the 350-mile long SOO Green buried line will carry direct, rather than alternating, current, as the B2H line will. Intvs. Br. at 33. (cont.)

information triggers the agency's obligation to evaluate whether it "alter[s] the results of its original environmental analysis." *Friends of the Clearwater*, 222 F.3d at 557. The Bureau has an obligation under the NTSA to offset high residual impacts to the Oregon Trail and Interpretive Center, AR_156575–77, and burial could accomplish this. This obligation is amplified by the fact that it is the *agency*'s "primary duty" to comply with NEPA, and "[i]t is up to the agency, not the public, to ensure compliance with NEPA in the first instance." *City of Davis v. Coleman*, 521 F.2d 661, 671, 678 (9th Cir. 1975). Where, as here, there remains major federal action to occur, evidence that the cost of burying the line may be as low as one-third what the FEIS disclosed triggers the duty to prepare an SEIS, and the duty to discuss therein "all environmental factors essential to an informed agency decision"—including the benefits and costs of burial near the Interpretive Center. *Or. Nat. Res. Council v. Marsh*, 52 F.3d 1485, 1491 (9th Cir. 1995).

## C.    The Bureau did not Evaluate Whether Compensatory Mitigation can be Effective in Avoiding the Visual Harm to the Oregon Trail and Interpretive Center That Otherwise Would Violate the NTSA.

Neither the Bureau nor Idaho Power can point to any place in the FEIS or Appendix C where the agency evaluated if compensatory mitigation can be effective in mitigating the high residual visual impacts to the Oregon Trail and the Interpretive Center and ensuring that the B2H Project achieves "no net loss" and does not violate the NTSA. Defs. Br. at 26–29; Intvs. Br. at 34–37. As with sage-grouse mitigation, *supra* pp. 17–21, the Bureau made the goals of the compensatory mitigation—"no net loss" and avoiding an NTSA violation—considerations of the required analysis whether compensatory mitigation can be effective in avoiding these harms.

The issue is not whether the compensatory mitigation *will* allow the B2H Project to

---

The SOO Green project shows that engineering technology for burying transmission lines has advanced significantly; operational issues with burying a two-mile segment of the alternating-current B2H line should have been addressed in a fully developed discussion of that alternative.

achieve no net loss to the Oregon Trail and the Interpretive Center, and avoid an NTSA violation, but whether the agency has disclosed to the public whether it *could be effective* in doing so and thereby mitigating the harm from the Project. To be clear: plaintiffs are not belatedly asserting a claim under the NTSA—rather, the *Bureau itself* made the substantive considerations of the NTSA relevant to the NEPA analysis by forthrightly admitting that— without compensatory mitigation—the Project *will* violate the NTSA. AR_173076 ("The objective for compensatory mitigation will be to offset high residual impacts on National Trail Management Components in order to meet the NTSA requirement to not substantially interfere with the nature and purposes of the trail."); *see ONDA v. Bureau*, 625 F.3d at 1109. Accordingly, whether the proposed compensatory mitigation can be effective in mitigating the residual visual harm to the historic Trail and the Interpretive Center, achieving "no net loss" to these values, and preventing the NTSA violation is an essential evaluation that the FEIS must—but does not— contain. Merely citing the residual impacts description in the ROD does not substitute for the effectiveness evaluation that was required in the FEIS. *See* Defs. Br. at 28 (citing AR_157452).

Instead, Idaho Power assures us that the Bureau and other agencies will ensure—later— that "there is no situation in which B2H Project will proceed without sufficient or effective mitigation." Intvs. Br. at 37. But NEPA requires that effectiveness of proposed mitigation be considered *in the EIS* to allow public comment and inform the decisionmaker *before* a decision is made—not after the as-yet-unwritten plan two steps removed from the EIS is developed without public input.[25] The Bureau's failure to evaluate if compensatory mitigation could avoid threatened harm to the Oregon Trail and the Interpretive Center violated NEPA.

---

[25] *National Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67 (D.D.C. 2013), is not relevant because that case did not rule on whether the agency considered the effectiveness of proposed compensatory mitigation to achieve promised goals. *Id*. at 76–77; *see* Intvs. Br. at 37.

