# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STOP B2H COALITION**, an Oregon nonprofit corporation, **GREATER HELLS CANYON COUNCIL**, an Oregon non-profit corporation, **CAROL "FUJI" KREIDER**, an individual, **JIM KREIDER**, an individual, and **GAIL CARBIENER**, an individual,<br><br>            Plaintiffs,<br><br>    v.<br><br>**BUREAU OF LAND MANAGEMENT**, **U.S. DEPARTMENT OF THE INTERIOR**, **JOSE LINARES**, State Director (Acting), BLM Oregon/Washington, **U.S. FOREST SERVICE**, and **TOM MONTOYA**, Forest Supervisor, Wallowa-Whitman National Forest,<br><br>            Defendants,<br><br>        and<br><br>**IDAHO POWER CO.** and **PACIFICORP**,<br><br>            Intervenor-Defendants. | Case No. 2:19-cv-1822-SI<br><br>**OPINION AND ORDER** |

David H. Becker, LAW OFFICE OF DAVID H. BECKER, LLC, 4110 SE Hawthorne Boulevard #168, Portland, OR 97214; Oliver J. H. Stiefel and Maura C. Fahey, CRAG LAW CENTER, 3141 E. Burnside Street, Portland, OR 97214. Of Attorneys for Plaintiffs.

Paul E. Salamanca, Deputy Assistant Attorney General, and Krystal-Rose Perez, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENT AND NATURAL RESOURCES DIVISION, 150 M Street NE, Washington, DC 20002; Andrew A. Smith, U.S. DEPARTMENT OF JUSTICE, NATURAL RESOURCES SECTION c/o UNITED STATES ATTORNEY'S OFFICE, P.O. Box 607, Albuquerque, NM 87103. Of Attorneys for Defendants.

Beth S. Ginsberg and James C. Feldman, STOEL RIVES LLP, 600 University Street, Suite 3600, Seattle, WA 98101. Of Attorneys for Intervenor-Defendants.

**Michael H. Simon, District Judge.**

**TABLE OF CONTENTS**

Introduction ................................................................................................................. 3

Standards .................................................................................................................... 4

  A.  National Environmental Policy Act ...................................................................... 4

  B.  Federal Land Policy and Management Act ........................................................... 5

  C.  Administrative Procedure Act .............................................................................. 6

  D.  Motion for Summary Judgment in an APA Case ................................................. 8

  E.  Extra-Record Material ......................................................................................... 8

Background ................................................................................................................ 10

Discussion ................................................................................................................. 11

  A.  Motion to Strike ................................................................................................ 11

    1.  Documents Relating to Plaintiffs' Motion to Compel an SEIS ....................... 12

    2.  Documents Asserted to Summarize Information ........................................... 13

    3.  Documents Asserted to be Subject to Judicial Notice .................................. 16

    4.  Documents Asserted to Fall Within the *Lands Council* Exceptions ............... 16

    5.  Conclusion ................................................................................................. 17

  B.  Cross-Motions for Summary Judgment ............................................................. 18

    1.  NEPA—SEIS ............................................................................................. 18

      a.  Information about Greater Sage-Grouse population and harm ................. 19

      b.  Information about transmission line burial .............................................. 21

      c.  Information about the Mill Creek alternative .......................................... 22

      d.  Conclusion ......................................................................................... 23

    2.  NEPA—Sage-Grouse ................................................................................. 23

      a.  Environmental Baseline ........................................................................ 23

        i.  Habitat acreage ............................................................................. 24

        ii.  Risk of extirpation ........................................................................ 27

        iii.  Greater Sage-Grouse distribution .................................................. 28

        iv.  Indirect effects of greater than 3.1 miles ........................................ 30

        v.  Winter habitat ............................................................................... 31

  b.  Mitigation ............................................................................ 33
   i. Perch deterrents ......................................................... 34
   ii.  Compensatory mitigation ....................................... 36
  c. Cumulative Effects ............................................................... 41
 3. NEPA—Interpretative Center ..................................................... 46
  a. Burying a Segment of Line ................................................... 46
  b.  Mitigation ............................................................................ 51
 4. NEPA—Mill Creek Violation ...................................................... 52
  a. Supplemental Draft EIS ....................................................... 52
  b. Analysis of effects ............................................................... 57
 5. FLPMA ........................................................................................ 58
Conclusion ............................................................................................... 58

## INTRODUCTION

Plaintiffs Stop B2H Coalition, Greater Hells Canyon Council, Carol "Fuji" Kreider, Jim Kreider, and Gail Carbiener bring this action challenging the Final Environmental Impact Statement (FEIS) issued by Defendant Bureau of Land Management (BLM), the Record of Decision (ROD) issued by Defendant U.S. Department of the Interior (DOI), and the Rights-of-Way (ROWs) granted by BLM and DOI relating to the siting of a powerline transmission project. The proposed transmission line runs from Boardman, Oregon to the Hemingway Substation in Idaho (the B2H Project). The B2H Project was first proposed by Intervenor-Defendant Idaho Power Co. (Idaho Power), who has since been joined in the B2H Project by Intervenor-Defendant PacifiCorp (collectively, Intervenors). The B2H Project is a nearly 300-mile electrical transmission line that crosses over private, state, and federal land.

Plaintiffs allege that BLM and DOI (collectively, with named BLM official Jose Linares, Defendants) violated the National Environmental Policy Act of 1969[1] (NEPA) and the Federal Lands Policy Management Act of 1976[2] (FLPMA) in issuing the FEIS, ROD, and ROWs, and by failing to issue a supplemental draft supplemental environmental impact statement (EIS) before the FEIS and after the FEIS.[3] Now before the Court are Plaintiffs' motion for summary judgment and the cross-motions for summary judgment by Defendants and Intervenors. Also pending is the motion to strike extra-record materials filed by Defendants and joined by Intervenors. For the reasons discussed below, the Court grants in part and denies in part the motion to strike, denies Plaintiffs' motion for summary judgment, and grants the cross-motions for summary judgment filed by Defendants and Intervenors.

## STANDARDS

### A.  National Environmental Policy Act

NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2017).[4] "NEPA requires that 'to the fullest extent possible . . . all agencies of the

---

[1] Pub. L. No. 91-190, 83 Stat. 852, (codified at 42 U.S.C. §§ 4321, *et seq.*).

[2] Pub. L. No. 94-579, 90 Stat. 2743 (codified at 43 U.S.C. §§ 1701, *et seq.*).

[3] Plaintiffs also allege that the U.S. Forest Service and its named official, Tom Montoya, violated NEPA and the National Forest Management Act. Plaintiffs, however, did not offer any evidence or argument relating to these claims in their Motion for Summary Judgment. Nor did Plaintiffs respond in their reply to Defendants' and Intervenors' arguments that Plaintiffs failed to address these claims in their opening brief and thus waived them. As a result, Defendants' and Intervenors' cross motions for summary judgment against these claims are granted. *See Audubon Soc'y of Portland v. U.S. Army Corps of Eng'rs*, 2016 WL 4577009, at *4 (D. Or. Aug. 31, 2016) (granting summary judgment against claims asserted in the plaintiffs' complaint for which the plaintiffs did not provide any evidence or argument in their summary judgment briefing). This leaves only Plaintiffs' claims against Defendants BLM and DOI for the Court to resolve on the merits.

[4] The Council on Environmental Quality promulgates regulations implementing NEPA (40 C.F.R. Parts 1500-1508) that are binding on federal agencies and are given substantial

Federal Government shall' complete an environmental impact statement (EIS) in connection

with 'every recommendation or report on proposals for legislation and other major Federal

actions significantly affecting the quality of the human environment.'" *San Luis & Delta-*

*Mendota Water Auth. v. Jewell* (*Jewell*), 747 F.3d 581, 640-41 (9th Cir. 2014) (alteration in

original) (quoting 42 U.S.C. § 4332(2)(C)). "In addition to the proposed agency action, every

EIS must '[r]igorously explore and objectively evaluate all reasonable alternatives' to that action.

40 C.F.R. § 1502.14(a). The analysis of alternatives to the proposed action is 'the heart of the

environmental impact statement.'" *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623

F.3d 633, 642 (9th Cir. 2010) (second citation omitted). The purpose of NEPA is twofold: (1) to

ensure that agencies carefully consider information about significant environmental impacts; and

(2) to guarantee relevant information is available to the public and decisionmakers at a time

when decisionmakers retain a maximum range of options. *See N. Plains Res. Council, Inc. v.*

*Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011); and *Pit River Tribe v. U.S. Forest*

*Serv.*, 469 F.3d 768, 785 (9th Cir. 2006). "In order to accomplish this, NEPA imposes procedural

requirements designed to force agencies to take a 'hard look' at environmental consequences."

*Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005) (citation omitted).

## B.  Federal Land Policy and Management Act

The FLPMA provides direction for the management of public lands. "In enacting

FLPMA, 'Congress declared that it is the policy of the United States to manage the public lands

---

deference by courts. *See Cal. ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 789 n.3 (9th Cir. 2014) (given substantial deference by courts); *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1138 n.3 (9th Cir. 1998) (binding on federal agencies). The Council issued new regulations that went into effect after the EIS that is before the Court was issued, and thus the Court evaluates the sufficiency of the challenged EIS under the old regulations.

in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 498-99 (9th Cir. 2011) (quoting *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1075 (9th Cir. 2009)). The FLPMA authorizes the grant of rights-of-way on public lands for transmission lines. 43 U.S.C. § 1761(a)(4). The FLPMA instructs that the terms and conditions for transmission lines shall: (1) carry out the purposes of the FLPMA and implementing rules and regulations; (2) "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment"; and (3) comply with state standards for health, safety, environmental protection, siting, construction, and operation, if those standards are more stringent. 43 U.S.C. § 1765(a). The statute also establishes that the terms and conditions may include requirements to: (1) protect federal property and economic interests; (2) manage efficiently the lands subject to or next to the right-of-way and protect users of the lands; (3) protect lives and property; (4) protect the interests of the individuals living in the general area who rely on the fish, wildlife, and other biotic resources for subsistence; (5) "require location of the right-of-way along a route that will cause least damage to the environment, taking into consideration feasibility and other relevant factors"; and (6) otherwise protect the public interest in the lands traversed by or next to the right-of-way. *Id.* § 1765(b).

## C.  Administrative Procedure Act

Under the Administrative Procedure Act (APA), a court must "hold unlawful and set aside agency action . . . found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2). "An agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Gill*

*v. U.S. Dep't of Justice*, 913 F.3d 1179, 1187 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43; *see also Gill*, 913 F.3d at 1187. The basis for the agency's decision must come from the record. *Gill*, 913 F.3d at 1187.

A reviewing court's inquiry must be "thorough," but "the standard of review is highly deferential; the agency's decision is 'entitled to a presumption of regularity,' and [the court] may not substitute [its] judgment for that of the agency." *Jewell*, 747 F.3d at 601 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Although a court's review is deferential, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008); *see also Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001) ("The presumption of agency expertise can be rebutted when its decisions, while relying on scientific expertise, are not reasoned."). A court "must not 'rubber-stamp' . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (first alteration in original, remaining alterations added). A court, however, may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Gill*, 913 F.3d at 1187-88 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

The reasoned-decisionmaking requirement, the Supreme Court has often observed, includes a duty to explain any "departure from prior norms." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *see also Int'l Union, UAW v. NLRB*, 802 F.2d 969, 973-74 (7th Cir. 1986) ("[A]n administrative agency is not allowed to change direction without some explanation of what it is doing and why."). "Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

**D.  Motion for Summary Judgment in an APA Case**

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In an action reviewing the merits under the APA, however, the Court does not ask whether there is a genuine dispute as to any material fact. Rather, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). In an APA-review case, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Id.* at 770

**E.  Extra-Record Material**

"In general, a court reviewing agency action under the APA must limit its review to the administrative record." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014). This is to ensure that the reviewing court affords the agency sufficient deference. *Id.* Under the APA, an agency has substantial discretion "to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Courts generally are

prohibited from considering extra-record materials because doing so "inevitably leads the

reviewing court to substitute its judgment for that of the agency." *Locke*, 776 F.3d at 992

(quoting *Asarco, Inc. v. E.P.A.*, 616 F.2d 1153, 1160 (9th Cir. 1980)). A reviewing court may not

perform a *de novo* review of the agency's action and must "limit[ ] itself to the deferential

procedural review that the APA's arbitrary or capricious standard permits." *Id.*

> Courts may, however, review extra-record material when:

>> (1) it is necessary to determine whether the agency has considered
>> all relevant factors and explained its decision, (2) the agency has
>> relied on documents not in the record, (3) supplementing the
>> record is necessary to explain technical terms or complex subject
>> matter, or (4) plaintiffs make a showing of bad faith.