IV.    **DEFENDANTS VIOLATED NEPA BY NOT PREPARING SUPPLEMENTAL ANALYSIS ON THE MILL CREEK AND MORGAN LAKE ROUTES**

A.    **NEPA Required the Bureau to Issue a Supplemental DEIS for Comments.**

An EIS is intended to be a "springboard for public comment." *Robertson*, 490 U.S. at 349. It does not foster NEPA's public participation purpose to describe routes the Project will actually follow for the first time in the EIS, after the close of public comment. The Bureau now argues that it was not required to provide opportunity for comment on the Mill Creek Alternative and Morgan Lake variation before adding them in the FEIS because they are minor variations of routes discussed in the DEIS or within the "spectrum" of the two alternatives evaluated near La Grande. Defs. Br. at 23. The FEIS offered neither rationale, and the facts do not bear them out.

The Mill Creek and Morgan Lake routes are not "minor variations" to the Proposed Action and Glass Hill Alternative the DEIS reviewed because Mill Creek/Morgan Lake will have significantly greater impacts on the environment near La Grande. Both routes would cross Ladd Marsh Wildlife area, with greater harm to migrating waterfowl than the DEIS alternatives. AR_170803; AR_159379 (Mill Creek Alternative), 159468 (Morgan Lake variation).[26] The Morgan Lake variation would cross Winn Meadow and pass within 900 feet of Rebarrow Forest, AR_159467, 19938, and the Mill Creek Alternative within a mile of both, causing greater potential harm to elk and other wildlife. AR_170803, 19932–53, 12871. Both new routes would cause greater harm to residential views in La Grande. The Mill Creek Alternative would run within a ½ mile of many residences. AR_171628. The Morgan Lake variation would run along the ridge above La Grande, within two miles of the city and about 500 feet of Morgan Lake Park, AR_159466, 169953, 169383–84, with greater impacts to recreationists at the Park. AR_171432.

---

[26] Maps of the routes near La Grande are assembled in Exhibit 2 to the Third Becker Declaration.

The cross-motions do not address noise, tacitly admitting the FEIS violates NEPA by not taking a hard look at noise impacts from the Mill Creek and Morgan Lake routes. *See* Pls. Br. at 23, 40. These would pass within 1,200 feet of dozens of potential sensitive noise receptors, likely exceeding the 10 dBA state anti-degradation criterion. AR_12871, 169383–84, 169953 (marked as link 2-48 and "Variation S2-C2"), 12866–67. The Proposed Action came within 1,200 feet of only six noise receptors; the Glass Hill Alternative, none. AR_173739–40; *see* AR_173738–58.

On this record, it is arbitrary to assert that the Mill Creek Alternative and Morgan Lake variation are "minor" variations of the alternatives considered. A "minor variation" is one where another alternative is "similar" to ones already evaluated, which the new alternative/variation here was not. 46 Fed. Reg. at 18035. The cases the Bureau cites are inapposite because this record shows that there will *not* be "substantially similar consequences" from the Mill Creek Alternative/Morgan Lake variation compared to the two evaluated in the DEIS. Defs. Br. at 25.

Nor are the two new routes "within the spectrum" of the DEIS alternatives: they lie east of both, closer to La Grande, cross the Ladd Marsh Wildlife Area, and would cause more serious impacts than the others. The new routes lie between one and three miles closer to La Grande than both other alternatives, AR_169953—indeed, the Glass Hill Alternative furthest west was "developed to address concerns about the Proposed Action's proximity to the Ladd Marsh Wildlife Management Area and visibility concerns from La Grande." AR_16344. Thus, *Russell Country Sportsmen v. U.S. Forest Service* is inapposite, because there the agency added to the final EIS an alternative motorized use network whose total mileage fell between the lowest- and highest-mileage alternatives considered—thus "within the spectrum." 668 F.3d 1037, 1045–48 (9th Cir. 2011). The significantly higher impacts of the Mill Creek/Morgan Lake routes make them qualitatively different from, and not within the spectrum of, the two evaluated alternatives.