*City of Las Vegas v. F.A.A.*, 570 F.3d 1109, 1116 (9th Cir. 2009) (discussing what are commonly

known as the "*Lands Council*" exceptions). These exceptions are widely accepted, but are to be

"narrowly construed and applied" to ensure that they do not undermine the general rule limiting

review to the administrative record. *Lands Council*, 395 F.3d at 1030. The party seeking

admission of the extra-record material "initially bears the burden of demonstrating that a relevant

exception applies." *Locke*, 776 F.3d at 993.

> There may be other circumstances in which extra-record material is appropriate for a

court to consider. *See, e.g.*, *Oregon Natural Desert Ass'n v. Bureau of Land Management*

(*ONDA*), 625 F.3d 1092, 1113 n.14 (9th Cir. 2010) (taking judicial notice of and considering

"public documents" outside the record under Rule 201(b)(2) of the Federal Rules of Civil

Procedure). Courts also may consider extra-record materials when considering a claim to compel

an agency to produce a supplemental EIS under 5 U.S.C. § 706(1), because courts are not limited

to the administrative record in such claims. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552,

560 (9th Cir. 2000).

## BACKGROUND[5]

The B2H Project is an approximately 290-mile, 500-kilovolt transmission line to connect a planned Longhorn Substation near Boardman, Oregon to the existing Hemingway Substation located near Melba, Idaho. Around two-thirds of the project is on private land and land managed by the State of Oregon, and one-third is on land managed by BLM and the U.S. Forest Service. In December 2007, Idaho Power applied to the federal government for a right-of-way to construct segments of the B2H Project over the federally managed lands. Although agencies such as the U.S. Forest Service were involved in some aspects of considering Idaho Power's request, BLM took the lead in working with Idaho Power. BLM prepared the documents required under NEPA. BLM began scoping in 2008 and issued a draft EIS (DEIS) in December 2014. BLM issued the FEIS in November 2016.

The B2H Project includes towers up to 195 feet tall, spaced 1,200 to 1,800 feet apart, with the powerline located a minimum of 29.5 feet above the ground. The B2H Project area consists of six segments that are based generally on similar geography, natural features, drainages, resources, and land uses. In the FEIS and DEIS, BLM evaluated multiple alternative routes for each of the segments, plus some minor variations of those alternatives, including the segments crossing over private land and land managed by the State of Oregon. BLM analyzed approximately 556 miles of route alternatives. The FEIS added consideration of a new alternative route in Segment 2, Mill Creek, and a variation of that route, Morgan Lake, which Plaintiffs challenge as improper based on lack of notice and public comment. BLM then chose an

---

[5] This section provides a general overview. More specific facts are discussed where relevant in each section below.

alternative route, the Glass Hill Alterative, as the Selected Alternative. BLM did not select the route proposed by Idaho Power or the Mill Creek alternative.

Relating to the State-managed lands, Idaho Power must also obtain easements and rights-of-way from the State. Idaho Power is currently in proceedings before the Oregon Energy Facility Siting Council (EFSC) regarding siting on State land. In those proceedings, Idaho Power requested the Mill Creek route, which was not the Selected Alternative under the FEIS. Plaintiffs are challenging that request in the EFSC proceedings.

## DISCUSSION

Plaintiffs submitted extra-record materials in support of their motion for summary judgment. Defendants move to strike the extra-record materials, and Intervenors join in that motion. The Court first addresses Defendants' motion to strike and the admissibility of Plaintiffs' extra-record materials and then considers the parties' cross-motions for summary judgment.

### A.  Motion to Strike

Plaintiffs argue that different extra-record materials are admissible for differing reasons. The various reasons are because the applicable documents: (1) relate to Plaintiffs' motion to compel Defendants to issue a supplemental EIS (SEIS) and, as such, review is not limited to the administrative record; (2) are offered under the Federal Rules of Evidence to summarize voluminous documents in the record; (3) are subject to judicial notice and are a proper exception to administrative record-review outside of the *Lands Council* exceptions; and (4) are offered under the well-recognized *Lands Council* exceptions to the record-review requirement.

### 1.   Documents Relating to Plaintiffs' Motion to Compel an SEIS

Among other challenges, Plaintiffs move to compel Defendants to issue an SEIS. Plaintiffs argue that there is significant new information relating to Greater Sage-Grouse,[6] the National Historic Oregon Trail Interpretive Center (Interpretive Center), and the City of La Grande with respect to the B2H Project, all of which require Defendants to prepare an SEIS. In support of this argument, Plaintiffs submit the following extra-record materials: (A) the Declaration of Dr. Clait E. Braun, an expert on Greater Sage-Grouse, along with its exhibits; (B) the Declaration of David H. Becker Exhibits 6, 7, 8, 9, 10, 12, and 13; (C) the Declaration of Craig Miller Exhibit 3.

When a plaintiff moves under NEPA to compel the government to prepare an SEIS, the Ninth Circuit has held that such a claim is under 5 U.S.C. § 706(1), and a court is not limited to reviewing only the administrative record. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000). As explained by the Ninth Circuit in rejecting the plaintiff's argument that extra-record materials could not be considered under these circumstances:

> [The plaintiff's] argument reflects confusion between lawsuits that challenge the propriety of a final agency action, and suits that are brought to compel an agency to act in the first instance. When a plaintiff challenges a final agency action, judicial review normally is limited to the administrative record in existence at the time of the agency's decision. In these cases, the agency must justify its final action by reference to the reasons it considered at the time it acted. An action to compel an agency to prepare an SEIS, however, is not a challenge to a final agency decision, but rather an action arising under 5 U.S.C. § 706(1), to compel agency action unlawfully withheld or unreasonably delayed. In such cases, review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record.

---

[6] In this Opinion and Order, the Court references the Greater Sage-Grouse, or, more informally, "sage-grouse."

*Id.* (quotation marks and citations omitted); *see also Firebaugh Canal Water Dist. v. United States*, 2010 WL 3702664, at *10 (E.D. Cal. Sept. 17, 2010) (allowing the plaintiffs' extra-record materials based on *Dombeck*); *Consejo de Desarrollo Economico de Mexicali, AC v. United States*, 438 F. Supp. 2d 1207, 1221-22 (D. Nev. 2006), *vacated and remanded on other grounds sub nom. Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157 (9th Cir. 2007) ("Because the remaining claims are actions to compel agency action unlawfully withheld, the Court will not limit its review to the Administrative Record and instead will consider materials submitted by Plaintiffs as they relate to the present matter.").

Defendants argue that review of Plaintiffs' extra-record materials in this category is impermissible because Plaintiffs have not shown that Defendants must prepare a supplemental SEIS. Defendants' argument relates to the merits of Plaintiffs' claim, and the Court needs to consider Plaintiffs' extra-record materials to make that determination. Defendants' motion to strike is denied with respect to the Court considering the documents in this category for purposes of Plaintiffs' motion for summary judgment seeking to compel Defendants to prepare an SEIS. The Court, however, will only consider the documents for that limited purpose based on this exception to extra-record review and will not consider the documents related to Plaintiffs' other challenges under NEPA or the other statutes.

### 2.  Documents Asserted to Summarize Information

Plaintiffs provide what they describe as summaries or syntheses of data in the record. Exhibit 1 to the Becker Declaration is a map of Greater Sage-Grouse habitat from the record to which Plaintiffs add a highlight in dark yellow of the FEIS's chosen alternative for the route for the B2H Project. Exhibit 2 to the Becker Declaration is that same map with the highlighted addition, cropped to show only a close-up of the region around the selected route. Exhibit 3 to the Becker Declaration are several pages from the administrative record that show Greater Sage-

Grouse lek count data, to which Plaintiffs have (1) added highlighting in orange to the lek count data for the Baker Priority Area of Conservation (PAC)/population; (2) removed the geographical information about the location of the leks, and (3) added the headers from the first page to all the later pages for ease in understanding the data. Exhibit 4 to the Becker Declaration is a spreadsheet Plaintiffs created from the lek count data in the record pages from Exhibit 3. Plaintiffs highlighted in yellow the leks within four miles of the B2H Project and emphasized with bold text the leks active in 2011. The spreadsheet also calculates the number of males counted each year at the Baker PAC leks, and, for active leks in 2010 and 2011, the percentage of males that attended leks within four miles of the location of the Selected Alternative. Exhibit 11 to the Becker Declaration are pages from the FEIS describing mitigation measures, to which Plaintiffs have highlighted in orange those that apply to sage-grouse based on the table that describes which measures apply to Greater Sage-Grouse.

The Miller Declaration Exhibit 1 is a map of the Baker PAC leks in 2010 and 2011, created by Dr. Miller. Dr. Miller prepared the map based on coordinates, lek status, and male count information for the leks in the Baker PAC taken from the ODFW spreadsheet that appears in the administrative record at AR 131922-51. He added the PAC boundary information using BLM's GIS information available online and he added the Selected Alternative route based on information from the record and a geodatabase he had obtained from BLM in 2012. Dr. Miller used other software to create a four-mile buffer around the Selected Alternative route. Exhibit 2 of the Miller Declaration is a map of active Baker PAC leks in 2011. It was created by Dr. Miller based on information from the ODFW spreadsheet that appears in the administrative record at AR 131922-51. He again used GIS software and map software to add four-mile buffer around the transmission line and the leks.

PAGE 14 – OPINION AND ORDER

Rule 1006 of the Federal Rules of Evidence provides that the proponent of evidence "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." The Ninth Circuit has explained:

> Charts and summaries as evidence are governed by Federal Rule of Evidence 1006. In contrast, charts or summaries of testimony or documents already admitted into evidence are merely pedagogical devices, and are not evidence themselves. However, we have not articulated a bright-line rule against admission of summary charts as evidence. Although we do not approve of receiving summary exhibits of material already in evidence, we have not reversed for that reason. We have also elsewhere recognized a district court's discretion under Federal Rule of Evidence 611(a) to admit summary exhibits for the purpose of assisting the jury in evaluating voluminous evidence.

*United States v. Anekwu*, 695 F.3d 967, 981-82 (9th Cir. 2012) (simplified).

Exhibits 1 and 2 to the Becker Declaration purport to summarize or synthesize disparate pages in the record—the map of the Greater Sage-Grouse habitat with the information showing the Selected Alternative of the route of the B2H Project. This information is not voluminous enough to require summary under Rule 1006. It may be beneficial to help the Court understand the technical information, but that is not the purpose of Rule 1006 or Rule 611(a). The exhibits are not admissible as summaries of voluminous evidence.

Exhibits 3 and 11 to the Becker Declaration are not summaries of voluminous evidence. They are copies of pages from the administrative record to which Plaintiffs have added highlighting or made other minor changes. They are not admissible under this category.

Exhibit 4 to the Becker Declaration is a summary of the information in AR 131937-38 and AR 131945-46. This is not a summary of "voluminous" information. This exhibit is not admissible under this category.