The Bureau was required in the NEPA process here to disclose and evaluate *all* environmental impacts associated with the B2H Project, including those not on federal lands, before the agency decisionmaker could make an informed decision whether to approve the ROW. An "EIS process should serve both to alert the public of what the agency intends to do and to give the public enough information to be able to participate intelligently in the EIS process." *Cal. v. Block*, 690 F.2d 753, 772 (9th Cir. 1982). Where—as here—a newly-added alternative fell outside "the range of alternatives the public could have reasonably anticipated" and the public's comments on the DEIS's alternatives do *not* apply to the new alternatives, and thus do not allow the public to inform the decisionmaker if its views on the effect of the new alternatives, "circulation of a draft supplement for public comment was in order." *Id.*

## B.     Significant New Information Requires Preparation of a SEIS.

The EFSC Proposed Order authorizes construction of either the Mill Creek or Morgan Lake routes, waiving the noise anti-degradation criterion. Pls. Br. at 41. Use of either route will affect the environment near La Grande to a significant extent not considered in the FEIS. *Marsh*, 490 U.S. at 374. Idaho Power now claims it will build the Morgan Lake route and not the Mill Creek Alternative. Second Colburn Decl. ¶ 5 (ECF No. 60). However, EFSC is still considering the Mill Creek Alternative as well. *See id.*; Becker Decl. Ex. 10 at 2–16. But if Idaho Power's new intention is true, it too is new information "bearing on the proposed action"—construction and operation of the *entire* line from Boardman to Hemingway, AR_169930–31—not considered in the FEIS. The Bureau had the duty to evaluate the environmental impacts of approving the ROW over lands it manages, which includes impacts that would not occur but for that approval—such as the impacts of the route near La Grande. The extent of impacts of the Morgan Lake variation is significantly greater than described in the FEIS, including impacts from noise

effects and the variance EFSC is proposing to grant from the state noise standard. Pls. Br. at 23, 41; *supra* pp. 39–40; Becker Decl. Ex. 6 at 4–7, 24–25, 135–62 (effects of Morgan Lake alternative, particularly related to harm to recreational opportunities). Idaho Power's decision to build along the Morgan Lake variation triggers the duty to supplement because it bears on the proposed action and its impacts, and the significant impacts of this route were not fully disclosed in the FEIS because no public comment was allowed.

## V.   DEFENDANTS VIOLATED FLPMA BY NOT INCLUDING TERMS IN THE ROW TO MINIMIZE DAMAGE TO SCENIC VALUES AND WILDLIFE

The cross-motions acknowledge that the Bureau has a mandatory duty under Section 505(a) to impose conditions that "*will* . . . minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." 43 U.S.C. § 1765(a)(ii) (emphasis added). The terms of that section do not limit this specifically to "damage" on the land within the corridor. In addition, the obligation to impose terms and conditions that "protect Federal property and economic interests" in Section 505(b) requires the Bureau to impose conditions that protect not only the land crossed by the right-of-way, but *all* federal land affected by the grant—including federal land *outside* the narrow right-of-way. *Id*. § 1765(b)(i). Although the cross-motions argue that the agency discharged its duty through the terms and conditions of the ROW, the agency was in no position to do so because its NEPA analysis did not establish an accurate baseline from which to determine the necessary conditions, and did not evaluate whether compensatory mitigation can—much less "will"—minimize damage to scenic values and wildlife. Without this information, the Bureau's ROW grants violated FLPMA as well.

## <u>CONCLUSION</u>

For these reasons, plaintiffs respectfully request that this Court grant their motion and hold unlawful and vacate the DOI ROD, FEIS, and the Bureau's rights-of-way grants.

Respectfully submitted this 20th of November 2020.

 s/ David H. Becker
**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC

 s/ Maura C. Fahey
**Maura C. Fahey (OSB # 133549)**
Crag Law Center

 s/ Oliver J. H. Stiefel
**Oliver J. H. Stiefel (OSB # 135436)**
Crag Law Center

Attorneys for Plaintiffs Stop B2H Coalition,
Jim Kreider, Carol "Fuji" Kreider, Gail
Carbiener, and Greater Hells Canyon
Council