Exhibits 1 and 2 to the Miller Declaration are not merely summaries of information in the record. They are newly created evidence submitted by Plaintiffs. In addition, not all the information contained in these exhibits can be found in evidence already in the record. The four-mile buffer, for example, is not information in the record. Thus, these exhibits are not admissible under this category.

### 3.   Documents Asserted to be Subject to Judicial Notice

Plaintiffs argue that Exhibit 5 to the Becker Declaration is admissible under Rule 201 of the Federal Rules of Evidence. This exhibit is a map of the Interpretive Center from the brochure displayed on BLM's website. Plaintiffs note that BLM did not include a map of the Interpretive Center anywhere in the record, and Plaintiffs assert that the Interpretive Center is the "most significant feature" BLM manages along the B2H Project's route. Plaintiffs cite *ONDA* in arguing that the map is admissible because it is from a source whose accuracy cannot reasonably be questioned. Plaintiffs cite the map in their background discussion. The Court agrees with Plaintiffs that the map is admissible under Rule 201(b)(2) and appropriate for the Court to consider.

### 4.   Documents Asserted to Fall Within the *Lands Council* Exceptions

Plaintiffs "recognize the imperfection" of the three specific bases to admit the extra-record documents asserted above. Plaintiffs argue in the alternative that if the Court rejects any of those arguments, the *Lands Council* exceptions apply. As discussed above, these exceptions are: (1) documents necessary to determine whether the agency considered all relevant factors and explained its decision; (2) when the agency relied on documents not in the record; (3) documents necessary to explain technical terms or complex subject matter; and (4) when the plaintiffs show bad faith. Plaintiffs argue that the submitted materials fall within the first and third exceptions. The only specifically identified materials discussed in this section, however, are the Miller

PAGE 16 – OPINION AND ORDER

Declaration Exhibits 1 and 2 and the Becker Declaration Exhibits 1-4. Thus, those are the only materials the Court considers submitted under the *Lands Council* exceptions.

Plaintiffs argue that these materials are appropriate under *Lands Council* and its progeny because they do not "attack the wisdom" of the agency and do not create a "battle of the experts." Plaintiffs invoke the first *Lands Council* exception to argue that the FEIS "fails to provide the necessary clear and intelligible information" on topics such as maps showing the intersection between Greater Sage-Grouse habitat, leks, and the selected transmission route of the B2H Project, and information about the remaining active leks. Additionally, Plaintiffs argue under the third exception that the maps depicting active leks within four miles of the transmission line (Miller Decl. Exs. 1-2), or the synthesis of the ODFW 1980-2014 lek count data (Becker Decl. Exs. 3-4), will assist this Court in its review of whether BLM adequately disclosed and considered the Baker population's risk of extirpation from B2H Project's impacts.

The Court concludes that Exhibits 1-4 of the Becker Declaration are admissible under the third *Lands Council* exception. These documents take technical and complex information from the record and provide it in a more understandable format to the Court. These documents do not attack the wisdom or decisionmaking of the agency.

The Court also concludes that Exhibits 1-2 of the Miller Declaration fall within the first *Lands Council* exception. Plaintiffs challenge whether BLM considered all of the relevant factors in choosing a 3.1 mile boundary. These exhibits relate to whether BLM considered all of the relevant factors in not considering a four mile boundary. That is the narrow purpose for which the Court considers these documents.

### 5.  Conclusion

The Court admits the following extra-record materials for the following purposes:

- Braun Declaration and its exhibits, for the limited purposes of evaluating whether BLM must prepare an SEIS;

- Becker Declaration Exhibits 6, 7, 8, 9, 10, 12, and 13, for the limited purpose of evaluating whether BLM must prepare an SEIS;

- Miller Declaration Exhibit 3, for the limited purpose of evaluating whether BLM must prepare an SEIS;

- Miller Declaration Exhibits 1 and 2, for the limited purposes of evaluating whether BLM considered all relevant factors when deciding on a 3.1-mile buffer zone; and

- Becker Declaration Exhibits 1 through 5, for all purposes.

## B. Cross-Motions for Summary Judgment

### 1. NEPA—SEIS

Plaintiffs argue that BLM was required to supplement the FEIS. The duty to supplement an EIS is triggered "where there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. . . . [and] there remains major Federal action to occur, as that term is used in § 4332(2)(C)." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 72-73 (2004) (simplified). "Supplementation is not required 'every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information.' Whether new information requires supplemental analysis is a 'classic example of a factual dispute the resolution of which implicates substantial agency expertise.'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (citation omitted) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373-74, 376 (1989)).

Plaintiffs argue that there was significant new information about the decline of the Baker Greater Sage-Grouse population, the feasibility and cost of burying a short section of the transmission line near the Interpretive Center, and how Idaho Power was seeking approval from state authorities for the Mill Creek alternative, which had not been disclosed in the DEIS and

subject to public comment. Defendants and Intervenors respond that no SEIS was required because no major federal action as that term is used in § 4332(2)(C) is left to occur. Defendants and Intervenors also argue that even if major federal action is left to occur, the type of information asserted by Plaintiffs is neither significant nor new and does not trigger the need for an SEIS. The Court agrees with the latter argument and thus, regardless of whether major federal action under § 4332(2)(C) remains, Plaintiffs' argument fails.

### a.  Information about Greater Sage-Grouse population and harm

For the Greater Sage-Grouse population, Plaintiffs assert that the FEIS "offers no information about the status of the sage-grouse population" and argue that new information shows the "perilous decline of the statewide and Baker populations." Plaintiffs argue the 2018 and 2019 population counts and 2018 active lek counts show a new and significantly different picture than the one considered in the FEIS. Plaintiffs also argue that a 2018 study[7] provides significant new scientific evidence that transmission line effects harmful to Greater Sage-Grouse can extend up to 7.7 miles from the lines, and that perch deterrents are not effective.

The new information about the declining population of Greater Sage-Grouse is not *significantly* new or different circumstances from what is discussed in the FEIS. *See Norton*, 542 U.S. at 72; *see also City of Olmsted Falls v. F.A.A.*, 292 F.3d 261, 274 (D.C. Cir. 2002) ("A supplemental EIS is only required where new information provides a *seriously* different picture of the environmental landscape." (emphasis in original) (quotation marks omitted)). The FEIS discloses that in 2013 the moving five-year average population of the Baker core habitat was an estimated 517 birds, a decline of 62.6 percent from 2003 to 2013. AR 170813. The FEIS then

---

[7] D. Gibson, *et al.*, *Effects of Power Lines on Habitat Use and Demography of Greater Sage-Grouse*, WILDLIFE MONOGRAPHS 200 (2018).

explains that the moving five-year average dropped to only 165 birds in 2015, "triggering the hard adaptive management trigger established in the Oregon Greater Sage-Grouse ARMPA which requires that more restrictive management actions are taken to stop a severe deviation from Greater Sage-Grouse conservation objectives." *Id.* The FEIS also discloses that of the 35 known leks in the Baker core area, 10 had had no male attendance in the last 10 years. *Id.* The FEIS also explains:

> The Baker population is more at risk and likely less resilient than other populations, since connectivity to other populations appears limited. There is no redundancy in this population as all birds are believed to be in one general area. For the entire population, the environmental similarity to extirpated populations is high.

*Id.* The FEIS further emphasizes that the "Magpie Peak area is a particularly important area of habitat for the Baker Oregon PAC. Impacts on this area would be estimated at a higher magnitude than adjacent areas." *Id.* Because of the dire circumstances of the Baker population of Greater Sage-Grouse, the FEIS and the ROD require a compensatory mitigation plan that results in net benefits to Greater Sage-Grouse.

Plaintiffs' proposed information shows that the Baker population of males increased to 102 in 2017 and decreased to 92 in 2018, versus the 95 in 2015 disclosed in the FEIS. Dr. Braun emphasizes the Magpie Peak area, but so does the FEIS. This is not significant or seriously different information. Plaintiffs' proposed information that transmission lines may have effects up to 7.7 miles from lines also is not new or significantly different information because, as Plaintiffs argue in other areas of their motion, the record contains information that transmission lines may have negative effects up to 6.8, 11.2, and 12.4 miles from the lines. *See* AR 131125.

### b.  Information about transmission line burial

For the transmission line, Plaintiffs submit an article dated September 18, 2018, discussing Canada's use of AltaLink's underground transmission lines for a project in Alberta and underground transmission lines in general, an AltaLink brochure, and an article dated March 27, 2020, discussing a project running from Iowa and Illinois using underground transmission lines. Plaintiffs argue this evidence is new and significant information showing that underground transmission lines are feasible and not as expensive as BLM believed in preparing the FEIS.

The first problem with Plaintiffs' submission is that it consists of news articles and a brochure. These are not specific, persuasive types of sources that rise to the level of significant information triggering an SEIS, such as scientific studies or information relating to the permitting or construction of a buried transmission line. Although the articles may suggest that such information exists, under these circumstances they do not rise to the level of significant, new information that triggers an agency to supplement an EIS. To hold otherwise would make the agency determination "intractable."

The second problem with the proposed information is that it is not significant because it does not relate to many of the reasons provided by BLM for rejecting underground burial. BLM states in the FEIS that underground transmission lines were rejected because of "the increased land disturbance, reduced reliability, unproven technology for 500-kV lines over long distances compared to an overhead line, and high costs . . . . " AR 170208. Plaintiffs argue that the new information shows that the costs are not as prohibitive as previously thought. That does not, however, address the other concerns raised by BLM.

The third problem is that the AltaLink and Iowa-to-Illinois projects are different from the B2H Project. They involve different voltage and one is direct current versus alternating current.

PAGE 21 – OPINION AND ORDER

Whether to supplement an EIS generally falls within the expertise of the agency, *see Tri-Valley CAREs*, 671 F.3d at 1130, particularly when the applicability of the purported new information involves scientific and technical analyses.

### c.   Information about the Mill Creek alternative

For the Mill Creek alternative, Plaintiffs provide information that Idaho Power's application to the Oregon EFSC requested approval of the Mill Creek alternative route. This route was added in the FEIS but was not in the DEIS. Defendants did not allow public comment on the FEIS. Thus, the Mill Creek alternative was not subject to public comment. The EFSC issued a Proposed Order authorizing the Mill Creek alternative or its Morgan Lake variation and a variance from the Oregon noise anti-degradation standard. Plaintiffs are challenging these alternatives before the EFSC.

Plaintiffs argue that the federal decisionmaker did not know that Idaho Power would request the Mill Creek or Morgan Lake alternative routes from the State, EFSC would issue a Proposed Order authorizing those routes, or EFSC would issue a Proposed Order authorizing a noise variance when the federal decisionmaker approved the DOI ROD. Plaintiffs also argue that the federal decisionmaker did not have the benefit of any public comment about the Mill Creek or Morgan Lake alternative routes when she made her decision. Plaintiffs contend that this frustrated "NEPA's goal of allowing the public the opportunity to play a role in the decisionmaking process." *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 n.4 (9th Cir. 2019) (quotation marks omitted). Plaintiffs assert that the fact that Idaho Power requested the Mill Creek route to the State and the EFSC's response is significant, new information requiring an SEIS.

That Idaho Power requested the Mill Creek alternative with the State of Oregon is not significant new information. The Court considers below whether inclusion of the Mill Creek

PAGE 22 – OPINION AND ORDER

alternative in the FEIS without a supplemental DEIS violated NEPA. Idaho Power, however, was free to apply to the EFSC for a route other than the Selected Alternative and thus the fact that Idaho Power did so is not significant new information.

### d. Conclusion

Plaintiffs fail to show that significant new information triggered BLM's obligation to prepare an SEIS. The agency properly exercised its decisionmaking authority within its significant area of expertise in considering the proposed information submitted by Plaintiffs and deciding not to prepare an SEIS.

### 2. NEPA—Sage-Grouse

Plaintiffs assert that the FEIS violates NEPA with its analysis of the B2H Project's effects on Greater Sage-Grouse. Plaintiffs argue that the FEIS does not include a proper discussion of the environmental baseline of the Baker population; does not include a proper analysis of the effectiveness of the proposed mitigation, particularly compensatory mitigation; and improperly fails to include grazing in the cumulative effects discussion. The Court addresses each argument in turn.

### a. Environmental Baseline

Plaintiffs argue that BLM does not properly identify the baseline environmental conditions of the area to be affected by the B2H Project under NEPA. "Without establishing the baseline conditions which exist [in the action area], there is simply no way to determine what effect [the action] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1998). Plaintiffs argue that the FEIS fails to accurately disclose the environmental baseline by: (1) disclosing an inaccurate amount of Baker PAC habitat to downplay the percentage affected by the B2H Project; (2) failing to disclose in a clear and comprehensive way that the Baker PAC

has a high risk of extirpation; (3) failing to disclose the distribution of birds within leks, which

Plaintiffs contend is crucial information in weighing the potential effects of the transmission line;

(4) failing to disclose how many leks would be indirectly affected by the B2H Project, despite

evidence in the record of negative effects at distances greater than 3.1 miles; and (5) failing to

disclose information about winter habitat.

### i.  Habitat acreage

Plaintiffs argue that the FEIS falsely asserts that the ODFW's 2011 *Greater Sage-Grouse*

*Conservation Assessment and Strategy for Oregon: A Plan to Maintain and Enhance*

*Populations and Habitat* (*Strategy*) states that the Baker population has available habitat

of 853,848 acres. Plaintiffs contend that the *Strategy*, in fact, states that 435,979 acres of the

Baker Resource Area consists of sagebrush, with 88% of that being high viability habitat.[8]

The FEIS indicates that ODFW's *Strategy* states that there are 853,848 acres of available

habitat to the Baker population. AR 170812. The FEIS continues, however, to describe various

limitations on habitat for the Baker population. It describes a closed population that does not

emigrate or immigrate. *Id.* It notes that "steeper habitat and rugged topography reduces the

---

[8] Plaintiffs raise this argument in their combined response and reply brief, after raising a different argument relating to habitat acreage in their opening brief. Intervenors argue that Plaintiffs waived this argument, and other arguments Plaintiffs made in their reply, by failing to raise them in Plaintiffs' opening brief. Because these are cross-motions for summary judgment, Defendants and Intervenors each filed replies to Plaintiffs' combined response and reply brief. Further, some of Plaintiffs' arguments responded to issues raised by Defendants and Intervenors in their briefs. Thus, the Court does not consider the arguments in Plaintiffs' reply waived. *See, e.g.*, *Paul v. Colvin*, 2013 WL 5797427, at *6 (S.D. Cal. Oct. 28, 2013) (considering arguments raised in reply on cross-motions for summary judgments because "Defendant will not be unfairly prejudiced by Plaintiff's failure to raise his arguments in his opening brief because Defendant was given the opportunity to respond to Plaintiff's newly raised arguments in her reply"); *accord United States v. Boggi*, 74 F.3d 470, 478 (3d Cir. 1996) (considering issue raised in reply on cross-appeal because the government could respond in its final brief and one of the issues needed clarification in the circuit).

suitability" of habitat. *Id.* It explains that "core" habitat, the equivalent of Priority Habitat

Management Areas (PHMA), "represent key habitat areas" and are described as PACs.

AR 170813. The FEIS discloses that there are 336,539 available core habitat acres to the Baker

PAC, but only 243,259 acres are considered current Greater Sage-Grouse habitat while the

remaining 77,434 acres are considered potential habitat. *Id.* The potential habitat includes burned

areas, areas with juniper, areas with crested wheat plantings, and areas with agricultural land. *Id.*

The FEIS continues, discussing population trends on the core habitat. *See, e.g.*, *id.*

("ODFW calculations of 2013 spring trend (moving 5-year average) count for the population in

Baker *core habitat* estimates 571 birds, which is 62.6 percent below the 2003 baseline of 2,017

birds. There are 34 known leks/lek complexes within this *core habitat* area, 10 of which have not

had any observed male attendance in the last 10 years." (emphasis added)). It is not confusing or

ambiguous that the FEIS is discussing the population of the Baker PAC on the core habitat.[9] The

core habitat is disclosed as 336,539 total available acres with 243,259 of that as existing habitat.

Regardless of whether the 853,848 acre number is erroneous, that is not the acreage that is

important in the FEIS's discussion of Greater Sage-Grouse habitat and declining population. The

FEIS focuses on the core habitat.

Additionally, the crux of Plaintiffs' argument is that the FEIS discloses the 853,848

acreage number to downplay the percentage affected in its later analysis. Plaintiffs rely on the

statement in the FEIS's cumulative effects section, that the "majority of Greater Sage-Grouse

habitat would remain undisturbed by the B2H Project." AR 172562. The direct acreage affected

is 1,305. Plaintiffs appear to argue that the FEIS includes the higher acreage number to be the

"denominator" so that 1,305 will lead to a lower percentage of affected acreage. There are

---

[9] The FEIS next discusses the extirpation risk of the "entire" Baker population.

several problems with this argument. First, as discussed above, in discussing the Baker PAC, the FEIS focuses on core habitat, not all available habitat. Thus, the record does not support that 853,848 was the "denominator."

Second, the FEIS also discloses that along with the 1,305 acres directly affected, the B2H Project will have indirect effects on 41.3% of the core habitat (or PHMA) of the Baker PAC. *See* AR 170895 ("Along with the direct effects that would be expected within the footprint of the Applicant's Proposed Action Alternative, indirect effects on Greater Sage-Grouse would be anticipated within a 3.1-mile buffer around the route centerline, of which 41.3 percent is Greater Sage-Grouse PHMA on the Baker Oregon PAC and 25.2 percent is GHMA [general habitat management area]."). Thus, the record does not support that 1,305 was the numerator in calculating the B2H Project's effects. It appears that the agency considered the acreage of indirect effects, but it was still less than a majority of acreage expected to be affected by the B2H Project.

Third, even if the numerator were 1,305, assuming a denominator of 853,848, 336,539, or 243,259, the affected acreage would be .15%, .39%, or .54%, respectively. The difference between the three is negligible.

Fourth, it is not apparent that the 853,848 figure is as inaccurate as Plaintiffs contend. The *Strategy* discloses that the population has 435,979 acres of sagebrush habitat available to sage-grouse, as Plaintiffs contend. AR 129738. The *Strategy* also, however, shows more acreage of *potential* habitat containing, for example, juniper, invasive grasses, and native grasses, totaling 269,647 acres. *Id.* It further discloses acreage identified as agricultural and non-habitat, for a grand total of 840,203 acres. *Id.* The FEIS includes agricultural land in its definition of potential habitat. Thus, the FEIS includes all of that *potential* acreage in what the FEIS describes

as "available" habitat to the Baker population. And although the *Strategy* listed 840,203 acres

instead of 853,848, that difference is not material under the circumstances.

Finally, Plaintiffs provide no argument or evidence in the record that the "majority" of

Greater Sage-Grouse habitat was not expected to be undisturbed by the B2H Project, regardless

of the numerator or denominator applied. For all these reasons, although the Court does not

condone sloppiness in drafting an EIS, even if the 853,848 figure is inaccurate, it ultimately is

immaterial and does not render the FEIS baseline inaccurate, improper, arbitrary, or capricious.

*See City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1153 (9th Cir. 1997)

("We do not condone the 'loose' language used in the Final Environmental Impact

Statement/Report on this issue, but ultimately this error did not significantly undermine the goals

of the National Environmental Policy Act.").

### ii.  Risk of extirpation

Plaintiffs argue that the discussion in the FEIS about the risk of extirpation of the Baker

population is confusing and too general to meet NEPA's standards. Plaintiffs quote *Rose*,

"warn[ing] that 'general statements about "possible" effects and "some risk" do not constitute a

"hard look" absent a justification' for why an agency could not supply more 'definitive

information.'" *Rose*, 921 F.3d at 1191 (quoting *Blue Mountains Biodiversity Proj. v.

Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998)). Plaintiffs also argue that the FEIS's discussion

fails to meet BLM's "obligat[ion] . . . to make available to the public high quality information,

including accurate scientific analysis, expert agency comments and public scrutiny, before

decisions are made and actions are taken." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349

F.3d 1157, 1167 (9th Cir. 2003). Plaintiffs further contend that BLM's own biologist pointed out

during the DEIS process that the Baker population had a 61.9% chance of extirpation and thus

the agency had specific, accurate information and chose not to disclose it, in violation of NEPA.

The Court quotes the FEIS's discussion of the risk to the Baker population in Section A.1, *supra*. Although the FEIS's extirpation discussion could have been more clear, "[t]he Court is loath to engage in a 'magic words review,' where the propriety of [BLM's] analysis hinges on whether it included the correct words in its [FEIS], rather than whether its analysis carried the substantive weight arbitrary and capricious review demands." *Wilderness Watch, Inc. v. Creachbaum*, 225 F. Supp. 3d 1192, 1207 (W.D. Wash. 2016), *aff'd*, 731 F. App'x 709 (9th Cir. 2018).

The FEIS does more than vaguely assert "some risk." It describes the declining Baker PAC, including that there were only 165 birds in 2015. It notes this triggered the ARMPA measures. It then expands the discussion from the Baker PAC to the Baker population, describing that the population is "more at risk and likely less resilient" than other populations and giving the reasons. It concludes that "[f]or the entire population, the environmental similarity to extirpated populations is high." AR 170813. Although not a model of clarity, the discussion is not indecipherable. *See Gill*, 913 F.3 at 1187-88 (stating that a court may uphold an agency decision of "less than ideal clarity if the agency's path may reasonably be discerned"). It is readily apparent from the FEIS's discussion that the Baker population is in dire straits. *Accord Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004) (stating that "NEPA documents 'shall be written in plain language . . . so that decisionmakers and the public can readily understand them'" and "are unacceptable if they are indecipherable to the public" (alteration in original) (quoting 40 C.F.R. § 1502.8)). This discussion is a sufficient baseline analysis and is not arbitrary and capricious.

### iii.  Greater Sage-Grouse distribution

Plaintiffs argue that the FEIS fails to provide a sufficient baseline because it does not disclose information about the distribution of the Greater Sage-Grouse population in the leks,

PAGE 28 – OPINION AND ORDER

which, in turn, does not provide enough information to consider how the B2H Project affects the

Baker PAC. If this population, which is at such high risk of extirpation, is mostly contained in

the leks nearest to the B2H Project, then providing information about distribution will show that

the B2H Project will have a greater effect versus just evaluating how many leks are near the

proposed transmission line.

Plaintiffs cite *WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920 (9th

Cir. 2015). In *WildEarth Guardians*, the Ninth Circuit held:

> Here, the Wildlife Habitat section of the EIS lists the percentage of
> big game winter range protected in each landscape area, but
> provides virtually no information about where the big game winter
> range is actually located, nor the concentration of game in each
> area. In other words, the EIS does not make public the "underlying
> environmental data," nor specifically reference any documentary
> source that the Forest Service relied upon in making its
> determinations on snowmobile access.

*Id.* at 925 (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998).

Unlike the EIS in *WildEarth Guardians*, the FEIS specifically references the

documentary sources on which BLM relied, including the ODFW *Strategy*. The EIS also

includes a table setting forth each proposed alternative route and the number of leks in

occupation status categories (unoccupied, unoccupied pending, occupied, occupied pending,

historic, and unknown) for PHMA and GHMA. This table discloses lek occupation within 0.25,

2.0, and 3.1 miles from the proposed transmission line of each alternative. BLM's disclosure of

leks was not arbitrary and capricious. "It is not for this court to tell the [agency] what *specific*

evidence to include, nor how *specifically* to present it." *League of Wilderness Defs.-Blue

Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008)

(emphasis in original).

### iv.  Indirect effects of greater than 3.1 miles

Plaintiffs argue that it was arbitrary and capricious for BLM to only consider leks within 3.1 miles of the proposed transmission lines. Plaintiffs assert that BLM did not consider the best available science that transmission lines have negative effects at distances greater than 3.1 miles. Plaintiffs argue that BLM failed to consider all the relevant factors, including that four miles was a distance better supported by the science and the record. BLM used five miles in the DEIS.

Plaintiffs argue in their reply brief that BLM "arbitrarily used a figure that ignored scientific evidence that powerlines negatively affect Greater Sage-Grouse lek persistence up to four miles away, that ravens forage up to 6.8 miles from transmission towers, and that powerlines were associated with negative trends in lek counts up to 12.4 miles away." ECF 65 at 21[10] (citations omitted). BLM had many options of distances it could choose as the buffer distance from the transmission lines. BLM elected to use the same distance that the ARMPA uses—3.1 miles for "infrastructure related to energy development." AR 175735. The ARMPA, in turn, obtained that figure from the U.S. Geological Survey Report on Conservation Buffer Distance Estimates for Greater Sage-Grouse. *Id.* Although the FEIS was exempt from the ARMPA, BLM's decision to use the same distance measurement as the ARMPA is not an arbitrary or capricious and is entitled to deference. *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1131 (9th Cir. 2010) (stating that a court must give the "highest deference" to an agency's "technical analyses and judgments within its area of expertise").

---

[10] The Court cites the ECF pagination, not the internal pagination of the document.

Additionally, the fact that the distance changed from five miles in the DEIS to 3.1 miles in the FEIS is not arbitrary and capricious. The ARMPA was issued in September 2015, after the DEIS and before the FEIS. BLM's decision to change its buffer distance to the distance adopted in the ARMPA is entitled to deference.

### v.  Winter habitat

Plaintiffs argue that BLM must provide detailed information about the Baker population's winter habitat. Plaintiffs cite *Oregon Natural Desert Ass'n v. Jewell* (*ONDA v. Jewell*), 840 F.3d 562 (9th Cir. 2016). In *ONDA v. Jewell*, the Ninth Circuit held that the agency erred by failing to conduct an accurate baseline assessment of a site, instead extrapolating from nearby sites and using inaccurate information to conclude that there was no winter Greater Sage-Grouse habitat in a particular location. *Id.* at 568-69. The Ninth Circuit explained:

> BLM had a duty to assess, in some reasonable way, the actual baseline conditions at the Echanis site. Baseline conditions were particularly important here because impacts to sage grouse were by far the most significant concern during environmental review, and the unique features of winter habitat are essential to sage-grouse survival. Baseline conditions at the Echanis site thus warranted comprehensive study in the FEIS.

> The FEIS did not report on any observations of the Echanis site surveying winter sage grouse use of the area. Instead, the FEIS assumed that sage grouse are absent from the site during winter.

> * * *

> In short, the FEIS's inaccurate data concerning the closer East Ridge site that was surveyed rendered its assumption concerning the winter presence of sage grouse at the Echanis site arbitrary and capricious.

> * * *

> But we do not hold that habitat extrapolations from one site to another are impermissible. Instead, our holding is that any such extrapolation must be based on accurate information and defensible reasoning.

*Id.* at 569-70 (citations omitted). The Ninth Circuit noted, however, that the agency is only obligated to "succinctly" describe baseline conditions. *Id.* at 568 (quoting 40 C.F.R. § 1502.15).

*ONDA v. Jewell* does not hold that in every EIS involving sage-grouse there must be a separate, detailed discussion about winter habitat. In *ONDA v. Jewell*, the site at issue provided potential winter foraging for Greater Sage-Grouse. *Id.* at 567. Impacts to Greater Sage-Grouse, and thus whether birds were present on the site during the winter, were "by far the most significant concern" in whether the right-of-way would be issued. *Id.* at 566. Here, the presence of Greater Sage-Grouse in the winter is not "by far" the most important concern.

BLM does not ignore Greater Sage-Grouse habitat for the Baker population or extrapolate information about it using inaccurate information. BLM discusses Greater Sage-Grouse habitat year-round in the FEIS because winter is not the only season at issue. Specific to winter habitat, the FEIS incorporates by reference a 2013 study by the USFWS on Greater Sage-Grouse telemetry in Baker County, explaining:

> Most birds occupied relatively small ranges during spring and summer months, but showed large movements to winter habitat. Several birds moved approximately 16 kilometers southwest to the Virtue Flat area for winter. One female moved out of the B2H Project area to winter in southwest Idaho (a distance of 33 miles) and returned to Oregon in spring (USFWS 2013).

AR 170812; *see also* AR 170782 (incorporating the USFWS 2013 study in discussing Greater Sage-Grouse movements between summer and winter habitats). The FEIS also describes the differences in winter versus spring and summer habitat and explains how winter habitat is categorized. *See* AR 170781 (explaining that "core" habitat includes where "winter habitat use polygons overlap with either low lek density strata, connectivity corridors, or occupied habit"). Additionally, the FEIS requires seasonal protection for winter habitat from disturbances or disruptive activities (which includes noise, human foot or vehicle traffic, or other human

presence) from November 1 to February 28. *See* AR 173035. Thus, the treatment of winter

habitat in the FEIS is not arbitrary or capricious.

### b. Mitigation

The FEIS discusses three types of mitigation measures. The first are "design features,"

which are to be implemented "as standard practice of construction, operation, and/or

maintenance" of the B2H Project. AR 170116. These are described in Table 2-7 of the FEIS. The

second are "selective mitigation measures," which are to be applied "to certain areas through the

planning process to avoid, reduce, or minimize impacts of the B2H Project." *Id.* These are

discussed in Section 2.5.1.1. of the FEIS, including Table 2-13. The FEIS describes which of

these measures apply to Greater Sage-Grouse. *See* AR 173060-62. The last is compensatory

mitigation, which is discussed in Appendix C. Compensatory mitigation is required when

"residual impacts" remain after the design features and selective mitigation measures have been

implemented. AR 170135.

"Greater Sage-Grouse GHMA is crossed by all alternative routes in Segments 2

through 6. PHMA is crossed by all alternative routes in Segment 3, except for the Timber

Canyon Alternative[,]" and the "Proposed Action Alternative crosses substantially more PHMA

than the other alternative routes in Segment 3." AR 169968-69. Because of this, the FEIS

explains that

> [a]ll alternative routes that cross GHMA would have long-term
> moderate residual impacts on Greater Sage-Grouse, and all
> alternative routes that cross PHMA would have long-term high
> residual impacts on Greater Sage-Grouse. In addition to the design
> features of the B2H Project for environmental protection and
> selective mitigation measures that would avoid or minimize
> impacts on Greater Sage-Grouse, the B2H Project would be
> required to achieve a net conservation gain for Greater Sage-
> Grouse through compensatory mitigation.

PAGE 33 – OPINION AND ORDER

AR 169969; *see also* AR 173061-62 (describing the expected residual impacts to Greater Sage-Grouse after the design features and selective mitigation measures, triggering the compensatory mitigation requirement). Plaintiffs argue that the FEIS violates NEPA because it does not include a sufficient discussion of the effectiveness of one mitigation measure for Greater Sage-Grouse discussed in Table 2-13, perch deterrents, and the compensatory mitigation discussed in Appendix C.

### i. Perch deterrents

The FEIS contains a significant discussion about mitigation. It requires many specific mitigation measures, including seasonal and time restrictions on construction and other disturbances, requirements that Idaho Power restore construction areas, limiting areas of travel to reduce disturbances, and measures to protect riparian areas, among others. *See, e.g.*, AR 170117-28. The entry in Table 2-13 on Measure 15, Flight Diverters and Perch Deterrents focuses its mitigation analysis on flight diverters. AR 170145. Plaintiffs' focus on this single measure, however, is an improper "fly-speck" of an EIS and does not raise a consequential error. *See Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016) ("Yet the mitigation measures, including the 85-page Protection Plan, provide ample detail and adequate baseline data for the agency to evaluate the overall environmental impact of the Project. Plaintiffs merely 'fly speck' the EIS rather than identify consequential flaws that would prevent the agency from sufficiently grasping the Project's potential environmental consequences."); *Friends of Se. Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998) ("In determining whether the EIS contains a 'reasonably thorough discussion,' we may not 'fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies. . . .'" (quoting *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996)); *accord* 40 C.F.R. § 1500.1(b) (2017)

("Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question rather than amassing needless detail.").

Plaintiffs also mischaracterize the effectiveness, or lack thereof, of perch deterrents as disclosed in the record. Plaintiffs assert that perch deterrents are not effective. Plaintiffs cite Lammers & Collopy, *Effectiveness of Avian Predator Perch Deterrents on Electric Transmission Lines*, Journal of Wildlife Management (2007), describing the results of their study on perch deterrents. The authors "concluded that the deterrents *discouraged perching*; however, as other studies have found, raptors with sit-and-wait hunting methods prefer the highest perches available, and even though other elevated perches existed, avian predators were motivated to perch on the deterrents to take advantage of the height the towers offered." AR 178885 (citation omitted) (emphasis added). The authors also concluded, however, that

> [t]he perch-deterrent design we studied is a satisfactory option to minimize potential conflicts between sensitive species and energy development such as the expansion of high-voltage transmission lines. If land managers determine that perching or hunting by avian predators on overhead utility structures represents a threat to a sensitive prey species, we recommend the use of this perch-deterrent design on overhead utility structures where the objective is to reduce perching time for large-sized avian predators such as golden eagles and rough-legged hawks.

*Id.*

Further, Plaintiffs misunderstand the basic premise of the mitigation measures in the FEIS. The perch deterrent is a possible selective mitigation measure to reduce impacts on Greater Sage-Grouse, which will be applied after consultation with appropriate agencies. The FEIS, however, determined that there would be residual impacts despite implementation of all the design features and possible selective mitigation measures. Thus, the FEIS does not assume that those measures will provide sufficient mitigation. That is why the FEIS requires compensatory mitigation that will provide a net conservation gain to Greater Sage-Grouse. As a

PAGE 35 – OPINION AND ORDER

result, even if the perch deterrents are as ineffective as Plaintiffs contend, which is not clear from the record and for which the agency's determination is entitled to deference, it would simply mean that more compensatory mitigation would be required. Indeed, in discussing compensatory mitigation and residual impacts, the FEIS states in Appendix C that perch deterrents in Measure 15 may "reduce, but will not eliminate perching and nesting by raptors and other avian predators" and lists avian predation as one of the residual effects requiring compensatory mitigation.

Plaintiffs argue that the discussion of perch deterrents in Appendix C is a "patchwork" discussion that fails under NEPA. Plaintiffs cite *National Parks & Conservation Ass'n v. Bureau of Land Management*, 606 F.3d 1058 (9th Cir. 2010). In *National Parks*, the Ninth Circuit held that an EIS's discussion of atmospheric eutrophication that had to be cobbled together from a comment in the "Biological Resources" section that referred to data from the "Air Quality" section and then a discussion about effects on Joshua Tree, versus its surrounding area, was a "patchwork" that did not serve as a "reasonably thorough" discussion. *Id.* at 1073-74. BLM's discussion of perch deterrents and their mitigating effects is in Section 2.5.1.1. of the FEIS, specifically the "Impact Assessment and Mitigation Planning" section, and in Appendix C, the "Mitigation Framework." These are not such disparate sections that they represent a "patchwork," too untethered and difficult to read together and understand as a reasonably thorough discussion. Appendix C provides supporting information for the mitigation discussion in Chapter 2. Indeed, it is specifically referenced and incorporated into that Chapter in, among other pages, the page after Table 2-13 containing the perch deterrent entry. *See* AR 170147.

### ii.  Compensatory mitigation

Plaintiffs also assert that the compensatory mitigation plan is insufficient under NEPA because it does not evaluate whether the compensatory mitigation is likely to be effective or will

achieve the required conservation gain. Instead, Plaintiffs contend, the FEIS establishes a generic framework for a future plan and merely presumes the compensatory mitigation plan will be effective after it is developed in the future.

Plaintiffs cite *South Fork Band Council of Western Shoshone v. United States Department of Interior*, 588 F.3d 718 (9th Cir. 2009). In *South Fork Band Council*, the Ninth Circuit explained:

> An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective. The Supreme Court has required a mitigation discussion precisely for the purpose of evaluating whether anticipated environmental impacts can be avoided. A mitigation discussion without at least *some* evaluation of effectiveness is useless in making that determination.
>
> Although the District Court's written order finds that the EIS discusses the effectiveness of each mitigation measure, close inspection reveals that the EIS does not in fact assess the effectiveness of the mitigation measures relating to groundwater. It states only, "Feasibility and success of mitigation would depend on site-specific conditions and details of the mitigation plan." Nothing whatsoever is said about whether the anticipated harms could be avoided by *any* of the listed mitigation measures. This discussion is inadequate.
>
> BLM argues that an effectiveness discussion was not required because it is impossible to predict the precise location and extent of groundwater reduction, and that problems should instead be identified and addressed as they arise. But NEPA requires that a hard look be taken, if possible, *before* the environmentally harmful actions are put into effect.

*Id.* at 727 (emphasis in original) (citations omitted).

Defendants and Intervenors respond that NEPA does not require a mitigation plan that is fully developed or funded, but merely developed to a "reasonable degree." They point out that the Ninth Circuit repeatedly has upheld mitigation plans where specific mitigation would be developed in the future. They cite *Protect Our Communities*; *Pacific Coast Federation of*

*Fishermen's Assocs. v. Blank*, 693 F.3d 1084 (9th Cir. 2012); *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468 (9th Cir. 2000); and *Carmel-By-The-Sea*.

The mitigation approach in *Protect Our Communities* is much like the one in the FEIS. The EIS in *Protect Our Communities* included many specific mitigation actions to reduce the effects of the action, and then also included a requirement for monitoring and inspection of the environmental effects on birds and bats as part of an adaptive management plan. 825 F.3d at 577-78. The plaintiffs challenged the mitigation measures in the EIS, arguing that they were improperly deferred until post-development through the adaptive management plan. *Id.* at 582. The Ninth Circuit rejected this argument, explaining that

> the EIS's inclusion of an adaptive-management plan, among other mitigation measures, provides flexibility in responding to environmental impacts through a regime of continued monitoring and inspection. That an agency decides to incorporate an adaptive management plan as one component of a comprehensive set of mitigation measures does not mean that the agency lacked a sufficient foundation of current baseline data from which to evaluate the Project's environmental effects. Rather, the use of such a continuous monitoring system may complement other mitigation measures, and help to refine and improve the implementation of those measures as the Project progresses.

*Id.*

In *Blank*, the Ninth Circuit upheld the mitigation analysis in an EIS that contained two primary features: an "adaptive management plan" to address unforeseen effects and a "quadrennial review to make sure the program is meeting its goals, with the first review occurring five years after implementation." 693 F.3d at 1103. The agency had "discussed, but did not adopt, criteria for deciding when and how to allocate these reserve shares [for adaptive management], and stated that shares not used for adaptive management would be proportionally distributed to privilege holders." *Id.* The Ninth Circuit rejected the plaintiffs' challenge that the mitigation measures were "vague, uncertain, and inadequate." *See id.*

In *Okanogan*, the Ninth Circuit upheld a mitigation analysis in which the potential harm was specifically analyzed, some specific measures were analyzed, extensive monitoring was required, and a process for more mitigation was put in place if additional harm was discovered after monitoring. 236 F.3d at 476-77. The Ninth Circuit explained:

> It is true that the mitigating measures are described in general terms and rely on general processes, not on specific substantive requirements.
>
> * * *
>
> Because the actual adverse effects are uncertain, and the EIS considered extensively the *potential* effects and mitigation processes, we conclude that the present case is closer to *Methow Valley*. Accordingly, we hold that the discussion of mitigating measures in the EIS is adequate.

*Id.* at 477; *see also id.* at 476 ("The Forest Service took the requisite 'hard look' at those potential problems and required BMG to monitor the *actual* effects of the Project throughout its life. The EIS provides methods for ensuring that environmental problems do not develop. For example, if there is a decrease in water quality, the EIS provides procedures for ensuring compliance with applicable water-quality standards. The procedures are in 'bullet' form and are stated in somewhat general terms, but this format is not deficient in the circumstances: The exact environmental problems that will have to be mitigated are not yet known because the Project does not exist.").

In *Carmel-By-The-Sea*, the Ninth Circuit affirmed a mitigation plan that was "intended to be 'conceptual' only" and was "flexible to adapt for future problems." 123 F.3d at 1154. It included specific actions, but also provided "a contingent plan that will be utilized should all or part of the proposed mitigation fail." *Id.* (quotation marks omitted).

The Court finds that the mitigation plan in the FEIS is more like the plans in the cases cited by Defendants and Intervenors than *South Fork Band Council*. BLM took a "hard look" at

the effects of the B2H Project, set forth many specific mitigation measures, discussed their

effectiveness in a succinct manner, anticipated residual impacts on Greater Sage-Grouse despite

these measures, required monitoring, and required flexible compensatory mitigation to be

tailored after the effects of the B2H Project are better known. The compensatory mitigation also

must produce a net conservation benefit for Greater Sage-Grouse. Further, BLM requires a

specific, detailed compensatory mitigation plan as part of the approval process for the B2H

Project—it is to be prepared after a route is selected and after final engineering and design.

AR 173066. This delay is "to identify a suite of site-specific compensatory mitigation options for

selection and implementation under the review and guidance of the cooperating agencies." *Id.* It

also includes a requirement, however, that "a final detailed [compensatory mitigation plan] must

be reviewed by the cooperating agencies and a recommendation will be made to the authorized

officer for approval prior to any issuance of any notice to proceed for surface-disturbing

activities associated with the [B2H] Project." *Id.* In other words, there can be no construction

without a detailed plan. This is not a case in which the action will commence before it can be

determined whether mitigation will be effective.

Additionally, the FEIS incorporates by reference many documents into its compensatory

mitigation framework, requiring that the compensatory mitigation plan "be consistent with the

ODFW's Greater Sage-Grouse Conservation Strategy for Oregon policy (OAR 635-140) and

guidance documents (Oregon Greater Sage-Grouse Action Plan, State of Oregon Greater Sage-

Grouse Habitat Mitigation Manual, and Governor's Executive Order No. 15-18)." AR 173062. It

also requires that the compensatory mitigation plan may not significantly deviate from the

underlying tenets and goals of those documents, plus the ARMPA, the Idaho and Southwestern

Montana Greater Sage-Grouse ARMPAs, and the Idaho Department of Fish and Game's

PAGE 40 – OPINION AND ORDER

Conservation Plan for the Greater Sage-Grouse in Idaho. AR 173057. The FEIS mitigation framework provides a process for creating the final compensatory mitigation plan and includes several specific examples of the types of mitigation actions that should be included. AR 173062-66. The FEIS places many requirements on the eventual compensatory mitigation plan, which itself is a requirement for the B2H Project. BLM's treatment of mitigation, including requiring compensatory mitigation through a yet-to-be finalized plan for which BLM provides a process and significant guidance, was not arbitrary or capricious.

### c. Cumulative Effects

Plaintiffs argue that the FEIS's analysis of cumulative effects (or impacts, the terms are used synonymously, *see* 40 C.F.R. § 1508.8 (2017)) violates NEPA because it does not analyze the cumulative effects of livestock grazing along with the B2H Project. Plaintiffs assert that the Selected Alternative in segments 3 and 4 of the B2H Project, in which it will intersect with the Baker PAC and the Cow Valley PAC, will cross through hundreds of thousands of acres of grazing allotments. Plaintiffs argue that ignoring the combined effects of the transmission line and grazing was erroneous.

The regulations governing the FEIS require that BLM analyze cumulative impacts. *See* 40 C.F.R. §§ 1508.7 (2017) ("Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."); 1508.8 (defining direct and indirect effects); 1508.25 (establishing that in developing the scope of an EIS, agencies must consider actions, cumulative actions, and similar actions, and explaining those terms); *see also*

*Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002) ("We have interpreted the regulations to require that the EIS consider the cumulative impact of the proposed action.").

Because cumulative impacts can result from individually minor but collectively significant actions, "in a cumulative impact analysis, an agency must take a 'hard look' at *all* actions that may combine with the action under consideration to affect the environment." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) (simplified) (emphasis in original). "Furthermore, simply listing all relevant actions is not sufficient. Rather, some quantified or detailed information is required. Without such information, neither the courts nor the public can be assured that the agency provided the hard look that it is required to provide." *Id.* (simplified). Additionally, "cumulative impact analysis must be timely. It is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now." *Kern*, 284 F.3d at 1075. "When an agency's determination of what are 'reasonably foreseeable future actions' and appropriate 'component parts' is " fully informed and well-considered, [courts] will defer to that determination." *Id.* (quotation marks omitted).

As Plaintiffs highlight, the FEIS states that grazing has been identified as a "major threat" to Greater Sage-Grouse habitat. AR 170746. Plaintiffs also point out that persons other than Plaintiffs submitted public comments raising the issue that the cumulative effects analysis needed to include grazing. For example, WildLands Defense submitted a comment under the heading "Grazing Disturbance Footprint Represents Significant Indirect and Cumulative Threat." AR 19894. This comment, among other things, stated: "The EIS must provide a firm baseline of ecological impacts of grazing that is stressing and degrading habitats and other values of the public lands." *Id.* BLM responded:

Chapter 2, Section 2.5.1 of the Final EIS presents an explanation of the study and analysis approach employed for the B2H Project. Chapter 3 has been expanded to provide more description of the methods for used for analyzing effects associated with each resource (tiered to the overall approach). Chapter 3 also provides more information about the resources, mitigation applied to reduce impacts, and residual impacts on resources along each alternative route by segment, including cumulative effects.

Because this is not a document determining whether grazing should be occurring, impacts of grazing on wildlife habitat and vegetation are not disclosed. Impacts of grazing on wildlife habitat would be addressed in the environmental assessment for each allotment when grazing permits expire and come up for renewal. No change has been made to the livestock grazing section (Section 3.2.7) in response to this comment.

*Id.*

The FEIS includes grazing as one of the existing agricultural operations. The FEIS analyzes whether the B2H Project, along with other actions, will have cumulative effects *on* livestock grazing. *See, e.g.*, AR 172627 ("This section estimates cumulative effects on agriculture (including existing . . . livestock grazing) from the B2H Project in addition to past and present actions and other RFFAs [reasonably foreseeable future actions]."). The FEIS also includes grazing as a relevant action in its cumulative effects analysis for fish. *See, e.g.*, AR 172593-95 (one example of fish analysis including grazing). In listing past and present actions that likely affect Greater Sage-Grouse habitat, however, the FEIS does not list grazing. *See* AR 172566-67.

Defendants argue that the Court should defer to the agency to define the scope of the cumulative effects review. The FEIS, however, provides no reason or explanation for why grazing was excluded in the past and present actions that likely affect Greater Sage-Grouse habitat despite grazing admittedly being an identified major threat. The Court does not accept an unsupported generalized argument to defer to an agency under these circumstances. *See Ctr. for*

*Biological Diversity v. Kempthorne*, 588 F.3d 701, 710 (9th Cir. 2009) ("An agency's blanket statement that it has considered all evidence is ineffective where the analysis makes clear that a crucial issue has been overlooked."); *Selkirk Conservation All. v. Forsgren,* 336 F.3d 944, 962 (9th Cir. 2003) (recognizing that the scope of an EIS is a "delicate choice" and should be entrusted to the agency, but the agency must have "considered the relevant factors and articulated a rational connection between the facts found and the choice made" (citation omitted)).

Defendants also cite *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208 (D. Or. 2019). In that case, U.S. District Court Chief Judge Marco Hernandez rejected the argument that overlooking grazing in a cumulative effects analysis rendered a final EIS insufficient. He found that the challengers "have not provided any studies or rationale for why the Forest Service would have been required to address the cumulative impacts of grazing along with the Project. Hunters cite two mentions in the SFEIS to continued grazing, but this does not amount to a mandate that such grazing be the subject of a cumulative effects analysis." *Id.* at 1241. In the FEIS, however, BLM identified grazing as a major threat to sage-grouse and there is other evidence in the record about grazing's harm to sage-grouse. Thus, *WildEarth Guardians* is distinguishable.

Intervenors argue that requiring a cumulative effects analysis on remand would be futile because the regulations have changed and a cumulative effects analysis is no longer required. Plaintiffs argue that those regulations are being challenged because the statute requires cumulative analysis, and whatever may or may not be required in a future analysis does not affect the Court's review of BLM's error in the subject FEIS. After the hearing, Plaintiffs also provided supplemental authority that the new Biden administration may be reconsidering the rule

that changed the cumulative effects analysis. The Court agrees with Plaintiffs that for purposes

of the current evaluation, the Court considers the regulation in effect at the time of the FEIS.

Whether there may or may not be a cumulative effects analysis required at the time of any

potential future reconsideration on remand is too speculative to preclude the Court from now

considering an alleged cumulative effects error.

The Court concludes that BLM erred in failing to consider grazing in the cumulative

effects analysis. Intervenors, however, argue that any error was harmless. "When considering an

agency's failure to comply with NEPA, [a court must] examine whether the error 'materially

impeded NEPA's goals—that is, whether the error caused the agency not to be fully aware of the

environmental consequences of the proposed action, thereby precluding informed

decisionmaking and public participation, or otherwise materially affected the substance of the

agency's decision.'" *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 860

F.3d 1244, 1252 (9th Cir. 2017) (quoting *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095,

1104 (9th Cir. 2016)). In other words, the party asserting the error must "demonstrate[] that

NEPA's goals were materially impeded." *Id.*

The Court also concludes that the error was harmless. Plaintiffs have not shown how

including grazing in the cumulative effects analysis "would have made a difference in agency

decionmaking or public participation." *Id.* BLM incorporated the ARMPA by reference, which

analyzed grazing practices. BLM also concluded that the B2H Project *would* harm sage-grouse

and included significant mitigation measures, including requiring compensatory mitigation that

must achieve a net conservation gain to sage-grouse. Plaintiffs do not show how adding grazing

to the cumulative effects analysis would have materially affected the substance of BLM's sage-

grouse mitigation decision or other decisions relating to sage-grouse.

### 3. NEPA—Interpretative Center

#### a. Burying a Segment of Line

Plaintiffs argue that BLM should have given a "hard look" to burying a short, two-mile segment of the transmission line near the Interpretative Center. Plaintiffs mainly rely on *Western Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013), and *Muckleshoot Indian Tribe v. United States Forest Service*, 177 F.3d 800 (9th Cir. 1999). In *Abbey*, the Ninth Circuit emphasized that the "existence of a viable but unexamined alternative renders an [EIS] inadequate" and an agency must consider options that operate in a "more friendly way toward" protected objects the agency manages. *Abbey*, 719 F.3d at 1052. In *Muckleshoot*, the Ninth Circuit stated that an agency also must consider alternatives that are "more consistent with its basic policy objectives than the alternatives [considered]." *Muckleshoot*, 177 F.3d at 813.

Plaintiffs assert that under the Baker Regional Management Plan, BLM is supposed to manage the Oregon Trail "for public values, with restrictions to preserve historic resources." AR 97179. Plaintiffs also contend that under the National Trails System Act, BLM is supposed to avoid projects that "substantially interfere" with the nature of the Oregon Trail and "to avoid activities incompatible with the purposes for which such trails were established." 16 U.S.C. § 1246(c). Plaintiffs argue that the proposed 165-foot tower just outside the Interpretative Center and nearly on top of the Oregon Trail does not comply with BLM's statutory and other obligations in operating the Interpretative Center and preserving the Oregon Trail.

Plaintiffs also argue that BLM "predetermined" not to bury any segment of the line because Idaho Power stated at the outset that it would not bury the line. Plaintiffs cite a letter dated April 22, 2013 from Douglas J. Dockter of Idaho Power to BLM, in which Mr. Dockter explains the environmental effects of underground transmission, the reliability problems, and additional cost. AR 134845. Mr. Dockter states that even underground transmission of less than

five miles require more investment and transmission stations at each end. *Id.* He states that Idaho

Power "is not comfortable with or willing to entertain this option." *Id.*; *see also* AR 155525-27

(detailing Idaho Power's concerns with underground transmission lines). Plaintiffs also rely on

BLM's undated "Cooperating Agency Guidance for Determining a Range of <u>Reasonable</u> Route

Alternatives" to argue that BLM predetermined not to consider line burial. AR 93500 (emphasis

in original). This document sets forth "the following criteria will be used to determine route

alternatives that <u>are not reasonable and don't require analysis</u>." *Id.* (emphasis in original). After

explaining one of the criterium, it provides as an example "e.g., it would require some or all of

the transmission line to be buried." *Id.* Plaintiffs argue that an EIS is not for "justifying decisions

already made." 40 C.F.R. § 1502.2(g)(2017); *see also Simmons v. U.S. Army Corps of

Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997) ("An agency cannot restrict its analysis to those

alternative means by which a particular applicant can reach his goals." (quotation marks

omitted)).

Plaintiffs further argue that BLM did not properly consider whether an alternative of

burying only a short segment, instead of the entire line, was feasible. Plaintiffs contend that the

FEIS cites only three documents for its conclusion that burying the line is not feasible, and those

documents relate to cost. Thus, Plaintiffs contend that cost is the only reason cited by BLM that

is not "pretextual." Plaintiffs argue that the remaining reasons asserted by BLM are not based on

any facts or supported in the record and are therefore not entitled to any deference or

consideration. As for cost, Plaintiffs note that the USFWS commented in response to the DEIS

that the cited documents' conclusions "may not be applicable to short reaches of below ground

construction costs in eastern Oregon" and may be outweighed by the mitigation costs required

for above line transmission. AR 14280.

Plaintiffs add that there is nothing in the record supporting the FEIS's conclusory statement that "no segments of the proposed transmission line have been identified where burying the transmission line would be justified," AR 170208, and that this statement ignores the fact that there is no evidence that BLM analyzed any segments to see if burying that segment would be justified. *See Muckleshoot*, 177 F.3d at 813 ("That alternative was rejected on the grounds that it would decrease Weyerhaeuser's incentive to trade. However, there is nothing in the record to demonstrate that the Forest Service even considered increasing Weyerhaeuser's incentive to trade either by offering additional acreage, subject to deed restrictions, or by decreasing the amount of Weyerhaeuser land transferred in the Exchange."). Plaintiffs also argue that other than this one sentence, the analysis in the FEIS focuses on burying the full 300-miles and not a short segment, particularly around the Interpretative Center. Finally, Plaintiffs argue that BLM failed in its responsibility "for the independent evaluation" and "verifi[cation]" of the information provided by Idaho Power about the infeasibility of burying any or all of the transmission line. 40 C.F.R. § 1506.5(a) (2017).

Defendants respond that when a private actor proposes an action, versus agency-proposed action, it is appropriate to consider and give weight to the proponent's wishes and goals. *See Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1031 (10th Cir. 2002) ("Where the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weight to the goals and objectives of that private actor."). Defendants also point out that BLM provided several reasons, besides cost, for not burying the line, including longer outages, increased time for repairs, no ability to visually assess, decreased reliability in service, and need for specialized equipment. AR 170207-08. BLM also noted greater impact on sage-grouse with burying the line. AR 55753.

Defendants note that *Abbey* and *Muckleshoot* emphasize that a *viable* alternative that is unexamined renders an EIS inadequate, but that BLM both examined line burial and determined it was not viable, distinguishing *Abbey* and *Muckleshoot*. As for Plaintiffs' assertion of predetermination by BLM, Defendants argue that Plaintiffs rely on a draft guidance document, which is not a predetermination, and that it is irrelevant because BLM provided the required analysis of line burial.

Regarding BLM's obligation to independently evaluate and verify the information provided by Idaho Power about the challenges with burying the line, Defendants respond that when the government and the private party work closely together in a joint analysis, that requirement is inapplicable. The Court is not persuaded by that argument. Defendants also argue that Plaintiffs improperly place the burden on BLM to show that it verified information when the burden is on Plaintiffs to show otherwise. BLM's decision is "entitled to a presumption of regularity." *Jewell*, 747 F.3d at 601 (quoting *Overton Park*, 401 U.S. at 416. Plaintiffs' argument that BLM merely recited Idaho Power's information is insufficient to overcome that presumption. *See Ctr. for Food Safety v. Vilsack*, 844 F. Supp. 2d 1006, 1023 (N.D. Cal. 2012), *aff'd*, 718 F.3d 829 (9th Cir. 2013) (rejecting the plaintiff's argument that the agency "simply cut and pasted [the private party's] reports into the FEIS's appendices, passing them off as agency work product," thereby failing in the agency's duties to independently evaluate and verify the data). As the court noted in *Center for Food Safety*, "[t]he purpose of the regulation is that 'acceptable work not be redone.' 40 C.F.R. § 1506.5(a). In the instant action, there is no indication that [the agency] failed to independently evaluate the material submitted by [the private party]." Similarly, there is no indication in the record that BLM failed to independently evaluate the material submitted by Idaho Power.

Intervenors argue that the FEIS takes the requisite "hard look" and concludes that the B2H Project will have a significant effect on the Interpretative Center. Intervenors state that this analysis is all that NEPA requires—process and information, not particular results. *See, e.g.*, *Muckleshoot*, 177 F.3d at 814 ("NEPA does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." (simplified)). Further, Intervenors note that rejected alternatives need only be "briefly" discussed, and the conclusion not to offer line burial was sufficiently addressed in the FEIS (*see* AR 170206-8). *Abbey*, 719 F.3d at 1046 (stating that "if an alternative is eliminated from detailed study, the agency must briefly discuss its reasons for doing so" (simplified)).

The Court has reviewed the record on burying the transmission line, and although the discussion about burying only a segment could have been more robust, the Court cannot conclude that BLM did not "briefly" discuss the issue. *Abbey*, 719 F.3d at 1046. BLM discussed that "burying a transmission line would generally have greater environmental impacts (e.g., impacts on Greater Sage-Grouse habitat . . . .)." AR 55753; *see also* AR 170208 (noting that burying a segment of transmission line may be incompatible with "wildlife habitat"). BLM also discussed other negative effects of burying only a segment, including that transition stations are required at either side, the increased cost, and the decreased reliability. AR 170207. The record also supports that the FEIS's discussion of concerns with reliability and other challenges generally with burial of transmission lines, and description of the redundancy required for underground transmission lines, applies to shorter segments of buried transmission and not only burial of the entire line. *See, e.g.*, AR 182342 (summarizing the problems of burying transmission lines in segments "up to 10 miles"). Nor does the Court agree with Plaintiffs that

the documents cited in the FEIS solely focus on cost. For example, the Everglades Study states that burying transmission lines "is fraught with major technical, operational, and financial challenges." *Id.* It then analyzes all of those challenges. The study discusses the challenges with finding persons with appropriate installation experience, and the problems with not having any in-country installations of buried 500kV lines. AR 182345-46. It evaluates the problems with reliability and concludes that only with redundancy could line burial even be considered technically feasible. AR 182346-48. Only then does the study analyze cost.

The Court also notes that the Oregon Department of Fish and Wildlife submitted comments requesting that BLM prioritize sage-grouse habitat over the visual impact to the cultural resource of the Oregon Trail and Interpretative Center. *See, e.g.*, AR 49962-63; AR 49797. The record supports BLM's concern that burying the line for a segment around the Interpretative Center and placing towers at either end may have greater effects on sage-grouse than the Selected Alternative.

BLM and Idaho Power worked closely together on this project. The Court is satisfied that there is sufficient evidence in the record supporting BLM's conclusion relating to line burial, particularly given the level of deference the Court gives BLM for this type of conclusion.

### b. Mitigation

Plaintiffs raise the same argument challenging the mitigation in the FEIS relating to the Oregon Trail and Interpretative Center as they raise challenging the mitigation relating to the Greater Sage-Grouse mitigation. Plaintiffs argue that the FEIS contains an insufficient analysis of effectiveness of mitigation, that the FEIS concludes that there will be high residual impacts to the Oregon Trail, and that the FEIS improperly relies on undefined compensatory mitigation. For the same reasons that the Court rejected these arguments about the Greater Sage-Grouse, the Court rejects these arguments with respect to the Oregon Trail and Interpretative Center. BLM

appropriately analyzed selective mitigation measures, concluded that additional mitigation would be required, and appropriately required additional compensatory mitigation with the requisite necessary framework.

### 4.  NEPA—Mill Creek Violation

Plaintiffs argue that the Mill Creek alternative route and its Morgan Lake variation violate NEPA in two ways. First, because they triggered a mandatory supplemental draft EIS and BLM failed to prepare one. Second, because the analysis in the FEIS failed to take the requisite "hard look" at the impacts caused by the alternative, including noise and effects on protected areas.

### a.  Supplemental Draft EIS

Plaintiffs argue that the Mill Creek and Morgan Lake alternative routes added after the DEIS were "significant new circumstances . . . relevant to environmental concerns and bearing on the impacts of the [B2H Project]." 40 C.F.R. § 1502.9(c)(1)(ii)(2017). As a result, Plaintiffs contend that BLM had to prepare a supplemental draft EIS for public comment before proceeding to the FEIS. Plaintiffs argue that without a supplemental draft EIS, the public was not allowed to comment on the new route and its effects, and decisionmakers were not given the benefit of those comments and the resulting analysis. Plaintiffs assert that this alternative route has "unique and serious" impacts that are "barely mentioned" because the public was unable to comment.

The Mill Creek alternative is a 35-mile stretch in Segment 2. It is not the Selected Alternative for that segment. It is not on BLM-managed land. Defendants and Intervenors assert that it was added after commenters to the DEIS requested a route that turned east and ran parallel to the existing power lines to reduce the number of transmission lines. "The intent of this route-variation option is to reduce impacts on privately owned land and consolidate utilities to avoid

proliferation of utility corridors in this area." AR 170063. Defendants and Intervenors assert that it has the same geography and affected resources as other alternatives.

Defendants and Intervenors argue that a supplemental draft EIS is unnecessary because the Mill Creek alternative meets the requirements for the exception established by the Ninth Circuit. The Ninth Circuit has explained that supplementation is "not required when two requirements are satisfied: (1) the new alternative is a *minor variation* of one of the alternatives discussed in the draft EIS, and (2) the new alternative is *qualitatively within the spectrum of alternatives* that were discussed in the draft EIS." *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011) (emphasis in original) (simplified).

Intervenors also argue that the "rule of reason" counsels against requiring BLM to prepare a supplemental draft EIS for an alternative that BLM did not choose as the Selected Alternative. "Judicial review of the range of alternatives considered by an agency is governed by a 'rule of reason' that requires an agency to set forth only those alternatives necessary to permit a 'reasoned choice.'" *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1231 (9th Cir. 2014) (quoting *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)). "NEPA imposes procedural mandates for the purpose of ensuring informed decisionmaking and public participation, not to impose red tape for its own sake." *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 424 (4th Cir. 2012); *see also Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1041, 1047 (1st Cir. 1982) ("No purpose would be served by requiring EPA to study exhaustively all environmental impacts at each alternative site considered once it has reasonably concluded that none of the alternatives will be substantially preferable to the proposed site.").

The Ninth Circuit has emphasized that "[t]he main policy reason for soliciting public comment is to use public input in assessing a decision's environmental impact." *Block*, 690 F.2d

at 771. In *Block*, the Ninth Circuit was considering whether the agency had to conduct a supplemental EIS when the *chosen action* was a modification from alternatives in the draft EIS. The Ninth Circuit noted that "agencies must have some flexibility to modify alternatives canvassed in the draft EIS to reflect public input. If an agency must file a supplemental draft EIS every time any modifications occur, agencies as a practical matter may become hostile to modifying the alternatives to be responsive to earlier public comment." *Id.*

The Ninth Circuit also commented that requiring agencies to submit a supplemental draft EIS and repeat the public comment process for minor modifications "promises to prolong endlessly the NEPA review process." *Id.* The Ninth Circuit explained that "the EIS process should serve both to alert the public of what the agency intends to do and to give the public enough information to be able to participate intelligently in the EIS process." *Id.* at 772. Thus, the Ninth Circuit crafted a test focused on the alternative finally selected by the agency. *Id.* (concluding that a supplemental draft EIS was not required when (1) the alternative finally selected was "was within the range of alternatives the public could have reasonably anticipated" that the agency was considering from the draft EIS, and (2) the public's comments on the draft EIS also apply to the chosen alternative).

There are several problems with Plaintiffs' argument that the Mill Creek alternative (and its Morgan Lake variation) requires a supplemental draft EIS. The first is that it is not the Selected Alternative. A primary purpose of NEPA is to require federal decisionmakers to take a hard look at the environmental consequences of proposed actions at a time when the options are many so that federal decisionmakers can make informed choices. Here, BLM did *not* choose the Mill Creek alternative. Plaintiffs cite no case in which a supplemental DEIS was requested for an alternative that was *not* the selected alternative. Plaintiffs argue that a supplemental draft EIS is

now required so that BLM will be forced to analyze the environmental consequences of an alternative that BLM did not select. Requiring a supplemental draft EIS in these circumstances "would impermissibly elevate form over substance." *Ctr. for Env't Law & Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1009 (9th Cir. 2011).

The second problem is that the Mill Creek alternative is not on federal land. Plaintiffs request a more thorough analysis of an alternative that was not selected by BLM because Plaintiffs argue that BLM might have added (or might add upon remand) additional requirements to the federal permit that would constrain the State of Oregon decisionmakers if public comment had been received relating to the Mill Creek alternative. That assertion is too speculative to support requiring BLM to analyze in a new draft EIS an alternative that is not the Selected Alternative. Plaintiffs also argue that State decisionmakers are influenced by a federal EIS, and it would help inform State decisionmakers about the harms of the Mill Creek alternative. Plaintiffs and other members of the public, however, can make their arguments about the harms of this route directly to State decisionmakers.

The third problem is that although the Mill Creek alternative is a new route segment, Plaintiffs do not identify any *elements* of the route that were not analyzed in the DEIS. Plaintiffs discuss that siting the route on this pathway causes issues with noise to the residents of La Grande and adverse environmental effects to the Ladd Marsh Wildlife Management Area, Winn Meadows, and Rebarrow Forest. These same effects, however, were analyzed in the DEIS with respect to other routes. *Accord Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 854 (9th Cir. 2013) (finding that the agency's selected alternative, a new alternative from those disclosed in the draft EIS, was within the spectrum of alternatives discussed in the draft EIS because it was "primarily made of elements" from disclosed alternatives and thus the agency and

the public "could assess the cumulative effect of these elements"). Plaintiffs argue that the Mill

Creek alternative causes *greater* negative effects, but they are the *same* negative effects already

analyzed. Further, many effects discussed in the DEIS were common to all alternatives. *See*

AR 16769-71 (DEIS discussing "effects to wildlife common to all alternatives" including from

"from line construction (long term), noise and dust from construction activities (short term),

tower placement (long term), substation construction (short term), placement of multi-use areas

and tensioning sites and road construction and upgrading (short and long term)"); AR 16852-57

(DEIS discussing effects to fish and aquatic resources common to all alternatives); AR 16899-

901 (DEIS discussing the "affected environment common to all alternatives"); AR 17084,

17463-90, 17607-8 (DEIS discussing the environmental consequences of the B2H Project and

the effects common to all alternatives, including noise and air quality).

BLM considered the new route and found that it was a minor variation and within the

spectrum of alternatives already considered. In the FEIS, BLM explained

> The B2H Project area is organized into the same six segments
> broadly described in the Draft EIS and are based generally on
> similar geography, natural features, drainages, resources, and/or
> land uses.
>
> * * *
>
> There are multiple alternative routes in each segment. Each
> segment begins and ends where the alternative routes meet and
> intersect at a common point, or segment node. . . . The alternative
> routes analyzed for the Final EIS include the alternative routes
> analyzed in the Draft EIS and the route variations resulting
> (1) from colocating the alignment of the proposed transmission
> line closer to existing transmission lines and (2) from
> recommendations received in comments on the Draft EIS. The
> BLM took a hard look at the route variations and determined the
> route variations are all within the B2H Project area and,
> additionally, the route variations incorporated into the network of
> alternative routes are within the spectrum of alternatives already
> analyzed; therefore, the EIS does not require supplementation.

AR 170150. The Court does not find that this conclusion is arbitrary or capricious.

### b.  Analysis of effects

Plaintiffs argue that the FEIS fails to take the requisite hard look at effects on the human environment caused by the Mill Creek alternative and its Morgan Lake variation. Plaintiffs contend that BLM failed properly to: (1) consider noise impacts along the route, despite the many potential sensitive noise receptors within 1200 feet of route, particularly in the City of La Grande; (2) evaluate likely harm to protected areas like Ladd Marsh, Winn Meadow, and EOU's Rebarrow Forest, simply noting that these areas could suffer "potential effects"; (3) analyze harm to migratory waterfowl at Ladd Marsh, merely stating that collision risk is "potentially higher"; and (4) analyze visual effects, such as with simulations, only noting that they would be "higher." Plaintiffs argue that the FEIS analysis offers merely "general statements about 'possible' effects and 'some risk' [that] do not constitute a 'hard look' absent a justification for why an agency could not supply more definitive information" that violate NEPA. *Rose*, 921 F.3d at 1191.

"The 'rule of reason' guides both the choice of alternatives as well as the extent to which the Environmental Impact Statement must discuss each alternative." *Carmel-By-The-Sea*, 123 F.3d at 1155. For the same reasons a supplemental draft EIS is not required under the rule of reason, remand for more analysis of the Mill Creek alternative is not warranted under the rule of reason. Further, the analysis of the Mill Creek alternative is sufficient because it has the same type of effects as the other alternatives, even if Plaintiffs argue those effects are on a larger scale. *See, e.g.*, *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174 (9th Cir. 1990) ("NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.").

### 5. FLPMA

Plaintiffs argue that because the FEIS violated NEPA, the ROWs issued violate the

FLPMA. Because the Court rejects Plaintiffs' arguments that the FEIS violated NEPA, the Court

rejects Plaintiffs' argument that the FEIS violated the FLPMA.

## CONCLUSION

The Court DENIES Plaintiffs' Motion for Summary Judgment (ECF 43). The Court

GRANTS Defendants' Motion for Summary Judgment (ECF 53) and Intervenor-Defendants'

Motion for Summary Judgment (ECF 59). The Court GRANTS IN PART AND DENIES IN

PART Defendants' Motion to Strike Plaintiffs' Extra-Record Documents (ECF 58).

**IT IS SO ORDERED**.

DATED this 4th day of August, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge